**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

====================================

|  |  |
|---|---|
| LIFE PROJECT, LLC, a : | |
|   New York limited liability company, and : | |
| DR. PETER BACH, : | |
| : | |
|   **Plaintiffs,** : | |
| : | |
| v. : | **Civil Action No.**_____ |
| : | |
| ILLUMINA, INC., a : | |
|   Delaware corporation, : | |
| GRAIL, INC., a : | |
|   Delaware corporation, and : | |
| COMPUTERSHARE TRUST COMPANY, : | |
|   a National Association, : | |
| : | |
|   **Defendants.** : | |
| : | |

====================================

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

### I. INTRODUCTION

1.       The Plaintiffs, Life Project, LLC (hereinafter "Life Project") and Dr. Peter Bach (hereinafter "Dr. Bach")  (collectively hereinafter the "Plaintiffs"), by and through their attorneys, Philip M. Giordano, Esq. and Reed & Giordano, P.A., for their Complaint and Demand for Jury Trial (hereinafter the "Complaint") against the Defendants, Illumina Inc. (hereinafter "Illumina" or "ILMN"), Grail, Inc. (hereinafter "GRAIL"), and Computershare Trust Company (hereinafter "Computershare"), upon their knowledge and understanding, and otherwise upon information and belief, hereby state their allegations as to the breaches and misconduct of the Defendants, their violations of law and the Plaintiffs' injuries arising therefrom.

2.       The Plaintiffs' allegations, as set out herein, are asserted against the Defendants, jointly and severally, for general, consequential, and special damages, together with statutory

interest, costs and attorney's fees, arising from, and resulting from, the Defendants' violations of the following:

> a)    Breach of contract arising from the breach of the Merger Agreement (defined below) where Plaintiff was an intended third-party beneficiary;
>
> b)    breach of the implied covenant of good faith and fair dealing as to the Merger Agreement (defined below); and/or
>
> c)    breach of contract arising from the breach of the Consulting Agreements (as defined below).

3.    The Plaintiffs allege that, on or around May 1, 2018, and later on or around May 1, 2019, Dr. Bach, together with, and by and through Life Project, executed the Consulting Agreement and Amended Consulting Agreement (collectively referred to as the "Consulting Agreements") (defined below) with GRAIL. Per the Consulting Agreements, Dr. Bach was to provide his research and expertise as a consultant to GRAIL, and, in return, the Plaintiff was to receive compensation at a rate of $950.00 / hour and a total of 200,000 GRAIL stock options.

4.    In or around June 2021, all of Plaintiffs' stock options had vested, and Dr. Bach thus exercised his options for the entire 200,000 shares of GRAIL common stock (hereinafter the "GRAIL Shares").

5.    On or around August 18, 2021, Illumina acquired GRAIL and executed the Merger Agreement (defined below). Pursuant to the Merger Agreement, Dr. Bach's 200,000 GRAIL Shares were to be converted into 2,754 Illumina shares of common stock (hereinafter the "Illumina Shares" or the "Shares"). In addition, Illumina and GRAIL, together with Computershare as the Exchange Agent (defined below), were to *promptly* make such Illumina Shares available to Dr. Bach.

6.    Due to their violations and breaches of the Consulting Agreements and Merger Agreement, to the detriment of the intended third-party beneficiaries, Plaintiffs Life Project and

Dr. Bach, as detailed herein, the Defendants did not make the Illumina Shares promptly available to the Plaintiffs. As a result, the Plaintiffs received the Shares in October, more than a month after Defendants were supposed to make such Shares available to him.

7.      Due to various controversies around Illumina's acquisition of GRAIL, Illumina's stock price plummeted. Upon finally receiving the Illumina Shares, after the passage of weeks, the Plaintiffs were only able to sell them at a value of $1,092,911.67. Had the Plaintiffs received such Shares promptly on August 24, 2021 (when the shares of common stock were otherwise issued to the stockholders), the Plaintiffs would have immediately sold the Shares for a total value $1,321,011.18.

8.      Thus, the Plaintiffs allege that, as a result of Defendants' breaches, actions, and course of conduct, Life Project and Dr. Bach have suffered damages in the amount of not less than **$228,099.51**.

9.      The Plaintiffs respectfully request that 1) their causes of action against the Defendants proceed to a trial by jury, 2) that a judgment be entered on Counts I and II against all of the Defendants, 3) that a judgment be entered on Count III against Defendants GRAIL and Illumina, and 4) that Life Project and Dr. Bach be awarded their general, consequential, and special damages in an amount of not less than **$228,099.51**, together with statutory interest, costs, and reasonable attorney's fees.

10.     The Plaintiffs respectfully request that this Honorable Court further enter temporary, preliminary and/or permanent injunctive and/or equitable remedies or relief, and/or grant, order, award, and enter any such other relief as this Court deems just and appropriate.

## II. **PARTIES**

11.     The Plaintiff, Life Project, LLC, is a limited liability company with its principal place of business at 1333 Sagg Road, PO Box 1767, Sag Harbor, NY 11963. Dr. Peter Bach is the Manager, President and sole Member of Plaintiff Life Project.

12.     The Plaintiff, Dr. Peter Bach, is a pulmonary physician, epidemiologist, professor, writer, healthcare policy expert, and frequent contributor to *The New York Times* and other news media. A large portion of Dr. Bach's extensive career as a physician has been focused on cancer research. Notably, Dr. Bach created the first lung cancer risk prediction model (dubbed the "Bach Model") that formed the basis for future risk models used in the evaluation of screening eligible individuals for lung cancer.

13.     Since receiving his MD in 1992, Dr. Bach has studied, researched, and written about numerous healthcare-related topics, ranging from pharmaceutical drug price surges for cancer medication to the significant racial disparities within the provision of cancer care. Today, Dr. Bach continues to contribute to the advancement of cancer research and care, and serves as the Chief Medical Officer for Delfi Diagnostics, a company dedicated to developing high-performing, accessible blood tests for the early detection of cancer in individuals. The Plaintiff is the Manager, President and sole Member of Life Project, LLC, and is a resident of the State of New York.

14.     Upon information and belief, the Defendant, Grail, Inc., was a Delaware corporation and is, at the present time, still a wholly-owned subsidiary of Illumina, having a principal place of business at 1525 Obrien Drive, Menlo Park, California 94025. Per its website, GRAIL is a healthcare company dedicated to the advancement of early cancer detection, changing the trajectory of cancer mortality, and transforming the provision of cancer treatment. GRAIL was

formed on or around January 10, 2016 by Illumina, when Illumina spun it off and created GRAIL as an entirely new company.

15.     On or around September 20, 2020, Illumina sought to reacquire GRAIL, but was faced with antitrust probes from the Federal Trade Commission (hereinafter the "FTC") and European Union (hereinafter the "EU") regulators who sought to stop the deal and who demanded that Illumina keep GRAIL as a separate company. Despite this growing scrutiny, Illumina officially acquired GRAIL for $8 billion on or around August 18, 2021. Since then, GRAIL, now a wholly-owned subsidiary of Illumina, has acted as a standalone division of Illumina with its own leadership team, and has retained its same name, logo, and mission.

16.     Upon information and belief, the Defendant, Illumina, Inc., is a Delaware corporation (Delaware File No. 3228889) with its principal place of business located at 5200 Illumina Way, San Diego, California 92122. Illumina was founded in 1998 and is focused on providing products and services relating to genetic sequencing, genotyping, proteomics, and gene expression. The Defendant is a multi-faceted company with global outreach, serving more than 140 countries and a wide array of pharmaceutical companies, clinical research organizations, academic institutions, and biotechnology companies.

17.     Illumina initially formed GRAIL, and, on or around January 10, 2016, spun off GRAIL as an independent company. On or around August 18, 2021, despite intense regulatory pressure from the FTC and EU, Illumina reacquired GRAIL in a self-proclaimed vertical acquisition. Despite completing the acquisition, the Defendant continues to face regulatory troubles with the FTC and EU. On or around April 3, 2023, the FTC ordered Illumina to divest GRAIL over antitrust concerns. On  or around July 12, 2023, the EU fined Illumina $476 million for acquiring GRAIL without EU permission. Most recently, on or around October 9, 2023, the

EU ordered Illumina to sell GRAIL, citing similar antitrust issues. As of today, Illumina still plans on appealing these various orders, and continues to fight for ownership and control as the parent company of GRAIL.

18.     Upon information and belief, the Defendant, Computershare Trust Company, N.A., is a National Bank Association with its principal place of business in the United States located at 150 Royall Street, Canton, Massachusetts 02021-1011. Computershare Trust Co. is a U.S. subsidiary of Computershare Limited, which is headquartered in Abbotsford, Victoria, Australia. The Computershare organization provides services internationally, having offices in twenty-one (21) different countries, with eighteen (18) office locations in the United States alone. The Defendant offers primarily stock transfer services, including corporate trust and employee share plan services. Computershare operates share registries and computer bureaus which includes the administration of employee share and option plans and the provision of software that specializes in share registry and financial and stock markets.

### III. JURISDICTION AND VENUE

19.     The Plaintiffs assert that this Honorable Court has jurisdiction over this action under 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000.00 and the Parties are of complete diversity. This civil action between, on the one hand, the Plaintiffs, a New York limited liability company and an individual residing in New York, and, on the other hand, the Defendants, entities incorporated in Delaware with principal places of business in California and Massachusetts.

20.     The Plaintiffs further contend that, pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of New York in that, pursuant to the Plaintiff's Consulting Agreements (defined below), the Parties agreed that any and all disputes between and/or among them shall be

brought, *inter alia*, in the state or federal courts located in New York. Additionally, this Court is such District where a substantial part of the events or omissions giving rise to the Plaintiffs claims.

21.     The Plaintiffs assert that this Court has personal jurisdiction, generally and specifically, over Defendant GRAIL by express terms of the Consulting Agreements, and as arising from its extensive business contacts, specifically in its business dealings with the Plaintiffs within the State of New York.

22.     The Plaintiffs further contend that this Honorable Court has personal jurisdiction, generally and specifically, over Defendant Illumina by express terms of the Consulting Agreements as GRAIL's successor-in-interest, and as arising from its extensive business contacts, specifically in its contacts with the Plaintiffs within the State of New York.

23.     Additionally, the Plaintiffs also contend this Court has personal jurisdiction, generally and specifically, over Defendant Computershare as arising from its extensive business contacts, and specifically through their contacts with the Plaintiffs within the State of New York.

## IV. <u>FACTS</u>

### A.     <u>The Plaintiffs' Background and Consulting Contracts with GRAIL</u>

24.     The Plaintiff, Life Project LLC, was formed on or around February 23, 1999 in New York by Plaintiff Dr. Peter Bach, who is the sole Member, Manager, and President of the limited liability company. As described above, Dr. Bach is a renowned pulmonary physician, epidemiologist, professor, writer, healthcare policy expert, and frequent contributor to *The New York Times* and other news media. Throughout the years, Dr. Bach, by and through Life Project, has served as an important researcher and figurehead in the realm of cancer treatment, contributing substantial innovations to the field such as the first lung cancer risk prediction model (dubbed the

"Bach Model") that formed the basis for future risk models used in the evaluation of screening eligible individuals for lung cancer.

25.     Recognizing Dr. Bach's expertise and value to the advancement of cancer screening and research, Defendant GRAIL sought to hire Life Project and Dr. Bach for consulting services in order to assist in the research and operations of the Defendant.

26.     Thus, on or about May 1, 2018, GRAIL and Dr. Bach, through Life Project, executed a consulting contract (hereinafter the "Consulting Agreement"), memorializing the consulting and advisory terms and conditions of their business relationship. A true copy of the Consulting Agreement between the Plaintiffs and Defendant GRAIL is attached, restated and incorporated by reference herein as **Exhibit A**.

27.     The Consulting Agreement provides, in pertinent part:

> "Peter Bach of the Consultant will perform the services described in Exhibit A (the 'Services') as requested by the Company (or its designee) from time to time, and the Company agrees to pay Consultant the compensation described in Exhibit A for Consultant's performance of the Services. If not specified on Exhibit A, the scope, timing, duration, and site of performance of said Services shall be mutually and reasonably agreed to by the Company and Consultant and are subject to change upon the written agreement of both Parties. Consultant will provide the Services in a timely and professional manner consistent with industry practices."

**Exhibit A**, at p. 1.

28.     Under the Consulting Agreement, the Plaintiff agreed to provide services, in pertinent part, as follows:

> "Consultant will render to the Company the following Services:
>
> ● Develop GRAIL's value based performance strategy with commercial payors
>    o Ex. Humana, Managed Medicaid, Centene
>
> ● Multi-Cancer Health Economic Argument
>    o Outline the key components of the health economic arguments by stakeholder for the multi-cancer products (diagnostic odyssey and

asymptotic screening) to inform evidence generation and modeling needs

- US Reimbursement Strategy
  o  Identify target list of integrated health systems and commercial payers likely to be interested in collaborating with GRAIL to generate evidence for a multicancer product
  o  Assist with development of the business case/value proposition to encourage participation by the health systems and payers
  o  Assist with engagement of the potential health systems and payers

- Support CMS strategy "Pathways to Reimbursement in 65+ population" projects with ADVI and Bruce Quinn."

*Id.* at p. 9.

29.     In return, GRAIL agreed to compensate Life Project at a rate of $950.00 / hour. *Id.*

30.     In addition to the $950.00 / hour compensation rate, the Plaintiff was also to receive

GRAIL stock options. The Consulting Agreement provided, in pertinent part:

"Subject to execution of Grail's standard stock options agreement, *50,000 shares of GRAIL stock options at FMV* (such value to be determined by appraisal), one-fourth vesting every three months at the end of each three-month period following the Effective Date for so long as this agreement remains in effect until the entire amount has vested; *shares may be exercised immediately upon vesting*, and are subject to repurchase over the vesting period."

*Id.* at p. 1. (italics and underline added).

31.     The Consulting Agreement provided for other matters as well, including choice-of-

forum and assignability provisions. The Consulting Agreement Addendum, entered into on the

same date as the Consulting Agreement and attached thereto, states, in pertinent part:

"The Agreement, and all claims arising out of, relating to, or in connection with this Agreement, are governed by and construed in accordance with the laws of the State of New York, without regard to its provisions concerning the applicability of the laws of other jurisdictions. All claims arising out of, relating to, or in connection with this Agreement, or the relationship between the parties hereto, are subject to the exclusive jurisdiction of and venue in the federal and state courts within New York, and each party hereby consents to the exclusive jurisdiction and venue of these courts, without regard to any conflicts of law principles."

**Exhibit A**, at p. 12.

32.     As to assignability, the Consulting Agreement further provides:

> "[GRAIL] may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of [GRAIL's] relevant assets, whether by _merger_, consolidation, reorganization, reincorporation, sale of assets or stock, change of control or otherwise."

**Exhibit A**, at p. 6. (emphasis added).

33.     After execution of the Consulting Agreement, Dr. Bach performed the services required of him exceptionally, and received his rightfully owed base compensation rate of $950.00/hour. Life Project served as Consultant to GRAIL for a full year thereafter, and, as such, all 50,000 Shares of GRAIL stock options granted to him and Life Project per the Consulting Agreement had fully vested.

34.     Exactly one year after executing the Consulting Agreement, GRAIL, satisfied and impressed with Life Project and Dr. Bach's services, agreed to modify the Consulting Agreement, which, among other changes, provided more stock options to the Plaintiffs. As such, the Plaintiffs and GRAIL executed the First Extension and Amendment of Consulting Agreement (the "Amended Consulting Agreement" and collectively with the Consulting Agreement as the "Consulting Agreements") on May 1, 2019. A true copy of the Amended Consulting Agreement between the Plaintiffs and Defendant GRAIL is attached, restated and incorporated by reference herein as **Exhibit B**.

35.     The Amended Consulting Agreement, in pertinent part, provided:

> "Subject to approval by the Company's Board of Directors, and execution of Company's standard stock options agreement, Company will grant _150,000 Shares of Company stock options_ ("2019 Option Grant") at FMV (such value to be determined by appraisal), one-fourth vesting every six months at the end of each six-month period following May 1, 2019 ("Amendment Effective Date") for so long as this Agreement remains in effect until the entire amount has vested; _Shares_

*may be exercised immediately upon vesting*, and are subject to repurchase as set forth in the Company's 2016 Equity Incentive Plan, as amended."

**Exhibit B**, at p. 1. (emphasis added).

36.     Under this new Amended Consulting Agreement, Dr. Bach, through Life Project, continued to perform his services diligently to the satisfaction of GRAIL.

### B.     The Plaintiffs Separate  From GRAIL as the Acquisition by Illumina Looms

37.     On or around September 21, 2020, Defendant Illumina, Inc. announced via press release that Illumina and GRAIL had entered into a definitive agreement under which Illumina would acquire GRAIL for cash and stock consideration of $8 billion. A true copy of the Illumina press release announcing such acquisition is attached, restated and incorporated by reference herein as **Exhibit C**.

38.     The day prior, as filed with the SEC on September 20, 2020, GRAIL and Illumina entered into an Agreement and Plan of Merger (the "Merger Agreement") which fully laid out the acquisition transaction. A true copy of the relevant pages of the Merger Agreement, dated September 20, 2020, is attached, restated and incorporated by reference herein as **Exhibit D**. The full text of the Merger Agreement can be found online through the SEC database at: https://www.sec.gov/Archives/edgar/data/1110803/000095015720001121/ex2-1.htm.

39.     The provisions of the Merger Agreement became effective on the "Effective Time," defined in the Agreement as the date of the filing of the Certificate of Merger with the Secretary of State of Delaware, which occurred on or around August 18, 2021. *See* **Exhibit D**, p. 21.

40.     The acquisition announcement caught the immediate attention of regulatory authorities, who cited antitrust concerns and worries that such a transaction would stifle innovation when it came to cancer care.

41.     On or around March 30, 2021, the FTC filed an administrative complaint seeking to prevent the acquisition over antitrust and anti-monopoly issues. A true copy of the FTC complaint against Illumina and GRAIL, dated March 30, 2021, is attached, restated and incorporated by reference herein as **Exhibit E**. Later, on July 13, 2021, the EU launched its own antitrust investigation into the deal.

42.     Despite the immense scrutiny, Illumina remained steadfast in its decision to officially acquire GRAIL by the summer of 2021.

43.     On or about June 1, 2021, under the context of the looming acquisition and the regulatory troubles, the Plaintiffs informed GRAIL that Dr. Bach had accepted a new position as Chief Medical Officer at Delfi Diagnostics, and the Plaintiffs would thus be ending their relationship with GRAIL.

44.     By the time of the Plaintiffs' departure, the Plaintiffs had provided services to GRAIL under the Amended Consulting Agreement for around two years and one month. Thus, under the Amended Consulting Agreement, all 150,000 of the stock options owed had fully vested at that time.

45.     In total, Dr. Bach, by and through Life Project, earned 200,000 GRAIL stock options that were fully vested and thus immediately exercisable by the time of the Plaintiffs' departure from GRAIL. Later in June 2021, Dr. Bach exercised all 200,000 of his stock options.

### C.     Illumina Acquires GRAIL

46.     On or about August 18, 2021, Illumina finally completed its acquisition of GRAIL. A true copy of the Illumina press release announcing the completed acquisition, dated August 18, 2021, is attached, restated, and incorporated by reference herein as **Exhibit F**. As a result of the acquisition, the Merger Agreement between GRAIL and Illumina became effective on such date.

47.     At the time of the acquisition, Dr. Bach still held his 200,000 Shares of GRAIL common stock, which were to be converted into Shares of Illumina common stock as laid out in the Merger Agreement.

48.     The Merger Agreement provides, in pertinent part:

> "Section 2.04 <u>Effect of the First Merger; Conversion of Securities</u>.  (a)  At the Effective Time, by virtue of the First Merger and without any action on the part of Parent, First Merger Sub, the Company or any holders of Company Stock, each share of Company Class A Common Stock, Company Class B Common Stock, Company Series A Preferred Stock, Company Series B Preferred Stock, Company Series C Preferred Stock and Company Series D Preferred Stock issued and outstanding immediately prior to the Effective Time (other than Appraisal Shares, Company Restricted Stock Awards and any shares of Company Stock to be canceled pursuant to Section 2.04(c)) shall be converted automatically into the right to receive, in accordance with Section 251(b)(5) of the DGCL and the terms of this Agreement, the following consideration at the election of the holder thereof:
>
> (i)      Each share of [GRAIL] Stock with respect to which an election to receive a combination of cash, Parent Common Stock and a CVR has been effectively made and not revoked pursuant to Section 3.01 (each, a "CVR Election Share") shall be converted into the right to receive (A) the Cash Consideration, without interest, (B) *<u>the number of validly issued, fully paid and non-assessable shares of [Illumina] Common Stock equal to the Exchange Ratio (the "Stock Consideration")</u>*, subject to Section 3.02(e), and (C) one contingent value right issued by Parent subject to and in accordance with the CVR Agreement (a "CVR") (collectively, the "CVR Consideration")."

*See* **Exhibit D**, p. 22. (italics and underline added).

49.     Per the Exchange Ratio[1] as provided in the Merger Agreement, the Plaintiffs' 200,000 Shares of GRAIL stock converted into 2,754 Shares of Illumina stock. A true copy of Plaintiffs' Computershare Statement which shows that Plaintiffs were entitled to 2,754 Illumina Shares is attached, restated, and incorporated by reference herein as **Exhibit G**.

---

[1] As defined in the Merger Agreement, the Exchange Ratio is found by dividing the Aggregate Stock Consideration by GRAIL's Fully Diluted Share Count. Upon the Effective Time, the Exchange Ratio was equal to or around .01377. Multiplying the Exchange Ratio with Plaintiff's 200,000 shares of GRAIL stock, thus, leads to 2,754 Illumina shares.

50. The Merger Agreement also provided the means to which the newly converted Illumina Shares would be delivered to the holder. Article III, Section 3.02 of the Merger Agreement provides, in pertinent part:

> "Exchange of Certificates. (a)  Exchange Agent.  Prior to the Mailing Date, Parent shall designate a commercial bank or trust company reasonably acceptable to the Company to act as agent (the "Exchange Agent") for the exchange of shares of Company Stock in accordance with this Article III.  *Parent shall deposit, or shall cause to be deposited, with the Exchange Agent, for the benefit of the holders of shares of Company Stock (other than shares of Company Stock cancelled pursuant to Section 2.04(c), Company Restricted Stock Awards and Appraisal Shares), for exchange in accordance with this Article III at or prior to the Effective Time, (i) book-entry shares representing the aggregate Stock Consideration.*
>
> ...
>
> (b)    Exchange Procedures.  (i)  As *promptly as practicable* after the Effective Time, *the parties shall cause the Exchange Agent to mail to each holder of record of shares of Company Stock as of the Effective Time who is entitled to receive the Merger Consideration pursuant to Section 2.04(a)*, as set forth on the Closing Capitalization Schedule if such holder of shares of Company Stock has not already returned a valid, duly completed Letter of Transmittal.
> ...
>
> (ii)    *Promptly* following the later of (x) the Effective Time and (y) (A) delivery to the Exchange Agent of a letter of transmittal properly completed and validly executed in accordance with the instructions thereto and (B) with respect to holders of Certificates, surrender to the Exchange Agent of a Certificate for cancellation, in each case, together with such other documents as may be reasonably requested, *the holder of such shares of Company Stock shall be entitled to receive in exchange therefor* (I) cash in the amount equal to the Cash Consideration and, if applicable, the cash portion, if any, of the Alternative Consideration that such holder has the right to receive pursuant to Section 2.04(a) and this Article III (in each case, rounded to the nearest cent); (II) *book-entry shares representing the Stock Consideration* and, if applicable, any shares of Parent Common Stock included in the Alternative Consideration that such holder has the right to receive pursuant to Section 2.04(a) and this Article III."

*See* **Exhibit D**, p. 27. (italics and underline added).

51.     Under Section 3.02 of the Merger Agreement, the "Exchange Agent" would be a commercial bank or trust company reasonably acceptable to the Company that would act as agent for the exchange of Shares of Company Stock in accordance with Article III. *See id.* at p. 26.

52.     Upon information and belief, Defendant Computershare served as the Exchange Agent for the acquisition.

53.     As provided in the Merger Agreement, GRAIL, Illumina, and Computershare were jointly and collectively responsible for the <u>prompt</u> notice, delivery, and receipt of the converted Illumina Shares for the stockholders.

### D.     **<u>Defendants Fail to Promptly Notify and Deliver Plaintiffs' Shares</u>**

54.     On the same day of the merger announcement, Defendants GRAIL/Illumina delivered an "Employee FAQ" to all GRAIL employees in order to adequately inform them of what, if any, changes were to come to their employment as a result of the acquisition. A true copy of the Employee FAQ, dated August 18, 2021, is attached, restated, and incorporated by reference herein as **<u>Exhibit H</u>**.

55.     The Employee FAQ provided answers to general questions regarding employment, details on the FTC and EU challenges to the acquisition, and additional information such as partner considerations and potential policy changes. Most importantly, however, the Employee FAQ detailed how employees and other US stockholders, such as the Plaintiffs, could receive their newly converted Illumina Shares which resulted from the acquisition. *See* **<u>Exhibit H</u>**, p. 4.

56.     Per the Employee FAQ, Illumina and Computershare had established individual accounts for all US stockholders of Illumina so that the stockholders could receive their newly converted Illumina Shares upon the acquisition. The Employee FAQ provides, in pertinent part:

"**_For all U.S. stockholders and equity award holders_**:

To process the Illumina equity portion of your consideration (the conversion of GRAIL stock or vested equity awards to Illumina shares), we established a Computershare account tied to the U.S. Tax Identification Numbers we have on file for you. Illumina shares (and contingent value rights ("CVRs") if elected) will be deposited into your Computershare account. Shortly after the closing, Computershare will mail a paper statement to your address on file in Shareworks, GRAIL's equity platform that is integrated with GRAIL's HR system. The statement will list your equity consideration and include your Computershare account number. It is important that you do not lose your Computershare account number.

- If you are a U.S. employee, you will be able to log into your Computershare account at https://www-us.computershare.com/Investor by using your TIN, which in most cases is your Social Security Number (SSN), zip code and the name of the stock (ILMN) prior to receiving the statement in the mail. Please note you cannot access your account until the shares have been issued (please allow a few days for processing). Also, online registration is not required, but is helpful if you are looking to certify your account and/or sell.

- You will be able to trade the Illumina stock online via your Computershare account once you have completed the online tax form (***Note: if you sell the Illumina stock before your TIN is certified, a 24% withholding tax is applied***). Alternatively, you may choose to hold shares in your Computershare account or transfer the shares to your brokerage account. To transfer shares to a broker, you will need to provide the statement you received in the mail with your Computershare account number to your broker. Your broker may also accept a screenshot of your account or have other processes for transferring shares from Computershare. Computershare does not charge a fee to transfer your shares to another broker, and the transfer typically takes two business days, depending on the broker."

*See id.*

57.     Unfortunately for Dr. Bach, despite being a U.S. stockholder and former consultant at GRAIL, the Defendants never delivered this FAQ to him. Fortunately, on or about August 21, 2021, a mutual colleague and former employee of GRAIL reached out to Dr. Bach with the Employee FAQ to inform him on how to obtain his Shares. A true copy of the email from Jessica Owens apprising Dr. Bach of the Employee FAQ is attached, restated, and incorporated by

reference herein as **Exhibit I**. Importantly, Dr. Bach's colleague informed him that his equity distribution would likely hit his account on Tuesday, August 22, 2021. *See id.*

58.     Upon receiving the Employee FAQ, Dr. Bach prepared to access his Computershare account and sell all of his Illumina Shares. Sensing that the regulatory ire around the acquisition would sink Illumina's share price, Dr. Bach concluded that immediately selling his Shares once available would ensure he received the maximum value from his past GRAIL contract.

59.     As evidenced by the Employee FAQ, Illumina was to set up a Computershare account for each individual U.S. stockholder affected by the GRAIL acquisition. *See* **Exhibit H**, p. 4. Upon creation, Computershare would send the account information to the corresponding stockholder. *See id.* The stockholder could access the account by inputting their tax information on file and following the series of steps laid out in the Employee FAQ once the Shares had been issued. *See id.* Because Dr. Bach had worked at GRAIL for three years prior to the acquisition, GRAIL had all of Dr. Bach's tax information, and thus GRAIL and Illumina could undoubtedly create a Computershare account for Dr. Bach with such information.

60.     On or about August 24, 2021, the converted Illumina Shares were issued to the respective stockholders in their Computershare account. That same day, Dr. Bach followed the instructions as provided in the Employee FAQ. Dr. Bach followed these instructions step-by-step multiple times, but each time upon completion was denied access to his Computershare account.

61.     Worried that any delay could result in diminished gain, Dr. Bach contacted Computershare directly to try and receive access to his account. After multiple calls with Computershare representatives, Dr. Bach was still unable to access his account and his Shares. At one point, Dr. Bach was asked to submit his tax information again to Computershare, information

that GRAIL and Illumina would have already had on file and submitted to Computershare. A week

passed, and Dr. Bach was still unable to access his Shares.

62.     After reaching out to Computershare proved useless, Dr. Bach reached out directly

to GRAIL to apprise them of his situation. On August 30, 2021, Dr. Bach emailed Aaron Freidin,

the Senior Vice President of GRAIL, and stated:

> "Hi Aaron,
>
> I am not able to access my mailbox now or for another couple of weeks. I have
> called compushare and they are for some reason unable to locate me. I have tried
> every combo or name, company name, ssn, ein and address. Can you help me locate
> my shares or is there someone to call who can help me? I am on with them again
> today and now they can't find the shares at all.
> --
> Peter"

A true copy of the email exchange between Dr. Bach and Aaron Freidin, beginning on August 30,

2021, is attached, restated, and incorporated by reference herein as **Exhibit J**.

63.     The following day, Aaron Freidin emailed Dr. Bach, stating: "We will request an

electronic statement for you and email it when we receive." *See* **Exhibits J & K**. Dr. Bach never

received an electronic statement.

64.     Weeks went by with no word from either Computershare, Illumina, or GRAIL.

Eventually, Dr. Bach received his mailed account statement, which led him to accomplish at least

one step in the process. Unfortunately, Dr. Bach's problems continued. Upon entering the

information from his account statement, Computershare once again blocked access due to alleged

security concerns. As a result, Computershare had to send Dr. Bach a confirmation code through

the mail, which took an additional two weeks for him to receive and use to gain initial access.

65.     After inputting the confirmation code, Dr. Bach was able to access his account on

or around September 26, 2023. Promptly upon access, Plaintiff's Bank, JP Morgan, attempted to

pull the Shares from the account, but to no avail. Computershare alerted Plaintiff and JP Morgan

that there was *another* supposed Tax ID issue with the account, and Dr. Bach could not pull and

sell the Shares until such issue was resolved.

66.     Frustrated that over a month had passed and he was still unable to access his Shares,

Dr. Bach emailed Aaron Freidin again, and, on the same day, Aaron Freidin responded:

> "Hi Peter,
>
> Connected with Hans today. Happy to chat further if you like. Last we spoke I let
> you know we sent all the information we had on your account to CS
> ["Computershare"] correctly. If there were delays in you getting access to your
> account, you would need to follow up with CS or ILMN as CS is engaged and
> managed by ILMN.
>
> Take care,
> Aaron."

A true copy of the email exchange between Dr. Bach and Aaron Freidin, beginning on September

26, 2021, is attached, restated, and incorporated by reference herein as **Exhibit K**.

67.     What followed was a series of additional email exchanges explaining Dr. Bach's

situation. On or about September 26, 2021 at 8:38 PM,[2] Dr. Bach responded:

> "Hi Aaron. I know everyone is trying to do their best. But I raised the issue with
> you on 8/30 that they couldn't find my account and you told me you would generate
> a statement and email to me so they could locate it. I don't think I ever got that so
> I kept at it with [Computershare] and finally got access today. I know it's a drag all
> around but I was relying on you and I am sure you have way more important stuff
> to do but the relay was extremely costly to me."

*See* **Exhibit K**.

68.     On the same day, at 11:46 PM, Aaron Freidin wrote back:

> "As I said Peter, we sent all information as you had entered it. There was nothing
> else I or Grail could do. We rely on ILMN to send statements and I never received
> one for you.

---

[2] The time stamps reflect each respective senders' time zones. Emails are provided here sequentially unless otherwise
stated.

Take care,
Aaron."

*See id.*

69.    The next day, Dr. Bach, confused, responded:

"Thank you Aaron. I feel like I am in a parallel universe. When I scroll down in this email I see you saying you are going to send me an account statement and my saying thank you. If you were wrong at the time and in fact there was nothing you could do I totally understand. But we still have the problem that I relied on this. I think nothing other than that it was an honest error or oversight, something that happens when everyone is busy. But this is the exchange below. Did you request the electronic statement? Did you ever receive it?"

*See id.*

70.    Aaron Freidin replied:

"We did request from ILMN when you and i corresponded. I never received one from them. I can ask them what happened if useful. The last correspondence I have from them was around 9/2 at which time they said your LoT was completed recently and your statement wasn't available. When did you receive your statement?"

*See id.*

71.    Dr. Bach answered:

"It was supposed to be emailed to me which would have eliminated the first mailing delay at least. I only finally got access with the code and everything [on September 26]. Took 10 days to get the code at least which is nuts."

*See id.*

72.    Finally, on or about September 27, 1:59 PM, Aaron Freidin responded:

"Yep. That was my same experience and I completed the LoT on the day of close. CS is horrible and we warned/gave all that feedback to ILMN. CS won't even talk to Grail directly."

*See id.*

73.    Computershare still denied access to Dr. Bach for another week. Eventually, Dr.

Bach's Tax ID issues were apparently resolved by Computershare and Illumina, and, with no

explanation provided, the Plaintiff was once again given access to his account and control of his Shares.

74.      On or about October 1, 2021, the Plaintiffs were finally able to obtain his converted Shares, and, on October 6, 2021, sold off the first of five tranches of their Illumina stock.

75.      On or about August 24, 2021, the date on which stockholders of converted Illumina Shares should have been able to obtain and trade them, the Illumina stock price was $479.67 per share. A true copy of the Yahoo! Financial report detailing the Illumina stock price on August 24, 2021 is attached, restated, and incorporated herein as **Exhibit L**.

76.      As a result, the Plaintiffs' 2,754 Shares of Illumina stock had an estimated value of $1,321,011.18 on or about August 24, 2021. *See* **Exhibit L**.

77.      As anticipated by the Plaintiffs, Illumina's stock price quickly declined just days after the merger. On or about October 1, 2021, the day on which the Plaintiffs finally received their Shares from Illumina and Computershare, the Illumina stock price had dropped to $394.84 a share. A true copy of the Yahoo! Financial report detailing the Illumina stock price on October 1, 2021 is attached, restated, and incorporated herein as **Exhibit M**. As a result, the value of Dr. Bach's 2,754 Shares on October 1, 2021 declined to an estimated $1,087,389.36, a $233,621.82 loss. *See* **Exhibits L & M**.

78.      Smartly, the Plaintiffs decided to sell their Shares in five tranches, and were able to mitigate this loss by selling their Shares in groups of 500 on October 6, October 7, October 12, November 2, and the rest on December 22, 2021, for a total value of $1,092,911.67. Nevertheless, the Plaintiffs still suffered a loss.

79. Under the Merger Agreement, Defendants GRAIL/Illumina had an obligation to deliver the converted Illumina Shares to Computershare for the benefit of the Plaintiffs. *See* **Exhibit D**.

80. Under the Merger Agreement, each of the Defendants had an obligation to ensure prompt delivery and receipt of Illumina Shares to the Plaintiffs upon the "Effective Time" of August 18, 2021.

81. The Defendants failed to promptly deliver the Plaintiffs' rightfully owed Shares of converted Illumina stock by blocking them out of their account despite their repeated attempts to gain access through communications with the Defendants.

82. Had Defendants performed their obligations under the Merger Agreement, the Plaintiffs would have received the delivery of their Illumina Shares on August 24, 2021.

83. Had Defendants performed their obligations under the Merger Agreement, the Plaintiffs would have immediately sold their Shares on August 24, 2021 at $479.67 per share, netting them a profit of $1,321,011.18 instead of the $1,092,911.67 eventually sale price.

84. As a result of Defendants' breaches of the Merger Agreement to which the Plaintiffs were third-party beneficiaries, the Plaintiffs have suffered **$228,099.51** in damages and have been placed in a worse position than they would have been had the Defendants performed their obligations.

# V. <u>VIOLATIONS OF LAW</u>

### COUNT I – BREACH OF CONTRACT / <u>INTENDED THIRD-PARTY BENEFICIARY</u>
(As against all Defendants)

85.     The Plaintiffs reassert Paragraphs 1 through 84 of the Complaint, together with **Exhibits,** and restate and incorporate them herein by reference.

86.     On or around September 20, 2020, Defendants GRAIL and Illumina entered into the Merger Agreement, whereby Defendant Computershare would act as the Exchange Agent.

87.     The Merger Agreement expressly provided that Defendant Illumina shall "deposit, or shall cause to be deposited, with the Exchange Agent, *for the benefit of the holders of shares of Company Stock* ... book-entry shares representing the aggregate Stock Consideration." (emphasis added).

88.     As such, the Defendants intended for the Plaintiffs, as a stockholder, to benefit from the Merger Agreement.

89.     The Plaintiffs were intended third-party beneficiaries of the Defendants' Merger Agreement and of their contract with Computershare by which it acted as Exchange Agent.

90.     As evidenced by Articles II and III of the Merger Agreement, the intent to benefit Plaintiffs as a stockholder was a material part of the Defendants' purpose to enter the Merger Agreement.

91.     Upon the Effective Time of the Merger Agreement, the Plaintiffs were entitled to prompt delivery and receipt of their 2,754 converted Shares of Illumina stock.

92.     As a result of the Defendants' breaches, acts, omissions, and course of conduct detailed herein, the Plaintiffs did not receive prompt delivery of his 2,754 converted Shares of Illumina stock, in violation of the Merger Agreement.

93.     As a result, Defendants breached the Merger Agreement.

94.     As a result of the Defendants' breaches, acts, omissions, and course of conduct detailed herein, the Plaintiffs received their Shares on October 1, 2021 instead of on August 24, 2021- the day that such converted Shares would have been issued and available to be sold.

95.     If not for the Defendants' breach, the Plaintiffs would have sold their 2,754 Shares of Illumina stock immediately upon receipt on August 24, 2021, for a total value of $1,321,011.18.

96.     As a result of Defendants' breach, the Plaintiffs instead received their 2,754 Shares of Illumina stock on October 1, 2023, and eventually sold them for a total value of $1,092,911.67.

97.     As a result of Defendants' breach, the Plaintiffs have suffered damages in the amount of **$228,099.51**, the difference between (1) the market value of the Plaintiffs' Shares at the time that, under the Merger Agreement, the Shares should have been received, and (2) the market value of the Plaintiffs' Shares at the time they actually were received and eventually sold.

98.     By reason of the foregoing, Defendants are liable to the Plaintiffs in the amount of **$228,099.51**, together with statutory interest, costs, and reasonable attorney's fees.

99.     As a direct and proximate cause of the Defendants' breaches of contract as to their intended third-party beneficiaries, the Plaintiffs have suffered irreparable harm requiring temporary, preliminary and permanent equitable and injunctive relief and specific performance for the benefit of the Plaintiffs, and suffered general, special, and consequential damages, including, but not limited to, loss of profits, lost opportunity, interest, and other damages, injuries, and losses, to their detriment.

## COUNT II – BREACH OF THE IMPLIED
## COVENANT OF GOOD FAITH AND FAIR DEALING
(As to all Defendants)

100.    The Plaintiffs reassert Paragraphs 1 through 99 of the Complaint, together with **Exhibits,** and restate and incorporate them herein by reference.

101.    It is well established that in every contract there exists an implied covenant of good faith and fair dealing that requires parties to a contract to act reasonably and in good faith under such contract.

102.    As described herein, the Defendants, as parties to the Merger Agreement, had an obligation to promptly make available the Plaintiffs converted Illumina Shares to them.

103.    As described herein, the Defendants engaged in arbitrary and unreasonable conduct which deprived the Plaintiffs of the benefits they were to receive, as intended third-party beneficiaries, under the Merger Agreement.

104.    The Defendants' arbitrary and unreasonable conduct prevented the Plaintiffs from receiving their rightfully owed Shares of converted Illumina stock on August 24, 2021, when the converted Shares were issued to stockholders, and what would have otherwise been considered "prompt" delivery.

105.    The Defendants' arbitrary and unreasonable conduct resulted in the Plaintiffs being unable to receive and sell their Illumina Shares beginning on October 1, 2021, after the Illumina share price had significantly declined.

106.    As a result of the Defendants' arbitrary and unreasonable conduct, the Plaintiffs were unable to sell their 2,754 Shares on August 24, 2023 for a value of $1,321,011.18, and instead had to sell their stock for a total value of $1,092,911.67, a $228,099.51 depreciation in value.

107.     As a result of the Defendants' arbitrary and unreasonable conduct, the Plaintiffs suffered damages in the amount of **228,099.51**, the difference between (1) the market value of the Shares at the time that, if not for Defendants' arbitrary and unreasonable conduct, the Shares would have been received and (2) the market value of Shares at the time they actually were received and eventually sold.

108.     By reason of the foregoing, Defendants are liable in the amount of **$228,099.51**, together with statutory interest, costs, and attorney's fees.

109.     As a direct and proximate cause of the Defendants' breaches of implied covenant of good faith and fair dealing as to their intended third-party beneficiaries, the Plaintiffs have suffered irreparable harm requiring temporary, preliminary and permanent equitable and injunctive relief and specific performance for the benefit of the Plaintiffs, and suffered general, special, and consequential damages, including, but not limited to, loss of profits, lost opportunity, interest, and other damages, injuries, and losses, to their detriment.

## COUNT III – BREACH OF CONTRACT / THE CONSULTING AGREEMENTS
(As to Defendants GRAIL and Illumina)

110.     The Plaintiffs reassert Paragraphs 1 through 109 of the Complaint, together with **Exhibits,** and restate and incorporate them herein by reference.

111.     On or around May 1, 2018, the Plaintiffs and GRAIL executed the Consulting Agreement, whereby the Plaintiffs were to receive 50,000 GRAIL stock options, immediately exercisable upon vesting.

112.     On or around May 1, 2019, the Plaintiffs and GRAIL executed the Amended Consulting Agreement, granting the Plaintiffs an additional 150,000 GRAIL stock options, immediately exercisable upon vesting.

113.    In or around June 2021, all 200,000 of the Plaintiffs' stock options earned from the Consulting Agreements vested and were subsequently executed by the Plaintiffs.

114.    Per the Consulting Agreements, GRAIL and Illumina, as successors-in-interest to GRAIL upon acquisition, had surviving obligations to ensure the Plaintiffs were able to freely enjoy such stock options upon execution.

115.    As a result of the Defendants' acts, omissions, and course of conduct detailed herein, the Plaintiffs were not able to freely enjoy such stock options upon execution, as the Plaintiffs were denied timely access to their Shares by Defendants GRAIL and Illumina.

116.    As a result, Defendants GRAIL and Illumina breached the Consulting Agreements.

117.    As a result of the Defendants' breaches, acts, omissions, and course of conduct detailed herein, the Plaintiffs were only able to freely enjoy their Shares on October 1, 2021 instead of on August 24, 2021 - the day that their newly converted Shares would have been issued and available to be sold.

118.    If not for the Defendants GRAIL and Illumina's breach, the Plaintiffs would have sold their 2,754 Shares of Illumina stock immediately upon receipt on August 24, 2021, for a total value of $1,321,011.18.

119.    As a result of Defendants GRAIL and Illumina's breach, the Plaintiffs instead received their 2,754 Shares of Illumina stock on October 1, 2023, and eventually sold them for a total value of $1,092,911.67.

120.    As a result of Defendants GRAIL and Illumina's breach, the Plaintiffs have suffered damages in the amount of **$228,099.51**, the difference between (1) the market value of the Plaintiffs' Shares at the time that, under the Consulting Agreements, the Shares would otherwise

have been received and freely enjoyed and (2) the market value of the Plaintiffs' Shares at the time they actually were received and sold.

121.   By reason of the foregoing, Defendants GRAIL and Illumina are liable in the amount of **$228,099.51**, together with statutory interest, costs, and attorney's fees.

122.   As a direct and proximate cause of the Defendants' breaches of contract as to their intended third-party beneficiaries, the Plaintiffs have suffered irreparable harm requiring temporary, preliminary and permanent equitable and injunctive relief and specific performance for the benefit of the Plaintiffs, and suffered general, special, and consequential damages, including, but not limited to, loss of profits, lost opportunity, interest, and other damages, injuries, and losses, to their detriment.

## VI. **REQUEST FOR RELIEF**

WHEREFORE, the Plaintiffs, Life Project LLC and Dr. Peter Bach, respectfully request that this Honorable Court grant them the following relief:

A)      Order, grant and enter temporary, preliminary and permanent injunctive and equitable relief, and specific performance, and finding that the Plaintiffs have suffered irreparable harm, have a likelihood of success on the merits, that the balance of hardships favors the Plaintiffs and that it is in the public interest to grant such temporary, preliminary and permanent injunctive and equitable relief, and specific performance for the benefit of the Plaintiff, as set forth herein;

B)      Enter a final Judgment for the Plaintiffs, for their general, special, consequential and punitive damages, including, but not limited loss of profits, lost opportunity, interest, and other and losses, with costs and attorney's fees;

C)      Determine that the Defendants are liable, jointly and severally, for all damages, losses, costs and attorney's fees;

D)      Determine and award the Plaintiffs the actual losses sustained by them as a result of the violations of law by the Defendants, as set forth herein;

E)      Render a judgment and decision on behalf of the Plaintiffs on all Counts of the Complaint, and issue findings of fact and rulings of law, as necessary and appropriate, that the Defendants are liable, in all respects;

F)      Order, decide, adjudge, and determine that the liability of the Defendants, is for all losses, injuries, and damages, special, consequential, general, punitive, and/or otherwise, and for all interest and costs, as alleged herein;

G)      Award the Plaintiffs their costs, including, but not limited to, filing fees, costs, and

interest, their attorneys' fees, as required to prosecute this action;

H)      Award the Plaintiffs multiple, double, treble, and/or punitive damages in an amount

to be determined;

I)      Order declaratory relief, as appropriate and as this Court deems necessary; and/or

J)      Any additional relief, which this Honorable Court deems just and proper.

**THE PLAINTIFFS DEMAND A TRIAL**
**BY JURY ON ALL COUNTS SO TRIABLE**

Dated: May 19, 2024

Boston, Massachusetts                    Respectfully submitted,
                                         PLAINTIFFS, Peter Bach and Life Project, LLC,

                                         By their Attorneys,


                                         */s/ Philip M. Giordano*
                                         Philip M. Giordano, Esq.
                                         Giordano & Company, P.C.
                                         REED & GIORDANO, P.A.
                                         One McKinley Square, 6th Floor
                                         Boston, Massachusetts 02109-2724
                                         Telephone: (617) 723-7755
                                         Facsimile: (617) 723-7756
                                         Email: pgiordano@reedgiordano.com

# EXHIBIT A

DocuSign Envelope ID: 9281160F-993E-429B-AF93-2A9651A1D209

CONFIDENTIAL

## GRAIL, INC.

## CONSULTING AGREEMENT

This Consulting Agreement (this "**Agreement**") is made and entered into as of May 1, 2018 (the "**Effective Date**") by and between GRAIL, Inc., a Delaware corporation with its principal place of business at 1525 O'Brien Drive, Menlo Park, California 94025 (the "**Company**"), and Life Project, LLC, a limited liability company with principal place of business at 1333 Sagg Road, PO Box 1767, Sag Harbor NY 11963 ("**Consultant**") (each herein referred to individually as a "**Party**," or collectively as the "**Parties**").

The Company desires to retain Consultant as an independent contractor to perform consulting services for the Company, and Consultant is willing to perform such services, on the terms described below. In consideration of the mutual promises contained herein, the Parties agree as follows:

1. **Services and Compensation**

Peter Bach of the Consultant will perform the services described in **Exhibit A** (the "**Services**") as requested by the Company (or its designee) from time to time, and the Company agrees to pay Consultant the compensation described in **Exhibit A** for Consultant's performance of the Services. If not specified on **Exhibit A**, the scope, timing, duration, and site of performance of said Services shall be mutually and reasonably agreed to by the Company and Consultant and are subject to change upon the written agreement of both Parties. Consultant will provide the Services in a timely and professional manner consistent with industry practices.

Subject to execution of Grail's standard stock options agreement, 50,000 shares of GRAIL stock options at FMV (such value to be determined by appraisal), one-fourth vesting every three months at the end of each three-month period following the Effective Date for so long as this agreement remains in effect until the entire amount has vested; shares may be exercised immediately upon vesting, and are subject to repurchase over the vesting period. If GRAIL terminates this agreement without cause prior to six months from the Effective Date, any unvested shares from the first six months of vesting will be accelerated and shall occur on the date of such termination, for a total of 25,000 vested shares upon such termination, and the remaining 25,000 shares will remain unvested.

2. **Confidentiality**

        A.    **Definition of Confidential Information.** "**Confidential Information**" means any data, information, technology (including any and all combinations of individual items of information) that relates to the actual or anticipated business and/or products, research or development of the Company, its affiliates or subsidiaries or to the Company's, its affiliates' or subsidiaries' technical data, trade secrets, or know-how, including, but not limited to, research, product plans, non-clinical, clinical or regulatory affairs, or other information regarding the Company's, its affiliates' or subsidiaries' products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on whom Consultant called or with whom Consultant became acquainted during the term of this Agreement), software, developments, inventions, discoveries, ideas, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company, its affiliates or subsidiaries, whether written,

DocuSign Envelope ID: 9281160F-993E-429B-AF93-2A9651A1D209

CONFIDENTIAL

graphic or oral, furnished to Consultant by or on behalf of the Company, either directly or indirectly, or obtained or observed by Consultant while providing Services hereunder, and the Services to be provided by Consultant hereunder. Notwithstanding the foregoing, Confidential Information will not include any such information which Consultant can establish (i) is publicly known or made generally available prior to the time of disclosure to Consultant; (ii) becomes publicly known or made generally available after disclosure to Consultant through no breach of this Agreement by Consultant; or (iii) is in the rightful possession of Consultant, without confidentiality obligations, at the time of disclosure as shown by Consultant's then-contemporaneous written records; provided that any combination of individual items of information will not be deemed to be within any of the foregoing exceptions merely because one or more of the individual items are within such exception, unless the combination as a whole is within such exception.

B.   *Nonuse and Nondisclosure.* During and after the term of this Agreement, Consultant will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Confidential Information, and Consultant will not (i) use the Confidential Information for any purpose whatsoever other than as necessary for the performance of the Services on behalf of the Company, or (ii) disclose the Confidential Information to any third party without the prior written consent of an authorized representative of Company, except that Consultant may disclose Confidential Information to employees or consultants of the Company, in each case, who need to know such Confidential Information for the purposes of Consultant performing the Services who, prior to any such disclosure, are subject to written non-use and non-disclosure obligations at least as protective of Company and the Confidential Information as this Article 2. Consultant agrees that, as between the Company and Consultant, all Confidential Information will remain the sole property of the Company. Consultant may also disclose Confidential Information to the extent such disclosure is compelled by a court of competent jurisdiction; *provided* that Consultant (x) promptly (and in any event, prior to such disclosure) notifies the Company of such requirement, (y) uses its best efforts to assist Company in seeking a protective order or similar confidential protection as may be available, and (z) only discloses that portion of the Confidential Information that is legally required to be disclosed. Without limiting the foregoing, Consultant will not use or disclose any Company property, intellectual property rights, trade secrets or other proprietary know-how of the Company to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design identical or substantially similar designs as those developed under this Agreement for any third party. Consultant acknowledges that the use or disclosure of Confidential Information without the Company's express written permission may cause the Company irreparable harm and that any breach or threatened breach of this Section 2.B by Consultant will entitle the Company to seek injunctive relief and reasonable attorneys' fees, in addition to any other legal remedies available to it, in any court of competent jurisdiction. Consultant agrees that Consultant's obligations under this Section 2.B will continue after the termination of this Agreement.

C.   *Other Client Confidential Information.* Consultant agrees that Consultant will not improperly use, disclose, or induce the Company to use or disclose, in connection with Consultant's work for or for the benefit of Company, any proprietary information or trade secrets of any former or concurrent employer of Consultant or other person or entity with which Consultant has an obligation to keep in confidence. Consultant also agrees that Consultant will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary

DocuSign Envelope ID: 9281160F-993E-429B-AF93-2A9651A1D209

CONFIDENTIAL

information, or trade secrets belonging to any third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

      D.    **Third Party Confidential Information.** Consultant recognizes that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Consultant agrees that at all times during the term of this Agreement and thereafter, Consultant owes the Company a duty to hold all such confidential or proprietary information in the strictest confidence and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out the Services for the Company consistent with the Company's agreement with such third party.

**3.    Ownership**

      A.    **Assignment of Inventions.** Consultant agrees that all information (including without limitation, business plans and/or business information), technology, know-how, materials, notes, records, drawings, designs, inventions, ideas, discoveries, enhancements, modifications, improvements, developments, devices, compositions, trade secrets, processes, methods and/or techniques, whether or not patentable or copyrightable, that are conceived, generated, made, discovered, developed or reduced to practice by Consultant, solely or jointly with others, in the course of performing Services or through the use of Confidential Information and all intellectual property rights in the foregoing (collectively, **"Inventions"**), are the sole and exclusive property of the Company. Consultant agrees to disclose such Inventions promptly to the Company and hereby irrevocably assigns to the Company all right, title and interest in and to any and all such Inventions, including all intellectual property rights therein and thereto.

      B.    **Maintenance of Records.** Consultant agrees to keep and maintain adequate, current, accurate, and authentic written records of all work conducted under this Agreement, and all Inventions made by Consultant during the term of this Agreement, and for a period of three (3) years thereafter. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that is customary in the industry and/or otherwise specified by the Company. Such records are and remain the sole property of the Company at all times and upon Company's request, Consultant shall deliver (or cause to be delivered) such records (or copies thereof, if requested) to Company or its designee, and Company and its designees shall have the right to audit, inspect and copy any such records.

      C.    **Further Assurances.** Consultant will sign, execute and acknowledge (and/or cause to be signed, executed and acknowledged), without cost but at the expense of the Company, any and all documents, and to perform such acts, as may be necessary, useful or convenient for the purposes of perfecting the foregoing assignment of such Inventions and to obtain, enforce and/or defend intellectual property rights, including copyright and patent rights, in any and all countries with respect to such Inventions.  Consultant also agrees that Consultant's obligation to sign, execute and acknowledge (and/or cause to be signed, executed and acknowledged) any such documents shall continue after the expiration or earlier termination of this Agreement.

      D.    **Attorney-in-Fact..**

DocuSign Envelope ID: 9281160F-993E-429B-AF93-2A9651A1D209

CONFIDENTIAL

**4.      Conflicting Obligations**

Consultant agrees to use its best efforts: (a) to segregate Consultant's Services performed under this Agreement from Consultant's work done for any other corporation, institution or other person or entity so as to minimize any questions of disclosure of, or rights under, any inventions; (b) to notify the Chief Executive Officer or the Board of Directors of the Company in writing if at any time the Consultant believes that such questions may result from its performance under this Agreement; and (c) to assist Company in fairly resolving any questions in this regard which may arise.  The Services performed hereunder will not be conducted on time that is required to be devoted to any other third party.  The Consultant shall not use the funding, resources and facilities of any other third party, without the prior written consent of Company, to perform Services hereunder and shall not perform the Services hereunder in any manner that would give any third party rights or access to any work product of such Services.

**5.      Return of Company Materials**

Upon the expiration or termination of this Agreement, or upon Company's earlier request, Consultant will immediately deliver to the Company, and will not keep in Consultant's possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Confidential information, tangible embodiments of the Inventions, all devices and equipment belonging to the Company, all electronically-stored information and passwords to access such property, those records maintained pursuant to Section 3.B and any reproductions of any of the foregoing items that Consultant may have in his possession or control; and, upon the Company's request, Consultant agrees to certify in writing that Consultant has fully complied with this obligation.

**6.      Reports**

From time to time during the term of this Agreement, or otherwise at the request of the Company, Consultant agrees to keep the Company advised as to Consultant's progress in performing the Services under this Agreement. Consultant further agrees that Consultant will, as reasonably requested by the Company, prepare written reports with respect to such progress. The Company and Consultant agree that the reasonable time expended in preparing such written reports will be considered time devoted to the performance of the Services.  All such reports prepared by Consultant shall be the sole property of the Company.

**7.      Term and Termination**

        A.      *Term.* The term of this Agreement will begin on the Effective Date of this Agreement and will continue for one (1) year thereafter unless earlier terminated in accordance with Section 7.B.

        B.      *Termination.* Company may terminate this Agreement upon giving Consultant fourteen (14) days prior written notice of such termination pursuant to Section 12.G of this Agreement. The Company may terminate this Agreement immediately and without prior notice if Consultant refuses to or is unable to perform the Services or is in breach of any material provision of this Agreement.

DocuSign Envelope ID: 9281160F-993E-429B-AF93-2A9651A1D209

CONFIDENTIAL

       C.     ***Survival.*** Upon any termination, all rights and duties of the Company and Consultant toward each other will cease except:

       (1)     The Company will pay, within thirty (30) days after the effective date of termination, all amounts owing to Consultant for unpaid Services properly completed and accepted by the Company prior to the termination date and related reimbursable expenses, if any, submitted in accordance with the Company's policies and in accordance with the provisions of Article 1 of this Agreement; and

       (2)     Article 2 (Confidentiality), Article 3 (Ownership), Article 4 (Conflicting Obligations), Article 5 (Return of Company Materials), Article 7 (Term and Termination), Article 8 (Independent Contractor Relationship; Taxes), Article 9 (Indemnification), Article 10 (Nonsolicitation), Article 11 (Representations and Warranties; Limitation of Liability), and Article 12 (Miscellaneous) will survive termination or expiration of this Agreement in accordance with their terms.

**8.**     **Independent Contractor Relationship; Taxes**

       A.     It is the express intention of the Company and Consultant that Consultant performs the Services as an independent contractor to the Company. Nothing in this Agreement will in any way be construed to constitute Consultant as an agent, employee or representative of the Company. Without limiting the generality of the foregoing, Consultant is not authorized to bind the Company to any liability or obligation or to represent that Consultant has any such authority. Consultant agrees to furnish (or reimburse the Company for) all tools and materials necessary to accomplish this Agreement and will incur all expenses associated with performance, except as expressly provided in **Exhibit A**. Consultant acknowledges and agrees that Consultant is obligated to report as income all compensation received by Consultant pursuant to this Agreement.

       B.     ***Taxes and Withholdings.*** The Company shall not be responsible for paying any federal, state or local taxes on compensation, and Consultant shall be solely responsible for the payment thereof. The Company may, however, report payments made to Consultant hereunder to tax authorities and shall inform Consultant of such actions. Consultant acknowledges and agrees that Consultant is obligated to report as income all compensation received by Consultant pursuant to this Agreement. Consultant further agrees to accept exclusive liability for complying with all applicable state and federal laws, including laws governing self-employed individuals, if applicable, such as laws related to payment of taxes, social security, disability, and other contributions based on fees paid to Consultant under this Agreement. The Company will not withhold or make payments for social security, unemployment insurance or disability insurance contributions, or obtain workers' compensation insurance on Consultant's behalf. Consultant hereby agrees to indemnify and defend the Company against any and all such taxes or contributions, including penalties and interest. Consultant agrees to provide proof of payment of appropriate taxes on any fees paid to Consultant under this Agreement upon reasonable request of the Company.

**9.**     **Indemnification**

.

DocuSign Envelope ID: 9281160F-993E-429B-AF93-2A9651A1D209

CONFIDENTIAL

**10.     Nonsolicitation**

To the fullest extent permitted under applicable law, from the date of this Agreement until twelve (12) months after the termination of this Agreement for any reason (the "*Restricted Period*"), Consultant will not, without the Company's prior written consent, directly or indirectly, solicit any of the Company's employees to leave their employment, or attempt to solicit employees of the Company, either for Consultant or for any other person or entity. Consultant agrees that nothing in this Article 10 will affect Consultant's continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, Consultant's obligations under Article 2.

**11.     Representations and Warranties; Limitation of Liability**

     A.     *Representations and Warranties.* Consultant represents and warrants to the Company that Consultant is legally able to enter into this Agreement and that Consultant's execution, delivery and performance of this Agreement does not, and will not, conflict with any agreement, arrangement or understanding, written or oral, to which Consultant is a party or by which Consultant is bound.

     B.     *Limitation of Liability.* IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHER THEORY OF LIABILITY, REGARDLESS OF WHETHER COMPANY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. IN NO EVENT WILL EITHER PARTY'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE AMOUNTS PAID BY COMPANY TO CONSULTANT UNDER THIS AGREEMENT FOR THE SERVICES, DELIVERABLES OR INVENTION GIVING RISE TO SUCH LIABILITY.

**12.     Miscellaneous**

     A.     *Governing Law; Consent to Personal Jurisdiction.* This Agreement will be governed by the laws of the State of California, without regard to the conflicts of law provisions of any jurisdiction.  To the extent that any lawsuit is permitted under this Agreement, the Parties hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in San Mateo County, California.

     B.     *Assignability.* This Agreement will be binding upon Consultant's assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as expressly stated. Except as may otherwise be provided in this Agreement, Consultant may not sell, assign or delegate any rights or obligations under this Agreement, by operation of law or otherwise (including by merger, consolidation, reorganization, reincorporation, sale of assets or stock or change of control), and any such attempted assignment, delegation or transfer will be null and void.  Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, change of control or otherwise.

DocuSign Envelope ID: 9281160F-993E-429B-AF93-2A9651A1D209

CONFIDENTIAL

      C.      **_Entire Agreement._** This Agreement (including the Exhibit) constitutes the entire agreement and understanding between the Parties with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between the Parties. Consultant represents and warrants that it is not relying on any statement or representation not contained in this Agreement.  To the extent any terms set forth in any exhibit or schedule conflict with the terms set forth in this Agreement, the terms of this Agreement will control unless otherwise expressly agreed by the Parties in such exhibit or schedule.

      D.      **_Headings._** Headings are used in this Agreement for reference only and will not be considered when interpreting this Agreement.

      E.      **_Severability._** If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

      F.      **_Modification, Waiver._** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the Parties. Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

      G.      **_Notices._** Any notice or other communication required or permitted by this Agreement to be given to a Party will be in writing and will be deemed given (i) if delivered personally or by commercial messenger or courier service, (ii) when sent by confirmed facsimile, (iii) if mailed by U.S. registered or certified mail (return receipt requested), to the Party at the Party's address written below or at such other address as the Party may have previously specified by like notice, or (iv) by email with confirmation by the recipient confirming such email has been received and reviewed. If by mail, delivery will be deemed effective three business days after mailing in accordance with this Section 12.G.

            If to the Company, to:
            GRAIL, Inc.
            1525 O'Brien Drive
            Menlo Park, CA 94025
            Attn:  CEO
            E-mail: legalnotice94025@grailbio.com

            If to Consultant, to the address indicated in the preamble above.

      H.      **_Attorneys' Fees._** [The Parties Agree to Omit This Section]

      I.      **_Signatures._** This Agreement may be signed in two counterparts, each of which will be deemed an original, with the same force and effectiveness as though executed in a single document.  Signatures delivered by facsimile or similar electronic transmission (e.g., portable document format (PDF)) shall be deemed to be binding as originals for all purposes.

*[Signature Page Follows]*

DocuSign Envelope ID: 9281160F-993E-429B-AF93-2A9651A1D209

CONFIDENTIAL


The Parties have executed this Agreement as of the Effective Date.


**CONSULTANT**                                    **GRAIL, INC.**

By:  *Peter Bach*                                 By:  *Patrick Broderick*
     ⎿ 597D9235EC35474...                              ⎿ FBBF6EA347B944F...

Name:  Peter Bach                                 Name:  Patrick Broderick

Title:  President, Life Project LLC               Title:  General Counsel

DocuSign Envelope ID: 9281160F-993E-429B-AF93-2A9651A1D209

CONFIDENTIAL

# EXHIBIT A

## SERVICES AND COMPENSATION

1.      ***Contact.*** Consultant's principal Company contact:

   Name:  Ken Drazan

   Title:  President

   Email:  ken@grail.com

   Phone:  (650) 455-9320

2.      ***Services.*** Consultant will render to the Company the following Services:

- Develop GRAIL's value based performance strategy with commercial payors
  - Ex. Humana, Managed Medicaid, Centene

- Multi-Cancer Health Economic Argument
  - Outline the key components of the health economic arguments by stakeholder for the multi-cancer products (diagnostic odyssey and asymptomatic screening) to inform evidence generation and modeling needs

- US Reimbursement Strategy
  - Identify target list of integrated health systems and commercial payers likely to be interested in collaborating with GRAIL to generate evidence for a multi-cancer product
  - Assist with development of the business case/value proposition to encourage participation by the health systems and payers
  - Assist with engagement of the potential health systems and payers

- Support CMS strategy "Pathways to Reimbursement in 65+ population" projects with ADVI and Bruce Quinn

Consultant won't average more than twenty-five (25) hours per month (***"Authorized Time"***), which Authorized Time may be increased in writing (including by exchange of email correspondence or text messaging) by authorization of the Company contact identified above or another authorized representative of Company. The manner and means that Consultant chooses to complete the Services are in Consultant's sole discretion and control. Consultant agrees to provide Consultant's own equipment, tools, and other materials at Consultant's own expense; however, the Company may make its facilities and equipment available to Consultant when necessary for occasional meetings.

3.      ***Compensation.***

   A.      The Company will pay Consultant $950.00 per hour, except that Consultant will not be paid for more than the Authorized Time.

DocuSign Envelope ID: 9281160F-993E-429B-AF93-2A9651A1D209

CONFIDENTIAL

        B.      The Company will reimburse Consultant, in accordance with Company policy (with the exception GRAIL will reimburse consultant for travel via business class), for all reasonable expenses incurred by Consultant in performing the Services pursuant to this Agreement, if Consultant receives written consent from Consultant's principal Company contact prior to incurring such expenses and submits receipts for such expenses to the Company in accordance with Company policy.

        On a monthly basis, Consultant will submit to the Company a written invoice for Services and expenses, and such statement will be subject to the approval of the contact person listed above or other designated agent of the Company.   Payment of such invoices shall be due within 30 days of the Company's receipt thereof.

        This **Exhibit A** is accepted and agreed upon as of April 11, 2018.

**CONSULTANT**

By: _Peter Bach_

Name: Peter Bach

Title: President, Life Project LLC

**GRAIL, INC.**

By: _Patrick Broderick_

Name: Patrick Broderick

Title: General Counsel

DocuSign Envelope ID: 9281160F-993E-429B-AF93-2A9651A1D209

**Consulting Agreement Addendum**

This Consulting Agreement Addendum is attached to, and made effective as a part of the Consulting Agreement entered into between Peter, Bach, M.D. ("Consultant") and Grail, Inc. ("Company") as of 05-01-2018 _____ (the "Agreement").

The parties acknowledge and agree that the Services to be provided by Consultant under the Agreement are exclusive to the Agreement and are not governed by, nor subject to, the provisions of any other agreement entered into between Consultant and Company.

Company acknowledges that Consultant's primary employment responsibility is to Memorial Sloan Kettering Cancer Center and/or its affiliates, Sloan Kettering Institute for Cancer Research and Memorial Hospital for Cancer and Allied Diseases ("MSKCC") and that Consultant is bound by MSKCC policies including those related to consulting and extramural activities and that Consultant's obligations under MSKCC policies take priority over any obligations that Consultant may have to the Company by reason of this Agreement. The parties understand and agree that Consultant's services to the Company cannot employ proprietary information of MSKCC or make substantial use of MSKCC's time or resources without the written agreement of MSKCC.

The Consultant acknowledges and agrees that all developments remain the sole and exclusive property of Company or the third party entrusting any Confidential Information to Company, except to the extent that such developments contain or resulted from the use of MSKCC resources or proprietary intellectual property or materials.

Consultant will ensure that the Services provided to Company under the Agreement do not restrict or hinder Consultant's current or foreseeable research assignments with MSKCC, do no limit Consultant's ability to publish work generated at or on the behalf of MSKCC, and do not infringe on Consultant's obligations to MSKCC with respect to academic freedom.

Company acknowledges that Consultant will serve as a consultant in the capacity of an individual, and not as an agent, employee or representative of MSKCC. Accordingly, Company has not and shall not obtain any right in or respecting any invention or related ideas, discoveries, or developments that: (a) received direct or indirect financial support from MSKCC; (b) made any substantial use of any space, facilities, materials or other resources of MSKCC; or (c) were otherwise made under any grant, contract or other arrangement between MSKCC and a third party. The parties understand and agree that it is Consultant's responsibility to ensure that Consultant's services to Company do not employ proprietary information of MSKCC or make substantial use of MSKCC's space, facilities, materials or resources without the written agreement of MSKCC.

Pursuant to the Agreement, Company may not use the name of the MSKCC, nor any variation or adaptation of any such names, in any advertising, promotional or sales literature, or other public media without the prior written approval of MSKCC. Pursuant to the Agreement, Company may not use the Consultant's name in any advertising, promotional or sales literature, or other public media without the prior written approval from Consultant.

Except for Consultant's obligations pursuant to the Agreement (including without limitation to maintain Company's confidential or proprietary information), nothing in this Agreement shall restrict or otherwise limit Consultant's ability to: (i) publish the results of research, education, or other activities Consultant performed at or through Consultant's employment with MSKCC; or (ii) consult for other companies, and conduct research (including that sponsored by any third party), education, administrative activities, and

DocuSign Envelope ID: 9281160F-993E-429B-AF93-2A9651A1D209

academically related activities; or (iii) perform other duties Consultant is performing or may perform in the course of Consultant's position at MSKCC.

Confidential Information as defined in the Agreement does not include information solely to the extent that: (i) it is now in the public domain or subsequently enters the public domain through no breach of this Agreement, or (ii) Consultant lawfully received it from any third party without restriction as to use or confidentiality, (iii) was known to Consultant without obligation of confidentiality before the Services were performed, or (iv) was developed by Consultant, or on Consultant's behalf, independently and without use of or reference to the information disclosed to Consultant by the Company, or (v) Consultant is obligated to produce pursuant to an order of a court of competent jurisdiction or a valid administrative or Congressional subpoena, provided that Consultant promptly notify Company.

Company shall indemnify, defend and hold harmless Consultant and Consultant's assigns from and against any and all causes of action, liabilities, damages, penalties, costs, expenses, investigations, fines, claims, losses, suits, demands, liens, and all expenses of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees) ("Losses") that may be incurred by, made, charged, or instituted against Consultant, and which arise out of, result from or are based on (a) the material breach of this Agreement by Company; or (b) the negligence or willful misconduct of Company, except to the extent that such Losses are attributable to the negligence, wrongful act or omission, willful malfeasance or misconduct by Consultant.

The Agreement, and all claims arising out of, relating to, or in connection with this Agreement, are governed by and construed in accordance with the laws of the State of New York, without regard to its provisions concerning the applicability of the laws of other jurisdictions. All claims arising out of, relating to, or in connection with this Agreement, or the relationship between the parties hereto, are subject to the exclusive jurisdiction of and venue in the federal and state courts within New York, and each party hereby consents to the exclusive jurisdiction and venue of these courts, without regard to any conflicts of law principles.

Consultant and Company agree that these terms are incorporated into and made a part of the Agreement. To the extent that there is a conflict between the terms of the Agreement and the terms of the Addendum, this Addendum shall govern.

COMPANY                                                          CONSULTANT

DocuSigned by:                                                   DocuSigned by:

*Peter Bach*                                                    *Patrick Broderick*

597D9235EC35474...                                              FBBF6EA347B944F...



## Certificate Of Completion

Envelope Id: 9281160F993E429BAF932A9651A1D209                    Status: Completed
Subject: Please DocuSign: Bach - GRAIL Consulting Agreement & Addendum 05-01-2018 (for signing).pdf
Source Envelope:
Document Pages: 12                          Signatures: 6          Envelope Originator:
Certificate Pages: 5                        Initials: 0            Bill Barrett
AutoNav: Enabled                                                   1525 OBrien Drive
EnvelopeId Stamping: Enabled                                       Menlo Park, CA  94025
Time Zone: (UTC-08:00) Pacific Time (US & Canada)                  bbarrett@grailbio.com
                                                                   IP Address: 75.166.183.72

## Record Tracking

Status: Original                    Holder: Bill Barrett            Location: DocuSign
       5/1/2018 8:34:58 AM                 bbarrett@grailbio.com

| Signer Events | Signature | Timestamp |
| --- | --- | --- |
| Peter Bach<br>peterbbach@gmail.com<br>President, Life Project LLC<br>Security Level: Email, Account Authentication (None) | *Peter Bach*<br>Using IP Address: 140.163.254.156 | Sent: 5/1/2018 8:39:09 AM<br>Viewed: 5/1/2018 10:38:17 AM<br>Signed: 5/1/2018 10:39:44 AM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |
| Patrick Broderick<br>pbroderick@grailbio.com<br>General Counsel<br>Security Level: Email, Account Authentication (None) | *Patrick Broderick*<br>Using IP Address: 50.224.183.2 | Sent: 5/1/2018 10:39:46 AM<br>Viewed: 5/1/2018 1:15:47 PM<br>Signed: 5/1/2018 1:16:02 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 5/1/2018 1:15:46 PM<br>ID: 63ff06c5-2be1-4953-a23f-9458ba9a205f | | |

| In Person Signer Events | Signature | Timestamp |
| --- | --- | --- |

| Editor Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Agent Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Intermediary Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Certified Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Carbon Copy Events | Status | Timestamp |
| --- | --- | --- |
| Manuel English<br>english1@mskcc.org<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 5/1/2018 1:16:03 PM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Irja Jade Skye<br>ijskye@grailbio.com<br>Paralegal<br>GRAIL, Inc.<br>Security Level: Email, Account Authentication (None)<br><br>**Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | **COPIED** | Sent: 5/1/2018 1:16:04 PM<br>Viewed: 5/1/2018 1:19:40 PM |

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/1/2018 1:16:04 PM |
| Certified Delivered | Security Checked | 5/1/2018 1:16:04 PM |
| Signing Complete | Security Checked | 5/1/2018 1:16:04 PM |
| Completed | Security Checked | 5/1/2018 1:16:04 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 1/30/2017 8:13:39 PM
Parties agreed to: Patrick Broderick

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, GRAIL, Inc. (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact GRAIL, Inc.:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

To contact us by email send messages to: bbarrett@grailbio.com

**To advise GRAIL, Inc. of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at bbarrett@grailbio.com and in the body of such request you must state your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from GRAIL, Inc.**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to bbarrett@grailbio.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with GRAIL, Inc.**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

   i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

   ii. send us an e-mail to bbarrett@grailbio.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
| --- | --- |
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify GRAIL, Inc. as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  GRAIL, Inc. during the course of my relationship with you.

# EXHIBIT B

DocuSign Envelope ID: 4B2D9AFC-3FE7-4E05-8847-811208472890

CONFIDENTIAL

# FIRST EXTENSION AND AMENDMENT OF
# CONSULTING AGREEMENT

This First Extension and Amendment (the "**Amendment**") to that certain Consulting Agreement and Consulting Agreement Addendum, both dated May 1, 2018 (the "**Agreement**"), by and among Life Project, LLC, a limited liability company with principal place of business at 1333 Sagg Road, PO Box 1767, Sag Harbor NY 11963 ("**Contractor**") and GRAIL, Inc., a Delaware corporation ("**GRAIL**"), is made effective as of May 1, 2019 (the "**Amendment Effective Date**"). Each of Contractor and GRAIL is sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## BACKGROUND

WHEREAS, Contractor and GRAIL entered into the Agreement, pursuant to which Contractor provides certain services to GRAIL on the terms and conditions set forth therein.

WHEREAS, Contractor and GRAIL now desire to amend the Agreement by, inter alia, extending the term for an additional twenty-four months, all as set forth herein.

**NOW THEREFORE,** in consideration of the various promises and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by both Parties, the Parties agree as follows:

## AGREEMENT

1. **Definitions**. Unless otherwise defined in this Amendment, initially capitalized terms used herein shall have the meanings given to them in the Agreement.

2. **Section 1**. Section 1 of the Agreement is hereby amended by adding the following paragraph after the second paragraph of that Section:

Subject to approval by the Company's Board of Directors, and execution of Company's standard stock options agreement, Company will grant 150,000 shares of Company stock options ("***2019 Option Grant***") at FMV (such value to be determined by appraisal), one-fourth vesting every six months at the end of each six-month period following May 1, 2019 ("***Amendment Effective Date***") for so long as this Agreement remains in effect until the entire amount has vested; shares may be exercised immediately upon vesting, and are subject to repurchase as set forth in the Company's 2016 Equity Incentive Plan, as amended. If Company terminates this Agreement without Cause prior to six months from the Amendment Effective Date any unvested shares that would have vested during such six month period will be accelerated and such acceleration shall occur on the date of such termination for a total of 37,500 vested shares upon such termination, and the remaining 112,500 shares will remain

1

DocuSign Envelope ID: 4B2D9AFC-3FE7-4E05-8847-811208472890

CONFIDENTIAL

unvested.

3. **Section 3.B**.  The first sentence of Section 3.B will be deleted and replaced with the following sentence:

Consultant agrees to keep and maintain adequate, current, accurate, and authentic written records of all work conducted under this Agreement, and all Inventions made by Consultant during the term of this Agreement, and to maintain such records for a period of three (3) years thereafter.

4. **Section 4**.  The following new paragraph is hereby added after the first paragraph of Section 4:

During the period beginning May 1, 2019 and ending upon the expiration or termination of this Agreement (the "*Extension Period*"), Consultant shall not, without the express, prior written consent of the Company, directly or indirectly, including as principal, sole proprietor, partner, member, stockholder or investor or in any other capacity, own, control, manage, participate in, be employed by, serve as an independent contractor for or otherwise provide direct or indirect services to any of the following entities or their respective Affiliates: EXACT Sciences Corporation; Freenome, Inc.; Guardant Health, Inc.; Thrive Earlier Detection Corp.; Roche; Singlera Genomics, Inc.; and Foundation Medicine, Inc. (each, a "*Competing Company*").  In addition, if at any time during the Extension Period Consultant becomes employed by any other entity, including any Competing Company or non-Competing Company, Consultant shall (i) notify the Company of such employment and (ii) provide such employer with a copy of the covenants provided for in this Section 10.  Consultant agrees that if he fails to be in compliance with this paragraph of Article 4 at any time during the Extension Period, (1) Consultant will immediately notify the Company, and (2) the Extension Period and Consultant's right to receive any payments and benefits under this Agreement will automatically end as of the first date of such noncompliance and payments and benefits under this Agreement after such date shall be immediately forfeited.  Notwithstanding anything to the contrary contained herein, nothing shall prevent Consultant from (x) owning as a passive investment of less than 1% of the outstanding shares of the capital stock of a Competing Company, provided that he is not otherwise associated with such Competing Company, and (y) performing any speaking engagement for a Competitive Company, provided Consultant has notified his principal Company contact (set forth in **Exhibit A**) and received advanced written approval for such speaking engagement from Consultant's principal Company contact.

5. **Section 7**.  Section 7.A. and 7.B of the Agreement are hereby deleted in their entirety and replaced with the following:

A.   **Term.**  The term ("Term") of this Agreement will begin on the Effective Date of this Agreement and will continue for three (3) year(s) thereafter unless earlier terminated in accordance with Section 7.B.

2

DocuSign Envelope ID: 4B2D9AFC-3FE7-4E05-8847-811208472890

CONFIDENTIAL

     B     **Termination.** A Party may terminate this Agreement upon giving the other Party fourteen (14) days prior written notice of such termination pursuant to Section 12.G of this Agreement. The Company may at any time terminate this Agreement for Cause. For purposes of this Agreement, "*Cause*" means: (a) an intentional act of fraud, embezzlement, theft or any other material violation of law that occurs during or in the course of the term of this Agreement; (b) intentional damage to the Company's assets; (c) material breach of Consultant's obligations under this Agreement; (d) intentional breach by Consultant of any of the Company's policies; (e) the willful and continued failure to substantially perform the Services for the Company (other than as a result of incapacity due to physical or mental illness); or (f) willful conduct by Consultant that is demonstrably and materially injurious to Company, monetarily or otherwise.

6. **Section 8.B.** The second to last sentence of Section 8.B will be deleted and replaced with the following sentence:

Consultant hereby agrees to indemnify and defend the Company against any taxes or contributions, including penalties and interest arising out of Consultant's failure to pay taxes on compensation he receives as an independent contractor.

7. **Section 11.B.** Section 11.B of the Agreement shall be deleted in its entirety and replaced with the following:

     **B.**     **Limitation of Liability.** IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHER THEORY OF LIABILITY, REGARDLESS OF WHETHER COMPANY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. IN NO EVENT WILL EITHER PARTY'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED (I) THE AMOUNTS PAID BY COMPANY TO CONSULTANT UNDER THIS AGREEMENT FOR THE SERVICES, DELIVERABLES OR INVENTION GIVING RISE TO SUCH LIABILITY, PLUS (II) THE VALUE OF THE 2019 OPTION GRANT THAT VESTS OR WOULD VEST FROM THE AMENDMENT EFFECTIVE DATE UNTIL APRIL 30, 2021, THE VALUE OF THOSE SHARES TO BE DETERMINED BY THE DIFFERENCE BETWEEN THE GRANT PRICE OF THE 2019 OPTION GRANT AND THE PRICE OF THE SHARES SUBJECT TO THE 2019 OPTION GRANT AT THE TIME A PARTY MAKES PAYMENT FOR THE LIABILITY TO THE OTHER PARTY.

8. **Section 1 of Exhibit A.** Section 1 of Exhibit A of the Agreement is hereby deleted in its entirety and replaced with the following:

*Contact.* Consultant's principal Company contact:

> Name: <u>Josh Ofman</u>
>
> Title: <u>Chief of Corporate Strategy and External Affairs</u>
>
> Email: <u>jofman@grailbio.com</u>

9. **Section 2 of Exhibit A**. Section 2 of Exhibit A of the Agreement is hereby deleted in its entirety and replaced with the following:

*Services*. Consultant will perform for the Company the following projects comprising Services, in each case as approved in advance by Consultant's principal Company contact on a project-by-project basis:

- Work with Company's Health Economics and modeling team on current and future models, refining, reviewing, providing input and helping roll-out in publications and public forums.
- Work on CMS payment policy development with Company's Washington, D.C. office, and advise on ally development plan.
- Advise on and support evidence development, real-world evidence program.
- Advise on and support medical scientific communication platform development and publication planning.
- Support corporate narrative development and multi-stakeholder education campaign.
- Advise on commercial payer and Medicare advantage strategy and execution.
- Co-Chair the Company's Modeling & Real-world Evidence Executive Steering Committee.
- Support ad hoc deep dives to support Dr. Ofman in Consultant's areas of expertise.

Consultant's principal Company contact will review work product and deliverables generated by Consultant prior to completion and may provide feedback to be addressed by Consultant.

10. **Section 3 of Exhibit A**. Section 3.A. of Exhibit A of the Agreement is hereby deleted in its entirety and replaced with the following:

The Company will pay Consultant $950.00 per hour through August 31, 2019, and $750.00 per hour thereafter, except that Consultant will not be paid for more than the Authorized Time.

11. **Section 3 of Exhibit A**. The first paragraph of Section 3.B. of Exhibit A of the Agreement is hereby deleted in its entirety and replaced with the following:

4

DocuSign Envelope ID: 4B2D9AFC-3FE7-4E05-8847-811208472890

CONFIDENTIAL

The Company will reimburse Consultant, in accordance with Company policy (with the exception Company will reimburse consultant for travel via business class), for all reasonable expenses incurred by Consultant in performing the Services pursuant to this Agreement. For travel to or from Company offices in Menlo Park from Consultant's home of New York or other U.S. city, Consultant may arrange travel one time per month without prior approval of Company, unless and until Consultant's principal contact provides notice otherwise, which he or she may do in his/her sole discretion. Consultant will obtain prior written or verbal consent from Consultant's principal Company contact or his/her designee prior to incurring other types of expenses including travel to Company offices in Menlo Park more than one time per month or travel on behalf of Company to locales other than its Menlo Park offices. Consultant will submit receipts for such expenses to the Company in accordance with Company policy.

12. **No Other Modifications**. Except as specifically set forth in this Amendment, the terms and conditions of the Agreement shall remain in full force and effect. This Amendment, and the Agreement as amended by this Amendment, constitute and contain the entire understanding and agreement of the Parties respecting the subject matter of this Amendment, and supersede any and all prior or contemporaneous negotiations, correspondence, understandings and agreements between the Parties, whether oral or written, regarding such subject matter. No waiver, modification or amendment of any provision of this Amendment will be valid or effective unless made in writing and signed by a duly authorized officer of each party. The failure of either Party to assert a right hereunder or to insist upon compliance with any term or condition of this Amendment will not constitute a waiver of that right or excuse similar subsequent failure to perform any such term or condition.

13. **Miscellaneous**. This Amendment may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which need not contain the signature of more than one Party, but all such counterparts taken together will constitute one and the same agreement. This Amendment shall be governed by and interpreted in accordance with the laws of the State of California without reference to its choice of laws or conflict of laws provisions.

*[Signature pages follow]*

5

DocuSign Envelope ID: 4B2D9AFC-3FE7-4E05-8847-811208472890

CONFIDENTIAL

  **IN WITNESS WHEREOF**, the Parties have caused this Amendment to be executed by their respective duly authorized representatives as of the Amendment Effective Date, each copy of which will for all purposes be deemed to be an original.

**Life Project, LLC**

By:     *Peter Bach*

Name:   Peter Bach

Title:  Consultant, principal

Date:   September 7, 2019


**GRAIL, INC.**

By:     *Josh Ofman*

Name:   Josh Ofman

Title:  Chief Corporate strategy and External Affairs

Date:   September 4, 2019

6



## Certificate Of Completion

Envelope Id: 4B2D9AFC3FE74E058847811208472890                          Status: Completed
Subject: Please DocuSign: GRAIL - Bach Peter Amendment 1 to Consulting Agreement 2019-09-04 (final).docx
Source Envelope:
Document Pages: 6                          Signatures: 2                          Envelope Originator:
Certificate Pages: 5                          Initials: 0                          James Langston
AutoNav: Enabled                                                                    1525 OBrien Drive
EnvelopeId Stamping: Enabled                                                        Menlo Park, CA  94025
Time Zone: (UTC-08:00) Pacific Time (US & Canada)                                   jlangston@grailbio.com
                                                                                    IP Address: 50.224.183.2

## Record Tracking

Status: Original                          Holder: James Langston                          Location: DocuSign
      9/4/2019 4:08:35 PM                        jlangston@grailbio.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Josh Ofman<br>jofman@grailbio.com<br>Chief Corporate strategy and External Affairs<br>Security Level: Email, Account Authentication (None) | *[signature: Josh Ofman]*<br>1497B3D59E2C40E...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 174.210.13.142<br>Signed using mobile | Sent: 9/4/2019 4:14:28 PM<br>Viewed: 9/4/2019 4:33:37 PM<br>Signed: 9/4/2019 4:34:02 PM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via DocuSign | | |
| Peter Bach<br>pbach@grailbio.com<br>Consultant, principal<br>Security Level: Email, Account Authentication (None) | *[signature: Peter Bach]*<br>628DC2DCDB9D497<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 69.125.209.138 | Sent: 9/4/2019 4:34:04 PM<br>Viewed: 9/5/2019 1:20:57 PM<br>Signed: 9/7/2019 6:43:51 AM |
| Electronic Record and Signature Disclosure:<br>   Accepted: 9/5/2019 1:20:57 PM<br>   ID: 1103e2f5-dd29-434f-ab6b-327f2e42b809 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Irja Skye<br>ijskye@grailbio.com<br>Paralegal<br>GRAIL, Inc.<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 9/7/2019 6:43:52 AM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/7/2019 6:43:52 AM |
| Certified Delivered | Security Checked | 9/7/2019 6:43:52 AM |
| Signing Complete | Security Checked | 9/7/2019 6:43:52 AM |
| Completed | Security Checked | 9/7/2019 6:43:52 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 1/30/2017 8:13:39 PM
Parties agreed to: Peter Bach

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, GRAIL, Inc. (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact GRAIL, Inc.:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: bbarrett@grailbio.com

**To advise GRAIL, Inc. of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at bbarrett@grailbio.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.
**To request paper copies from GRAIL, Inc.**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to bbarrett@grailbio.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.
**To withdraw your consent with GRAIL, Inc.**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:
    i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
    ii. send us an e-mail to bbarrett@grailbio.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify GRAIL, Inc. as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  GRAIL, Inc. during the course of my relationship with you.

# **<u>EXHIBIT C</u>**

illumina®

Search Investor Information

Stock Information    Financials
Overview    Events & Presentations ⌄                    Resources
                          ⌄            ESG    GRAIL Acquisition    Governance ⌄
Go to illumina.com ›

**PRESS RELEASE**

Overview          Events & Presentations          Stock Information          Financials          ESG

GRAIL Acquisition          Governance          Resources

**View All News** →

## Illumina to Acquire GRAIL to Launch New Era of Cancer Detection

September 21, 2020

Accelerates Commercialization and Adoption of Transformative Multi-Cancer Screening Test with Potential to Detect More Cancers Earlier and Enable Better Outcomes

Adds Multi-Disciplinary Team and Capabilities Harnessing the Power of Next-Generation Sequencing (NGS), Population Scale Clinical Studies, and Machine Learning to Address One of Medicine's Greatest Challenges

Brings Significant New Growth Opportunities in the Clinical Setting

NGS Oncology Testing Total Addressable Market Anticipated to Grow to $75 Billion by 2035

SAN DIEGO & MENLO PARK, Calif.--(BUSINESS WIRE)-- Illumina, Inc. (NASDAQ: ILMN) and GRAIL, a healthcare company whose mission is focused on multi-cancer early detection, today announced they have entered into a definitive agreement under which Illumina will acquire GRAIL for cash and stock consideration of $8 billion upon closing of the transaction. In addition, GRAIL stockholders will receive future payments representing a tiered single digit percentage of certain GRAIL-related revenues. The agreement has been approved by the Boards of Directors of Illumina and GRAIL.

"Over the last four years, GRAIL's talented team has made exceptional progress in developing the technology and clinical data required to launch the Galleri™ multi-cancer screening test. Galleri is among the most promising new tools in the fight against cancer, and we are thrilled to welcome GRAIL back to Illumina to help transform cancer care using genomics and our NGS platform," said Francis deSouza, Illumina's President and Chief Executive Officer. "Together, we have an important opportunity to introduce routine and broadly available blood-based screening that enables early cancer detection when treatment can be more effective and less costly. Multi-cancer early detection is better for patients, their physicians, and payors. As we accelerate our path to clinical leadership and the path to multi-cancer early detection, we will continue to drive significant value creation for our stockholders."

"Cancer is one of society's most significant challenges, with most cancer being detected too late," said Hans Bishop, Chief Executive Officer of GRAIL. "We believe multi-cancer early detection technology could address a tremendous unmet need and reduce the cancer burden worldwide. Combining forces with Illumina enables broader and faster adoption of GRAIL's innovative,

protected by reCAPTCHA
Privacy · Terms

excited about this next step ilies and communities,

GRAIL was founded by Illumina in 2016 and was spun out as a standalone company, powered by Illumina's NGS technology, to develop state-of-the-art data science and machine learning and create the atlas of cancer signals in the blood, enabling multi-cancer early detection tests. GRAIL raised approximately $2 billion to support its innovative technology platform and develop Galleri. An earlier version of Galleri was able to detect more than 50 cancer types, over 45 of which have no recommended screening in the United States. Galleri is expected to launch commercially in 2021 as a multi-cancer, laboratory developed test for early cancer detection from blood. GRAIL plans to follow Galleri with future blood-based tests for cancer diagnosis, detection and post-treatment monitoring of cancer patients.

Strategic Benefits

- **Increases Illumina's Directly Accessible Total Addressable Market and Offers Multiple Future Growth Opportunities.** GRAIL extends Illumina's portfolio to include cancer screening, diagnosis and cancer monitoring, creating a portfolio of best-in-class, proprietary tests in each of the major oncology testing application areas. Oncology test utilization and payor coverage is accelerating, and the total NGS oncology opportunity is expected to grow at a CAGR of 27% to $75 billion in 2035.
- **Accelerates Adoption of NGS-Based Early Multi-Cancer Detection Test to Reach More Patients Faster.** Illumina plans to leverage its global scale, manufacturing and clinical capabilities to support GRAIL's commercialization efforts, realize the total addressable market potential and drive significant growth in the clinical value chain.
- **Enhances Illumina's Position in Clinical Genomics.** NGS ispoised to revolutionize oncology care, and this acquisition allows Illumina to participate more fully in the high value clinical solutions that are enabled by its NGS sequencing technology. With GRAIL, Illumina will continue as a leading sequencing innovator and partner, while also becoming a proprietary test provider.

Transaction Details

Under the terms of the agreement, at closing, GRAIL stockholders (including Illumina) will receive total consideration of $8 billion, consisting of $3.5 billion in cash and $4.5 billion in shares of Illumina common stock, subject to a collar. Illumina currently holds 14.5% of GRAIL's shares outstanding, and approximately 12% on a fully diluted basis.

The collar on the stock consideration will ensure that GRAIL stockholders excluding Illumina receive a number of Illumina shares equal to approximately $4 billion in value if the 20-trading-day volume weighted average price of Illumina stock as of 10 trading days prior to closing is between $295 and $399. GRAIL stockholders excluding Illumina will receive approximately 9.9 million Illumina shares if the 20-trading-day volume weighted average price of Illumina stock as of 10 trading days prior to closing is above $399 and approximately 13.4 million Illumina shares if the 20-trading-day volume weighted average price of Illumina stock as of 10 trading days prior to closing is below $295. Upon closing of the transaction, current Illumina stockholders are expected to own approximately 93% of the combined company, while GRAIL stockholders are expected to own approximately 7% based on the mid-point of the collar.

The cash consideration to GRAIL stockholders excluding Illumina of approximately $3.1 billion is expected to be funded using balance sheet cash of both Illumina and GRAIL plus up to $1 billion in capital raised through either a debt or equity issuance. In advance of this anticipated issuance, Illumina has obtained financing commitments for a $1.0 billion bridge facility with Goldman Sachs Bank USA.

In connection with the transaction, GRAIL stockholders will also receive contingent value rights, which will entitle holders to receive future payments representing a pro rata portion of certain GRAIL-related revenues each year for a 12-year period. This will reflect a 2.5% payment right to the first $1 billion of revenue each year for 12 years. Revenue above $1 billion each year would be subject to a 9% contingent payment right during this same period. Illumina will offer GRAIL stockholders the option to receive additional cash and/or stock consideration, in an amount to be determined prior to closing, in lieu of the contingent value rights.

We expect the transaction will be accretive to Illumina revenue starting in 2021, and to meaningfully accelerate revenue growth over time.

Skip to main content



Following the completion of the transaction, GRAIL will operate as a standalone division within Illumina with a dedicated leadership team to ensure continuation of GRAIL's success.

Advisors

Goldman Sachs & Co. LLC is serving as exclusive financial advisor and Cravath, Swaine & Moore LLP is serving as legal advisor to Illumina. Morgan Stanley & Co. LLC is serving as exclusive financial advisor and Latham & Watkins LLP is serving as legal advisor to GRAIL.

Conference Call Information

Illumina will host a conference call to discuss the transaction today, September 21, 2020 at 8:00 a.m. EDT.

Interested parties may access the live teleconference through the Investor Relations section of Illumina's web site under the "company" tab at www.illumina.com. Alternatively, individuals can access the call by dialing the Toll-Free Dial-In Number: (866) 211-4597, or the International Dial-In Number: (647) 689-6853 outside North America, both with passcode 2245817. Following the call, a replay will be posted on Illumina website and will be available for at least 30 days following posting.

About GRAIL

GRAIL is a healthcare company whose mission is to detect cancer early, when it can be cured. GRAIL is focused on saving lives and improving health by pioneering new technologies for early cancer detection. The company is using the power of next-generation sequencing, population-scale clinical studies, and state-of-the-art computer science and data science to overcome one of medicine's greatest challenges. GRAIL is headquartered in Menlo Park, California, with locations in Washington, D.C., North Carolina, and the United Kingdom. It is supported by leading global investors and pharmaceutical, technology, and healthcare companies.

About Illumina

Illumina is improving human health by unlocking the power of the genome. Our focus on innovation has established us as the global leader in DNA sequencing and array-based technologies, serving customers in the research, clinical and applied markets. Our products are used for applications in the life sciences, oncology, reproductive health, agriculture and other emerging segments. To learn more, visit www.illumina.com and connect with us on Twitter, Facebook, LinkedIn, Instagram, and YouTube.

Additional Information and Where to Find It

In connection with the proposed transaction, Illumina intends to file with the SEC a registration statement on Form S-4 that will include a preliminary prospectus with respect to Illumina's common stock and contingent value rights to be issued in the proposed transaction and a consent solicitation statement of GRAIL in connection with the proposed transaction. Illumina may also file other documents with the SEC regarding the proposed transaction. This document is not a substitute for consent solicitation statement/prospectus or registration statement or any other document which Illumina may file with the SEC. INVESTORS AND SECURITY HOLDERS OF GRAIL ARE URGED TO READ THE REGISTRATION STATEMENT, WHICH WILL INCLUDE THE CONSENT SOLICITATION STATEMENT/PROSPECTUS, AND ANY OTHER RELEVANT DOCUMENTS THAT ARE FILED OR WILL BE FILED WITH THE SEC, AS WELL AS ANY AMENDMENTS OR SUPPLEMENTS TO THESE DOCUMENTS, CAREFULLY AND IN THEIR ENTIRETY BECAUSE THEY CONTAIN OR WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED TRANSACTION AND RELATED MATTERS. Investors and security holders may obtain free copies of the registration statement on Form S-4 (when available), which will include the consent solicitation statement/prospectus, and other documents filed with the SEC by Illumina through the website maintained by the SEC at www.sec.gov, through Illumina's Investor Relations page (investor.Illumina.com) or by writing to Illumina Investor Relations, 5200 Illumina Way, San Diego, CA 92122.



an offer to subscribe for, y or sell any securities or a solicitation of any vote or approval in any jurisdiction, nor shall there be any sale, issuance or transfer of securities in any jurisdiction in which such offer, invitation, sale or solicitation would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended, and otherwise in accordance with applicable law.

<u>Cautionary Notes on Forward-Looking Statements</u>

This communication contains "forward-looking statements" within the meaning of the federal securities laws, including Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. In this context, forward-looking statements often address expected future business and financial performance and financial condition, and often contain words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "see," "will," "would," "may," "target," similar expressions and variations or negatives of these words. Forward-looking statements by their nature address matters that are, to different degrees, uncertain, such as statements about the consummation of the proposed transaction and the anticipated benefits thereof. These and other forward-looking statements are not guarantees of future results and are subject to risks, uncertainties and assumptions that could cause actual results to differ materially from those expressed in any forward-looking statements, including the failure to consummate the proposed transaction or to make any filing or take other action required to consummate such transaction in a timely matter or at all. Important risk factors that may cause such a difference include, but are not limited to: (i) the proposed transaction may not be completed on anticipated terms and timing, (ii) a condition to closing of the transaction may not be satisfied, including obtaining regulatory approvals, (iii) the potential impact of unforeseen liabilities, future capital expenditures, revenues, costs, expenses, earnings, synergies, economic performance, indebtedness, financial condition and losses on the future prospects, business and management strategies for the management, expansion and growth of Illumina's business after the consummation of the transaction, (iv) potential adverse reactions or changes to business relationships resulting from the announcement or completion of the transaction, (v) any negative effects of the announcement, pendency or consummation of the transaction on the market price of Illumina's common stock and on Illumina's operating results (vi) the risks and costs associated with the integration of, and the ability of Illumina to integrate, GRAIL's business successfully and to achieve anticipated synergies, (vii) risks associated with third-party contracts containing consent and/or other provisions that may be triggered by the proposed transaction, (viii) the risks and costs associated with the development and commercialization of, and Illumina's ability to develop and commercialize, GRAIL's products; (ix) the risk that disruptions from the proposed transaction will harm Illumina's business, including current plans and operations, (x) legislative, regulatory and economic developments, (xi) the other risks described in Illumina's most recent annual reports on Form 10-K and quarterly reports on Form 10-Q and in the registration statement on Form S-1 filed with the SEC by GRAIL on September 9, 2020, as amended on September 17, 2020, and (xii) management's response to any of the aforementioned factors.

These risks, as well as other risks associated with the proposed transaction, will be more fully discussed in the consent solicitation statement/prospectus that will be included in the registration statement on Form S-4 that will be filed with the SEC in connection with the proposed transaction. While the list of factors presented here is, and the list of factors to be presented in the registration statement on Form S-4 are, considered representative, no such list should be considered to be a complete statement of all potential risks and uncertainties. Unlisted factors may present significant additional obstacles to the realization of forward-looking statements. Consequences of material differences in results as compared with those anticipated in the forward-looking statements could include, among other things, business disruption, operational problems, financial loss, legal liability to third parties and similar risks, any of which could have a material adverse effect on Illumina's financial condition, results of operations, credit rating or liquidity. Illumina does not assume any obligation to publicly provide revisions or updates to any forward-looking statements, whether as a result of new information, future developments or otherwise, should circumstances change, except as otherwise required by securities and other applicable laws.

View source version on **businesswire.com: https://www.businesswire.com/news/home/20200921005256/en/**

Media:

Skip to main content

Karen Birmingham, PhD

# **EXHIBIT D**

AGREEMENT AND PLAN OF MERGER, dated as of September 20, 2020 (this "<u>Agreement</u>"), among Illumina, Inc., a Delaware corporation ("<u>Parent</u>"), SDG Ops, Inc., a Delaware corporation and direct, wholly owned subsidiary of Parent ("<u>First Merger Sub</u>"), SDG Ops, LLC, a Delaware limited liability company and a direct, wholly owned subsidiary of Parent ("<u>Second Merger Sub</u>"), and GRAIL, Inc., a Delaware corporation (the "<u>Company</u>").

WHEREAS, upon the terms and subject to the conditions of this Agreement and in accordance with the DGCL (as defined below) and the DLLCA (as defined below), Parent, First Merger Sub, Second Merger Sub and the Company have agreed to enter into a business combination transaction pursuant to which (a) First Merger Sub will merge with and into the Company (the "<u>First Merger</u>"), with the Company being the surviving corporation (the Company, in its capacity as the surviving corporation of the First Merger, is sometimes referred to as the "<u>Surviving Corporation</u>"), and (b) immediately following the First Merger and as part of the same overall transaction as the First Merger, the Surviving Corporation will merge with and into Second Merger Sub (the "<u>Second Merger</u>" and, together with the First Merger, the "<u>Mergers</u>"), with Second Merger Sub being the surviving company of the Second Merger (Second Merger Sub, in its capacity as the surviving company of the Second Merger, is sometimes referred to as the "<u>Surviving Entity</u>");

WHEREAS, for U.S. federal income tax purposes, each of the parties hereto intends that the First Merger and the Second Merger, taken together, will constitute an integrated transaction that qualifies as a "reorganization" within the meaning of Section 368(a) of the Code, and that this Agreement be, and hereby is, adopted as a "plan of reorganization" for the purposes of Section 368 of the Code and Treasury Regulations Sections 1.368-2(g) and 1.368-3(a).

WHEREAS, the Company Board (as defined below), including both Preferred Directors (as defined in the Company's certificate of incorporation), has (i) determined that this Agreement and the Transactions are fair to, and in the best interests of, the Company and its stockholders; (ii) approved and declared advisable this Agreement and the Transactions; (iii) approved the Transactions as a "Sale of the Company" pursuant to Section 2.2 of the Voting Agreement and specified that Section 2 of the Voting Agreement shall apply to the Transactions (the "<u>Drag-Along Resolutions</u>"); (iv) resolved to recommend that the stockholders of the Company adopt this Agreement; and (v) directed that this Agreement be submitted to the stockholders of the Company for adoption;

WHEREAS, the Parent Board (as defined below) has (i) determined that this Agreement and the Transactions are fair to, and in the best interests of, Parent and its stockholders and (ii) approved this Agreement and the Transactions;

WHEREAS, the Board of Directors of First Merger Sub has (i) approved this Agreement and declared its advisability and (ii) resolved to recommend the adoption of this Agreement by the sole stockholder of First Merger Sub;

WHEREAS, Parent, as the sole stockholder of First Merger Sub, shall adopt this Agreement immediately following the execution of this Agreement upon the approval of the Board of Directors of First Merger Sub;

"<u>Aggregate Stock Consideration</u>" means, subject to adjustment pursuant to <u>Section 3.02(f)</u>, the following: (a) if the Average Parent Stock Price is an amount greater than $399, then the Aggregate Stock Consideration shall be 11,278,195 shares of Parent Common Stock; (b) if the Average Parent Stock Price is an amount greater than or equal to $295 but less than or equal to $399, then the Aggregate Stock Consideration shall be a number of shares of Parent Common Stock equal to the quotient obtained by dividing (x) $4,500,000,000 by (y) the Average Parent Stock Price; or (c) if the Average Parent Stock Price is an amount less than $295, then the Aggregate Stock Consideration shall be 15,254,237 shares of Parent Common Stock.

"<u>Alternative Consideration</u>" means a number of shares of Parent Common Stock and/or an amount of cash (which may be set by reference to the Company Fully Diluted Share Count), such number and/or amount to be determined by Parent in its sole discretion prior to the mailing of the Election Form.

"<u>Average Parent Stock Price</u>" means the volume weighted average trading price of Parent Common Stock on the NASDAQ (as reported by Bloomberg L.P. or, if not reported therein, in another authoritative source mutually selected by the parties) for the 20 consecutive Trading Days ending on (and including) the Trading Day that is 10 Trading Days prior to the Closing Date (rounded to four decimal places).

"<u>beneficial owner</u>", with respect to any shares of Company Stock, has the meaning ascribed to such term under Rule 13d-3 of the Exchange Act.

"<u>Blue Sky Laws</u>" means state securities or "blue sky" Laws.

"<u>Business Day</u>" means any day on which banks are not required or authorized to close in the City of New York.

"<u>CARES Act</u>" means the Coronavirus Aid, Relief and Economic Stability Act.

"<u>Cash Consideration</u>" means the quotient obtained by dividing (a) $3,500,000,000 plus the Aggregate Option Exercise Price by (b) the Company Fully Diluted Share Count.

"<u>Class A Restricted Stock Award</u>" means an award of restricted shares of Company Class A Common Stock granted pursuant to the Company Stock Plan or otherwise (including as a result of any early exercise of Company Stock Options), whether subject to service- and/or performance-based vesting criteria.

"<u>Closing Date</u>" means the date on which the Closing occurs.

"<u>Code</u>" means the United States Internal Revenue Code of 1986, as amended.

"<u>Collaboration Partner</u>" means any third party that manufactures, co-develops or co-markets (or has a license to manufacture, develop, market or sell) any product of the Company or any of its Subsidiaries.

3

"Commitment Letter" has the meaning set forth in the definition of Financing Sources.

"Company Board" means the Board of Directors of the Company.

"Company Class A Common Stock" means Class A Common Stock, par value $0.001 per share, of the Company.

"Company Class B Common Stock" means Class B Common Stock, par value $0.001 per share, of the Company.

"Company Common Stock" means, collectively, the Company Class A Common Stock and the Company Class B Common Stock.

"Company Disclosure Letter" means the disclosure letter dated as of the date of this Agreement and delivered by the Company to Parent, First Merger Sub and Second Merger Sub simultaneously with the signing of this Agreement.

"Company Equity Awards" means, collectively, the Company Restricted Stock Awards, the Company RSU Awards and the Company Stock Options.

"Company Fully Diluted Share Count" means, in each case as of immediately prior to the Effective Time, (a) the aggregate number of shares of Company Class A Common Stock issued and outstanding, including all Class A Restricted Stock Awards; (b) the aggregate number of shares of Company Class A Common Stock issuable upon conversion of all issued and outstanding shares of Company Class B Common Stock and Company Preferred Stock in accordance with the Company's certificate of incorporation; and (c) except as otherwise included in the foregoing clause (b), the aggregate number of shares of Company Class A Common Stock issuable in respect of all outstanding options and other direct or indirect rights to acquire shares of Company Class A Common Stock or securities ultimately convertible into or exchangeable for shares of Company Class A Common Stock, including all Company RSU Awards and Company Stock Options; provided that, for the avoidance of doubt, any equity securities which may be issuable by the Company pursuant to the terms of the contract disclosed at item 35 of Section 4.09(a) of the Company Disclosure Letter shall not be included in "Company Fully Diluted Share Count" unless such equity securities are issued and outstanding as of immediately prior to the Effective Time.

"Company IP" means all Company Owned IP together with all Intellectual Property licensed by the Company or any of its Subsidiaries and used, held for use or planned for use in the Company's business.

"Company IP Agreements" means any and all contracts relating in whole or in part to the Company IP or IT Assets, to which the Company or any of its Subsidiaries is a party or beneficiary or by which the Company or any of its Subsidiaries, or any Company IP or IT

4

"<u>contract</u>" means any loan or credit agreement, bond, debenture, note, mortgage, indenture, lease, supply agreement, license agreement, development agreement or other contract, agreement, obligation, commitment or instrument, in each case, that is legally binding and including all amendments, supplements, restatements or other modifications thereto.

"<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, or as trustee or executor, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or credit arrangement or otherwise.

"<u>Designated Investments</u>" means one or more of the following: (a) direct obligations of, or obligations fully guaranteed as to principal and interest by, the United States or any agency or instrumentality thereof, <u>provided</u> such obligations are backed by the full faith and credit of the United States; or (b) a deposit account of Exchange Agent.

"<u>DGCL</u>" means the General Corporation Law of the State of Delaware.

"<u>DLLCA</u>" means the Delaware Limited Liability Company Act.

"<u>Drag-Along</u>" means the requirement of the Voting Agreement Parties to take certain actions upon the approval of a "Sale of the Company", as such term is defined in the Voting Agreement, to comply with the requirements of Section 2 of the Voting Agreement.

"<u>Encumbrances</u>" means mortgages, pledges, liens, security interests, hypothecations, conditional and installment sale agreements, encumbrances, charges or other claims to title of third parties or restrictions on ownership or use of any kind, including any easement, reversion interest, right of way or other encumbrance to title, limitations on voting rights or disposition rights, or any option, right of first refusal or right of first offer.

"<u>Environmental Law</u>" means any Law relating to pollution or protection of the environment, natural resources, threatened or endangered species or, as it relates to exposure to hazardous or toxic materials, human health and safety.

"<u>Environmental Permits</u>" means all permits, licenses and other authorizations required under any Environmental Law.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder.

"<u>Exchange Ratio</u>" means the number (rounded to four decimal places) obtained by dividing (x) the Aggregate Stock Consideration by (y) the Company Fully Diluted Share Count.

8

at the Second Effective Time, all the property, rights, privileges, agreements, powers and franchises, debts, liabilities, duties and obligations of Second Merger Sub and the Surviving Corporation shall become the property, rights, privileges, agreements, powers and franchises, debts, liabilities, duties and obligations of the Surviving Entity, which shall include the assumption by the Surviving Entity of any and all agreements, covenants, duties and obligations of the Surviving Entity and the Surviving Corporation set forth in this Agreement to be performed after the Second Effective Time.

      Section 2.04      <u>Effect of the First Merger; Conversion of Securities</u>. (a) At the Effective Time, by virtue of the First Merger and without any action on the part of Parent, First Merger Sub, the Company or any holders of Company Stock, each share of Company Class A Common Stock, Company Class B Common Stock, Company Series A Preferred Stock, Company Series B Preferred Stock, Company Series C Preferred Stock and Company Series D Preferred Stock issued and outstanding immediately prior to the Effective Time (other than Appraisal Shares, Company Restricted Stock Awards and any shares of Company Stock to be canceled pursuant to <u>Section 2.04(c)</u>) shall be converted automatically into the right to receive, in accordance with Section 251(b)(5) of the DGCL and the terms of this Agreement, the following consideration at the election of the holder thereof:

      (i)      Each share of Company Stock with respect to which an election to receive a combination of cash, Parent Common Stock and a CVR has been effectively made and not revoked pursuant to <u>Section 3.01</u> (each, a "<u>CVR Election Share</u>") shall be converted into the right to receive (A) the Cash Consideration, without interest, (B) the number of validly issued, fully paid and non-assessable shares of Parent Common Stock equal to the Exchange Ratio (the "<u>Stock Consideration</u>"), subject to <u>Section 3.02(e)</u>, and (C) one contingent value right issued by Parent subject to and in accordance with the CVR Agreement (a "<u>CVR</u>") (collectively, the "<u>CVR Consideration</u>"). Each CVR issued as Merger Consideration hereunder will be substantially in the form attached as Annex A to the CVR Agreement (the "<u>CVR Certificate</u>").

      (ii)      Each share of Company Stock with respect to which an election to receive the Alternative Consideration in lieu of receiving a CVR has been effectively made and not revoked pursuant to <u>Section 3.01</u> (each, a "<u>Cash & Stock Election Share</u>") shall be converted into the right to receive (A) the Cash Consideration, without interest, (B) the Stock Consideration, subject to <u>Section 3.02(e)</u>, and (C) the Alternative Consideration (collectively, the "<u>Cash & Stock Consideration</u>").

      (iii)      Each share of Company Stock with respect to which no election has been effectively made in accordance with Section 3.01 (the "<u>No Election Shares</u>") shall be converted into the right to receive the CVR Consideration.

      (b)      Except as set forth in <u>Section 2.04(c)</u>, by virtue of the First Merger, each share of Company Stock, when converted in accordance with <u>Section 2.04(a)</u>, shall cease to be outstanding and shall automatically be cancelled and cease to exist, and each holder of a

22

11/13/23, 4:00 PM
Case 1:24-cv-03872-DLC Document 1-1 Filed 05/19/24 Page 22 of 142
SEC.gov/Archives/edgar/data/1110803/000095015720001121/ex2-1.htm

certificate or certificates that immediately prior to the Effective Time represented outstanding shares of Company Stock ("<u>Certificates</u>") and each holder of shares of Company Stock outstanding immediately prior to the Effective Time that are not represented by Certificates ("<u>Book-Entry Shares</u>") shall thereafter cease to have any rights with respect to such shares of Company Stock except (i) the right to receive, as applicable, the Merger Consideration, any dividends pursuant to <u>Section 3.02(c)</u> and cash in lieu of any fractional shares payable pursuant to <u>Section 3.02(e)</u>, in each case to be issued or paid, without interest, in consideration therefor upon surrender of such Certificate or transfer of the Book-Entry Shares in accordance with <u>Section 3.02(b)</u> (or in the case of a lost, stolen or destroyed Certificate, <u>Section 3.02(j)</u>) or (ii) as provided by Law.

(c)       At the Effective Time, by virtue of the First Merger and without any action on the part of Parent, First Merger Sub, the Company or any holders of Company Stock, each share of Company Stock held in the treasury of the Company immediately prior to the Effective Time shall automatically be cancelled and retired and cease to exist without any conversion thereof, and no payment shall be made with respect thereto.

(d)       Each issued and outstanding share of capital stock of First Merger Sub, par value $0.01 per share, shall, by virtue of the First Merger and without any action on the part of Parent, First Merger Sub or the Company, be converted into and become one validly issued, fully paid and non-assessable share of Class A Common Stock, par value $0.001 per share, of the Surviving Corporation.

Section 2.05       <u>Effect of the Second Merger; Conversion of Securities</u>.  Upon the terms and subject to the conditions of this Agreement, at the Second Effective Time, by virtue of the Second Merger and without any action on the part of any party hereto or any holders of Company Stock or the holders of any shares of capital stock of Parent, the Surviving Corporation or Second Merger Sub: (a) each share of Class A Common Stock of the Surviving Corporation issued and outstanding immediately prior to the Second Effective Time shall be cancelled and shall cease to exist without any conversion thereof or payment therefor; and (b) each limited liability company interest of Second Merger Sub issued and outstanding immediately prior to the Second Effective Time shall not be affected and shall remain outstanding as a limited liability company interest of the Surviving Entity, which shall constitute one hundred percent (100%) of the outstanding equity of the Surviving Entity.

Section 2.06       <u>Certificate of Incorporation; Bylaws; Certificate of Formation; Operating Agreement</u>.  (a) At the Effective Time, the Company's certificate of incorporation in effect immediately prior to the Effective Time shall continue to be the certificate of incorporation of the Surviving Corporation until thereafter amended as provided therein or by applicable Law.

(b)       At the Effective Time, the bylaws of Company as in effect immediately prior to the Effective Time shall be amended and restated to read in their entirety as the bylaws of First Merger Sub as in effect immediately prior to the Effective Time, except that all references therein to First Merger Sub shall be replaced by references to the Surviving Corporation, until thereafter amended as provided therein or by applicable Law.

23

(c)      At the Second Effective Time, the certificate of formation and operating agreement of Second Merger Sub in effect immediately prior to the Second Effective Time shall continue to be the certificate of formation and operating agreement of the Surviving Entity until thereafter amended as provided therein or by applicable Law, except that the name of the Surviving Entity shall be "GRAIL, LLC".

Section 2.07      <u>Directors and Officers of the Surviving Corporation and the Surviving Entity</u>.  The parties shall take all requisite action so that, from and after the Effective Time, the directors of First Merger Sub immediately prior to the Effective Time shall be the directors of the Surviving Corporation, each to hold office in accordance with the certificate of incorporation and bylaws of the Surviving Corporation and until their respective successors are duly elected and qualified or until such director's earlier death, resignation or removal, and the officers of First Merger Sub immediately prior to the Effective Time shall be the officers of the Surviving Corporation, each until their respective successors are duly elected and qualified or until such officer's earlier death, resignation or removal.  The parties shall take all requisite action so that, from and after the Second Effective Time, the officers of Second Merger Sub immediately prior to the Second Effective Time shall be the officers of the Surviving Entity, as set forth in the operating agreement of the Surviving Entity, each until their respective successors are duly elected and qualified or until such officer's earlier death, resignation or removal.

Section 2.08      <u>Intended Tax Treatment</u>.  (a)  For U.S. federal income tax purposes (and for purposes of any applicable state or local Tax that follows the U.S. federal income tax treatment), the parties hereto intend that (i) the First Merger and the Second Merger, taken together, will constitute an integrated transaction that qualifies as a "reorganization" within the meaning of Section 368(a) of the Code, and (ii) this Agreement will constitute a "plan of reorganization" for the purposes of Section 368 of the Code and Treasury Regulations Sections 1.368-2(g) and 1.368-3(a) (clauses (i) and (ii) collectively, the "<u>Intended Tax Treatment</u>").

(b)      So long as the conditions set forth on <u>Exhibit D</u> are satisfied, then (i) each party hereto will agree to prepare and file all Tax Returns consistent with the position that the Mergers qualify for the Intended Tax Treatment, and (ii) no party shall take any position on any Tax Return or during the course of any audit, litigation or other proceeding with respect to Taxes that is inconsistent with the Intended Tax Treatment, except, in each case, as otherwise required by a final determination by a taxing authority or a change in applicable Law after the date of this Agreement.

(c)      The parties shall cooperate with each other and their respective counsel and use their reasonable best efforts to cause the conditions set forth on <u>Exhibit D</u> to be satisfied.  Neither the Company nor Parent shall, or shall cause or permit any of their respective Subsidiaries to, take or omit to take any reasonable action not required or contemplated by this Agreement, as a result of which the Mergers would reasonably be expected to fail to qualify for the Intended Tax Treatment.

(d)      Parent shall reasonably promptly notify the Company, and the Company shall reasonably promptly notify the Parent, in each case if such party becomes aware of any

24

11/13/23, 4:00 PM
SEC.gov/Archives/edgar/data/1110803/000095015720001121/ex2-1.htm
Case 1:24-cv-03872-DLC Document 1-1 Filed 05/19/24 Page 74 of 142

non-public fact or circumstance that would reasonably be likely to prevent or impede the Mergers from qualifying for the Intended Tax Treatment.

**ARTICLE III**

**DELIVERY OF MERGER CONSIDERATION**

Section 3.01        Election Procedures.  (a)  Not less than 30 days prior to the anticipated Effective Time (the "<u>Mailing Date</u>"), Parent will cause to be mailed to each record holder of shares of Company Stock (other than shares of Company Stock cancelled pursuant to <u>Section 2.04(c)</u>) as of five Business Days prior to the Mailing Date: (x) an election form in such form consistent with the terms of this Agreement as Parent shall specify (which such form shall be reasonably acceptable to the Company) (the "<u>Election Form</u>") and (y) a letter of transmittal which shall specify that delivery shall be effected, and risk of loss and title to the shares of Company Stock shall be deemed to pass, only upon proper delivery of the Certificates (or affidavits of loss in lieu thereof together with the required indemnity) or transfer of the Book-Entry Shares to the Exchange Agent, and shall be in a customary form and have such other provisions as are reasonably acceptable to the Company and Parent, including instructions for use in effecting the surrender or transfer (the "<u>Letter of Transmittal</u>").  The Election Form shall state the procedures for electing the Merger Consideration and shall specify the number of shares of Parent Common Stock and/or amount of cash that comprise the Alternative Consideration as determined by Parent.

(b)        Each Election Form will permit each holder of shares of Company Stock to specify (i) the number of shares of Company Stock with respect to which such holder elects to receive the CVR Consideration, (ii) the number of shares of Company Stock with respect to which such holder elects to receive the Cash & Stock Consideration or (iii) that such holder makes no election with respect to such holder's shares of Company Stock.  Any shares of Company Stock with respect to which the Exchange Agent does not receive a properly completed Election Form during the period (the "<u>Election Period</u>") from the Mailing Date to 5:00 p.m., Eastern time, on the date which Parent and the Company shall agree is as near as practicable to three Business Days preceding the Closing Date, or such other date as Parent and the Company will, prior to the Closing, mutually agree (the "<u>Election Deadline</u>"), will be deemed to be No Election Shares.  Parent and the Company shall publicly announce the date of the Election Deadline at least three Business Days prior to the Election Deadline.  If the Closing Date is delayed to a subsequent date, the Election Deadline shall be similarly delayed to a subsequent date, and Parent and the Company shall promptly announce any such delay and, when determined, the rescheduled Election Deadline.

(c)        Parent shall direct the Exchange Agent to make Election Forms available as may be reasonably requested from time to time by all Persons who become holders of record of Company Stock between the date that is five Business Days prior to the Mailing Date and the Election Deadline, and the Company shall provide to the Exchange Agent all information reasonably necessary for the Exchange Agent to perform as specified in this Agreement and as specified in any agreement between Parent and/or the Company and the Exchange Agent.

25

11/13/23, 4:00 PM
SEC.gov/Archives/edgar/data/1110803/000095015720001121/ex2-1.htm
Case 1:24-cv-03872-DLC Document 1-11 Filed 05/19/24 Page 25 of 142

(d)     Any election made pursuant to this Section 3.01 will have been properly made only if the Exchange Agent will have actually received a properly completed Election Form during the Election Period.  Any Election Form may be revoked or changed by the Person submitting it, by written notice received by the Exchange Agent during the Election Period.  In the event an Election Form is revoked during the Election Period, the shares of Company Stock represented by such Election Form will be deemed to be No Election Shares, except to the extent a subsequent election is properly made during the Election Period.  Any termination of this Agreement in accordance with Article IX shall result in the revocation of all Election Forms delivered to the Exchange Agent on or prior to the date of such termination.  Subject to the terms of this Agreement and of the Election Form, the Exchange Agent will have reasonable discretion to determine whether any election, revocation or change has been properly or timely made and to disregard immaterial defects in the Election Forms, and any good faith decisions of the Exchange Agent regarding such matters will be binding and conclusive.  None of Parent, First Merger Sub, Second Merger Sub, the Company or the Exchange Agent will be under any obligation to notify any Person of any defect in an Election Form.

Section 3.02     Exchange of Certificates. (a)  Exchange Agent.  Prior to the Mailing Date, Parent shall designate a commercial bank or trust company reasonably acceptable to the Company to act as agent (the "Exchange Agent") for the exchange of shares of Company Stock in accordance with this Article III.  Parent shall deposit, or shall cause to be deposited, with the Exchange Agent, for the benefit of the holders of shares of Company Stock (other than shares of Company Stock cancelled pursuant to Section 2.04(c), Company Restricted Stock Awards and Appraisal Shares), for exchange in accordance with this Article III at or prior to the Effective Time, (i) book-entry shares representing the aggregate Stock Consideration and any shares of Parent Common Stock included in the aggregate Alternative Consideration (excluding any portion of the aggregate Stock Consideration or Alternative Consideration deliverable in respect of shares of Company Stock owned directly or indirectly by Parent, First Merger Sub or Second Merger Sub and any part of the aggregate Stock Consideration in respect of which cash is to be paid in lieu of fractional shares pursuant to Section 3.02(e)), and (ii) cash in an amount sufficient to pay the aggregate Cash Consideration and the cash portion, if any, of the Alternative Consideration (excluding any Cash Consideration and the cash portion, if any, of the Alternative Consideration payable in respect of shares of Company Stock owned directly or indirectly by Parent, First Merger Sub or Second Merger Sub), plus any cash to be paid in lieu of any fractional shares pursuant to Section 3.02(e), and (iii) CVR Certificates representing the aggregate number of CVRs issuable pursuant to the CVR Agreement, in the case of each of clauses (i), (ii) and (iii), payable or deliverable pursuant to Section 2.04(a).  In addition, Parent shall deposit, or cause to be deposited, with the Exchange Agent, as necessary from time to time at or after the Closing any dividends or distributions payable pursuant to Section 3.02(c).  All shares of Parent Common Stock, cash (including any cash to be paid in lieu of any fractional shares pursuant to Section 3.02(e)) and CVR Certificates, together with any dividends or distributions with respect thereto pursuant to Section 3.02(c), deposited with or provided to the Exchange Agent by or on behalf of Parent, shall be referred to in this Agreement as the "Exchange Fund".  For avoidance of doubt, Parent shall not be required to deposit any funds related to any CVR with the Trustee unless and until such deposit is required pursuant to the terms of the CVR Agreement.  The cash portion of the Exchange Fund shall be invested by the

26

Exchange Agent as directed by Parent; provided that the Exchange Fund shall only be invested into Designated Investments. Any interest or other income from such investments shall be paid to and become income of Parent. Except as contemplated by Section 3.02(g), the Exchange Fund shall not be used for any purpose other than as specified in this Section 3.02(a).

       (b)      Exchange Procedures. (i) As promptly as practicable after the Effective Time, the parties shall cause the Exchange Agent to mail to each holder of record of shares of Company Stock as of the Effective Time who is entitled to receive the Merger Consideration pursuant to Section 2.04(a), as set forth on the Closing Capitalization Schedule if such holder of shares of Company Stock has not already returned a valid, duly completed Letter of Transmittal: (A) a Letter of Transmittal and (B) instructions for use in effecting the surrender of the Certificates or transfer of the Book-Entry Shares pursuant to such letter of transmittal.

       (ii)      Promptly following the later of (x) the Effective Time and (y) (A) delivery to the Exchange Agent of a letter of transmittal properly completed and validly executed in accordance with the instructions thereto and (B) with respect to holders of Certificates, surrender to the Exchange Agent of a Certificate for cancellation, in each case, together with such other documents as may be reasonably requested, the holder of such shares of Company Stock shall be entitled to receive in exchange therefor (I) cash in the amount equal to the Cash Consideration and, if applicable, the cash portion, if any, of the Alternative Consideration that such holder has the right to receive pursuant to Section 2.04(a) and this Article III (in each case, rounded to the nearest cent); (II) book-entry shares representing the Stock Consideration and, if applicable, any shares of Parent Common Stock included in the Alternative Consideration that such holder has the right to receive pursuant to Section 2.04(a) and this Article III; (III) if applicable, CVRs in the amount that such holder has the right to receive pursuant to Section 2.04(a) and this Article III (subject to and in accordance with the CVR Agreement); (IV) cash in lieu of any fractional shares of Parent Common Stock such holder is entitled to receive pursuant to Section 3.02(e) (rounded to the nearest cent) and (V) any dividends or other distributions such holder is entitled to receive pursuant to Section 3.02(c); and the Certificates or Book-Entry Shares so surrendered shall forthwith be cancelled. In the event of a transfer of ownership of shares of Company Stock which is not registered in the transfer records of the Company, (I) cash in the amount equal to the Cash Consideration and, if applicable, the cash portion, if any, of the Alternative Consideration that such holder has the right to receive pursuant to Section 2.04(a) and this Article III (in each case, rounded to the nearest cent); (II) book-entry shares representing the Stock Consideration and, if applicable, any shares of Parent Common Stock included in the Alternative Consideration that such holder has the right to receive pursuant to Section 2.04(a) and this Article III; (III), if applicable, CVRs in the amount that such holder has the right to receive pursuant to Section 2.04(a) and this Article III (subject to and in accordance with the CVR Agreement); (IV) cash in lieu of any fractional shares of Parent Common Stock such holder is entitled to receive pursuant to Section 3.02(e) (rounded to the nearest cent) and (V) any dividends or other distributions such holder is entitled to receive pursuant to Section 3.02(c) may be issued to a transferee if the Certificate or Book-Entry Shares representing such shares

27

of Company Stock are presented to the Exchange Agent, accompanied by all documents required to evidence and effect such transfer and by evidence that any applicable stock transfer Taxes have been paid.  Until surrendered as contemplated by Section 2.04(a) and this Section 3.02, each Certificate or Book-Entry Share shall be deemed at all times after the Effective Time to represent only the right to receive upon such surrender, in each case, without interest, the Merger Consideration, cash in lieu of any fractional shares of Parent Common Stock the holder of such Certificate or Book-Entry Share is entitled to receive pursuant to Section 3.02(e) and any dividends or other distributions such holder is entitled to receive pursuant to Section 3.02(c).

(c)    Distributions with Respect to Unexchanged Shares of Parent Common Stock.  No dividends or other distributions declared or paid with a record date after the Effective Time with respect to the Parent Common Stock (and no cash payment in lieu of fractional shares of Parent Common Stock pursuant to Section 3.02(e)) shall be paid to the holder of any unsurrendered Certificate or Book-Entry Share until the holder of such Certificate or Book-Entry Share shall surrender such Certificate or Book-Entry Share in accordance with Section 3.02(b).  Subject to the effect of escheat, Tax or other applicable Laws, following surrender of any such Certificate or Book-Entry Share in accordance with Section 3.02(b), there shall be paid to the record holder of shares of Parent Common Stock issued in exchange therefor, without interest, at the appropriate payment date (or, if previously paid, promptly), the amount of dividends or other distributions with a record date after the Effective Time but prior to surrender payable with respect to such shares of Parent Common Stock and the amount of any cash payable in lieu of fractional shares of Parent Common Stock pursuant to Section 3.02(e).

(d)    No Further Rights in Company Stock.  All Merger Consideration issued or paid upon surrender of Certificates or transfer of Book-Entry Shares in accordance with the terms of this Article III (including any cash paid pursuant to Section 3.02(c) or Section 3.02(e)) shall be deemed to have been issued or paid, as the case may be, in full satisfaction of all rights pertaining to the shares of Company Stock formerly represented by such Certificates or Book-Entry Shares.

(e)    No Fractional Shares.  No fractional shares of Parent Common Stock shall be issued as Stock Consideration or Alternative Consideration, but in lieu thereof each holder of Company Stock otherwise entitled to a fractional share of Parent Common Stock will be entitled to receive, from the Exchange Agent in accordance with the provisions of this Section 3.02(e), a cash payment in lieu of such fractional share of Parent Common Stock in an amount equal to the amount of such fractional share (expressed as a decimal) multiplied by the Average Parent Stock Price.  The parties hereto acknowledge that payment of such cash consideration in lieu of issuing fractional shares of Parent Common Stock was not separately bargained-for consideration but merely represents a mechanical rounding off for purposes of avoiding the expense and inconvenience to Parent that would otherwise be caused by the issuance of fractional shares of Parent Common Stock.  Such amounts payable to holders of shares of Company Stock shall be without interest, rounded down to the nearest whole cent and subject to the amount of any withholding Taxes as contemplated in Section 3.02(i).

28

# **<u>EXHIBIT E</u>**

# UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**     **Rebecca Kelly Slaughter, Acting Chairwoman**
**Noah Joshua Phillips**
**Rohit Chopra**
**Christine S. Wilson**

| | |
|---|---|
| **In the Matter of**<br><br>Illumina, Inc.,<br>          a corporation<br><br>and<br><br>GRAIL, Inc.,<br>          a corporation. | Docket No. 9401<br><br>**REDACTED-PUBLIC VERSION** |

# COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act ("FTC Act"), and by virtue of the authority vested in it by the FTC Act, the Federal Trade Commission ("Commission"), having reason to believe that Respondents Illumina, Inc. ("Illumina") and GRAIL, Inc. ("Grail") have executed a merger agreement in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, which if consummated would violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its complaint pursuant to Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), stating its charges as follows:

## NATURE OF THE CASE

1.      Illumina, the dominant provider of DNA sequencing, proposes to acquire Grail.  If consummated, the Acquisition would substantially lessen competition in the U.S. multi-cancer early detection ("MCED") test market by diminishing innovation and potentially increasing prices and reducing the choice and quality of MCED tests.  In other words, it is likely to harm U.S. consumers.

2.      MCED tests are poised to revolutionize how cancer is detected and treated, having the potential to save millions of lives in the United States and around the world.  Although cancer is the second leading cause of death in the United States, healthcare providers currently are able to screen for only a small number of cancer types, testing for one cancer at a time.  Doctors currently lack the option to broadly screen for multiple types of cancer using a single test.  As a result, the vast majority of cancers are only detected after patients exhibit symptoms, when it is often too late to treat the cancer effectively.

3.      Rather than wait for cancer symptoms to arise, MCED tests use a "liquid biopsy" process to examine fragments of DNA in the bloodstream to determine whether cancer cells have shed any DNA.  The vast majority of tumors shed cancer cells, making detection of cancer through liquid biopsy possible at very early stages of the disease and allowing for early treatment that could dramatically improve patients' outcomes.  The MCED testing workflow is as follows:  First, a phlebotomist collects a blood sample from a patient and ships it to a laboratory.  At the laboratory, the DNA in the sample is extracted and analyzed using a next-generation sequencing ("NGS") platform (which includes the NGS equipment and designated consumables such as cells/cartridges and reagents).  The NGS platform quickly and accurately identifies the order of the component blocks—called nucleotides—in the DNA sample, and it produces a data read-out that is used to

determine whether a patient has mutations and/or other biomarkers associated with any of the cancers analyzed by the MCED test.

4.      Respondent Grail, with its Galleri MCED test, is racing against several other firms to develop and ultimately commercialize this revolutionary technology.  Grail and its rivals are developing MCED tests that seek to shift the cancer paradigm by simultaneously screening for multiple cancers, including those not screened for today, using blood samples.  MCED tests will

███████████████████████████████████████████

ultimately saving lives.  Illumina recognizes the life-saving benefits of MCED tests and estimates that "[e]ach year of testing can potentially avert [approximately] 100,000 cancer-related deaths . . . ."  Grail, its rivals, and others in the industry view MCED tests as a major advancement in the war on cancer.

5.      Illumina's NGS platforms are an essential input for the development and commercialization of MCED tests.  Grail's Galleri test, along with its rivals' MCED tests in development, must and do rely on Illumina's NGS platforms.  They use Illumina's platforms to sequence the short fragments of DNA found in the bloodstream, known as cell-free DNA or "cfDNA," to determine whether any DNA comes from cancerous tumors and potentially where in the body that tumor is located.

6.      Illumina is a dominant provider of NGS platforms, which are used for a wide array of applications in addition to developing MCED tests.  Illumina accounts for the vast majority of NGS instrument and reagent sales in the United States, and its platforms produce more than 90 percent of the world's sequencing data.  With respect to the application relevant to this case— MCED tests—Grail's rivals have no substitutes for Illumina's NGS platforms.  Due to the technical limitations of other NGS and non-NGS products, Grail's rivals cannot use any product

other than Illumina's NGS platforms to develop a clinically effective and commercially viable MCED test capable of competing with Grail's Galleri test.

7.    Illumina initially formed Grail in 2015 with the purpose of "[enabling] the early detection of cancer in asymptomatic individuals through a blood screen,"—the "holy grail" of early cancer detection (hence, its name). At the time, Illumina identified cancer screening as ████ ████████████████████████████████ Illumina recognized that its ███████ ████████████████████████████████████████████████████████████ ████████████████████████████ For example, when Illumina first formed Grail, it offered ████████████████████████████████████████ while simultaneously concluding that it would █████████████████████████████ ████████████

8.    Two years after forming Grail, Illumina reduced its ownership interest to below 20 percent of the voting rights in the company, after concluding that ████████████ ██████████████████████████████████. Today Illumina owns 14.5 percent of Grail's voting shares, while other investors including Arch Venture Partners, Jeff Bezos, Bill Gates, and Johnson & Johnson control the rest. Since reducing its stake in Grail, Illumina has ███████████████████████████████ ████████████████████████████████████████████████████████████

9.    Grail projects Galleri will be ████████████████████████████ and that it will be able to detect up to 50 types of cancer, often at very early stages, in asymptomatic individuals.  Grail is currently conducting a █████████████████████ ████████████████████████████████████████████████████████████ ███████████.  Grail plans to launch its Galleri test as a laboratory developed test ("LDT,"

PUBLIC

meaning it can only be run in Grail's own laboratory) in 2021. ██████████████, it plans to obtain U.S. Food and Drug Administration ("FDA") approval for Galleri.

10.     Illumina recognizes that cancer screening is █████████████████████████ ██████████ worldwide, with a projected market size of tens of billions of dollars by 2035. Similarly, Grail projects Galleri could earn ████████████████████ ███████████



11.     As the only supplier of a critical input, Illumina already possesses the ability to foreclose or disadvantage Grail's MCED rivals.  Illumina has several tools available that it could use to impede the competitiveness of any MCED test developer.  If Illumina determined it would maximize its profits by limiting the competitiveness of an MCED test that posed a threat to Grail's Galleri business, among other things, it could (1) raise the test developer's prices for NGS instruments and consumables, (2) impede the rival's research and development efforts by denying important technical assistance and other proprietary information needed to obtain FDA approval or design a commercially successful MCED test, or (3) refuse or delay the execution of a license agreement required to sell distributed in vitro diagnostic ("IVD") versions of the test (or offer the license on terms that would restrict the competitiveness of the rival's IVD test).  Respondents recognize the combined firm will have the ability to disadvantage Grail's rivals.  For example, one Illumina executive explained that the combined firm will have the █████████████████ ████████████████████████████████████████████████████ ████████████

PUBLIC

12.     If the Acquisition is consummated, Illumina will gain the incentive to foreclose or disadvantage firms that pose a significant competitive threat to Grail and to limit the competitiveness of any MCED product that Respondents expect to compete closely with Galleri. While Illumina currently benefits from selling NGS platforms and consumables to all MCED test developers, if the Acquisition is consummated, instead of realizing profits only from the sale of NGS platforms and consumables, Illumina stands to profit significantly from sales of Grail's MCED test.  In fact, Illumina projects that it will ████████████████████████████ ████████████████████████████████████ estimating that by ██████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████

13.     Grail's rivals have no alternative to using Illumina's NGS platforms to develop and commercialize their MCED tests, therefore, they will be unable to divert away from Illumina if the combined firm raises their costs or otherwise forecloses or disadvantages them.  As a result, after the Acquisition, Illumina will control the fate of every potential rival to Grail for the foreseeable future.

14.     Post-Acquisition, Illumina will have the ability to monitor each company developing an MCED test using its NGS platform and the incentive to kill or disable any products that appear likely to take significant business away from Galleri.  Because Respondents expect Galleri to be the ████████████████████████████████████████ ████████████████████████████████ Galleri would likely recapture ██████████ ██████████████ all or most of the sales from Grail's rivals that the combined firm disadvantaged or foreclosed.  To maximize its profits, the combined firm would have the incentive to prevent the

launch, or limit the competitiveness, of each rival MCED test that appeared likely to compete closely with (and thus divert sales from) Galleri, while simultaneously promoting sales and development efforts of other Illumina NGS platform customers working on non-competing products.  Preserving robust competition among MCED test developers is critically important to the public and the effort to save American lives in the war against cancer.  As Grail's CEO explained, ███████████████████████████████████████████████████████ ████████████████████████████████████ Allowing Illumina to purchase Grail and act on the incentives created by the Acquisition would cause substantial harm to U.S. consumers, who would experience reduced innovation, as well as potentially higher costs and reduced choice and quality for these life-saving products.

15.     There are no countervailing factors sufficient to offset the likelihood of competitive harm from the Acquisition.  Respondents cannot demonstrate that new entry of an MCED test that does not rely on Illumina's NGS platform would be timely, likely, or sufficient to offset the anticompetitive effects of the proposed Acquisition.

16.     Respondents will be unable to show sufficient cognizable, verifiable, or merger-specific efficiencies that would offset the likely and substantial competitive harm from the Acquisition.

## **JURISDICTION**

17.     Respondents are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

18.     The Acquisition constitutes a merger subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.

## THE PARTIES AND THE PROPOSED ACQUISITION

19.     Plaintiff, the Federal Trade Commission, is an agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

20.     Respondent, Illumina, is a publicly-traded Delaware corporation, headquartered in San Diego, California.  Illumina develops, manufactures, and markets life sciences tools and integrated systems for the large-scale analysis of genetic variation and function.  Founded in 1998, Illumina's main product offerings are short-read NGS systems and the associated consumables. Illumina's NGS platforms are used for DNA sequencing.  In the United States, Illumina sells the only NGS platforms capable of being used by MCED test developers.  In 2020, Illumina earned $3.24 billion in revenue worldwide, ███████ of which was from U.S. sales.

21.     Respondent, Grail, is a private pre-commercial diagnostics company, headquartered in Menlo Park, California.  Grail develops NGS-based oncology tests, with a focus on early cancer detection.  Grail's development pipeline includes three NGS-based oncology tests with distinct applications: Galleri, an MCED test that screens for early signs of cancer in asymptomatic patients; a diagnostic aid to cancer ("DAC") test, which confirms cancer diagnoses in patients suspected to have cancer; and a minimal residual disease ("MRD") test, designed to assess cancer recurrence after a patient has already undergone treatment.  Today, Grail has no revenue but has raised approximately $2 billion in private funding since 2016.

22.     Grail's flagship test, Galleri, has been designed to detect over 50 different types of cancer from a single blood draw, most of which have "no existing recommended screening tests."

Grail's goal is for Galleri to be used in all patients over the age of 50 to detect cancer early, even in asymptomatic, otherwise healthy patients. ███████████████████████████████████████████████████████████████████████████████. Grail plans to launch Galleri in the United States as an LDT in 2021 and to obtain FDA approval for Galleri in ████████████████. Grail also plans to ██████████████████████████. All of Grail's tests depend on the use of Illumina's NGS platforms.

23.     Grail was originally formed by Illumina in 2015.  Starting in 2017, Illumina reduced its ownership of Grail to below 20 percent of the company's voting interest.  Currently, Illumina retains 14.5 percent ownership of Grail's voting shares and ███████████████████████ ██████████████████████████████████████ On September 20, 2020, Illumina entered into an Agreement and Plan of Merger to acquire the approximately 85.5 percent of Grail voting shares outstanding that it does not already own for cash and stock consideration valued at approximately $7.1 billion and additional contingent payments to Grail's non-Illumina stockholders valued at approximately $1.2 billion.

## INDUSTRY BACKGROUND

24.     Cancer is the second leading cause of death in the world.  In 2020, nearly two million new cases of cancer were diagnosed in the United States and over six hundred thousand Americans died from the disease.  Most cancers are detected only after a patient exhibits symptoms, when the tumor has grown and the cancer has often metastasized, or spread, to other parts of the body.  At this advanced stage, it is frequently too late for effective treatment and, unfortunately, the patient often dies from the disease.

25.     Currently in the United States, very few asymptomatic individuals are screened for many types of cancer.  In fact, the U.S. Preventive Services Task Force ("USPSTF") provides

PUBLIC

screening recommendations for only four cancers—lung, breast, colorectal, and cervical.  The screening recommendations for these four cancers allow cancer to be detected at very early stages when chances of survival are high.  Other cancers go undetected until a patient shows symptoms at later stages, resulting in worse treatment options and prognoses.

26.     Grail and other MCED test developers are researching, designing, and working to commercialize products that will shift the cancer screening and treatment paradigm.  Their MCED tests are designed to simultaneously screen for multiple cancers, including cancers that are not screened for at all today, using blood samples.  The tests compare DNA fragments in patients' blood samples with a clinical database of known biomarkers or patterns that indicate the presence of cancer.  Thus, the more clinical data that an MCED test developer acquires, the better the test performs.

27.     An MCED test may be initially launched as a LDT.  An LDT can only be run in a test developer's own proprietary laboratory because it has not undergone the rigorous FDA pre-market approval process.  LDTs provide only a limited commercial opportunity because payers may not reimburse LDTs as they have not yet received FDA approval for cancer screening.

28.     IVD MCED tests must undergo the FDA's premarket approval process, or PMA.  An IVD test can either be approved as a single-site IVD test, meaning each laboratory site where samples will be processed must be approved by the FDA including the MCED test supplier's own laboratory, or as a distributed IVD test, meaning tests can be sold as "kits" to third-party laboratories to run in their own laboratories.  As more patients receive access to MCED tests generally, it will likely become more important for MCED tests developers to offer distributed or kitted IVD tests.  As a former Illumina executive explained, ███████████████████ ███████████████████████████████████████.  Industry participants anticipate that

selling distributed IVD versions of MCED tests will be important to the effective long-term commercialization of these products because distributed IVD tests, unlike single-site IVDs, can be performed at third-party laboratories.  Many customers are expected to prefer distributed IVD tests.

29.     To analyze DNA fragments in the blood, MCED tests require the use of an NGS platform and consumables to determine the order of DNA components and identify mutations or patterns consistent with the presence of cancer.  While Grail and its rivals are currently at different stages of development, they all rely on Illumina's NGS platform and sequencing reagents (today and in the future) to develop, launch, and eventually market their MCED products.  No other NGS platform has the cost, accuracy, and throughput necessary for use in MCED tests.  As one MCED test developer explained, ████████████████████████████████████████████ ████████████████████████████████  As a result, Grail's competitors are self-described as Illumina's ████████████████ because if Illumina chose to stop supplying its instruments or reagents, or significantly increased its prices, that would end or derail their development efforts or greatly diminish their competitiveness.

30.     MCED test developers depend on Illumina at every stage of the development process.  For example, when a developer is designing its MCED test, it specifically tailors the test to work with a particular sequencer and reagents.  Further, because MCED tests are designed to work with a specific Illumina NGS platform, if an MCED test developer decides to seek FDA approval for its product, its approval is contingent on the test's performance on Illumina's platform, and the MCED test developer must rely on Illumina to supply vital information, such as design files, quality and accuracy data, or distributed IVD agreements.  Moreover, post-launch, third-party MCED test developers competing with Grail would need to rely on a vertically-

integrated Illumina in order for those MCED test developers to grow and better penetrate the MCED market.

## <u>THE RELEVANT ANTITRUST MARKET IS MCED TESTS</u>

31.     The Acquisition would substantially lessen competition in the market for the research, development, and commercialization of MCED tests in the United States and cause harm to American consumers.

### A. MCED Tests is the Relevant Product Market

32.     MCED tests are being designed to detect multiple types of early-stage cancer in asymptomatic individuals.  When cells in the body die, they shed DNA into the bloodstream, known as cfDNA.  cfDNA that comes from cancerous cells is referred to as circulating tumor DNA or "ctDNA."   MCED tests look for ctDNA by examining the small cfDNA fragments (approximately 150-180 base pairs), sometimes in conjunction with other analytes such as RNA, using an NGS platform to determine whether any cfDNA has been shed from cancerous cells. Because cancerous cells begin to shed DNA at very early stages, MCED tests are designed to detect cancer before a patient manifests any symptoms.

33.     Because existing cancer screening methods, like a mammography for breast cancer or a pap smear for cervical cancer, can only screen for a specific cancer type and are unlikely to expand to screen for more types of cancers, existing screening methods are not substitutes for MCED tests and are properly excluded from the relevant product market.  The USPSTF ███████ ████████  for cancer screening and recommends cancer screening tests for only four types of cancer—lung, breast, colorectal, and cervical.   MCED tests are ████████████████████ ██████████████████████████  by detecting other types of cancer for which there are no screening options today.  These cancers, such as pancreatic, liver, and stomach cancer, are, instead, typically only detected after patients have more advanced cancer (after exhibiting symptoms),

which is often too late to treat the cancer effectively.  Also, unlike existing screening methods, MCED tests can screen for multiple types of cancer at the same time.  A single MCED test can look for thousands or tens of thousands of potential biomarkers (such as mutations or methylation patterns) consistent with cancer in asymptomatic individuals, allowing it to look for early signs of many cancers at once and providing detailed information about the specific cancer, its genetic drivers, and often the cancer's location in the body.

34.     One existing testing technology, polymerase chain reaction ("PCR"), can be used to look for certain changes in a gene or chromosome, which may help with finding a specific genetic condition or a disease.  However, PCR-based tests can only search for the existence of a few cancer-related biomarkers per each run of the platform.  As a single cancer can have dozens or hundreds of possible biomarkers located throughout the genome, the utility of these tests as an oncology screening tool is severely limited compared to MCED and is unlikely to be a substitute for MCED tests in the near future.

35.     NGS-based single-cancer early detection tests are also unlikely to be substitutes for MCED tests in the near future.  Although several single-cancer early detection tests utilize the same technology as MCEDs, Grail recognizes that MCED tests ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████

36.     Finally, a tissue biopsy is not a substitute for MCED tests.  Unlike a minimally invasive liquid biopsy, a tissue biopsy requires the removal of a tissue sample from a patient to analyze.  This process is not only invasive, but some tumors are inaccessible for biopsy and others do not provide sufficient tissue to elicit conclusive results.  As a result, a tissue biopsy is often difficult to do, costly, time-consuming and may sometimes cause further spread of the cancer. Moreover, a tissue biopsy typically is used for assessing the presence of cancer in symptomatic patients where the location of the suspected cancer is known.

### B.  The United States is the Relevant Geographic Market

37.     The United States is the relevant geographic market to assess the competitive effects of the Acquisition.  U.S. MCED customers cannot practically turn to an MCED test provider located outside the United States.  Turnaround time for MCED tests is important to ensure that cancer is identified and treated quickly, making customers unlikely to turn to a foreign-based firm.

38.     MCED tests will likely require approval by the FDA to receive reimbursement from healthcare payers in the United States.  As such, MCED tests sold outside the United States, but not approved for sale in the United States, do not provide viable competitive alternatives for U.S. consumers.  In addition, distributed IVDs will require approval by the FDA prior to use in any non-manufacturer laboratory.

### C.  Size and Structure of U.S. MCED Test Market

39.     Although no MCED test is currently commercialized, Illumina, test developers, and others in the industry expect the U.S. MCED market to be large and have sales of tens of billions of dollars annually.  As Grail noted in its amended Form S-1 Registration Statement filing, "[w]e believe Galleri has the potential to integrate directly into the healthcare delivered to individuals every year who are already going to a physician for their standard-of-care cancer screening.  Over

time, we expect adopting physicians to recommend our test to be ordered annually as part of an individual's physical examination or wellness appointment, or when undertaking other screening examinations."

40.    Illumina recognizes that cancer screening is ███████████████████ ██████ with a projected market size of tens of billions of dollars by 2035. ██████████ ███████████████████████████████. Other MCED tests developers have also analyzed the projected addressable U.S. MCED test market and estimated sales of tens of billions of dollars annually.

41.    Multiple firms are developing MCED tests that would likely compete with Grail's Galleri test.  These firms include ██████████████████████████████ ███████████████████████. While in various stages of development, many have spent hundreds of millions of dollars to research, develop, and conduct clinical trials for their respective MCED tests.  MCED test developers use data collected from their clinical trials to improve the quality of their MCED tests.  All rely on Illumina's NGS platform to perform their tests.  For example, as one MCED test developer, ████████████████████████ ████████████████████████████████████████████████████████ ███████████████████

42.    Grail's Galleri MCED test will likely be ██████████, launching this year as an LDT.  In addition, Grail expects that its Galleri MCED test will obtain FDA approval ██████ ████ after the Galleri LDT is launched.  Grail's expected ████████████ is one reason Illumina chose to acquire Grail.  Grail projects that its Galleri test could generate ███████████ ████████████████ at a volume of ████████████████████████ tests.

43. ████████████████████████████████████████

appears closest to market ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

44. ██████ also plans to launch an MCED test. ███████████████

████████████████████████████████████████████████

██████████████████████████████████████ .

45. ███████████████████ expect to compete directly with Grail by launching MCED

tests ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ .

46. ██████████████████████ also expect to launch ████████████████

███████████████ as first steps towards developing MCED tests that would compete with Grail's

Galleri test. Similarly, ███████████████████████████ , plans to launch an MCED

█████████████ .

47. Because the MCED market is pre-commercial, market shares do not yet exist.

However, given Grail's expected ██████████████ status, Illumina's internal projections estimate

that Grail will have █████████ market share when it launches, likely ███████████ .

## ANTICOMPETITIVE EFFECTS

48. The Acquisition would substantially lessen competition in the U.S. MCED test

market, resulting in reduced innovation and potentially increased prices and reduced choice and

quality of MCED tests, thus negatively impacting the ability for Americans to receive early-stage diagnoses and successful treatment of their cancers.  As the Vertical Merger Guidelines explain, a vertical merger may diminish competition by leaving the merged firm with the ability and incentive to use its control of the related product to weaken or remove the competitive constraint from one or more of its actual or potential rivals in the relevant market.  As the only provider of a critical input into MCED tests, Illumina possesses multiple means of foreclosing or disadvantaging rivals to Grail.  After the Acquisition, Illumina will have an increased incentive to disadvantage close competitors to Grail because the value of foregone NGS instrument and consumable sales to disadvantaged third-party MCED test developers will be offset by the gain in MCED testing revenue captured by Grail.

I.      **As the Dominant Provider of NGS Platforms for MCED Tests, Illumina Has the Ability to Lessen Competition in the U.S. MCED Test Market by Raising Costs and Hindering Development Efforts of Grail's Rivals**

49.     MCED test developers must and do rely on Illumina's NGS platform, along with its service and support, to research, develop, launch, and sell their MCED tests successfully.  As the dominant provider of NGS platforms for MCED test developers, Illumina can use its control of a critical input to foreclose or disadvantage Grail's rivals through at least the following means: by raising the test developer's prices for NGS instruments and consumables, impeding the rival's research and development efforts by denying important technical assistance and other proprietary information needed to obtain FDA approval or design a commercially successful MCED test, or refusing or delaying the execution of an agreement required to sell distributed IVD versions of the test (or offering the agreement on terms that would restrict the competitiveness of the rival's IVD test) – terms that allow rivals to compete effectively with Grail.

A.  **Illumina is the Dominant (and Currently Only) Provider of a Related Product and Necessary Input to MCED Tests**

17

50.     Illumina's NGS platform is the related product and is a critical input for MCED tests. As the only NGS platform option for MCED test developers, the related product gives Illumina the ability to foreclose, raise the cost of, or otherwise disadvantage Grail's MCED rivals.

51.     A critical input for MCED tests is a sequencing platform that analyzes accurately and efficiently DNA fragments that measure no more than 150-180 base pairs.  The sequencing platform must be highly sensitive to detect even the lowest levels of ctDNA in the bloodstream, and highly specific to accurately identify those patients with cancer-related ctDNA.  In addition to sensitivity and specificity, MCED testing requires a cost-effective sequencing technology capable of high-throughput—the ability to sequence DNA samples at a high rate at a low cost per base pair.  Collectively, these technical capabilities make it possible to detect genomic variations in liquid biopsies at a sufficiently low cost to make an MCED test product both competitive and accessible to the American public.

52.     Short-read NGS—the type of sequencing provided by Illumina's platforms—is the only sequencing technology that can satisfy all requirements for MCED tests, including the ability to read short fragments of DNA, high sensitivity, high specificity, fast turnaround times, high throughput, and low cost per base.

53.     Long-read NGS platforms are not viable substitutes for MCED test developers. Although long-read NGS platforms are well-suited for different types of sequencing applications such as de novo whole-genome sequencing or detecting large structural rearrangements, long-read NGS platforms lack the sensitivity, specificity, throughput, and cost profile needed for companies to develop and commercialize competitive MCED tests.

54.     Other sequencing technologies are not substitutes for short-read NGS for MCED tests.  For example, Sanger sequencing, the original DNA sequencing technology, lacks the

PUBLIC

necessary high-throughput, high-accuracy, and low-cost required for ctDNA sequencing. Sanger sequencing throughput is orders of magnitude less than that of NGS and would require millions of additional runs per patient.

55.     Illumina is the dominant provider of short-read NGS platforms in the United States. Illumina's suite of short-read NGS platforms vary from benchtop instruments that are designed for targeted sequencing projects to factor-scale instruments geared for high-throughput projects like MCED testing. Today, Illumina's NGS platform portfolio offers higher throughput, lower cost, and higher accuracy rates than ███████████████████████████████████.

56.     Thermo Fisher Scientific, Inc. ("Thermo Fisher") is the only other short-read NGS platform manufacturer in the United States. Thermo Fisher's sequencing platforms ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████.

57.     Aside from Illumina and Thermo Fisher, Beijing Genomics Institute ("BGI") is the only other short-read NGS platform provider in the world. BGI is currently enjoined from selling its NGS platform in the United States during the duration of a patent infringement lawsuit filed by Illumina.

58.     MCED test developers recognize that Illumina's short-read NGS platform offers technical capabilities unavailable on any other platform. MCED test developers have spent hundreds of millions of dollars on Illumina products, and have developed, refined, and specifically tailored their MCED tests to work with Illumina's instruments.

59.     Sufficient and timely entry of a new short-read NGS platform capable of meeting the needs of MCED test developers appears unlikely to deter or counteract anticompetitive effects from the Acquisition because launching a new NGS platform requires considerable investment of capital and time to overcome significant scientific, legal, and commercial barriers.

60.     Multiple potential entrants have previously tried to enter the short-read NGS market but failed due to technological challenges.  Other entrants have spent hundreds of millions of dollars over multiple years but have not succeeded in launching viable short-read NGS platforms.

61.     Entry into the market for NGS platforms has also proved difficult as a result of patent protections, particularly related to patents held by Illumina.  For example, soon after Qiagen N.V. ("Qiagen") launched its NGS platform, Illumina sued Qiagen for patent infringement and won an injunction that forced Qiagen out of the U.S. market.  More recently, Illumina has sued potential rival BGI, winning a preliminary injunction that prevents BGI from selling its sequencers in the United States.

62.     Although some firms are attempting to develop NGS platforms, they are years away from launching viable substitutes for Illumina's short-read NGS.  Even if other NGS platform manufacturers enter the U.S. market, it would take years, assuming it was possible at all, for MCED test developers to switch from Illumina's NGS platforms to another platform.  An MCED test developer would first have to reconfigure its MCED test to work with the new NGS platform.  A switch to a new NGS platform may also require conducting new clinical trials because the extensive clinical trials required for FDA approval depend on interoperability with Illumina's platform.  Switching platforms is also costly as MCED test developers would have to reconfigure their test to properly work with the new NGS platform.

**B.  Illumina has a Multitude of Tools to Foreclose or Reduce the Competitiveness of Grail's MCED Test Rivals**

63.     Illumina has multiple tools at its disposal to foreclose, raise the costs of, or otherwise disadvantage Grail's rivals.  Some examples include increasing prices for its instruments and reagents, failing to provide reagents in a timely manner or otherwise diminishing service, or simply changing the payment structure by which it is compensated.  By raising the price of its instruments and reagents to Grail's rivals, Illumina would likely cause the price of the rival's test to increase and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a test.  Similarly, Illumina's customers are dependent on Illumina for the prompt service of Illumina's instruments, including repair parts, labor, and preventative maintenance.  Illumina's customers also rely on Illumina for an assured and timely supply of the consumables needed to run tests on its NGS platform.  And, Illumina has the ability to charge new, additional fees to clinical application test providers, such as per-test fees or royalties.

64.     Illumina will have the ability to delay or foreclose access to its new technology and reduce the levels of its technical assistance and service to Grail's rivals – impeding rivals' research and development efforts.  When Illumina releases new updates to its NGS platforms, its latest technology is typically cheaper, more accurate, and has a higher throughput than past versions, making it more attractive for MCED tests.  For example, Illumina's most recent NGS platform, the NovaSeq, is capable of reading tens of billions of DNA fragments per run and generates multiple terabases of sequences per run.  Simply knowing about planned updates or new technology in advance can help an MCED test developer with research and development efforts because it will know where to focus its expenditures.  Denying, delaying access, or delaying disclosure of new technology to Grail's rivals could harm their ability to compete effectively with Grail.

65.     When test developers seek FDA clearance to offer a distributed IVD test, they need approval from Illumina to do so in the form of an "IVD agreement."  Because the FDA must ensure that every laboratory that runs the distributed test has the same quality of results, the FDA looks for an IVD agreement between the test developer and the NGS platform provider during its review. Whether Illumina provides a customer an IVD agreement is entirely up to Illumina, and third-parties are beholden to Illumina's decision.  As a result, Illumina controls whether MCED test developers can develop a distributed IVD version of their tests.  Third-parties unable to sell distributed IVD tests will likely be significantly limited in their ability to compete against Grail's Galleri test once these tests are widely adopted in the United States.

### C. Illumina Will be Able to Identify and Discriminate Against MCED Test Developers Posing Competitive Threats to Grail's Galleri Test

66.     Illumina will be able to identify firms developing MCED tests likely to pose a competitive threat to Grail through publicly-available information as well as other information Illumina has access to in the ordinary course of business.

67.     For example, because all MCED test developers use Illumina's NGS platform, Illumina regularly negotiates and interacts one-on-one with its oncology test developer customers. A current Illumina executive explained that, during these interactions, customers will ██████ ████████████████████████████████████████████████████████████████████████  In particular, a customer may seek Illumina's advice as to ████████████████████████ █████████████████████████████.

68.     Illumina can also identify and discriminate against Grail rivals in terms of pricing. An Illumina executive explained that ████████████████████████████████████████ ███████████████████.  Using the core consumables that customers purchase, Illumina may be



able to ████████████████████████████████████████████████████████

████████████████ .

69.     Another means by which Illumina can discriminate against its customers' use of Illumina's NGS platforms for MCED development is through its supply agreement terms.  For example, even if a customer uses an Illumina NGS platform for multiple applications, Illumina can selectively target a customer's use of the NGS platform for MCED testing through a variety of mechanisms, ████████████████████████████████████████████████████

██████████████████████████████████████████████████  Illumina has

noted that it is ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

70.     Any existing or potential supply agreements between Illumina and third-party MCED tests cannot offset the likely anticompetitive effects of this Acquisition because these agreements cannot account for each and every current and future method by which Illumina may foreclose, raise the costs of, or otherwise disadvantage Grail's rivals.

## II.     Post-Acquisition, Illumina Would Have the Incentive to Lessen Competition in the U.S. MCED Test Market by Disadvantaging Grail's Rivals

71.     The Acquisition would create an incentive for Illumina to maximize its profits by foreclosing or disadvantaging Grail's rivals because it would benefit significantly in the U.S. MCED market when rivals lose sales or alter their behavior in response.

72.     Several Illumina customers are poised to become close competitors with Grail in the sale of MCED tests including ████████████████████████████████████████████████

████████████████ .  Respondents have identified many of these companies as competitors and would be able to target them post-Acquisition.  By disadvantaging these rivals of Grail, Illumina would maximize its total profits after the Acquisition.

73.     Grail will likely be ███████████████████████████ in the United

States, providing it with a dominant position in the market.  Grail projects that it will launch Galleri

this year as an LDT and will obtain FDA approval ████████████ after the Galleri LDT is

launched, allowing the combined firm to seek reimbursement from payers for its test.

74.     As the likely leader in the U.S. MCED test market and firm with the largest market

share, Grail would recapture a substantial portion of sales from any disadvantaged downstream

MCED-testing rival, particularly those rivals with MCED tests likely to compete closely with

Grail.

75.     Because the MCED market is pre-commercial, market shares do not yet exist.

However, given Grail's ████████████, Illumina's internal projections estimate that

Grail will have a ██ percent market share in ██.

76.     The benefits of capturing or preserving a larger share of the U.S. MCED test market

via Grail will outweigh any loss in NGS instrument and consumables sales to Grail's rivals.

Illumina recognizes that cancer screening is █████████████████████ with a

projected market size of tens of billions of dollars by 2035.  Similarly, Grail expects its Galleri test

could reach ███████████████████.  This revenue, and associated profits from selling

Grail's MCED tests, is projected to be ████████████████████████████

████████████████████████████████████████ For

example, Illumina projected, when assessing the larger oncological clinical testing space that, ██

████████████████████████████████████████

████████████████████████████████████████

████████████████████.

## **ABSENCE OF COUNTERVAILING FACTORS**

77.     Respondents cannot demonstrate that new entry of an MCED test that does not rely on Illumina's NGS platform would be timely, likely, or sufficient to offset the anticompetitive effects of the proposed Acquisition.  Moreover, by implementing a strategy to disadvantage Grail's rivals, the combined firm may make it more difficult for Grail's rivals to obtain and/or generate additional data post-Acquisition, which creates additional barriers to entry for such rivals on any NGS or non-NGS platform.

78.     Respondents fail to demonstrate that the Acquisition would likely generate verifiable, cognizable, merger-specific efficiencies that would offset the likely and substantial competitive harm from the Acquisition.  According to Illumina, ███████████████████████ █████████████████████████████████     To the extent that Acquisition results in any elimination of double-marginalization, Respondents cannot demonstrate that such a reduction in margin would offset the likely harm of the Acquisition.

## **VIOLATION**

## **COUNT I – ILLEGAL ACQUISITION**

79.     The allegations of Paragraphs 1 through 78 above are incorporated by reference.

80.     As the only provider of a critical input into MCED tests, Respondent Illumina possesses multiple means of foreclosing or disadvantaging rivals to Respondent Grail.  After the Acquisition, Respondent Illumina will have an increased incentive to disadvantage close competitors to Respondent Grail because the value of foregone NGS instrument and consumable sales to disadvantaged third-party MCED test developers will be offset by the gain in MCED testing revenue captured by Grail.  Respondents cannot show that any cognizable efficiencies are of a character and magnitude such that the Acquisition is not likely to be anticompetitive.

PUBLIC

81.     The Acquisition, if consummated, would be likely to lessen competition substantially in interstate trade and commerce in the market for MCED tests throughout the country in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

PUBLIC

# NOTICE

Notice is hereby given to the Respondents that the twenty-fourth day of August, 2021, at 10 a.m., is hereby fixed as the time, and the Federal Trade Commission offices at 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580, as the place, when and where an evidentiary hearing will be had before an Administrative Law Judge of the Federal Trade Commission, on the charges set forth in this complaint, at which time and place you will have the right under the Federal Trade Commission Act and the Clayton Act to appear and show cause why an order should not be entered requiring you to cease and desist from the violations of law charged in the complaint.

You are notified that the opportunity is afforded you to file with the Commission an answer to this complaint on or before the fourteenth (14th) day after service of it upon you. An answer in which the allegations of the complaint are contested shall contain a concise statement of the facts constituting each ground of defense; and specific admission, denial, or explanation of each fact alleged in the complaint or, if you are without knowledge thereof, a statement to that effect. Allegations of the complaint not thus answered shall be deemed to have been admitted. If you elect not to contest the allegations of fact set forth in the complaint, the answer shall consist of a statement that you admit all of the material facts to be true. Such an answer shall constitute a waiver of hearings as to the facts alleged in the complaint and, together with the complaint, will provide a record basis on which the Commission shall issue a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding. In such answer, you may, however, reserve the right to submit proposed findings and conclusions under Rule 3.46 of the Commission's Rules of Practice for Adjudicative Proceedings.

Failure to file an answer within the time above provided shall be deemed to constitute a waiver of your right to appear and to contest the allegations of the complaint and shall authorize the Commission, without further notice to you, to find the facts to be as alleged in the complaint and to enter a final decision containing appropriate findings and conclusions, and a final order disposing of the proceeding.

The Administrative Law Judge shall hold a prehearing scheduling conference not later than ten (10) days after the Respondents file their answers. Unless otherwise directed by the Administrative Law Judge, the scheduling conference and further proceedings will take place at the Federal Trade Commission, 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580. Rule 3.2l(a) requires a meeting of the parties' counsel as early as practicable before the pre-hearing scheduling conference (but in any event no later than five (5) days after the Respondents file their answers). Rule 3.3l(b) obligates counsel for each party, within five (5) days of receiving the Respondents' answers, to make certain initial disclosures without awaiting a discovery request.

## NOTICE OF CONTEMPLATED RELIEF

Should the Commission conclude from the record developed in any adjudicative proceedings in this matter that the Acquisition challenged in this proceeding violates Section 5 of the Federal Trade Commission Act, as amended, and/or Section 7 of the Clayton Act, as amended, the Commission may order such relief against Respondents as is supported by the record and is necessary and appropriate, including, but not limited to:

1. If the Acquisition is consummated, divestiture or reconstitution of all associated and necessary assets, in a manner that restores two or more distinct and separate, businesses, with the ability to offer such products and services as Illumina and Grail were offering and planning to offer prior to the Acquisition.

2. A prohibition against any transaction between Illumina and Grail that combines their businesses, except as may be approved by the Commission.

3. A requirement that, for a period of time, Illumina and Grail provide prior notice to the Commission of acquisitions, mergers, consolidations, or any other combinations of their businesses with any other company.

4. A requirement to file periodic compliance reports with the Commission.

5. Any other relief appropriate to correct or remedy the anticompetitive effects of the Acquisition or to restore Grail as an independent business.

**IN WITNESS WHEREOF**, the Federal Trade Commission has caused this complaint to be signed by its Secretary and its official seal to be hereto affixed, at Washington, D.C., this thirtieth day of March 2021.

By the Commission.

April J. Tabor
Secretary

SEAL:

# **<u>EXHIBIT F</u>**

illumina®

Search Investor Information

OverviewEvents & Presentations⌄    Stock InformationFinancials      ESGGRAIL AcquisitionGovernance⌄
Go to illumina.com ›

**PRESS RELEASE**

| | | | |
|---|---|---|---|
| Overview | Events & Presentations | Stock Information | Financials | ESG |

GRAIL Acquisition      Governance      Resources

**View All News** →

# Illumina Acquires GRAIL to Accelerate Patient Access to Life-Saving Multi-Cancer Early-Detection Test

August 18, 2021

*GRAIL will remain a separate and independent unit, pending ongoing regulatory and legal review*

SAN DIEGO, /PRNewswire/ -- Illumina, Inc. (NASDAQ: ILMN) announced today that it has acquired GRAIL, a healthcare company focused on life-saving early detection of multiple cancers, but will hold GRAIL as a separate company during the European Commission's ongoing regulatory review.



Illumina, the global leader in DNA sequencing, first announced its intention to acquire GRAIL nearly a year ago, reuniting Illumina with GRAIL four years after it was spun off. GRAIL's Galleri blood test detects 50 different cancers before they are symptomatic. Illumina's acquisition of GRAIL will accelerate access and adoption of this test worldwide.

protected by reCAPTCHA

Privacy · Terms

Regulators in the EU are reviewing the transaction, but a decision is projected after the deal expires. GRAIL has no business in the EU, and the company believes that the European Commission does not have jurisdiction to review the merger as the EU merger thresholds are not met, nor are they met in any EU member state. The General Court of the European Union will hear Illumina's jurisdictional challenge later this year. By holding GRAIL separate while proceedings are ongoing, Illumina is positioned to abide by whatever final decision is reached in these legal processes.

There is no legal impediment to acquiring GRAIL in the US. Illumina is committed to working through the ongoing FTC administrative process, and as always, will abide by whatever outcome is ultimately reached in the US courts.

Skip to main content

The reasons to reunite the two companies are compelling:



Otherwise, the company is locked into a situation where the deal terms will expire before there is a chance for full review; the clock will just run out.

- Right now, the Galleri test is available but costs $950 because it is not covered by insurance. Reuniting the two companies is the fastest way to make the test broadly available and affordable. Illumina's expertise in market development and access has resulted in coverage of genomic testing for over 1 billion people around the world already. This experience will help lead to coverage and reimbursement for the Galleri test.

- GRAIL and Illumina have a long history. Illumina formed GRAIL and spun it out in 2016. GRAIL's first employees were part of Illumina, which still owns 12 percent of the company. GRAIL and Illumina are not competitors—this is a vertical acquisition.

- Based on past experience, when Illumina enters a market, the market expands. When Illumina entered the non-invasive prenatal testing space, prices dropped, reimbursement expanded, the number of providers increased, and more expectant parents had access to testing.

- Illumina's acquisition of GRAIL is driven by the belief that this test should be available to as many people as possible as quickly as possible. From fighting the COVID-19 pandemic to matching cancer patients to therapies, Illumina's mandate is to save lives and transform healthcare. The first COVID-19 viral sequence was on an Illumina machine and now genomic surveillance has emerged as a critical tool in the global fight against the pandemic, with over 70 countries now using Illumina platforms for COVID-19 variant tracking.

"Just as we are now able to screen for early-stage diabetes and high cholesterol, we will soon be able to conduct multi-cancer early detection with a simple blood test in your doctor's office," said Francis deSouza, Chief Executive Officer of Illumina.  "Since early detection of cancer saves lives, this new genomic test will be nothing short of transformational for human health and the economics of healthcare."

"The merger with Illumina will get the Galleri test to people far faster. We aim to accelerate this process so the test will be available in doctors' offices everywhere, fully reimbursed," said Hans Bishop, Chief Executive Officer of GRAIL. "A one-year acceleration of access to the Galleri test for the US population has the potential to save 10,000 lives over a 9-year period."

"The decision to make the acquisition and hold the companies separate permits the regulatory processes to proceed while safeguarding the life-saving, pro-competitive benefits of this vertical transaction without the deal expiring. We will abide by any outcome ultimately reached by the courts," said Charles Dadswell, General Counsel of Illumina.

About Illumina

Illumina is improving human health by unlocking the power of the genome. Our focus on innovation has established us as the global leader in DNA sequencing and array-based technologies, serving customers in the research, clinical and applied markets. Our products are used for applications in the life sciences, oncology, reproductive health, agriculture, and other emerging segments. To learn more, visit www.illumina.com and connect with us on Twitter, Facebook, LinkedIn, Instagram, and YouTube.

Investors:
Brian Blanchett
858.291.6421
IR@illumina.com

Media:
Dr. Karen Birmingham
646.355.2111
pr@illumina.com

Skip to main content



d shares of Illumina
ck.

GRAIL stockholders, including Illumina, are entitled to cash consideration of approximately $3.5 billion or, excluding Illumina, approximately $3.1 billion.  We are also spending approximately $0.4 billion in cash to cover the tax withholding requirements from net settling shares of Illumina common stock issuable to GRAIL employees.

The base stock consideration was subject to a collar, where the number of shares issued at closing varied in the event the 20-trading-day volume weighted average price of Illumina stock as of 10 trading days prior to closing is between $295 and $399 but was fixed at 11.3 million shares if such volume weighted average share price is above $399, which is where the stock has traded over the last couple months.

In addition to the cash consideration and the base stock consideration, GRAIL stockholders were entitled, at their election, to receive CVRs or additional shares of Illumina common stock. The CVRs entitle holders to receive future payments representing a pro rata portion of certain GRAIL-related revenues each year for a 12-year period starting at close.  This will reflect a 2.5% payment right to the first $1 billion of revenue each year for 12 years.  Revenue above $1 billion each year will be subject to a 9% contingent payment right during this same period. Holders of approximately 47% of GRAIL equity interests and/or awards (on a fully diluted basis), or 54% excluding Illumina, elected to receive the CVR consideration.

The alternative additional stock consideration (that GRAIL stockholders could elect to receive in lieu of CVRs) consisted of up to $850 million of shares of Illumina common stock, with the number of shares issued capped at a specified amount if the 20-trading-day volume weighted average price of Illumina stock as of 10 trading days prior to closing is less than $280, which did not occur. In total, we will be issuing approximately 9.8 million shares of Illumina common stock as part of this acquisition. The number of shares issued reflects approximately 11.3 million shares of base stock consideration and approximately 0.7 million shares of additional stock consideration (in lieu of CVRs), reduced by approximately 1.4 million shares to which Illumina is entitled in respect of its GRAIL stock and approximately 0.8 million shares in respect of GRAIL employee net share settlement.

Conference Call Information

Illumina will host a conference call to discuss the transaction today, August 18, 2021 at 5:30 p.m. ET.  Interested parties may access the live teleconference through the Investor Relations section of Illumina's web site under the "company" tab at www.illumina.com. Alternatively, individuals can access the call by dialing the Toll-Free Dial-In Number: (866) 211-4597, or the International Dial-In Number: (647) 689-6853 outside North America, both with Conference ID: 9955888.  Following the call, a replay will be posted on Illumina website and will be available for at least 30 days following posting.

Cautionary Notes on Forward-Looking Statements

This communication contains "forward-looking statements" within the meaning of the federal securities laws, including Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. In this context, forward-looking statements often address expected future business and financial performance and financial condition, and often contain words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "see," "will," "would," "may," "target," similar expressions and variations or negatives of these words. Forward-looking statements by their nature address matters that are, to different degrees, uncertain, such as statements about the effects of the consummation of the transaction and the anticipated benefits thereof. These and other forward-looking statements are not guarantees of future results and are subject to risks, uncertainties and assumptions that could cause actual results to differ materially from those expressed in any forward-looking statements. Important risk factors that may cause such a difference include, but are not limited to: (i) the possibility of fines, penalties, remedies or restrictions sought or imposed by governmental or regulatory authorities as a result of consummating the transaction, (ii) the possibility of other adverse consequences to, among other things, Illumina's reputation, its relationships with governmental or regulatory authorities or its ability to successfully complete future acquisitions and/or divestitures as a result of consummating the transaction, (iii) the potential impact of unforeseen liabilities, future capital expenditures, revenues, costs, expenses, earnings, synergies, economic performance, indebtedness, financial condition and losses on the future prospects, business and management strategies for the management, expansion and growth of Illumina's business after the consummation



the completion of the ...mina's common stock and ...or other provisions that ...he integration of, and the ability of Illumina to integrate, GRAIL, Inc.'s ("GRAIL") business successfully and to achieve anticipated synergies, including any delay in integration following any hold separate period, (viii) the risks and costs associated with the development and commercialization of, and Illumina's ability to develop and commercialize, GRAIL's products, including Galleri, the cancer screening test developed by GRAIL; (ix) Illumina's ability to obtain regulatory clearance for its products from government agencies; (x) Illumina's ability to obtain approval by third-party payors to reimburse patients for its products; (xi) the risk that disruptions from the consummation of the transaction or any associated legal or regulatory proceedings or obligations will harm Illumina's business, including current plans and operations, (xii) legislative, regulatory and economic developments, (xiii) the other risks described in the Consent Solicitation Statement of GRAIL, Inc. and Prospectus of Illumina, Inc. (the "Consent Solicitation Statement/Prospectus") that is included in the registration statement on Form S-4 (File No. 333-250941) filed by Illumina with the Securities and Exchange Commission (the "SEC") (as amended, the "Registration Statement"), as well as in Illumina's most recent annual reports on Form 10-K and quarterly reports on Form 10-Q and in the registration statement on Form S-1 filed with the SEC by GRAIL on September 9, 2020, as amended on September 17, 2020, and (xiv) management's response to any of the aforementioned factors.

These risks, as well as other risks associated with the transaction, are more fully discussed in the Consent Solicitation Statement/Prospectus that is included in the Registration Statement. While the list of factors presented here is, and the list of factors presented in the Registration Statement are, considered representative, no such list should be considered to be a complete statement of all potential risks and uncertainties. Unlisted factors may present significant additional obstacles to the realization of forward-looking statements. Consequences of material differences in results as compared with those anticipated in the forward-looking statements could include, among other things, business disruption, operational problems, financial loss, legal liability to third parties and similar risks, any of which could have a material adverse effect on Illumina's financial condition, results of operations, credit rating or liquidity. Illumina does not assume any obligation to publicly provide revisions or updates to any forward-looking statements, whether as a result of new information, future developments or otherwise, should circumstances change, except as otherwise required by securities and other applicable laws.

Exhibit A Net Consideration (unaudited)

|  | Shares (in millions) | Cash (in billions) |
| --- | --- | --- |
| All GRAIL Shareholders | 11.3 | $3.5 |
| (-) Illumina Holdings (a) | (1.4) | (0.4) |
| GRAIL Shareholders (excluding Illumina) | 9.9 | 3.1 |
| (+) Additional Stock (in lieu of CVRs) (b) | 0.7 | - |
| (+) Employee Share Net Settlement (c) | (0.8) | 0.4 |
| Net Consideration (excluding Illumina) (d) | 9.8 | $3.5 |

(a)    Illumina owned 12.0% of the outstanding equity interests in GRAIL on a fully diluted basis.

(b)    GRAIL stockholders were entitled, at their election, to receive contingent value rights (CVRs) or additional shares of Illumina common stock. Holders of approximately 46% of GRAIL total equity interests and/or awards (on a fully diluted basis; excluding Illumina) elected to receive additional shares of Illumina common stock.

(c)    In accordance with the Amendment to the Agreement and Plan of Merger, dated as of February 4, 2021, the withholding tax obligation for the stock received by current and former GRAIL employees in respect of their equity awards was satisfied on a "net settlement" basis. As a result, the total number of shares issued was reduced by a number of shares with a value equal to such withholding obligation, and an equivalent cash amount was paid by Illumina in respect of such withholding obligations.

(d)    Excludes potential future consideration for the approximately 54% of GRAIL stockholders (on a fully diluted basis; excluding Illumina) that elected to receive the CVRs.  The CVRs entitle holders to receive future payments representing a pro rata portion of certain GRAIL-related revenues each year for a 12-year period starting at close.  This will reflect a 2.5% payment right to the first $1 billion of revenue each year for 12 years. Revenue above $1 billion each year will be subject to a 9% contingent payment right during this same period.

# **EXHIBIT G**



**Computershare**

Computershare Trust Company, N.A.
PO Box 505000
Louisville, KY 40233-5000
Telephone:    781 575 2879
www.computershare.com/investor

Illumina, Incorporated is incorporated under the laws
of the State of DE.

005324

PETER BACH
1333 SAGG ROAD
PO BOX 1767
SAG HARBOR NY  11963

**Holder Account Number**



Uncertified accounts are subject to withholding taxes
on dividend payments and sales proceeds.

## Illumina, Incorporated - Account Statement

### Summary of Account Holdings as of 03 Sep 2021

| Type of Holding | Restrictions on Holding | Opening Balance as of 01 Jan 2021 | Share/Unit Activity | Closing Balance as of 03 Sep 2021 | Closing Share Price (USD) on 03 Sep 2021 | Closing Value (USD) on 03 Sep 2021 |
|---|---|---|---|---|---|---|
| COMMON STOCK | | 0.000000 | 2,754.000080 | 2,754.000080 | 469.54 | 1,293,113.16 |
| **TOTAL HOLDINGS** | | **0.000000** | **2,754.000000** | **2,754.000000** | | **1,293,113.16** |

### Summary of Account Holdings as of 03 Sep 2021

| Type of Holding | Restrictions on Holding | Opening Balance as of 01 Jan 2021 | Share/Unit Activity | Closing Balance as of 03 Sep 2021 | Closing Share Price (USD) | Closing Value (USD) |
|---|---|---|---|---|---|---|
| CONTINGENT VALUE RIGHT | Restricted | 0.000000 | 200,000.000080 | 200,000.000080 | | |
| **TOTAL HOLDINGS** | | **0.000000** | **200,000.000000** | **200,000.000000** | | |

### Transaction Summary

| Date | Type of Holding | Transaction Description | Shares/Units |
|---|---|---|---|
| 18 Aug 2021 | CONTINGENT VALUE RIGHT | Company Issuance | 200,000.000000 |

**CONTINUED ON REVERSE SIDE**



025N8A

001CS0003.dss.min.054312_11566/005324/0072961

THIS CVR MAY NOT BE SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR IN ANY OTHER MANNER TRANSFERRED OR DISPOSED OF, IN WHOLE OR IN PART, OTHER THAN THROUGH A PERMITTED TRANSFER (AS DEFINED IN THE CONTINGENT VALUE RIGHTS AGREEMENT (THE "CVR AGREEMENT"), DATED AS OF AUGUST 18, 2021, BY AND AMONG ILLUMINA, INC., COMPUTERSHARE TRUST COMPANY, N.A. AND SHAREHOLDER REPRESENTATIVE SERVICES LLC) IN COMPLIANCE WITH THE TERMS OF THE CVR AGREEMENT AND APPLICABLE UNITED STATES FEDERAL AND STATE SECURITIES LAWS.

# **EXHIBIT H**

## Employee FAQ *(August 18, 2021)*

## Contents

General Questions                                              1

FTC and EU Challenge                                          2

The Combined Company                                         2

Impact to GRAIL Policies and Benefits                        3

Equity Awards and Merger Considerations                      4

Recruiting/New Hires                                        11

Partner Considerations                                     132

Additional Information                                     132

## General Questions

### Who is Illumina?
- Illumina is the leader in DNA sequencing and microarray-based solutions, whose mission is to improve human health by unlocking the power of the genome.
- In 2015, researchers at Illumina discovered pioneering technology to detect cancer in its early stages. In 2016, Illumina established GRAIL as a separate company around that technology and spun it off.
- Illumina employs about 9,000 people and operates in 30 countries around the world.

### What does this merger mean for GRAIL employees?
- Our goal is to further develop and encourage our talented team to continue making amazing advancements in early cancer detection.
- GRAIL will continue to operate as an independent entity until the proceedings with the European Commission resolve. The current leadership team will continue to run GRAIL.
- Talent retention is a priority for Illumina and incentives for GRAILers must remain attractive and consistent with market practices.
- Details of equity retention will take a few weeks to determine, but we are committed to updating you when we know more.
- After EU proceedings resolve, GRAIL will operate as a standalone division of Illumina, with a dedicated leadership team.
- In the meantime, it is business as usual.
- This transaction is not about cost savings through layoffs.
- GRAIL will continue to place significant emphasis on our strong culture and taking care of our employees.

**Where is the merger agreement?**
- You can access the merger agreement here and the amendment to the merger agreement here.

## FTC and EU Challenge

**What happened to the Federal Trade Commission and EU concerns?**
- Illumina and GRAIL determined that we are well within our legal rights to complete the merger. Illumina and GRAIL will continue to cooperate with the Federal Trade Commission's and EU regulatory proceedings, none of which precluded our merger from closing.

**Could the close be stopped or undone?**
- We expect FTC and European Commission will continue to challenge the transaction post-closing, including FTC seeking a divestiture of GRAIL. The parties remain confident that FTC and European Commission concerns are without merit.

**When will the regulatory proceedings resolve?**
- We cannot predict how long it will take to resolve the regulatory review process. We expect all proceedings could take several years to complete, but integration of our companies could occur sooner.

## The Combined Company

**Will we operate independently?**
- GRAIL will operate as a standalone entity with a dedicated leadership team, and Hans will remain the leader of GRAIL. There will be no immediate integration as Illumina entered into an agreement with the European Commission to hold GRAIL as a separate entity while the review in Europe is pending. No functions, systems or other processes will be integrated. In addition, it is important that the parties operate independently like prior to closing and GRAIL employees do not share confidential information with Illumina.

**Will there be layoffs?**
- We do not anticipate major changes. Details regarding roles, responsibilities, and structure will be shared as they are known.

**Will my supervisor change?**
- We do not anticipate major changes. GRAIL will operate as a standalone entity with a dedicated leadership team, and Hans will remain the leader of GRAIL.

**When will integration teams kick off and who will be involved?**
- Illumina has committed to keep GRAIL as a separate entity until the EU proceedings resolve. Integration will not commence until proceedings with the European Commission resolve.

- Certain details of how we will operate separately will be worked out in the coming weeks, and we expect little to change in how we work today.

**Where does Illumina plan to use their own capabilities vs. leveraging or incorporating GRAIL's?**
- GRAIL will continue to operate as an independent entity with Hans and current leadership running GRAIL. After EU issues resolve, GRAIL will operate as a standalone division of Illumina with a dedicated leadership team.
- Illumina understands we are a high performing team and they want to support us to be more successful – the objective is to figure out parts of Illumina that can help us accelerate our goals. Illumina's commitments to the EU to hold GRAIL separate do not preclude them from providing resources and other assistance to GRAIL.
- In time, we will benefit from the upside potential driven by access to the execution and technical prowess, resources and global relationships of Illumina.

**Are we worried about "brain drain" after closing?**
- We are always thinking about and looking for ways to keep our employees engaged and excited about being part of GRAIL.
- Importantly, we know Illumina and its leadership share that interest.
- We will develop plans in the near term to help retain GRAIL talent during this transition.
- More details about types and timing of potential incentives will be shared soon.

## Impact to GRAIL Policies and Benefits

**Will Illumina change GRAIL's name, logo, or branding?**
- No changes are anticipated at this time.

**Will there be any changes to GRAIL's mission or purpose?**
- GRAIL serves an important mission to detect cancer early, when it can be cured—that will not change.
- Combining with Illumina will allow us to better achieve our mission and reach more patients, faster.

**Will any of our IT, HR, or Payroll processes, or practices change as a result of the announcement?**
- Until proceedings in Europe resolve, we do not expect any changes to our systems or processes beyond what we independently may plan. Over time, there could be systems and processes, especially where it will be an improvement to our existing practices.

**Will my compensation or benefits change?**
- For the near term, GRAIL will remain under GRAIL's total rewards strategy. Despite closing, GRAIL and Illumina will be required to operate as separate entities until the review in Europe resolves. Further, even after European proceedings resolve, under the

merger agreement, GRAIL employees are guaranteed to receive the same cash compensation and substantially comparable benefits for at least 12 months following the close.

**How will this affect my company-sponsored visa?**

- We do not expect any changes as GRAIL will continue to operate as an independent entity in the near term.

## Equity Awards and Merger Considerations

**How and when will my financial interests in the transaction be paid?**

Illumina has taken steps to support prompt payment of equity and cash considerations to GRAIL shareholders and equity award holders following the closing. The process of receiving the equity portion of your merger considerations will vary depending on whether you reside in the U.S. and whether you *own shares* (including shares you received from exercising options) or *have outstanding equity awards* (options or RSUs). Please refer to the relevant section below for details on how to receive your consideration.

> ### _For all U.S. stockholders and equity award holders_:

> To process the Illumina equity portion of your consideration (the conversion of GRAIL stock or vested equity awards to Illumina shares), we established a Computershare account tied to the U.S. Tax Identification Numbers we have on file for you. Illumina shares (and contingent value rights ("CVR*s*") if elected) will be deposited into your Computershare account. Shortly after the closing, Computershare will mail a paper statement to your address on file in Shareworks, GRAIL's equity platform that is integrated with GRAIL's HR system. The statement will list your equity consideration and include your Computershare account number. It is important that you do not lose your Computershare account number.

>> - If you are a U.S. employee, you will be able to log into your Computershare account at https://www.us.computershare.com/Investor by using your TIN, which in most cases is your Social Security Number (SSN), zip code and the name of the stock (ILMN) prior to receiving the statement in the mail. Please note you cannot access your account until the shares have been issued (please allow a few days for processing). Also, online registration is not required, but is helpful if you are looking to certify your account and/or sell.

>> - You will be able to trade the Illumina stock online via your Computershare account once you have completed the online tax form (***Note: if you sell the Illumina stock before your TIN is certified, a 24% withholding tax is applied***). Alternatively, you may choose to hold shares in your Computershare account or transfer the shares to your brokerage account. To transfer your shares to a broker, you will need to provide the statement you received in the mail with your Computershare account number to your broker. Your broker may also accept a

4

screenshot of your account or have other processes for transferring shares from Computershare. Computershare does not charge a fee to transfer your shares to another broker, and the transfer typically takes two business days, depending on the broker.

- Please call 781-575-2879 to trade over the phone, discuss any questions not addressed here or with any general questions regarding the registration process or their Computershare accounts.

### _For all U.K. stockholders and equity award holders or US stockholders and equity award holders without a tax ID on file_:

To process the Illumina equity portion of your consideration (the conversion of GRAIL stock or vested equity awards to Illumina shares), we established a Computershare account for you. Illumina shares (and contingent value rights ("CVRs") if elected) will be deposited into your Computershare account (please allow a few days for processing). Shortly after the closing, Computershare will mail a paper statement to your address on file in Shareworks, GRAIL's equity platform that is integrated with GRAIL's HR system. The statement will list your equity consideration and include your Computershare account number. It is important that you do not lose your Computershare account number. If you would like to receive your statement sooner, after August 23, 2021 you may email stockadmin@grailbio.com and we will request a statement on your behalf to be emailed directly to you. Please note, a statement cannot be generated until the shares have been deposited into your account.

- You can access your Computershare account only after you receive your Computershare statement via regular mail. To access your account, you will need to register online at https://www.us.computershare.com/Investor using your Computershare account number listed in the statement. Once you register your account, you will receive an activation code in the mail. The activation code will allow you to unlock the account and trade your shares via Computershare.

- If you do not wish to trade or hold your shares in your Computershare account, and instead would like to transfer your shares to a broker, you may provide your statement to your broker to initiate the transfer process. Activating your Computershare account is not required to transfer your shares to a broker. Computershare does not charge a fee to transfer your shares to another broker, and the transfer typically takes two business days, depending on the broker.

- Please call 781-575-2879 to trade over the phone (including prior to receiving your activation code), discuss any questions not addressed here or with any general questions regarding the registration process or their Computershare accounts

### _Cash Consideration (U.S. and UK)_

**The cash portion of your consideration on equity awards will be paid through a special GRAIL payroll run within five (5) business days of closing.** This applies to GRAIL employees only.

*<u>For stockholders only</u> (those who have already exercised options or who otherwise own shares):*

SRS, an Illumina vendor, will email a unique-to-you link to a digital portal ("SRS Acquiom Clearinghouse") to login and complete a form called a Letter of Transmittal and choose your preferred payment method for the cash portion of your consideration.

Once you receive the email from SRS, you will need to complete a one-time passcode (OTP) verification process. When logging into the portal, you will request an OTP to be sent to the email address on file (for employees, this is likely your GRAIL email address). The email you receive will contain a 5-digit passcode to be used to verify your identity in addition to selecting the payee registration name. The use of this OTP is similar to what financial institutions use to establish accounts and authenticate access to online banking systems.

Once you log into the portal, the portal displays all your stock holdings. You can choose one of the following to receive the **cash** portion:

- ACH/Direct Deposit (Fee: Free) - Typically credits a bank account one business day after the payment is initiated by SRS.
- Bank Wire (Fee: $40) - Typically credits the bank account the same day as the payment is initiated by SRS.
- International Bank Wire (Fee: $50) - Typically credits the bank account the same day as the payment is initiated by SRS.
- Check (Fee: $55) - Typically prints and mails one business day after the payment is initiated by SRS. Checks are sent by first class mail.

Those with paper stock certificates will need to mail in their stock certificates to -- SRS Acquiom, 950 17th Street, Suite 1400, Denver, CO 80202; Attn: LOT Processing -- prior to receiving any merger consideration. If you cannot find your paper stock certificate, you may certify that you lost the stock certificate in the SRS Acquiom Clearinghouse portal.

If you have any questions about the Letter of Transmittal process, you can reach out to SRS Client Services group at support@srsacquiom.com or (303) 222-2080.

**The Illumina stock and CVRs (if elected) portion of your consideration should be deposited within a few days to Computershare accounts set up for you** *(See more details above about this portion of your consideration under "For all stockholders and equity holders.").*

**When will retention payments be made?**
We expect that retention bonuses that were extended last fall will be paid within 30 days of closing.

**Can I sell my Illumina shares immediately?**

Under Illumina's trading policy, all employees are subject to quarterly blackouts during the last three week period of each financial quarter until two business days after the Illumina earnings release/call for the prior quarter. Therefore, the trading window for employees with a title below Senior Vice President is currently open. Until September 13, 2021, absent any material non-public information you may hold, despite the language in the insider trading policy applicable to employees with titles or functions on Exhibit B, absent a special blackout event that would be communicated to you, GRAIL employees with a title below Senior Vice President may transact in Illumina stock *without any* pre-clearance or other approval.

If you are an employee with a title of Senior Vice President and above, you will need to enter into a 10b5-1 trading plan before you transact any Illumina shares, even when the trading window is open. You may utilize any broker to adopt a 10b5-1 plan and there is a 30-day cooling period prior to the first trade. Plans must be adopted in an open window (e.g., before September 13, 2021, or two days after Q3 earnings). Please contact rmaynes@illumina.com for information on trading plans.

**Is there a way to calculate the value of our individual considerations?**
- Shortly after receiving your consideration, we will provide you with a payout statement which will show you how the payout was calculated.

**What is the final share price used in the calculations?**
- Shortly after receiving your consideration, we will provide you with a payout statement which will show you how the payout was calculated.

**Is there any possibility our payouts could be clawed back?**
- The transaction is closed and we do not expect this to occur. Illumina and GRAIL determined that we are well within our legal rights to complete the merger. The remedies the FTC and European Commission could seek is a potential divestiture of GRAIL, not a return of the merger consideration.

**Will Illumina offer joiner grants or any other forms of compensation?**
- We know this is a source of interest for GRAILers.
- More details about types and timing of potential incentives will be shared soon.
- Retention of talent is a priority for Illumina and incentives must remain attractive and consistent with market practices.

**What happened to the unvested GRAIL equity awards I currently hold?**
- The only time-based equity awards that did not accelerate are those which would have vested more than three years after the date of the close of the transaction. Additionally, for the small subset of individuals that have performance based-options outstanding, a portion did not fully accelerate at close (impacted individuals may contact stockadmin@grailbio.com).
- Those awards instead converted into unvested Illumina equity awards at the time of the close of the transaction.

7

- Details about how to access unvested Illumina equity awards will be shared at a later date.

**I joined after August 9, 2021. Do I qualify for CVRs or acceleration of the shares?**
- Employees with a start date after August 9, 2021, were not granted RSUs by GRAIL prior to closing. These employees will not receive CVRs or acceleration; but will instead receive a competitive incentive award with equivalent value.
- For employees who joined GRAIL after the election portal closed on July 10, 2021, or those that chose not to make elections, will receive the default consideration option which is to receive CVRs.

**What happened to the equity awards I own that have already vested and that I have exercised?**
- Vested equity awards that have been exercised were converted into a combination of cash, Illumina equity and CVRs (or alternative consideration). Refer to the sections above for instructions on how to access and calculate your consideration.

**Were my exercised and unexercised shares treated differently at transaction close?**
- Yes. Unexercised but vested equity awards were converted into a combination of cash, and Illumina equity and CVRs (or alternative consideration). Any exercise amount owing has been subtracted from the cash consideration you received.
- Vested equity awards that have been exercised have been converted into a combination of cash, Illumina equity and CVRs (or alternative consideration).
- Shortly after receiving your consideration, we will provide you with a payout statement which will show you how the payout was calculated.
- Please refer to your own tax advisor for advice on tax reporting.

**How much cash/stock did I receive for the equity awards that I held?**
- Shortly after receiving your consideration, we will provide you with a payout statement which will show you how the payout was calculated.

**I have GRAIL unvested equity awards that converted to unvested Illumina awards at transaction close – what will the vesting period on those be? And how will their value be calculated?**
- The Illumina equity awards you receive in exchange for your unvested GRAIL equity awards will vest in accordance with the vesting timeline of your GRAIL award.
- The value of the unvested Illumina award that you received will be determined based on whether you selected CVRs or alternate cash consideration. For unvested options that converted to Illumina unvested options, your exercise price will be equivalent to the exercise price of your GRAIL option (for example, if it would have cost you $500 to exercise your unvested GRAIL awards, your new unvested Illumina awards will cost $500 to exercise).

**What price will our shares vest at?**
- You will receive a payout statement showing how much you are getting paid for your vested GRAIL equity awards.

**What are the tax implications when my equity awards are converted to cash and Illumina stock?**
- The conversion of stock options to cash, stock, and CVRs will trigger a taxable event. We recommend that you consult a tax advisor to better understand your specific tax situation.

**When and how do we pay the taxes that this conversion event triggered?**
- Shortly after receiving your consideration, we will provide you with a payout statement which will show you how the payout was calculated.
- The amount of the withholdings are likely not necessarily the taxes you will pay. You will likely owe and are responsible for additional taxes when filing your tax return.
- If you don't pay enough taxes through withholding, you may need to make quarterly estimated tax payments to the tax authorities over the course of the year to avoid being charged a penalty when you file your return for not paying enough in taxes during the year. You may need to make additional estimated tax payments since you may owe more taxes than what the withholding will cover.
- We recommend consulting with your personal tax advisor as to whether you should make estimated tax payments and if so, the amount, since each individual's tax situation is unique.

**Aren't we paying tax twice if we pay tax both when our equity converted to Illumina stock, and then when we sell it?**
- Tax implications of the merger consideration are complex. Materials presented at optional information sessions to assist employees with understanding the tax implications of their elections can be found here:
    - US PwC Personal Tax Treatment Resource Deck
    - UK PwC Personal Tax Treatment Resource Deck

- Although provided as a courtesy, these materials are not tax advice. Actual tax treatment and considerations will depend on individual facts and circumstances. We encourage you to discuss with your tax advisor.

**Will Illumina report this as a tax-free reorganization?**
- Yes, Illumina has determined that they will report the transaction as a tax-free reorganization under IRS tax codes.

**What is the collar? How did it work?**
- The collar was a financial mechanism that protected both us and Illumina from significant fluctuations – both up and down – in the price of Illumina stock prior to the closing.

- Since we agreed to receive a set amount of Illumina stock as part of the overall payment for GRAIL, it could have been unfair to either us or Illumina if the price of that stock either decreased or increased significantly between the signing of the merger agreement and the closing.
- So, the collar was intended to help ensure that we receive the same approximate total value -- $4.5 billion – in stock, regardless of the price of Illumina's shares at closing.

**What were the terms of the collar?**
- The number of shares that GRAIL equity holders will receive is based on the 20-day volume-weighted average price (VWAP) of Illumina stock. The 20-day calculation ends 10 days prior to the closing date.
- Because the VWAP was $399 or higher, GRAIL equity holders received 11.3 million Illumina shares which equated to approximately $5.8 billion as of the closing date.

**I just exercised some of my vested GRAIL shares because I was informed of a blackout period to exercise. What does this mean for me now?**
- You should contact your tax advisor about what this means for your specific tax situation.

**What is a CVR?**
- A CVR entitles its holders to receive a future income stream.
- In this case, the CVRs will be a prorated share of specific GRAIL revenues over the next 12 years.
- A CVR payment is similar to a royalty right or right to receive residual payments.

**What are the terms of our CVRs?**
- Under the terms of the specific CVR, 2.5% of the first $1 billion of revenue generated by our methylation-based products (in specific fields) each year will be distributed equally to each CVR. Please refer to the CVR Agreement for specific details. It is available as an exhibit to the [merger agreement](#).
- If the revenue from those products exceeds $1 billion in a given year, CVRs would then receive an additional equal distribution of 9% of all revenue generated after the initial $1 billion.
- So, the more CVRs you hold, the more of the total CVR revenue allotment you receive.
- These payments will be distributed to CVR holders every fiscal Illumina quarter for 12 years.

**Will we only receive the value generated by our CVRs while we are a GRAIL/Illumina employee? Do we need to hold onto the Illumina stock we receive at close in order to receive the value from the CVRs?**
- You do not need to remain a GRAIL/Illumina employee to receive the value generated by your CVRs, nor do you need to hold on to the Illumina stock you receive upon the close of the transaction.

- The only way you will stop receiving value from your CVRs is if you sell or otherwise transfer them, or if the 12 year period for which they are valid has expired.

**At what point in time will I pay tax on the CVRs I receive? How will that tax be calculated? Will I have to pay additional tax after I have paid the initial tax at transaction close?**
- Materials presented at optional information sessions to assist employees with understanding the tax implications of their elections can be found here:
  - US PwC Personal Tax Treatment Resource Deck
  - UK PwC Personal Tax Treatment Resource Deck
- Although provided as a courtesy, these materials are not tax advice. Actual tax treatment and considerations will depend on individual facts and circumstances.
- Please consult with a tax advisor for specific questions or concerns.

**Can you provide a rough estimate of the CVR value and tax implication?**
- Shortly after receiving your consideration, we will provide you with a payout statement which will show you how the payout was calculated.
- Materials presented on taxation on the CVR or alternative consideration is summarized here:
  - US PwC Personal Tax Treatment Resource Deck
  - UK PwC Personal Tax Treatment Resource Deck
- Although provided as a courtesy, these sessions are not tax advice. Actual tax treatment and considerations will depend on individual facts and circumstances.

**Is the total number of CVRs finite or is it possible that more CVRs will be issued in the future?**
- The total number of CVRs have been established and will not change after that point. No additional CVRs will be created.

**Do I have to hold onto the Illumina stock that I received as part of the transaction?**
- No. That equity is fully registered and freely tradable when the shares are issued to you, so as long as you are not subject to a Illumina or GRAIL trading blackout or other trading restrictions, you will have the ability to sell the Illumina stock you hold.

**Do I need to stay at Illumina/GRAIL to keep the Illumina stock issued to me?**
- No – you do not need to remain at Illumina to keep the equity.

**I have been holding onto my GRAIL equity long enough for it to enter into the long-term capital gains bracket – when that equity converted to Illumina, did it reset the clock? Or will I still only have to pay the long-term capital gains rate when I sell my Illumina shares?**
- Taxation of equity is complex. We encourage you to seek advice from a professional tax advisor.
- Materials presented at optional information sessions to assist employees with understanding the tax implications of the merger consideration can be found here:

- ■ US PwC Personal Tax Treatment Resource Deck
- ■ UK PwC Personal Tax Treatment Resource Deck
- ○ Although provided as a courtesy, these materials are not tax advice. You may share these materials with your tax advisor. Actual tax treatment and considerations will depend on individual facts and circumstances.

**How many CVRs did I receive? What equity/options/RSUs are being counted towards the number of CVRs we received?**

- ● Shortly after receiving your consideration, we will provide you with a payout statement which will show you how the payout was calculated.

**How often will the CVRs pay out?**

- ● If you elected to keep your CVR, you will receive a payout from your CVR following the close of each Illumina fiscal quarter for the 12 year duration of the CVR.

**Does the revenue we share via our CVRs reflect all of GRAIL's revenue? Or does it only reflect revenue generated by specific products?**

- ● You will receive a portion of the revenue generated by our methylation-based products in specific fields and for certain other revenues.
- ● Please refer to the details in the CVR agreement that is attached as an exhibit to the merger agreement.

**Can we transfer CVRs once received?**

- ● We encourage employees to read the CVR Agreement which covers all rights for CVR holders, including the rules around transferability. The S-4 filing also includes a summary of the CVR Agreement.
- ● Here is a link to the CVR agreement that explains this in more detail (See Annex B) https://www.sec.gov/Archives/edgar/data/0001110803/000119312520302773/d801214ds4.htm#toc801214_69

**Are there any resources for employees on how to navigate the taxes on our equity compensation? Are we allowed to disclose incentive details with outside advisors, including making decisions regarding CVR?**

- ● Taxation of equity is complex. We encourage you to seek advice from a professional tax advisor.
- ● Materials presented at optional information sessions to assist employees with understanding the tax implications of their elections can be found here:
  - ○ US PwC Personal Tax Treatment Resource Deck
  - ○ UK PwC Personal Tax Treatment Resource Deck
- ● Although provided as a courtesy, these materials are not tax advice. Actual tax treatment and considerations will depend on individual facts and circumstances. You are authorized to share these materials with your tax advisor (by downloading and sharing with them).

**Am I legally allowed to buy Illumina stock?**
- You are subject to Illumina's insider trading policy. See above on "Am I subject to an Illumina blackout or other trading restriction now that we closed?"

## Recruiting/New Hires

**Will we continue to hire new employees? Will our overall talent acquisition strategy change?**
- We do not expect any immediate changes to our hiring practices.

**What should we tell potential candidates?**
- We will continue our existing hiring plans and are excited to welcome new talented individuals to our company. There are plenty of exciting opportunities as we continue to work towards and execute on our mission – being part of Illumina does not change that.
- You can also remind potential candidates that combining with Illumina will drive faster adoption of our technology, transforming cancer identification and care and ultimately saving lives.
- This is an exciting time to join GRAIL.

## Partner Considerations

**Will the acquisition affect any of our existing partnerships?**
- No. It's business as usual at GRAIL and we do not anticipate the merger will have any effect on existing partnerships.

**How should we communicate this news to our partners/vendors?**
- You can tell them that this is an exciting step for GRAIL and that with Illumina, we expect to reach more patients, faster (among other benefits).
- You should also be sure to tell them they can continue to expect the same relationship with us.

## Additional Information

**What should I do if I'm contacted by the media, investors or other parties about the announcement?**
- If you are contacted by a reporter or investor via email, social media, phone, or in person, please decline to comment and refer media to Matt Burns (mburns@grailbio.com) and investors to John Craighead (jcraighead@grailbio.com).

**Who should I reach out to if I have additional questions?**
- We will continue to share updates as we work through integration.
- Please reach out to **Denise Knopping, Allison Campbell,** or **Keith Candau** with questions.

# **EXHIBIT I**

-----------------------------------------

**Jessica Owens <jesshowens@gmail.com>**
to Jenn, me

## Be careful with this message

Jessica Owens has never sent you messages using this email address. Avoid replying to this email unless you reach out to the sender by other means to ensure that this email address is legitimate. Report phishingLooks safe

Hey Jenn and Peter,

Congrats on the good news today from Delphi!

On the GRAIL transaction, I reached out to the Stock admin who wasn't very helpful but confirmed that we will get a Computershare account (see attached) and that they expect equity distribution to hit for us on Tuesday. Attached is the employee FAQ which has a bit more information. Hope this is helpful!

Jess


-------------------------------------------'

# **<u>EXHIBIT J</u>**

On Tue, Aug 31, 2021 at 11:18 AM Peter Bach <peterbbach@gmail.com> wrote:

thank you

On Tue, Aug 31, 2021 at 1:32 PM Aaron Freidin <afreidin@grailbio.com> wrote:

We will request an electronic statement for you and email it when we receive

On Tue, Aug 31, 2021 at 9:55 AM Peter Bach <peterbbach@gmail.com> wrote:

hi, checking in on this again. Not really sure what to do.

On Mon, Aug 30, 2021 at 5:17 PM Aaron Freidin <afreidin@grailbio.com> wrote:

did you complete the SRS Letter of Transmittal? Everything went to this email: peterbbach@gmail.com

Aaron Freidin

SVP Finance @ GRAIL
Mobile# - 650-255-9986


On Mon, Aug 30, 2021 at 1:43 PM Peter Bach
<[peterbbach@gmail.com](mailto:peterbbach@gmail.com)> wrote:

> Hi Aaron,
>
> I am not able to access my mailbox now or for
> another couple of weeks. I have called compushare
> and they are for some reason unable to locate me. I
> have tried every combo or name, company name,
> ssn, ein and address. Can you help me locate my
> shares or is there someone to call who can help
> me? I am on with them again today and now they
> can't find the shares at all.
>
>
> --
> Peter

This email message, including attachments, may contain private, proprietary, or privileged information and is the confidential information and/or property of GRAIL, Inc., and is for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

# **EXHIBIT K**

**Aaron Freidin**
to me

Yep. That was my same experience and I completed the LoT on the day of close. CS is horrible and we warned/gave all that feedback to ILMN. CS won't even talk to Grail directly.

 On Mon, Sep 27, 2021 at 10:57 AM Peter Bach <peterbbach@gmail.com> wrote:
  It was supposed to be emailed to me which would have eliminated the first mailing delay at least. I only finally got access with the code and everything yesterday. Took 10 days to get the code at least which is nuts.

We did request from ILMN when you and i corresponded. I never received one from them. I can ask them what happened if useful. The last correspondence I have from them was around 9/2 at which time they said your LoT was completed recently and your statement wasn't available. When did you receive your statement?

On Mon, Sep 27, 2021 at 10:07 AM Peter Bach <peterbbach@gmail.com> wrote:
 Thank you Aaron. I feel like I am in a parallel universe. When I scroll down in this email I see you saying you are going to send me an account statement and my saying thank you. If you were wrong at the time and in fact there was nothing you could do I totally understand. But we still have the problem that I relied on this. I think nothing other than that it was an honest error or oversight, something that happens when

everyone is busy. But this is the exchange below. Did you request the electronic statement? Did you ever receive it?

> On Tue, Aug 31, 2021 at 11:18 AM Peter Bach <peterbbach@gmail.com> wrote:
>
>> thank you
>>
>> On Tue, Aug 31, 2021 at 1:32 PM Aaron Freidin <afreidin@grailbio.com> wrote:
>>
>>> We will request an electronic statement for you and email it when we receive

On Mon, Sep 27, 2021 at 10:10 AM Aaron Freidin <afreidin@grailbio.com> wrote:

ILMN hired CS and manages them directly. Grail does not have access to CS records, only ILMN stock admin does. We sent to ILMN the information you had entered into Shareworks as your contact information and that is where statements were sent. Grail had no part in that process other than forwarding your contact information per our system to ILMN. ILMN can only send a statement 8-9 business days after you have completed your letter of transmittal. There is nothing I or grail could have done.

On Mon, Sep 27, 2021 at 4:17 AM Peter Bach <peterbbach@gmail.com> wrote:

If you scroll down in this email you will see that you told me on 8/31 that you would send me a statement. I relied on that and now that I have gained access it is clear that this was the step that was needed as you said. So your not doing so is why I did not get access some time ago.

ILMN used a largely defunct PO Box as an address that is 3 plus hours driving from my primary residence and not open at convenient hours either. Meanwhile I could not find my account online or when ai callee them.

This is why I wrote that I could not easily access it and why I believe you offered to help back then.

I don't understand how ILMN is involved here. Grail is ILMN and I have no relationship with ILMN.

> On Sep 26, 2021, at 11:46 PM, Aaron Freidin <afreidin@grailbio.com> wrote:
>
>
> As I said Peter, we sent all information as you had entered it. There was nothing else I or Grail could do. We rely on ILMN to send statements and I never received one for you.
>
> Take care,
> Aaron

On Sun, Sep 26, 2021 at 8:38 PM Peter Bach
<peterbbach@gmail.com> wrote:

Hi Aaron. I know everyone is trying to do their best. But I raised the
issue with you on 8/30 that they couldn't find my account and you told
me you would generate a statement and email to me so they could
locate it. I don't think I ever got that so I kept at it with compushare
and finally got access today. I know it's a drag all around but I was
relying on you and I am sure you have way more important stuff to do
but the relay was extremely costly to me.

> On Sep 26, 2021, at 10:49 PM, Aaron Freidin
> <afreidin@grailbio.com> wrote:

> Hi Peter,

> Connected with Hans today. Happy to chat further if you
> like. Last we spoke I let you know we sent all the
> information we had on your account to CS correctly. If
> there were delays in you getting access to your account,
> you would need to follow up with CS or ILMN as CS is
> engaged and managed by ILMN.

> Take care,
> Aaron

# **<u>EXHIBIT L</u>**



Finance Home    Watchlists    My Portfolio    Markets    News    Videos    Yahoo Finance Plus

Try the new **yahoo!**finance →

## Illumina, Inc. (ILMN)
NasdaqGS - NasdaqGS Real Time Price. Currency in USD

Follow    Visitors trend  2W ↑  10W ↑  9M ↑

Quote Lookup

**92.79**  -5.58 (-5.67%)
As of 02:21PM EST. Market open.

Summary   Company Insights ▾   Chart   Conversations   Statistics   **Historical Data**   Profile   Financials   Analysis   Options   Holders   Sustainability

Advertisement

Time Period:  Aug 23, 2021 - Aug 24, 2021 ▾     Show:  Historical Prices ▾
Frequency:  Daily ▾                                                          Apply

Currency in USD                                                      ⬇ Download

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|------|------|------|-----|--------|-------------|--------|
| Aug 24, 2021 | 473.70 | 481.30 | 471.00 | 479.67 | 479.67 | 1,409,700 |

*Close price adjusted for splits.    **Adjusted close price adjusted for splits and dividend and/or capital gain distributions.



### Morningstar Rating

| Rating | Fair Value | Economic Moat |
|--------|-----------|---------------|
| Subscribe | Subscribe | Subscribe |

**yahoo!**finance

## NEW: EXPERIENCE OUR BEST CHARTS YET.

Explore new charts



### People Also Watch

| Symbol | Last Price | Change | % Change |
|--------|-----------|--------|----------|
| VRTX | 378.92 | +5.27 | +1.41% |
| Vertex Pharmaceuticals Incorporated | | | |
| REGN | 796.70 | -2.24 | -0.28% |
| Regeneron Pharmaceuticals, Inc. | | | |
| SRG | | | |
| BIIB | 222.59 | -2.20 | -0.98% |
| CRSP | 52.01 | -1.15 | -2.16% |

Total ESG Ri...
**10.9**   Low   3rd percentile

**Earnings** ›

NVTA

GH

TMO

EXAS

DHR
Danaher Corporation

**Financials** ›

# **EXHIBIT M**



Illumina Stock Historical Data

**Finance Home**   **Watchlists**   **My Portfolio**   **Markets**   **News**   **Videos**   **Yahoo Finance Plus** 🟣   ...

Try the new **yahoo!finance** →

## Illumina, Inc. (ILMN)
NasdaqGS - NasdaqGS Real Time Price. Currency in USD

Follow    👥 Visitors trend   2W ↑   10W ↑   9M ↑

Quote Lookup

### 92.79   -5.58 (-5.67%)
As of 02:21PM EST. Market open.

Summary   Company Insights 🟣   Chart   Conversations   Statistics   **Historical Data**   Profile   Financials   Analysis   Options   Holders   Sustainability

Advertisement

Time Period: **Sep 30, 2021 - Oct 01, 2021** ⌄     Show: **Historical Prices** ⌄

Frequency: **Daily** ⌄                                              Apply

Currency in USD                                               ⬇ Download

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|------|------|------|-----|--------|-------------|--------|
| Oct 01, 2021 | 403.42 | 403.95 | 391.33 | 394.84 | 394.84 | 1,116,200 |

*Close price adjusted for splits.    **Adjusted close price adjusted for splits and dividend and/or capital gain distributions.



Morningstar Rating

| Rating | Fair Value | Economic Moat |
|--------|-----------|---------------|
| 🟣 Subscribe | 🟣 Subscribe | 🟣 Subscribe |

**yahoo!**finance

## NEW: EXPERIENCE OUR BEST CHARTS YET.

Explore new charts



People Also Watch

| Symbol | Last Price | Change | % Change |
|--------|-----------|--------|----------|
| VRTX | 378.92 | +5.27 | +1.41% |
| Vertex Pharmaceuticals Incorporated | | | |
| REGN | 796.70 | -2.24 | -0.28% |
| Regeneron Pharmaceuticals, Inc. | | | |
| SRG | ... | | |
| Surgical, Inc. | | | |
| BIIB | 222.59 | -2.20 | -0.98% |
| CRSP | 52.01 | -1.15 | -2.16% |

Total ESG Risk
**10.9** Low   3rd percentile

Earnings ›
Consensus EPS

NVTA

GH

TMO

EXAS

DHR
Danaher Corporation

Earnings ›