# EXHIBIT B

EX-2.1 2 ex2-1.htm AGREEMENT AND PLAN OF MERGER

**Exhibit 2.1**

AGREEMENT AND PLAN OF MERGER

among

ILLUMINA, INC.,

SDG OPS, INC.,

SDG OPS, LLC

and

GRAIL, INC.

Dated as of September 20, 2020

**TABLE OF CONTENTS**

**Page**

**ARTICLE I DEFINED TERMS**   **2**

| | | |
|---|---|---|
| Section 1.01 | Certain Defined Terms | 2 |
| Section 1.02 | Other Defined Terms | 17 |
| Section 1.03 | Interpretation; Headings | 19 |

**ARTICLE II THE MERGERS**   **20**

| | | |
|---|---|---|
| Section 2.01 | The Mergers | 20 |
| Section 2.02 | Closing; Effective Times | 21 |
| Section 2.03 | Effect of the Mergers | 21 |
| Section 2.04 | Effect of the First Merger; Conversion of Securities | 22 |
| Section 2.05 | Effect of the Second Merger; Conversion of Securities | 23 |
| Section 2.06 | Certificate of Incorporation; Bylaws; Certificate of Formation; Operating Agreement | 23 |
| Section 2.07 | Directors and Officers of the Surviving Corporation and the Surviving Entity | 24 |
| Section 2.08 | Intended Tax Treatment | 24 |

**ARTICLE III DELIVERY OF MERGER CONSIDERATION**   **25**

| | | |
|---|---|---|
| Section 3.01 | Election Procedures | 25 |
| Section 3.02 | Exchange of Certificates | 26 |
| Section 3.03 | Stock Transfer Books | 29 |
| Section 3.04 | Company Equity Awards | 30 |
| Section 3.05 | Appraisal Rights | 34 |
| Section 3.06 | Closing Capitalization Schedule | 35 |

| | |
|---|---|
| **ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY** | **36** |

| | | |
|---|---|---|
| Section 4.01 | Organization and Qualification; Subsidiaries | 36 |
| Section 4.02 | Capitalization | 37 |
| Section 4.03 | Authority Relative to This Agreement; Vote Required | 39 |
| Section 4.04 | No Conflict; Required Filings and Consents | 40 |
| Section 4.05 | Permits; Compliance | 41 |
| Section 4.06 | Company Registration Statement; Financial Statements; Undisclosed Material Liabilities | 41 |
| Section 4.07 | Absence of Certain Changes or Events | 43 |
| Section 4.08 | Absence of Litigation | 43 |
| Section 4.09 | Employee Benefit Plans | 43 |
| Section 4.10 | Labor and Employment Matters | 45 |
| Section 4.11 | Real Property; Title to Assets | 46 |
| Section 4.12 | Intellectual Property | 47 |

i

| | | |
|---|---|---|
| Section 4.13 | Taxes | 51 |
| Section 4.14 | Environmental Matters | 52 |
| Section 4.15 | Material Contracts | 53 |
| Section 4.16 | Insurance | 55 |
| Section 4.17 | Brokers | 56 |
| Section 4.18 | Regulatory Compliance | 56 |
| Section 4.19 | Prohibited Payments | 57 |
| Section 4.20 | Rights Agreement; State Takeover Statutes | 59 |
| Section 4.21 | Opinion of Financial Advisor | 59 |
| Section 4.22 | Information Supplied | 60 |
| Section 4.23 | No Other Representations and Warranties | 60 |

| | |
|---|---|
| **ARTICLE V REPRESENTATIONS AND WARRANTIES OF PARENT, FIRST MERGER SUB AND SECOND MERGER SUB** | **61** |

| | | |
|---|---|---|
| Section 5.01 | Organization | 61 |
| Section 5.02 | Certificate of Incorporation and Bylaws | 61 |
| Section 5.03 | Capitalization | 62 |
| Section 5.04 | Authority Relative to This Agreement; Vote Required | 62 |
| Section 5.05 | No Conflict; Required Filings and Consents | 63 |
| Section 5.06 | Compliance | 64 |
| Section 5.07 | Intellectual Property | 64 |
| Section 5.08 | Financing | 65 |
| Section 5.09 | SEC Filings; Financial Statements; Absence of Changes | 66 |
| Section 5.10 | Information Supplied | 67 |
| Section 5.11 | Absence of Litigation | 67 |
| Section 5.12 | Operations of First Merger Sub and Second Merger Sub | 67 |
| Section 5.13 | Brokers | 67 |
| Section 5.14 | No Other Representations and Warranties | 68 |

| | |
|---|---|
| **ARTICLE VI CONDUCT OF BUSINESS PENDING THE MERGERS** | **69** |

| | | |
|---|---|---|
| Section 6.01 | Conduct of Business by the Company Pending the Mergers | 69 |

| | | |
|---|---|---|
| Section 6.02 | Conduct of Business by Parent Pending the Mergers | 73 |

**ARTICLE VII ADDITIONAL AGREEMENTS** — 73

| | | |
|---|---|---|
| Section 7.01 | Registration Statement; Consent Solicitation Statement | 73 |
| Section 7.02 | No Solicitation of Transactions | 75 |
| Section 7.03 | Access to Information; Confidentiality | 78 |
| Section 7.04 | Employee Benefits Matters | 79 |
| Section 7.05 | Directors' and Officers' Indemnification and Insurance | 81 |
| Section 7.06 | Notification of Certain Matters | 82 |
| Section 7.07 | Reasonable Best Efforts; Further Action | 83 |
| Section 7.08 | Obligations of First Merger Sub and Second Merger Sub | 85 |
| Section 7.09 | Consents of Accountants | 85 |
| Section 7.10 | Listing | 85 |

ii

| | | |
|---|---|---|
| Section 7.11 | Public Announcements | 85 |
| Section 7.12 | Certain Tax Matters | 85 |
| Section 7.13 | Drag-Along; Stockholder Agreements and Communications | 86 |
| Section 7.14 | Anti-Takeover Statutes | 86 |
| Section 7.15 | Stockholder Litigation | 87 |
| Section 7.16 | Section 16 Matters | 87 |
| Section 7.17 | CVR Agreement. | 87 |
| Section 7.18 | Financing | 87 |
| Section 7.19 | Financing Cooperation | 89 |
| Section 7.20 | Resignations of Directors and Officers | 93 |

**ARTICLE VIII CONDITIONS TO THE MERGERS** — 93

| | | |
|---|---|---|
| Section 8.01 | Conditions to the Obligations of Each Party | 93 |
| Section 8.02 | Conditions to the Obligations of Parent, First Merger Sub and Second Merger Sub | 93 |
| Section 8.03 | Conditions to the Obligations of the Company | 94 |

**ARTICLE IX TERMINATION, AMENDMENT AND WAIVER** — 95

| | | |
|---|---|---|
| Section 9.01 | Termination | 95 |
| Section 9.02 | Effect of Termination | 97 |
| Section 9.03 | Fees and Expenses | 97 |
| Section 9.04 | Continuation Payments; Additional Termination Payment; Equity Issuance Fees and Expenses | 99 |
| Section 9.05 | Amendment | 103 |
| Section 9.06 | Waiver | 103 |
| Section 9.07 | Procedure for Termination or Amendment | 103 |

**ARTICLE X CVR HOLDER REPRESENTATIVE** — 104

| | | |
|---|---|---|
| Section 10.01 | Designation and Replacement of CVR Holder Representative | 104 |
| Section 10.02 | Authority and Rights of the CVR Holder Representative; Limitations on Liability | 104 |

**ARTICLE XI GENERAL PROVISIONS** — 106

| | | |
|---|---|---|
| Section 11.01 | Non-Survival of Representations, Warranties, Covenants and Agreements; Exclusive Remedy | 106 |
| Section 11.02 | Notices | 106 |
| Section 11.03 | Severability | 107 |
| Section 11.04 | Entire Agreement; Assignment | 107 |
| Section 11.05 | Parties in Interest | 108 |
| Section 11.06 | Specific Performance | 108 |

| Section 11.07 | Governing Law | 108 |
| Section 11.08 | Counterparts | 109 |
| SECTION 11.09 | WAIVER OF JURY TRIAL | 109 |

iii

| Section 11.10 | Non-Assertion of Attorney-Client Privilege | 110 |
| Section 11.11 | Release by Equityholders | 111 |

Schedules
Schedule A    Selling Investors

Exhibits
Exhibit A    Form of Selling Investor Support Agreement
Exhibit B    Form of Drag-Along Consent
Exhibit C    Form of CVR Agreement
Exhibit D    Tax Treatment Conditions
Exhibit E    Form of Drag-Along Notice
Exhibit F    Form of Support Agreement

iv

AGREEMENT AND PLAN OF MERGER, dated as of September 20, 2020 (this "Agreement"), among Illumina, Inc., a Delaware corporation ("Parent"), SDG Ops, Inc., a Delaware corporation and direct, wholly owned subsidiary of Parent ("First Merger Sub"), SDG Ops, LLC, a Delaware limited liability company and a direct, wholly owned subsidiary of Parent ("Second Merger Sub"), and GRAIL, Inc., a Delaware corporation (the "Company").

WHEREAS, upon the terms and subject to the conditions of this Agreement and in accordance with the DGCL (as defined below) and the DLLCA (as defined below), Parent, First Merger Sub, Second Merger Sub and the Company have agreed to enter into a business combination transaction pursuant to which (a) First Merger Sub will merge with and into the Company (the "First Merger"), with the Company being the surviving corporation (the Company, in its capacity as the surviving corporation of the First Merger, is sometimes referred to as the "Surviving Corporation"), and (b) immediately following the First Merger and as part of the same overall transaction as the First Merger, the Surviving Corporation will merge with and into Second Merger Sub (the "Second Merger" and, together with the First Merger, the "Mergers"), with Second Merger Sub being the surviving company of the Second Merger (Second Merger Sub, in its capacity as the surviving company of the Second Merger, is sometimes referred to as the "Surviving Entity");

WHEREAS, for U.S. federal income tax purposes, each of the parties hereto intends that the First Merger and the Second Merger, taken together, will constitute an integrated transaction that qualifies as a "reorganization" within the meaning of Section 368(a) of the Code, and that this Agreement is, and hereby is, adopted as a "plan of reorganization" for the purposes of Section 368 of the Code and Treasury Regulations Sections 1.368-2(g) and 1.368-3(a).

WHEREAS, the Company Board (as defined below), including both Preferred Directors (as defined in the Company's certificate of incorporation), has (i) determined that this Agreement and the Transactions are fair to, and in the best interests of, the Company and its stockholders; (ii) approved and declared advisable this Agreement and the Transactions; (iii) approved the Transactions as a "Sale of the Company" pursuant to Section 2.2 of the Voting Agreement and specified that Section 2 of the Voting Agreement shall apply to the Transactions (the "Drag-Along Resolutions"); (iv) resolved to recommend that the stockholders of the Company adopt this Agreement; and (v) directed that this Agreement be submitted to the stockholders of the Company for adoption;

WHEREAS, the Parent Board (as defined below) has (i) determined that this Agreement and the Transactions are fair to, and in the best interests of, Parent and its stockholders and (ii) approved this Agreement and the Transactions;

WHEREAS, the Board of Directors of First Merger Sub has (i) approved this Agreement and declared its advisability and (ii) resolved to recommend the adoption of this Agreement by the sole stockholder of First Merger Sub;

WHEREAS, Parent, as the sole stockholder of First Merger Sub, shall adopt this Agreement immediately following the execution of this Agreement upon the approval of the Board of Directors of First Merger Sub;

WHEREAS, Parent, as the sole member of Second Merger Sub, has (i) determined that this Agreement and the Transactions are advisable, fair to, and in the best interests of, Second Merger Sub and its sole member and (ii) approved this Agreement and the Transactions;

WHEREAS, following the execution and delivery of this Agreement, each holder of Company Stock listed on Schedule A (the "Selling Investors") will enter into a Selling Investor Support Agreement in the form attached hereto as Exhibit A, with such changes and modifications as may be mutually agreed by Parent and the Company (the "Selling Investor Support Agreement");

WHEREAS, following the execution and delivery of this Agreement, the Selling Investors will execute and deliver a consent in the form attached hereto as Exhibit B (the "Drag-Along Consent"); and

WHEREAS, as of or prior to the Closing, Parent and a trustee mutually agreeable to Parent and the Company (the "Trustee") will enter into a Contingent Value Rights Agreement, substantially in the form attached hereto as Exhibit C, with such changes as may be mutually agreed by Parent and the Company or as the Trustee shall reasonably request (the "CVR Agreement");

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements contained in this Agreement, and intending to be legally bound hereby, Parent, First Merger Sub, Second Merger Sub and the Company hereby agree as follows:

## ARTICLE I

## DEFINED TERMS

Section 1.01     Certain Defined Terms.  For purposes of this Agreement:

"Acceptable Confidentiality Agreement" means a customary confidentiality agreement between the Company and a Person who has made a proposal satisfying the requirements of Section 7.02(c) that contains terms no less favorable to the Company than those contained in the Confidentiality Agreement and does not include provisions requiring exclusive negotiations.

"Action" means any litigation, suit, claim, action, proceeding or investigation.

"Affiliate" of a Person means a Person who, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.

"Aggregate Option Exercise Price" means the aggregate exercise price of all Company Stock Options that are outstanding as of immediately prior to the Effective Time.

"Aggregate Stock Consideration" means, subject to adjustment pursuant to Section 3.02(f), the following: (a) if the Average Parent Stock Price is an amount greater than $399, then the Aggregate Stock Consideration shall be 11,278,195 shares of Parent Common Stock; (b) if the Average Parent Stock Price is an amount greater than or equal to $295 but less than or equal to $399, then the Aggregate Stock Consideration shall be a number of shares of Parent Common Stock equal to the quotient obtained by dividing (x) $4,500,000,000 by (y) the Average Parent Stock Price; or (c) if the Average Parent Stock Price is an amount less than $295, then the Aggregate Stock Consideration shall be 15,254,237 shares of Parent Common Stock.

"Alternative Consideration" means a number of shares of Parent Common Stock and/or an amount of cash (which may be set by reference to the Company Fully Diluted Share Count), such number and/or amount to be determined by Parent in its sole discretion prior to the mailing of the Election Form.

"<u>Average Parent Stock Price</u>" means the volume weighted average trading price of Parent Common Stock on the NASDAQ (as reported by Bloomberg L.P. or, if not reported therein, in another authoritative source mutually selected by the parties) for the 20 consecutive Trading Days ending on (and including) the Trading Day that is 10 Trading Days prior to the Closing Date (rounded to four decimal places).

"<u>beneficial owner</u>", with respect to any shares of Company Stock, has the meaning ascribed to such term under Rule 13d-3 of the Exchange Act.

"<u>Blue Sky Laws</u>" means state securities or "blue sky" Laws.

"<u>Business Day</u>" means any day on which banks are not required or authorized to close in the City of New York.

"<u>CARES Act</u>" means the Coronavirus Aid, Relief and Economic Stability Act.

"<u>Cash Consideration</u>" means the quotient obtained by dividing (a) $3,500,000,000 plus the Aggregate Option Exercise Price by (b) the Company Fully Diluted Share Count.

"<u>Class A Restricted Stock Award</u>" means an award of restricted shares of Company Class A Common Stock granted pursuant to the Company Stock Plan or otherwise (including as a result of any early exercise of Company Stock Options), whether subject to service- and/or performance-based vesting criteria.

"<u>Closing Date</u>" means the date on which the Closing occurs.

"<u>Code</u>" means the United States Internal Revenue Code of 1986, as amended.

"<u>Collaboration Partner</u>" means any third party that manufactures, co-develops or co-markets (or has a license to manufacture, develop, market or sell) any product of the Company or any of its Subsidiaries.

3

"<u>Commitment Letter</u>" has the meaning set forth in the definition of Financing Sources.

"<u>Company Board</u>" means the Board of Directors of the Company.

"<u>Company Class A Common Stock</u>" means Class A Common Stock, par value $0.001 per share, of the Company.

"<u>Company Class B Common Stock</u>" means Class B Common Stock, par value $0.001 per share, of the Company.

"<u>Company Common Stock</u>" means, collectively, the Company Class A Common Stock and the Company Class B Common Stock.

"<u>Company Disclosure Letter</u>" means the disclosure letter dated as of the date of this Agreement and delivered by the Company to Parent, First Merger Sub and Second Merger Sub simultaneously with the signing of this Agreement.

"<u>Company Equity Awards</u>" means, collectively, the Company Restricted Stock Awards, the Company RSU Awards and the Company Stock Options.

"<u>Company Fully Diluted Share Count</u>" means, in each case as of immediately prior to the Effective Time, (a) the aggregate number of shares of Company Class A Common Stock issued and outstanding, including all Class A Restricted Stock Awards; (b) the aggregate number of shares of Company Class A Common Stock issuable upon conversion of all issued and outstanding shares of Company Class B Common Stock and Company Preferred Stock in accordance with the Company's certificate of incorporation; and (c) except as otherwise included in the foregoing clause (b), the aggregate number of shares of Company Class A Common Stock issuable in respect of all outstanding options and other direct or indirect rights to acquire shares of Company Class A Common Stock or securities ultimately convertible into or exchangeable for shares of Company Class A Common Stock, including all Company RSU Awards and Company Stock Options; <u>provided</u> that, for the avoidance of doubt, any equity securities which may be issuable by the Company pursuant to the terms of the contract disclosed at item 35 of <u>Section 4.09(a) of the Company Disclosure Letter</u> shall not be included in "Company Fully Diluted Share Count" unless such equity securities are issued and outstanding as of immediately prior to the Effective Time.

"Company IP" means all Company Owned IP together with all Intellectual Property licensed by the Company or any of its Subsidiaries and used, held for use or planned for use in the Company's business.

"Company IP Agreements" means any and all contracts relating in whole or in part to the Company IP or IT Assets, to which the Company or any of its Subsidiaries is a party or beneficiary or by which the Company or any of its Subsidiaries, or any Company IP or IT

4

Assets may be bound, which contracts are used, held for use or planned for use in the Company's business, including all (a) licenses or covenants, including covenants not to sue, to Intellectual Property granted by the Company or any of its Subsidiaries to any third party, (b) licenses or covenants, including covenants not to sue, to Intellectual Property granted to the Company or any of its Subsidiaries by any third party, (c) other contracts between the Company or any of its Subsidiaries and any third party relating to the transfer, development, maintenance or use of Intellectual Property or IT Assets and (d) consents, settlements, and Orders governing the use, validity or enforceability of Intellectual Property or IT Assets.

"Company Material Adverse Effect" means any event, occurrence, state of facts, development, circumstance, change or effect that, individually or in the aggregate with all other events, occurrences, state of facts, developments, circumstances, changes and effects, (a) has had or would reasonably be expected to have a material adverse effect on the business, financial condition or results of operations of the Company and its Subsidiaries taken as a whole; provided, however, that any event, occurrence, state of facts, development, circumstance, change or effect to the extent resulting from the following shall not be taken into account in determining whether a Company Material Adverse Effect has occurred: (i) any failure, in and of itself, to meet internal projections or forecasts for any period ending on or after the date of this Agreement (provided that the facts or causes underlying or contributing to such change or failure shall be considered in determining whether a Company Material Adverse Effect has occurred); (ii) changes in U.S. or non-U.S. general economic or political conditions, or in the financial, credit or securities markets in general, including any shutdown of any Governmental Authority; (iii) changes in applicable Law or GAAP or in any interpretation thereof; (iv) changes in the industries in which the Company and its Subsidiaries operate regardless of geographic region (including legal and regulatory changes); (v) acts of civil unrest or war (whether or not declared), armed hostilities or terrorism, or any escalation or worsening of any acts of civil unrest or war (whether or not declared), armed hostilities or terrorism; (vi) earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, volcanic eruptions or other natural disasters or any epidemic or pandemic (including the COVID-19 pandemic); (vii) FDA and other regulatory actions, enforcement, requirements or directives (including delay, clinical hold, rejection or additional clinical requirements with respect to any premarket approval application or investigational device exemption application), the scope of marketing approval or intended use statement(s), issuance of warning letters, audit findings, and other exercise or enforcement discretion, pre- or post-approval requirements, limitations or restrictions or rejection or revocation of any accreditations, authorizations, certifications, permits licenses related to the Company's businesses and products (provided that the exception in this clause (vii) shall only apply to the definition of "Company Material Adverse Effect" for the purposes of Section 8.02(a) as applied to the representations and warranties in Section 4.18 if the representations and warranties in Section 4.18 were true as of the date hereof, disregarding the exceptions set forth in this clause (vii) and clause (viii)); (viii) data and other results from clinical trials (including PATHFINDER, STRIVE and SUMMIT) (provided that the exception in this clause (viii) shall only apply to the definition of "Company Material Adverse Effect" for the purposes of Section 8.02(a) as applied to the representations and warranties in Section 4.18 if the representations and warranties in Section 4.18 were true as of the date hereof, disregarding the exceptions set forth in clause (vii) and this clause (viii)); (ix) any disruptions in Parent's supply of sequencers and associated

5

reagents to the Company and its Subsidiaries; or (x) the public announcement of this Agreement or the pendency of the Transactions; provided that, in each of clauses (ii) through (vi), the Company and its Subsidiaries, taken as a whole, are not affected disproportionately relative to other participants in the industries in which they operate; or (b) would reasonably be expected to prevent or materially delay the consummation of the Transactions by the Company. Notwithstanding the foregoing, in the case of clauses (a)(vii) and (a)(viii), any event, occurrence, state of facts, development, circumstance, change or effect resulting from intentional fraud by the Company or any of its Subsidiaries may be taken into account in determining whether the condition set forth in Section 8.02(a) has been satisfied.

"Company Owned IP" means all Intellectual Property owned or purported to be owned by the Company or any of its

Subsidiaries (whether solely or jointly with one or more other Persons) as of the date of this Agreement.

"Company Permits" means franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, concessions, registrations, clearances, exemptions, certificates, filings, notices, approvals and orders of any Governmental Authority necessary for each of the Company and its Subsidiaries to own, lease and operate their respective properties and assets or to carry on their respective businesses as they are now being conducted.

"Company Preferred Stock" means, collectively, the Company Series A Preferred Stock, the Company Series B Preferred Stock, the Company Series C Preferred Stock and the Company Series D Preferred Stock.

"Company Recommendation" means the recommendation of the Company Board that the Company stockholders adopt this Agreement.

"Company Registration Statement" means the registration statement on Form S-1 (File No. 333-248672) filed by the Company with the SEC on September 9, 2020, including all exhibits thereto.

"Company Restricted Stock Awards" means, collectively, the Class A Restricted Stock Awards.

"Company RSU Award" means an award of restricted stock units with respect to shares of Company Class A Common Stock granted pursuant to the Company Stock Plan or otherwise, whether subject to service- and/or performance-based vesting criteria.

"Company Series A Preferred Stock" means the Series A Preferred Stock, par value $0.001 per share, of the Company.

"Company Series B Preferred Stock" means the Series B Preferred Stock, par value $0.001 per share, of the Company.

"Company Series C Preferred Stock" means the Series C Preferred Stock, par value $0.001 per share, of the Company.

6

"Company Series D Preferred Stock" means the Series D Preferred Stock, par value $0.001 per share, of the Company.

"Company Stock" means, collectively, the Company Common Stock and Company Preferred Stock.

"Company Stock Option" means an award of unexercised options to purchase shares of Company Class A Common Stock granted pursuant to the Company Stock Plan or otherwise, whether subject to service- and/or performance-based vesting criteria.

"Company Stock Plan" means the Company's 2016 Equity Incentive Plan, as amended and/or amended and restated from time to time.

"Company Stockholder Approvals" means the adoption of this Agreement and approval of the Transactions by the affirmative vote of, or the execution and delivery to the Company of a written consent by, (a) holders of a majority of the total voting power of Company Common Stock and Company Preferred Stock, voting together as a single class, and (b) holders of a majority of the Company Preferred Stock, voting together as a single class on an as-converted to Class A Common Stock basis.

"Competing Proposal" means any inquiry, proposal or offer from any Person (other than Parent or its Affiliates) relating to, or that would reasonably be expected to lead to, in one transaction or a series of related transactions (other than the Mergers), (a) any merger, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or other similar transaction involving the Company or any of its Subsidiaries pursuant to which any Person or the shareholders of any Person would own 15% or more of any class of equity securities of the Company or of any resulting parent company of the Company; (b) any sale, lease, license, exchange, transfer or other disposition of, or joint venture involving, assets or businesses that constitute or represent more than 15% of the total revenue, operating income, EBITDA or fair market value of the assets of the Company and its Subsidiaries, taken as a whole (other than sales of inventory and dispositions of non-material assets or licenses, in each case, in the ordinary course of the Company's business); (c) any sale, exchange, transfer or other disposition of more than 15% of any class of equity securities, or securities convertible into or exchangeable for equity securities, of the Company; (d) any tender offer or exchange offer that, if consummated, would result in any Person becoming the beneficial owner of more than 15% of any class of equity securities of the Company; or (e) any combination of the foregoing.

"Competing Transaction Agreement" means a binding letter of intent, binding memorandum of understanding, binding agreement in principle, merger agreement, acquisition agreement, option agreement or other contract or agreement which would reasonably be expected to lead to any Competing Proposal (other than an Acceptable Confidentiality Agreement).

"Confidentiality Agreement" means the Confidentiality Agreement, dated as of August 11, 2020, between the Company and Parent.

7

"contract" means any loan or credit agreement, bond, debenture, note, mortgage, indenture, lease, supply agreement, license agreement, development agreement or other contract, agreement, obligation, commitment or instrument, in each case, that is legally binding and including all amendments, supplements, restatements or other modifications thereto.

"control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, or as trustee or executor, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or credit arrangement or otherwise.

"Designated Investments" means one or more of the following: (a) direct obligations of, or obligations fully guaranteed as to principal and interest by, the United States or any agency or instrumentality thereof, provided such obligations are backed by the full faith and credit of the United States; or (b) a deposit account of Exchange Agent.

"DGCL" means the General Corporation Law of the State of Delaware.

"DLLCA" means the Delaware Limited Liability Company Act.

"Drag-Along" means the requirement of the Voting Agreement Parties to take certain actions upon the approval of a "Sale of the Company", as such term is defined in the Voting Agreement, to comply with the requirements of Section 2 of the Voting Agreement.

"Encumbrances" means mortgages, pledges, liens, security interests, hypothecations, conditional and installment sale agreements, encumbrances, charges or other claims to title of third parties or restrictions on ownership or use of any kind, including any easement, reversion interest, right of way or other encumbrance to title, limitations on voting rights or disposition rights, or any option, right of first refusal or right of first offer.

"Environmental Law" means any Law relating to pollution or protection of the environment, natural resources, threatened or endangered species or, as it relates to exposure to hazardous or toxic materials, human health and safety.

"Environmental Permits" means all permits, licenses and other authorizations required under any Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exchange Act" means the Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder.

"Exchange Ratio" means the number (rounded to four decimal places) obtained by dividing (x) the Aggregate Stock Consideration by (y) the Company Fully Diluted Share Count.

8

"Expenses" means all out-of-pocket fees and expenses (including all fees and expenses of counsel, accountants, investment banking firms and other financial institutions, experts and consultants to a party hereto and its Affiliates) actually incurred or accrued by a party hereto or its Affiliates or on its or their behalf or for which it or they are liable in connection with or related to the authorization, preparation, negotiation, execution and performance of the Transactions, the solicitation of stockholder approvals, the filing of any required notices under applicable foreign, federal or state antitrust, competition, fair trade or similar Laws or other similar regulations and all other matters related to the

closing of the Transactions, including the Mergers.

"FFCRA" means the Families First Coronavirus Response Act.

"Financing Sources" means the Persons that have committed to provide or have otherwise entered into agreements to provide (such agreements, a "Commitment Letter") any part of the Financing and any joinder agreements, indentures, credit agreements or other definitive agreements entered into pursuant thereto or relating thereto, and any arrangers, underwriters, initial purchasers, placement agents or administrative agents in connection with the Financing, together with their current and future Affiliates and their and such Affiliates', officers, directors, employees, attorneys, partners (general or limited), controlling parties, advisors, members, managers, accountants, consultants, agents, representatives and funding sources of each of the foregoing, and their successors and assigns.

"Fraud" means common law intentional fraud under Delaware law in the making of the representation and warranties contained in this Agreement or in the certificates contemplated by Section 8.02(c) or Section 8.03(c).

"GAAP" means United States generally accepted accounting principles in effect from time to time, applied consistently throughout the periods involved.

"Governmental Authority" means any federal, national, foreign, supranational, state, provincial, county, local or other government, governmental, regulatory or administrative authority, agency, instrumentality or commission or any court, tribunal, or judicial or arbitral body of competent jurisdiction. For purposes of Section 4.19, the term "Governmental Authority" shall also include any entity controlled by a Governmental Authority.

"Hazardous Materials" means any petroleum or petroleum products, radioactive materials, medical wastes, asbestos, polychlorinated biphenyls, hazardous or toxic substances and any other chemical, material, substance or waste that is regulated or that forms the basis of liability under any Environmental Law.

"Health Authority" means the Governmental Authorities that administer Health Laws, including the FDA.

"Health Law" means any Law applicable to the Company's products and activities, including any Law the purpose of which is to ensure the safety, efficacy and quality of medical, biotechnology, diagnostic and similar products by regulating the research, development,

manufacturing and distribution of these products, including applicable Law relating to good laboratory practices, good clinical practices, investigational use, product marketing authorization, manufacturing facilities compliance and approval, good manufacturing practices, labeling, advertising, promotional practices, safety surveillance, record keeping and filing of required reports, including, without limitation, the FDCA.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Indebtedness" means, with respect to any Person, all obligations or undertakings by such Person (i) for borrowed money (including deposits or advances of any kind to such Person); (ii) evidenced by bonds, debentures, notes or similar instruments; (iii) under swaps, options, derivatives and other hedging contracts or arrangements that will be payable upon termination thereof (assuming termination on the date of determination); (iv) letters of credit, bank guarantees, and other similar contracts or arrangements entered into by or on behalf of such Person to the extent they have been drawn upon; (v) pursuant to a guarantee of any Indebtedness of a type referred to in clauses (i) through (iii) above, and (v) all Indebtedness of a type referred to in clauses (i) through (iii) above of any Person secured by (or for which the holder of such Indebtedness has a right, contingent or otherwise, to be secured by) any Encumbrance (other than a Permitted Encumbrance) (other than those set forth in clauses (h) and (i) of the definition thereof) on any property or assets owned by the Company or any of its Subsidiaries.

"Intellectual Property" means all rights in or to (a) patents, utility models, statutory invention registrations, registered designs and equivalent thereof, and all applications and pre-grant and post-grant forms of any of the foregoing, including, in each case, any provisionals, substitutions, divisionals, continuations, continuations-in-part, re-examinations, renewals, extensions, reissues, and equivalents thereof in any jurisdiction; (b) registered or unregistered trademarks, trade dress, trade names, brand names, corporate names, service marks, certification marks, designs, logos, slogans and other indications of origin, the goodwill associated with the foregoing and registrations in any jurisdiction of, and applications in any jurisdiction to register, the foregoing, including any extension, modification or renewal of any such registration or application; (c) copyrightable works (including copyrights in Software and Internet websites), whether published or unpublished and copyright registrations, applications for registration, and extensions thereof; (d) rights associated with domain names, uniform resource locators, Internet Protocol

addresses, social media handles, and other names, identifiers, and locators associated with Internet addresses, sites, and services; (e) trade secrets, confidential know-how (including all ideas, concepts, research and development) and other proprietary confidential information, whether or not patentable, including inventions, discoveries, prototypes, results, data (including clinical data, pre-clinical data, and post-clinical data), testing procedures, testing results, methods, designs, specifications, know-how and other forms of technology, in each case, that derives economic value, whether actual or potential, from not being generally known to other persons (collectively, "Trade Secrets"); (f) Software; and (g) any and all other similar or equivalent intellectual property rights.

"Intentional Breach" means, with respect to any agreement or covenant of a party in this Agreement, an action or omission taken or omitted to be taken by such party in material breach of such agreement or covenant that the breaching party intentionally takes (or fails to

take) with knowledge that such action or omission would, or would reasonably be expected to, cause such material breach of such agreement or covenant; provided, that (a) as it applies to the Company, knowledge means the actual knowledge of any of the individuals listed in Section 1.01(a) of the Company Disclosure Letter or of the Company Board and (b) as it applies to Parent, First Merger Sub or Second Merger Sub, knowledge means the actual knowledge of Francis A. deSouza, Sam A. Samad and/or Charles E. Dadswell or of the Parent Board.

"Investor Agreements" means, collectively, (a) the Voting Agreement; (b) the Amended and Restated Investors' Rights Agreement dated November 27, 2019, by and among the Company and certain stockholders of the Company party thereto; and (c) the Amended Right of First Refusal and Co-Sale Agreement dated November 27, 2019, by and among the Company and certain stockholders of the Company party thereto.

"IRS" means the United States Internal Revenue Service.

"IT Assets" means all (a) computers (including, servers, firewalls, workstations, desktops, laptops and handheld devices), Software, hardware (whether general or special purpose), networks, firmware, middleware, routers, hubs, switches, data communications lines, data storage devices, information security and telecommunications capabilities, data centers, operating systems and all other information technology equipment and other similar or related items of information technology hardware and infrastructure, including any "Infrastructure-as-a-Service" or "Platform-as-a-Service" or other cloud or hybrid cloud services, and (b) any business systems software or applications (including, CRM, ERP, HR, IT support, and accounting systems), whether hosted in "on prem" and/or in the cloud, or provided as a service (e.g., "Software-as-a-Service"), in each case of both (a) and (b), owned, licensed or used by the Company or any of its Subsidiaries and the documentation, reference and resource materials relating thereto and all contracts and contractual rights required in connection with the foregoing.

"knowledge of Parent" means the actual knowledge of Francis A. deSouza, Sam A. Samad and/or Charles E. Dadswell.

"knowledge of the Company" means the actual knowledge of the individuals listed in Section 1.01(b) of the Company Disclosure Letter.

"Law" means any federal, state, local, national, supranational, foreign or administrative law (including common law), statute, ordinance, regulation, requirement, rule, code or Order.

"Merger Consideration" means the CVR Consideration or the Cash & Stock Consideration, as applicable.

"NASDAQ" means The NASDAQ Global Select Market.

"Non-U.S. Benefit Plan" means a Plan that is not subject exclusively to United States Law.

"Order" means any order, judgment, injunction, award, decision, determination, stipulation, ruling, subpoena, writ, decree or verdict entered by or with any Governmental Authority.

"<u>Outside Date</u>" means September 20, 2021.

"<u>Parent Board</u>" means the Board of Directors of Parent.

"<u>Parent Common Stock</u>" means the common stock, par value $0.01 per share, of Parent.

"<u>Parent IP</u>" means all Parent Owned IP together with all Intellectual Property licensed by Parent or any of its Subsidiaries and used, held for use or planned for use in Parent's business.

"<u>Parent Material Adverse Effect</u>" means any event, occurrence, state of facts, development, circumstance, change or effect that, individually or in the aggregate with all other events, occurrences, state of facts, developments, circumstances, changes and effects, (a) has had or would reasonably be expected to have a material adverse effect on the business, financial condition or results of operations of Parent and its Subsidiaries taken as a whole; <u>provided</u>, <u>however</u>, that any event, occurrence, state of facts, development, circumstance, change or effect to the extent resulting from the following shall not be taken into account in determining whether a Parent Material Adverse Effect has occurred:  (i) any change in the market price or trading volume of the Parent Common Stock or any failure, in and of itself, to meet internal projections or forecasts or published revenue or earnings predictions for any period ending (or for which revenues or earnings are released) on or after the date of this Agreement (<u>provided</u> that the facts or causes underlying or contributing to such change or failure shall be considered in determining whether a Parent Material Adverse Effect has occurred); (ii) changes in U.S. or non-U.S. general economic or political conditions, or in the financial, credit or securities markets in general, including any shutdown of any Governmental Authority; (iii) changes in applicable Law or GAAP or in any interpretation thereof; (iv) changes in the industries in which Parent and its Subsidiaries operate regardless of geographic region (including legal and regulatory changes); (v) acts of civil unrest or war (whether or not declared), armed hostilities or terrorism, or any escalation or worsening of any acts of civil unrest or war (whether or not declared), armed hostilities or terrorism; (vi) earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, volcanic eruptions or other natural disasters or epidemic or pandemic (including the COVID-19 pandemic); (vii) FDA and other regulatory actions, enforcement, requirements or directives (including delay, clinical hold, rejection or additional clinical requirements with respect to any premarket approval application or investigational device exemption application), the scope of marketing approval or intended use statement(s), issuance of warning letters, audit findings, and other exercise or enforcement discretion, pre- or post-approval requirements, limitations or restrictions or rejection or revocation of any accreditations, authorizations, certifications, permits licenses related to Parent's businesses and products; (viii) data and other results from clinical

12

trials, or (ix)  the public announcement of this Agreement or the pendency or consummation of the Transactions; <u>provided</u> that in each of clauses (ii) through (vi), Parent and its Subsidiaries, taken as a whole, are not affected disproportionately relative to other participants in the industries in which they operate; or (b) would reasonably be expected to prevent or materially delay the consummation of the Transactions by Parent, First Merger Sub or Second Merger Sub.  Notwithstanding the foregoing, in the case of clauses (a)(vii) and (a)(viii), any event, occurrence, state of facts, development, circumstance, change or effect resulting from intentional fraud by Parent or any of its Subsidiaries may be taken into account in determining whether the condition set forth in <u>Section 8.03(a)</u> has been satisfied.

"<u>Parent Owned IP</u>" means all Intellectual Property owned or purported to be owned by Parent or any of its Subsidiaries (whether solely or jointly with one or more other Persons) as of the date of this Agreement.

"<u>Parent Permits</u>" means franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, concessions, registrations, clearances, exemptions, certificates, filings, notices, approvals and orders of any Governmental Authority necessary for Parent and each of its Subsidiaries to own, lease and operate their respective properties and assets or to carry on their respective businesses as they are now being conducted.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation.

"<u>Performance-Vesting Award</u>" means any Company Equity Award that, as of immediately prior to the Closing, is outstanding and subject to performance-based vesting criteria.

"<u>Permitted Encumbrances</u>" means (a) statutory Encumbrances for current Taxes, special assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP, (b) mechanics', materialmen's, carriers', workers', repairers' and similar Encumbrances arising or incurred in the ordinary course of business, (c) zoning, entitlement, building and other land use Laws imposed by governmental agencies having jurisdiction over any real property which are not violated in any material respect by the current use and operation of

such real property, (d) deposits or pledges made in connection with, or to secure payment of, worker's compensation, unemployment insurance, old age pension programs mandated under applicable Laws, (e) covenants, conditions, restrictions, easements, and other similar non-monetary matters of record affecting title to, but not adversely affecting current occupancy or use of, the owned real property in any material respect, (f) restrictions on the transfer of securities arising under federal and state securities Laws, (g) any Encumbrances caused by state statutes or specific provisions of Real Property Leases, in each case, with respect to tenant's personal property, fixtures and/or leasehold improvements at the subject leased real property, (h) other Encumbrances incurred in the ordinary course of business and which would not reasonably be expected to have an adverse impact on the use of the property so encumbered, and (i) Encumbrances listed in <u>Section 1.01(c) of the Company Disclosure Letter</u>.

13

"<u>Person</u>" means an individual, corporation, partnership, limited partnership, limited liability company, syndicate, person (as defined in Section 13(d)(3) of the Exchange Act), trust, association, entity or Governmental Authority.

"<u>Personal Data</u>" means (a) any information defined as "personal data", "personally identifiable information" or "personal information" under any Privacy and Data Security Requirement, (b) any information that, alone or in combination with other information, can reasonably be used to identify an individual natural person or relating to an identified or identifiable natural person, directly or indirectly, including name, a unique identification number, government-issued identifier (including Social Security number and driver's license number) physical address, gender and date of birth; and (c) individually identifiable health information constituting "protected health information" as defined under 45 C.F.R. § 160.103. Personal Data that has been pseudonymized shall also be considered Personal Data to the extent treated as such under any Privacy and Data Security Requirement.

"<u>Plan</u>" means each (a) "employee benefit plan" as that term is defined in Section 3(3) of ERISA (whether or not subject to ERISA) and (b) each other employment, individual independent contractor, individual consulting, pension, retirement, profit sharing, deferred compensation, stock option, change in control, retention, equity or equity-based compensation, stock purchase, employee stock ownership, severance, vacation, bonus, incentive, disability, medical, vision, dental, health, life insurance, fringe benefit or other compensation or benefit plan, program, agreement, arrangement, policy or contract, in each case, sponsored, maintained or contributed to, or required to be sponsored, maintained or contributed to, by the Company or any of its Subsidiaries, or to which the Company or any of its Subsidiaries is a party or with respect to which the Company or any of its Subsidiaries have any obligation or liability, whether actual or contingent to provide compensation and/or benefits to or for the benefit of any Service Provider (or spouse, dependent or beneficiary thereof), other than any multiemployer plan (within the meaning of Section 3(37) of ERISA) and any statutory plan to which contributions are mandated by a Governmental Authority.

"<u>Privacy and Data Security Requirements</u>" means (a) any Laws regulating the Processing of Personal Data, (b) obligations under all contracts to which the Company or any of its Subsidiaries is a party that relate to Personal Data or protection of the IT Assets and (c) all of the Company's and its Subsidiaries' internal and publicly posted policies (including if posted on the Company's or its Subsidiaries' products and services) regarding the Processing of Personal Data.

"<u>Process</u>" or "<u>Processing</u>" with regard to Personal Data means the collection, use, storage, maintenance, retention, transmission, access, processing, recording, distribution, transfer, import, export, protection (including security measures), deletion, disposal or disclosure or other activity regarding data (whether electronically or in any other form or medium).

"<u>Public Software</u>" means (a) any Software used under a license identified as an open source license by the Open Source Initiative (www.opensource.org), and (b) any other Software that is distributed as freeware, or under similar licensing or distribution models.

14

"<u>Real Property Leases</u>" means all leases, subleases, licenses, occupancy agreements and other agreements under which the Company or any of its Subsidiaries uses or occupies or has the right to use or occupy, now or in the future, any real property (including all guaranties thereof and all material modifications, amendments, supplements, waivers and side letters thereto).

"<u>Registered Company IP</u>" means all Intellectual Property: (a) included in the Company Owned IP or (b) that is exclusively licensed to the Company, in each case (a) and (b), that is the subject of an application, certificate, filing, registration, or other document issued, filed with or recorded by any Governmental Authority or Internet domain name registrar.

"<u>Registered Parent IP</u>" means all Intellectual Property: (a) included in the Parent Owned IP or (b) that is exclusively licensed to Parent, in each case (a) and (b), that is the subject of an application, certificate, filing, registration, or other document issued, filed with or recorded by any Governmental Authority or Internet domain name registrar.

"<u>Registration Statement</u>" means the S-4 Registration Statement and/or a registration statement on another appropriate form for the registration under the Securities Act of all of the shares of Parent Common Stock to be issued in connection with the Mergers.

"<u>Representatives</u>" means a Person's officers, directors, employees, accountants, consultants, legal counsel, investment bankers, advisors, agents and other representatives.

"<u>SEC</u>" means the Securities and Exchange Commission.

"<u>Securities Act</u>" means the Securities Act of 1933, and the rules and regulations promulgated thereunder.

"<u>Service Provider</u>" means each director, officer, employee or independent contractor of the Company and each of its Subsidiaries.

"<u>Service-Vesting Award</u>" means each Company Equity Award that is outstanding immediately prior to the Closing other than a Performance-Vesting Award.

"<u>Software</u>" means all computer software, programs (whether in source code, object code, human readable form or other form), applications, algorithms, user interfaces, application programming interfaces, diagnostics, software development tools and kits, templates, menus, analytics and tracking tools, compilers, library functions, version control systems, operating system virtualization environments, databases and compilations, including data and collections of data, whether machine-readable or otherwise, technology supporting the foregoing, together with all boot, compilation, configuration, debugging, performance analysis and runtime files, libraries, data, documentation, including user manuals and training materials, related to any of the foregoing, and any cloud storage containing any of the foregoing.

"<u>SOX</u>" means the Sarbanes-Oxley Act of 2002, and the rules and regulations promulgated thereunder.

15

"<u>Subsidiary</u>" or "<u>Subsidiaries</u>" of any specified Person means an Affiliate controlled by such Person, directly or indirectly, through one or more intermediaries.

"<u>Superior Proposal</u>" means an unsolicited written bona fide offer made by a third party with respect to a Competing Proposal which the Company Board reasonably determines, in its good faith judgment, after having received the advice of a financial advisor of nationally recognized reputation and outside legal counsel, to be (a) more favorable to the stockholders of the Company from a financial point of view (after taking into account all of the terms and conditions of such proposal, including the sources and terms of any financing, financing market conditions and the existence of a financing contingency) than the Mergers (after taking into account any changes to the financial terms of this Agreement proposed by Parent in response to such offer or otherwise) and (b) reasonably expected to be consummated on the terms so proposed. For the purposes of the definition of "Superior Proposal", each reference to "15%" in the definition of "Competing Proposal" shall be replaced with "66 %".

"<u>Tax Return</u>" means any return, declaration, report, election, claim for refund or information return or other statement or form filed or required to be filed with any Governmental Authority relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>Tax Sharing Agreement</u>" means all existing agreements or arrangements (whether or not written) binding the Company or any of its Subsidiaries that provide for the allocation, apportionment, sharing or assignment of any Tax liability or benefit, or the transfer or assignment of income, revenues, receipts or gains for the purpose of determining any Person's Tax liability, in each case, excluding (i) any such agreement or arrangement between or solely among the Company and its Subsidiaries or (ii) any agreement or arrangement entered into in the ordinary course of business and not primarily related to Taxes.

"<u>Taxes</u>" means all taxes or similar duties, fees or charges or assessments thereof imposed by any Governmental Authority, in each case in the nature of a tax, including any interest, penalties and additions imposed with respect to such amount.

"Trading Day" means a day on which shares of Parent Common Stock are traded on the NASDAQ.

"Transaction Documents" means, collectively, (a) this Agreement, (b) the Selling Investor Support Agreement, (c) the CVR Agreement, (d) the Drag-Along Consent and (e) the Support Agreements.

"Transactions" means the Mergers and the other transactions contemplated by this Agreement and by the CVR Agreement.

"Trust Indenture Act" means the Trust Indenture Act of 1939.

"Voting Agreement" means the Amended and Restated Voting Agreement dated as of November 27, 2019, by and among the Company and the Voting Agreement Parties, as

16

amended by Amendment No. 1 to the Voting Agreement dated as of April 17, 2020, by and among the Company and the Voting Agreement Parties, and Amendment No. 2 to the Voting Agreement dated as of May 11, 2020, by and among the Company and the Voting Agreement Parties.

"Voting Agreement Parties" means those certain holders of Company Stock that are party to the Voting Agreement.

Section 1.02    Other Defined Terms.  The following terms have the meanings set forth in the Sections set forth below:

| Defined Term | Location of Definition |
| --- | --- |
| Additional Termination Payment | Section 9.04(b) |
| Agreement | Preamble |
| Alternative Capital Raise | Section 9.04(f)(ii) |
| Alternative Cash-Out Awards | Section 3.04(c) |
| Alternative Financing | Section 7.18(d) |
| Alternative Rollover Awards | Section 3.04(c) |
| Anti-Corruption Laws | Section 4.19(a) |
| Antitrust Laws | Section 7.07(a) |
| Appraisal Shares | Section 3.05(a) |
| Book-Entry Shares | Section 2.04(b) |
| Cash & Stock Consideration | Section 2.04(a)(ii) |
| Cash & Stock Election Share | Section 2.04(a)(ii) |
| Cash-Out Award | Section 3.04(b) |
| Cash-Out Award Consideration | Section 3.04(i) |
| Cash-Out Deductions | Section 3.04(i) |
| Certificates | Section 2.04(b) |
| Certificates of Merger | Section 2.02 |
| Change in the Company Recommendation | Section 7.02(d) |
| Claims | Section 11.11(a) |
| Closing | Section 2.02 |
| Closing Capitalization Schedule | Section 3.06(a) |
| Closing Year VCP | Section 7.04(d) |
| Company | Preamble |
| Company Related Parties | Section 9.03(d) |
| Consent Solicitation Statement | Section 7.01(a) |
| Continuation End Date | Section 9.04(a) |
| Continuation Payment | Section 9.04(a) |
| Continuing Employees | Section 7.04(a) |
| CVR | Section 2.04(a)(i) |
| CVR Agreement | Preamble |
| CVR Cash-Out Awards | Section 3.04(c) |
| CVR Certificate | Section 2.04(a)(i) |

17

18

| CVR Consideration | Section 2.04(a)(i) |
| Defined Term | Location of Definition |
| | |
| CVR Election Share | Section 2.04(a)(i) |
| CVR Holder Representative | Section 10.01 |
| CVR Rollover Awards | Section 3.04(c) |
| Designated Person | Section 11.10 |
| Drag-Along Consent | Preamble |
| Drag-Along Resolutions | Preamble |
| Effective Time | Section 2.02 |
| Election Deadline | Section 3.01(b) |
| Election Form | Section 3.01(a) |
| Election Period | Section 3.01(b) |
| Equity Award Ratio | Section 3.04(e) |
| Equity Election Form | Section 3.04(c) |
| Equity Issuance | Section 9.04(c) |
| Equity Issuance End Date | Section 9.04(f)(i) |
| Equityholder | Section 11.01 |
| Equityholder Released Claims | Section 11.11(a) |
| Equityholder Releasing Party | Section 11.11(a) |
| Exchange Agent | Section 3.02(a) |
| Exchange Fund | Section 3.02(a) |
| Existing Representation | Section 11.10 |
| Export Control Laws | Section 4.19(d) |
| FDA | Section 4.18(a) |
| FDA Fraud Policy | Section 4.18(a) |
| FDCA | Section 4.18(e) |
| Filed Parent SEC Reports | Article V |
| Financial Statements | Section 4.06(b) |
| Financing | Section 5.08 |
| Financing Commitments | Section 5.08 |
| Financing Offering Documents | Section 7.19(a)(v) |
| First Certificate of Merger | Section 2.02 |
| First Merger | Recitals |
| First Merger Sub | Preamble |
| Holder | Section 10.01 |
| Intended Tax Treatment | Section 2.08(a) |
| Letter of Transmittal | Section 3.01(a) |
| Mailing Date | Section 3.01(a) |
| Material Contracts | Section 4.15(a) |
| Mergers | Recitals |
| Money Laundering Laws | Section 4.19(b) |
| New Plans | Section 7.04(b) |
| No Election Awards | Section 3.04(c) |
| No Election Shares | Section 2.04(a)(iii) |
| Notice of Adverse Recommendation | Section 7.02(d) |
| Defined Term | Location of Definition |
| | |
| Parent | Preamble |
| Parent Awards | Section 3.04(g) |
| Parent Equity Awards | Section 7.04(e) |
| Parent Related Parties | Section 9.03(d) |
| Parent Restricted Stock | Section 3.04(f) |
| Parent SEC Reports | Section 5.09(a) |
| Parent Stock Options | Section 3.04(d) |
| Permitted Restrictions | Section 7.07(a) |
| Post-Closing Bonus Plan | Section 7.04(a) |
| Post-Closing Covenants | Section 11.01 |
| Pre-Closing Designated Persons | Section 11.10 |
| Pre-Closing Privileges | Section 11.10 |

| | |
|---|---|
| Prior Company Counsel | Section 11.10 |
| R&D Sponsor | Section 4.12(j) |
| Reduction Amount | Section 9.04(c) |
| Regulatory Termination Fee | Section 9.03(a)(ii) |
| Released Parties | Section 11.11(a) |
| Required Information | Section 7.19(a)(ii) |
| Restraint | Section 8.01(c) |
| Rollover Awards | Section 3.04(b) |
| Rollover Performance-Based Award | Section 3.04(b) |
| Rollover Service-Based Award | Section 3.04(a) |
| S-4 Effectiveness Time | Section 7.01(b) |
| S-4 Registration Statement | Section 7.01(a) |
| Sanctioned Person | Section 4.19(c) |
| Sanctions | Section 4.19(c) |
| Second Certificate of Merger | Section 2.02 |
| Second Effective Time | Section 2.02 |
| Second Merger | Recitals |
| Second Merger Sub | Preamble |
| Section 1542 | Section 11.11(c) |
| Selling Investor Support Agreement | Recitals |
| Selling Investors | Recitals |
| Social Security Act | Section 4.18(f) |
| Stock Consideration | Section 2.04(a)(i) |
| Support Agreement | Section 7.13(b) |
| Surviving Corporation | Recitals |
| Surviving Entity | Recitals |
| Termination Date | Section 9.04(c) |
| Trustee | Preamble |

Section 1.03    Interpretation; Headings.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the

words "without limitation".  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.  As used herein, the term "made available" means, with respect to any document, that such document was in the Company's electronic data room relating to the transactions contemplated by this Agreement prior to 5:00 pm Pacific Daylight Time on the day prior to the date of this Agreement or otherwise provided via electronic means.  When reference is made to an Article, Section, Schedule or Exhibit, such reference is to an Article or Section of, or Schedule or Exhibit to, this Agreement unless otherwise indicated.  The table of contents and descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.  All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.  The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.  Any contract, instrument or Law defined or referred to herein or in any contract or instrument that is referred to herein means such contract, instrument or Law as from time to time amended, modified or supplemented, including (in the case of contracts or instruments) by waiver or consent and (in the case of Laws) by succession of comparable successor Laws and references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its permitted successors and assigns.  Each of the parties has participated in the drafting and negotiation of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

## ARTICLE II

## THE MERGERS

Section 2.01    The Mergers.

(a)     Upon the terms and subject to the satisfaction or written waiver (where permissible) of the conditions set forth in Article VIII, and in accordance with the applicable provisions of the DGCL and this Agreement, at the Effective Time, First Merger Sub shall be merged with and into the Company.  As a result of the First Merger, the separate corporate existence of First Merger Sub shall cease and the Company shall continue as the Surviving Corporation and, following the First Merger, shall be a wholly owned Subsidiary of Parent (provided, that references to the Company for periods after the Effective Time until the Second Effective Time shall include the Surviving Corporation).

(b)     Upon the terms and subject to the satisfaction or written waiver (where permissible) of the conditions set forth in Article VIII, and in accordance with the applicable provisions of the DGCL, the DLLCA and this Agreement, at the Second Effective Time, the Surviving Corporation shall be merged with and into Second Merger Sub.  As a result of the Second Merger, the separate corporate existence of the Surviving Corporation shall cease and Second Merger Sub shall continue as the Surviving Entity and, following the Second Merger,

shall be a wholly owned Subsidiary of Parent (provided, that references to the Company for periods after the Second Effective Time shall include the Surviving Entity).

Section 2.02     Closing; Effective Times.  The closing of the Transactions (the "Closing") shall take place on the third Business Day after the satisfaction or written waiver (where permissible) of the conditions set forth in Article VIII (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or written waiver (where permissible) of those conditions at the Closing), unless another date is agreed to in writing by Parent and the Company; provided, however, that if all the conditions set forth in Article VIII shall no longer be satisfied or waived (where permissible) on such third Business Day, then the Closing shall take place on the first Business Day on which all such conditions shall again have been satisfied or waived (where permissible) unless another time is agreed to in writing by Parent and the Company.  The Closing shall be effected by the electronic exchange of signatures by electronic transmission, or by such other means or at such other place as the parties shall agree.  Subject to the terms and conditions of this Agreement, as soon as practicable on the Closing Date, the parties hereto shall cause the First Merger to be effected by filing a certificate of merger (the "First Certificate of Merger") with the Secretary of State of the State of Delaware, in such form and containing such information as is required by, and executed in accordance with, the relevant provisions of the DGCL.  The First Merger shall become effective at the date and time of such filing of the Certificate of Merger, or such later time as may be agreed by each of the parties hereto and specified in the First Certificate of Merger (such time being the "Effective Time").  As soon as practicable following the Effective Time and in any case on the same day as the Effective Time, the parties hereto shall cause the Second Merger to be effected by filing a certificate of merger (the "Second Certificate of Merger" and, together with the First Certificate of Merger, the "Certificates of Merger") with the Secretary of State of the State of Delaware, in such form and containing such information as is required by, and executed in accordance with, the relevant provisions of the DGCL and the DLLCA.  The Second Merger shall become effective at the date and time of such filing of the Second Certificate of Merger, or such later time as may be agreed by each of the parties hereto and specified in the Second Certificate of Merger (such time being the "Second Effective Time").

Section 2.03     Effect of the Mergers.

(a)     At the Effective Time, the effect of the First Merger shall be as provided in this Agreement, the First Certificate of Merger and in the applicable provisions of the DGCL.  Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all the property, rights, privileges, agreements, powers and franchises, debts, liabilities, duties and obligations of First Merger Sub and the Company shall become the property, rights, privileges, agreements, powers and franchises, debts, liabilities, duties and obligations of the Surviving Corporation, which shall include the assumption by the Surviving Corporation of any and all agreements, covenants, duties and obligations of First Merger Sub and the Company set forth in this Agreement to be performed after the Effective Time.

(b)     At the Second Effective Time, the effect of the Second Merger shall be as provided in this Agreement, the Second Certificate of Merger and in the applicable provisions of the DGCL and the DLLCA. Without limiting the generality of the foregoing, and subject thereto,

at the Second Effective Time, all the property, rights, privileges, agreements, powers and franchises, debts, liabilities, duties and obligations of Second Merger Sub and the Surviving Corporation shall become the property, rights, privileges, agreements, powers and franchises, debts,

liabilities, duties and obligations of the Surviving Entity, which shall include the assumption by the Surviving Entity of any and all agreements, covenants, duties and obligations of the Surviving Entity and the Surviving Corporation set forth in this Agreement to be performed after the Second Effective Time.

Section 2.04    Effect of the First Merger; Conversion of Securities.  (a)  At the Effective Time, by virtue of the First Merger and without any action on the part of Parent, First Merger Sub, the Company or any holders of Company Stock, each share of Company Class A Common Stock, Company Class B Common Stock, Company Series A Preferred Stock, Company Series B Preferred Stock, Company Series C Preferred Stock and Company Series D Preferred Stock issued and outstanding immediately prior to the Effective Time (other than Appraisal Shares, Company Restricted Stock Awards and any shares of Company Stock to be canceled pursuant to Section 2.04(c)) shall be converted automatically into the right to receive, in accordance with Section 251(b)(5) of the DGCL and the terms of this Agreement, the following consideration at the election of the holder thereof:

(i)    Each share of Company Stock with respect to which an election to receive a combination of cash, Parent Common Stock and a CVR has been effectively made and not revoked pursuant to Section 3.01 (each, a "CVR Election Share") shall be converted into the right to receive (A) the Cash Consideration, without interest, (B) the number of validly issued, fully paid and non-assessable shares of Parent Common Stock equal to the Exchange Ratio (the "Stock Consideration"), subject to Section 3.02(e), and (C) one contingent value right issued by Parent subject to and in accordance with the CVR Agreement (a "CVR") (collectively, the "CVR Consideration").  Each CVR issued as Merger Consideration hereunder will be substantially in the form attached as Annex A to the CVR Agreement (the "CVR Certificate").

(ii)    Each share of Company Stock with respect to which an election to receive the Alternative Consideration in lieu of receiving a CVR has been effectively made and not revoked pursuant to Section 3.01 (each, a "Cash & Stock Election Share") shall be converted into the right to receive (A) the Cash Consideration, without interest, (B) the Stock Consideration, subject to Section 3.02(e), and (C) the Alternative Consideration (collectively, the "Cash & Stock Consideration").

(iii)    Each share of Company Stock with respect to which no election has been effectively made in accordance with Section 3.01 (the "No Election Shares") shall be converted into the right to receive the CVR Consideration.

(b)    Except as set forth in Section 2.04(c), by virtue of the First Merger, each share of Company Stock, when converted in accordance with Section 2.04(a), shall cease to be outstanding and shall automatically be cancelled and cease to exist, and each holder of a

certificate or certificates that immediately prior to the Effective Time represented outstanding shares of Company Stock ("Certificates") and each holder of shares of Company Stock outstanding immediately prior to the Effective Time that are not represented by Certificates ("Book-Entry Shares") shall thereafter cease to have any rights with respect to such shares of Company Stock except (i) the right to receive, as applicable, the Merger Consideration, any dividends pursuant to Section 3.02(c) and cash in lieu of any fractional shares payable pursuant to Section 3.02(e), in each case to be issued or paid, without interest, in consideration therefor upon surrender of such Certificate or transfer of the Book-Entry Shares in accordance with Section 3.02(b) (or in the case of a lost, stolen or destroyed Certificate, Section 3.02(j)) or (ii) as provided by Law.

(c)    At the Effective Time, by virtue of the First Merger and without any action on the part of Parent, First Merger Sub, the Company or any holders of Company Stock, each share of Company Stock held in the treasury of the Company immediately prior to the Effective Time shall automatically be cancelled and retired and cease to exist without any conversion thereof, and no payment shall be made with respect thereto.

(d)    Each issued and outstanding share of capital stock of First Merger Sub, par value $0.01 per share, shall, by virtue of the First Merger and without any action on the part of Parent, First Merger Sub or the Company, be converted into and become one validly issued, fully paid and non-assessable share of Class A Common Stock, par value $0.001 per share, of the Surviving Corporation.

Section 2.05    Effect of the Second Merger; Conversion of Securities.  Upon the terms and subject to the conditions of this Agreement, at the Second Effective Time, by virtue of the Second Merger and without any action on the part of any party hereto or any holders of Company Stock or the holders of any shares of capital stock of Parent, the Surviving Corporation or Second Merger Sub: (a) each share of Class A Common Stock of the Surviving Corporation issued and outstanding immediately prior to the Second Effective Time shall be cancelled and shall cease to exist without any conversion thereof or payment therefor; and (b) each limited liability company interest of Second Merger Sub issued and outstanding immediately prior to the Second Effective Time shall not be affected and shall remain outstanding as a limited liability company interest of the Surviving Entity, which shall constitute one hundred percent (100%) of the outstanding equity of the Surviving Entity.

Section 2.06        Certificate of Incorporation; Bylaws; Certificate of Formation; Operating Agreement.  (a)  At the Effective Time, the Company's certificate of incorporation in effect immediately prior to the Effective Time shall continue to be the certificate of incorporation of the Surviving Corporation until thereafter amended as provided therein or by applicable Law.

(b)        At the Effective Time, the bylaws of Company as in effect immediately prior to the Effective Time shall be amended and restated to read in their entirety as the bylaws of First Merger Sub as in effect immediately prior to the Effective Time, except that all references therein to First Merger Sub shall be replaced by references to the Surviving Corporation, until thereafter amended as provided therein or by applicable Law.

23

(c)        At the Second Effective Time, the certificate of formation and operating agreement of Second Merger Sub in effect immediately prior to the Second Effective Time shall continue to be the certificate of formation and operating agreement of the Surviving Entity until thereafter amended as provided therein or by applicable Law, except that the name of the Surviving Entity shall be "GRAIL, LLC".

Section 2.07        Directors and Officers of the Surviving Corporation and the Surviving Entity.  The parties shall take all requisite action so that, from and after the Effective Time, the directors of First Merger Sub immediately prior to the Effective Time shall be the directors of the Surviving Corporation, each to hold office in accordance with the certificate of incorporation and bylaws of the Surviving Corporation and until their respective successors are duly elected and qualified or until such director's earlier death, resignation or removal, and the officers of First Merger Sub immediately prior to the Effective Time shall be the officers of the Surviving Corporation, each until their respective successors are duly elected and qualified or until such officer's earlier death, resignation or removal.  The parties shall take all requisite action so that, from and after the Second Effective Time, the officers of Second Merger Sub immediately prior to the Second Effective Time shall be the officers of the Surviving Entity, as set forth in the operating agreement of the Surviving Entity, each until their respective successors are duly elected and qualified or until such officer's earlier death, resignation or removal.

Section 2.08        Intended Tax Treatment.  (a)  For U.S. federal income tax purposes (and for purposes of any applicable state or local Tax that follows the U.S. federal income tax treatment), the parties hereto intend that (i) the First Merger and the Second Merger, taken together, will constitute an integrated transaction that qualifies as a "reorganization" within the meaning of Section 368(a) of the Code, and (ii) this Agreement will constitute a "plan of reorganization" for the purposes of Section 368 of the Code and Treasury Regulations Sections 1.368-2(g) and 1.368-3(a) (clauses (i) and (ii) collectively, the "Intended Tax Treatment").

(b)        So long as the conditions set forth on Exhibit D are satisfied, then (i) each party hereto will agree to prepare and file all Tax Returns consistent with the position that the Mergers qualify for the Intended Tax Treatment, and (ii) no party shall take any position on any Tax Return or during the course of any audit, litigation or other proceeding with respect to Taxes that is inconsistent with the Intended Tax Treatment, except, in each case, as otherwise required by a final determination by a taxing authority or a change in applicable Law after the date of this Agreement.

(c)        The parties shall cooperate with each other and their respective counsel and use their reasonable best efforts to cause the conditions set forth on Exhibit D to be satisfied.  Neither the Company nor Parent shall, or shall cause or permit any of their respective Subsidiaries to, take or omit to take any reasonable action not required or contemplated by this Agreement, as a result of which the Mergers would reasonably be expected to fail to qualify for the Intended Tax Treatment.

(d)        Parent shall reasonably promptly notify the Company, and the Company shall reasonably promptly notify the Parent, in each case if such party becomes aware of any

24

non-public fact or circumstance that would reasonably be likely to prevent or impede the Mergers from qualifying for the Intended Tax Treatment.

# ARTICLE III

# DELIVERY OF MERGER CONSIDERATION

Section 3.01    Election Procedures.  (a)  Not less than 30 days prior to the anticipated Effective Time (the "Mailing Date"), Parent will cause to be mailed to each record holder of shares of Company Stock (other than shares of Company Stock cancelled pursuant to Section 2.04(c)) as of five Business Days prior to the Mailing Date: (x) an election form in such form consistent with the terms of this Agreement as Parent shall specify (which such form shall be reasonably acceptable to the Company) (the "Election Form") and (y) a letter of transmittal which shall specify that delivery shall be effected, and risk of loss and title to the shares of Company Stock shall be deemed to pass, only upon proper delivery of the Certificates (or affidavits of loss in lieu thereof together with the required indemnity) or transfer of the Book-Entry Shares to the Exchange Agent, and shall be in a customary form and have such other provisions as are reasonably acceptable to the Company and Parent, including instructions for use in effecting the surrender or transfer (the "Letter of Transmittal").  The Election Form shall state the procedures for electing the Merger Consideration and shall specify the number of shares of Parent Common Stock and/or amount of cash that comprise the Alternative Consideration as determined by Parent.

(b)    Each Election Form will permit each holder of shares of Company Stock to specify (i) the number of shares of Company Stock with respect to which such holder elects to receive the CVR Consideration, (ii) the number of shares of Company Stock with respect to which such holder elects to receive the Cash & Stock Consideration or (iii) that such holder makes no election with respect to such holder's shares of Company Stock.  Any shares of Company Stock with respect to which the Exchange Agent does not receive a properly completed Election Form during the period (the "Election Period") from the Mailing Date to 5:00 p.m., Eastern time, on the date which Parent and the Company shall agree is as near as practicable to three Business Days preceding the Closing Date, or such other date as Parent and the Company will, prior to the Closing, mutually agree (the "Election Deadline"), will be deemed to be No Election Shares.  Parent and the Company shall publicly announce the date of the Election Deadline at least three Business Days prior to the Election Deadline.  If the Closing Date is delayed to a subsequent date, the Election Deadline shall be similarly delayed to a subsequent date, and Parent and the Company shall promptly announce any such delay and, when determined, the rescheduled Election Deadline.

(c)    Parent shall direct the Exchange Agent to make Election Forms available as may be reasonably requested from time to time by all Persons who become holders of record of Company Stock between the date that is five Business Days prior to the Mailing Date and the Election Deadline, and the Company shall provide to the Exchange Agent all information reasonably necessary for the Exchange Agent to perform as specified in this Agreement and as specified in any agreement between Parent and/or the Company and the Exchange Agent.

25

(d)    Any election made pursuant to this Section 3.01 will have been properly made only if the Exchange Agent will have actually received a properly completed Election Form during the Election Period.  Any Election Form may be revoked or changed by the Person submitting it, by written notice received by the Exchange Agent during the Election Period.  In the event an Election Form is revoked during the Election Period, the shares of Company Stock represented by such Election Form will be deemed to be No Election Shares, except to the extent a subsequent election is properly made during the Election Period.  Any termination of this Agreement in accordance with Article IX shall result in the revocation of all Election Forms delivered to the Exchange Agent on or prior to the date of such termination.  Subject to the terms of this Agreement and of the Election Form, the Exchange Agent will have reasonable discretion to determine whether any election, revocation or change has been properly or timely made and to disregard immaterial defects in the Election Forms, and any good faith decisions of the Exchange Agent regarding such matters will be binding and conclusive.  None of Parent, First Merger Sub, Second Merger Sub, the Company or the Exchange Agent will be under any obligation to notify any Person of any defect in an Election Form.

Section 3.02    Exchange of Certificates.  (a)  Exchange Agent.  Prior to the Mailing Date, Parent shall designate a commercial bank or trust company reasonably acceptable to the Company to act as agent (the "Exchange Agent") for the exchange of shares of Company Stock in accordance with this Article III.  Parent shall deposit, or shall cause to be deposited, with the Exchange Agent, for the benefit of the holders of shares of Company Stock (other than shares of Company Stock cancelled pursuant to Section 2.04(c), Company Restricted Stock Awards and Appraisal Shares), for exchange in accordance with this Article III at or prior to the Effective Time, (i) book-entry shares representing the aggregate Stock Consideration and any shares of Parent Common Stock included in the aggregate Alternative Consideration (excluding any portion of the aggregate Stock Consideration or Alternative Consideration deliverable in respect of shares of Company Stock owned directly or indirectly by Parent, First Merger Sub or Second Merger Sub and any part of the aggregate Stock Consideration in respect of which cash is to be paid in lieu of fractional shares pursuant to Section 3.02(e)), and (ii) cash in an amount sufficient to pay the aggregate Cash Consideration and the cash portion, if any, of the Alternative Consideration (excluding any Cash Consideration and the cash portion, if any, of the Alternative Consideration payable in respect of shares of Company Stock owned directly or indirectly by Parent, First Merger Sub or Second Merger Sub), plus any cash to be paid in lieu of any fractional shares pursuant to Section 3.02(e), and (iii) CVR Certificates representing the aggregate number of CVRs issuable pursuant to the CVR Agreement, in the case of each of clauses (i), (ii) and (iii), payable or deliverable pursuant to Section 2.04(a).  In addition, Parent shall deposit, or cause to be deposited, with the Exchange Agent, as necessary from time to time at or after the Closing any dividends or distributions payable pursuant to Section 3.02(c).  All shares of Parent Common Stock, cash (including any cash to be paid in lieu of

any fractional shares pursuant to Section 3.02(e)) and CVR Certificates, together with any dividends or distributions with respect thereto pursuant to Section 3.02(c), deposited with or provided to the Exchange Agent by or on behalf of Parent, shall be referred to in this Agreement as the "Exchange Fund". For avoidance of doubt, Parent shall not be required to deposit any funds related to any CVR with the Trustee unless and until such deposit is required pursuant to the terms of the CVR Agreement. The cash portion of the Exchange Fund shall be invested by the

26

Exchange Agent as directed by Parent; provided that the Exchange Fund shall only be invested into Designated Investments. Any interest or other income from such investments shall be paid to and become income of Parent. Except as contemplated by Section 3.02(g), the Exchange Fund shall not be used for any purpose other than as specified in this Section 3.02(a).

(b)     Exchange Procedures.  (i) As promptly as practicable after the Effective Time, the parties shall cause the Exchange Agent to mail to each holder of record of shares of Company Stock as of the Effective Time who is entitled to receive the Merger Consideration pursuant to Section 2.04(a), as set forth on the Closing Capitalization Schedule if such holder of shares of Company Stock has not already returned a valid, duly completed Letter of Transmittal: (A) a Letter of Transmittal and (B) instructions for use in effecting the surrender of the Certificates or transfer of the Book-Entry Shares pursuant to such letter of transmittal.

(ii)     Promptly following the later of (x) the Effective Time and (y) (A) delivery to the Exchange Agent of a letter of transmittal properly completed and validly executed in accordance with the instructions thereto and (B) with respect to holders of Certificates, surrender to the Exchange Agent of a Certificate for cancellation, in each case, together with such other documents as may be reasonably requested, the holder of such shares of Company Stock shall be entitled to receive in exchange therefor (I) cash in the amount equal to the Cash Consideration and, if applicable, the cash portion, if any, of the Alternative Consideration that such holder has the right to receive pursuant to Section 2.04(a) and this Article III (in each case, rounded to the nearest cent); (II) book-entry shares representing the Stock Consideration and, if applicable, any shares of Parent Common Stock included in the Alternative Consideration that such holder has the right to receive pursuant to Section 2.04(a) and this Article III; (III) if applicable, CVRs in the amount that such holder has the right to receive pursuant to Section 2.04(a) and this Article III (subject to and in accordance with the CVR Agreement); (IV) cash in lieu of any fractional shares of Parent Common Stock such holder is entitled to receive pursuant to Section 3.02(e) (rounded to the nearest cent) and (V) any dividends or other distributions such holder is entitled to receive pursuant to Section 3.02(c); and the Certificates or Book-Entry Shares so surrendered shall forthwith be cancelled. In the event of a transfer of ownership of shares of Company Stock which is not registered in the transfer records of the Company, (I) cash in the amount equal to the Cash Consideration and, if applicable, the cash portion, if any, of the Alternative Consideration that such holder has the right to receive pursuant to Section 2.04(a) and this Article III (in each case, rounded to the nearest cent); (II) book-entry shares representing the Stock Consideration and, if applicable, any shares of Parent Common Stock included in the Alternative Consideration that such holder has the right to receive pursuant to Section 2.04(a) and this Article III; (III), if applicable, CVRs in the amount that such holder has the right to receive pursuant to Section 2.04(a) and this Article III (subject to and in accordance with the CVR Agreement); (IV) cash in lieu of any fractional shares of Parent Common Stock such holder is entitled to receive pursuant to Section 3.02(e) (rounded to the nearest cent) and (V) any dividends or other distributions such holder is entitled to receive pursuant to Section 3.02(c) may be issued to a transferee if the Certificate or Book-Entry Shares representing such shares

27

of Company Stock are presented to the Exchange Agent, accompanied by all documents required to evidence and effect such transfer and by evidence that any applicable stock transfer Taxes have been paid. Until surrendered as contemplated by Section 2.04(a) and this Section 3.02, each Certificate or Book-Entry Share shall be deemed at all times after the Effective Time to represent only the right to receive upon such surrender, in each case, without interest, the Merger Consideration, cash in lieu of any fractional shares of Parent Common Stock the holder of such Certificate or Book-Entry Share is entitled to receive pursuant to Section 3.02(e) and any dividends or other distributions such holder is entitled to receive pursuant to Section 3.02(c).

(c)     Distributions with Respect to Unexchanged Shares of Parent Common Stock.  No dividends or other distributions declared or paid with a record date after the Effective Time with respect to the Parent Common Stock (and no cash payment in lieu of fractional shares of Parent Common Stock pursuant to Section 3.02(e)) shall be paid to the holder of any unsurrendered Certificate or Book-Entry Share until the holder of such Certificate or Book-Entry Share shall surrender such Certificate or Book-Entry Share in accordance with Section 3.02(b).

Subject to the effect of escheat, Tax or other applicable Laws, following surrender of any such Certificate or Book-Entry Share in accordance with <u>Section 3.02(b)</u>, there shall be paid to the record holder of shares of Parent Common Stock issued in exchange therefor, without interest, at the appropriate payment date (or, if previously paid, promptly), the amount of dividends or other distributions with a record date after the Effective Time but prior to surrender payable with respect to such shares of Parent Common Stock and the amount of any cash payable in lieu of fractional shares of Parent Common Stock pursuant to <u>Section 3.02(e)</u>.

        (d)      <u>No Further Rights in Company Stock</u>.  All Merger Consideration issued or paid upon surrender of Certificates or transfer of Book-Entry Shares in accordance with the terms of this <u>Article III</u> (including any cash paid pursuant to <u>Section 3.02(c)</u> or <u>Section 3.02(e)</u>) shall be deemed to have been issued or paid, as the case may be, in full satisfaction of all rights pertaining to the shares of Company Stock formerly represented by such Certificates or Book-Entry Shares.

        (e)      <u>No Fractional Shares</u>.  No fractional shares of Parent Common Stock shall be issued as Stock Consideration or Alternative Consideration, but in lieu thereof each holder of Company Stock otherwise entitled to a fractional share of Parent Common Stock will be entitled to receive, from the Exchange Agent in accordance with the provisions of this <u>Section 3.02(e)</u>, a cash payment in lieu of such fractional share of Parent Common Stock in an amount equal to the amount of such fractional share (expressed as a decimal) multiplied by the Average Parent Stock Price.  The parties hereto acknowledge that payment of such cash consideration in lieu of issuing fractional shares of Parent Common Stock was not separately bargained-for consideration but merely represents a mechanical rounding off for purposes of avoiding the expense and inconvenience to Parent that would otherwise be caused by the issuance of fractional shares of Parent Common Stock.  Such amounts payable to holders of shares of Company Stock shall be without interest, rounded down to the nearest whole cent and subject to the amount of any withholding Taxes as contemplated in <u>Section 3.02(i)</u>.

28

        (f)      <u>Adjustments to Stock Consideration</u>.  The calculation of the Aggregate Stock Consideration and aggregate shares of Parent Common Stock, if any, payable as Alternative Consideration shall be equitably adjusted to reflect appropriately the effect of any stock split, reverse stock split, stock dividend (including any dividend or distribution of securities of a Subsidiary of Parent or the Company or of securities convertible into Parent Common Stock or Company Stock), recapitalization, reclassification, combination, exchange of shares or other like change with respect to Parent Common Stock or Company Stock with a record date occurring on or after the date hereof and prior to the Effective Time; <u>provided</u> that nothing in this <u>Section 3.02(f)</u> shall be construed to permit the Company or Parent to take any of the foregoing actions with respect to Company Stock or Parent Common Stock, as applicable, to the extent otherwise prohibited by the terms of this Agreement, including <u>Section 6.01</u> and <u>Section 6.02</u>.

        (g)      <u>Termination of Exchange Fund</u>.  Any portion of the Exchange Fund (including proceeds of any investment thereof) that remains undistributed to the holders of shares of Company Stock on the date that is 12 months after the Effective Time shall be delivered to Parent, upon demand, and any holders of shares of Company Stock who have not theretofore complied with this <u>Article III</u> shall thereafter look only to Parent for the Merger Consideration to which they are entitled pursuant to <u>Section 2.04(a)</u>, any cash in lieu of fractional shares of Parent Common Stock to which they are entitled pursuant to <u>Section 3.02(e)</u> and any dividends or other distributions with respect to the Parent Common Stock to which they are entitled pursuant to <u>Section 3.02(c)</u>.

        (h)      <u>No Liability</u>.  None of the Exchange Agent, Parent, the Surviving Corporation or the Surviving Entity shall be liable to any holder of shares of Company Stock for any Merger Consideration from the Exchange Fund (or dividends or other distributions with respect to Parent Common Stock) or other cash delivered to a public official pursuant to any abandoned property, escheat or similar Law.

        (i)      <u>Withholding Rights</u>.  Each of the Surviving Corporation, the Surviving Entity, the Exchange Agent, Parent, First Merger Sub and Second Merger Sub shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement or the CVR Agreement such amount as it is required to deduct and withhold with respect to the making of such payment under the Code, the rules or regulations promulgated thereunder, any provision of applicable state, local or foreign Tax Law or any other Law.  To the extent that amounts are so deducted or withheld, such deducted or withheld amounts shall be treated for purposes of this Agreement and the CVR Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

        (j)      <u>Lost Certificates</u>.  If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if required by Parent, providing an indemnity agreement in customary form reasonably acceptable to Parent against any claim that may be made against Parent with respect to such Certificate, the Exchange Agent will issue in exchange for such lost, stolen or destroyed Certificate the Merger Consideration with respect to the shares of Company Stock formerly represented by such Certificate to which the holder thereof is entitled pursuant to

<u>Section 2.04(a)</u>, any cash in lieu of fractional shares of Parent Common Stock to which the holder thereof is entitled pursuant to <u>Section 3.02(e)</u> and any dividends or other distributions to which the holder thereof is entitled pursuant to <u>Section 3.02(c)</u>.

Section 3.03  <u>Stock Transfer Books</u>. At the Effective Time, the stock transfer books of the Company shall be closed and there shall be no further registration of transfers of shares of Company Stock thereafter on the records of the Company. On or after the Effective Time, any Certificates or Book-Entry Shares presented to the Exchange Agent or Parent for any reason shall be cancelled and exchanged for the Merger Consideration with respect to the shares of Company Stock formerly represented by such Certificates or Book-Entry Shares to which the holders thereof are entitled pursuant to <u>Section 2.04(a)</u>, any cash in lieu of fractional shares of Parent Common Stock to which the holders of such Certificates or Book-Entry Shares are entitled pursuant to <u>Section 3.02(e)</u> and any dividends or other distributions to which the holders thereof are entitled pursuant to <u>Section 3.02(c)</u>.

Section 3.04  <u>Company Equity Awards</u>. (a) Immediately prior to, and contingent on, the Effective Time, a number of options, shares of Company Stock or restricted stock units, as applicable, subject to each Service-Vesting Award that is unvested as of immediately prior to the Effective Time equal to the number of options, shares or units, as applicable, that would have vested on or prior to the third anniversary of the Effective Time if the applicable holder of such Service-Vesting Award satisfied all applicable service-based vesting criteria through such third anniversary shall vest, with such vesting applied to the options, shares or units, as applicable, that have the longest remaining vesting periods (*i.e.*, in reverse chronological order, as illustrated in the examples set forth on <u>Section 3.04(a) of the Company Disclosure Letter</u>). Any Service-Vesting Award (or portion thereof) that remains unvested following the application of the accelerated vesting provided for in this <u>Section 3.04(a)</u>, shall be referred to as a "<u>Rollover Service-Based Award</u>".

(b)  Immediately prior to, and contingent on, the Effective Time, a number of options, shares of Company Stock or restricted stock units, as applicable, subject to each Performance-Vesting Award that is unvested as of immediately prior to the Effective Time equal to the number of options, shares or units, as applicable, (rounded up to the nearest whole option, share or unit, as applicable) that would have vested based on achievement of the performance-based vesting criteria applicable to such Performance-Vesting Award shall vest as set forth on <u>Section 3.04(b)(i) of the Company Disclosure Letter</u>. Any Performance-Vesting Award (or portion thereof) that remains unvested following the application of the vesting described in this <u>Section 3.04(b)</u>, shall be referred to as a "<u>Rollover Performance-Based Award</u>" and, together with the Rollover Service-Based Awards, the "<u>Rollover Awards</u>". For purposes of this Agreement, the term "<u>Cash-Out Award</u>" shall mean any Company Equity Award (or portion thereof) that is outstanding and vested as of immediately prior to the Effective Time (including, for the avoidance of doubt, any such Company Equity Award (or portion thereof) that (x) vests as a result of the application of <u>Sections 3.04(a)</u> or <u>(b)</u>, or (y) vested in the ordinary course prior to the application of <u>Sections 3.04(a)</u> and <u>(b)</u> or on an accelerated basis in connection with (and on or prior to) the Effective Time (a "<u>Single-Trigger Award</u>")). <u>Section 3.04(b)(ii) of the Company Disclosure Letter</u> sets forth, to the Company's knowledge, all Single-Trigger Awards.

(c)  On the Mailing Date, Parent will cause to be provided to each holder of Company Equity Awards an election form in such form consistent with the terms of this Agreement as Parent shall specify (which such form shall be reasonably acceptable to the Company) (the "<u>Equity Election Form</u>"). The Equity Election Form shall state the procedures for electing among the options for the treatment of Rollover Awards and Cash-Out Awards described herein and shall specify the number of shares of Parent Common Stock and/or amount of cash that comprise the Alternative Consideration as determined by Parent. Each Equity Election Form will permit each holder of Company Equity Awards to specify: (i) which Cash-Out Awards such holder elects to treat as "<u>CVR Cash-Out Awards</u>"; (ii) which Cash-Out Awards such holder elects to treat as "<u>Alternative Cash-Out Awards</u>"; (iii) which Rollover Awards such holder elects to treat as "<u>CVR Rollover Awards</u>"; (iv) which Rollover Awards such holder elects to treat as "<u>Alternative Rollover Awards</u>"; and/or (v) that such holder makes no election with respect to some or all of such holder's Company Equity Awards (any Company Equity Awards described in this clause (v) and any other Company Equity Awards for which Parent does not receive a properly completed Equity Election Form during the Election Period, the "<u>No Election Awards</u>"). The treatment of each of the CVR Cash-Out Awards, Alternative Cash-Out Awards, CVR Rollover Awards and Alternative Rollover Awards is described below. Any No Election Award shall be treated for all purposes, except as set forth below, as a CVR Cash-Out Award or a CVR Rollover Award, as applicable. Notwithstanding anything else in this Agreement or any Election Form to the contrary, any Company Stock Option that is a Rollover Award and that has an exercise price that is greater than or equal to the sum of (x) the Cash Consideration and (y) an amount equal to the product of (I) the Stock Consideration and (II) the Average Parent Stock Price shall be treated as an Alternative Rollover Award. <u>Section 3.01(d)</u> shall

apply to the Equity Election Forms *mutatis mutandis*.

(d)　　　　Immediately prior to, and contingent on, the Effective Time, each Company Stock Option (or portion thereof) that is a Rollover Award shall be canceled in exchange for the right to receive (i) in the case of a CVR Rollover Award only, a number of fully vested CVRs equal to the number of shares of Company Class A Common Stock subject to such Rollover Award immediately prior to such cancelation and (ii) an option to acquire a number of shares of Parent Common Stock equal to the product (rounded down to the nearest whole share) of (A) the number of shares of Company Class A Common Stock subject to such Rollover Award immediately prior to such cancelation, and (B) the applicable Equity Award Ratio, at an exercise price per share (rounded up to the nearest whole cent) equal to the quotient obtained by dividing (x) the exercise price per share of Company Class A Common Stock of such Rollover Award immediately prior to such cancelation by (y) the Equity Award Ratio (such options, "<u>Parent Stock Options</u>"); <u>provided</u> that the exercise price and the number of shares of Parent Common Stock purchasable pursuant to such Parent Stock Option shall be determined in a manner consistent with the requirements of Section 409A of the Code and Section 422 of the Code (to the extent applicable); <u>provided further</u>, that the parties intend that the actions provided for in the foregoing with respect to CVR Rollover Awards shall be implemented by means of a deemed partial exercise of the Company Stock Option in exchange for Company Restricted Stock Awards covering a number of shares with an aggregate value equal to the aggregate value of the CVRs to be received in exchange for such Rollover Award, with such Company Restricted Stock Awards immediately thereafter canceled in exchange for the fully vested CVRs provided

for above in accordance with the election of the holder of such CVR Rollover Awards (and, for clarity, the remainder of the Company Stock Option converted into the Parent Stock Option provided for above in a manner consistent with the requirements of Section 409A of the Code and Section 422 of the Code (to the extent applicable)).

(e)　　　　For purposes of this Agreement, the "<u>Equity Award Ratio</u>" shall mean:

(i)　　　　in the case of a CVR Rollover Award, a fraction (A) the numerator of which is the sum of (x) the Cash Consideration and (y) an amount equal to the product of (I) the Stock Consideration and (II) the Average Parent Stock Price and (B) the denominator of which is the Average Parent Stock Price

(ii)　　　　in the case of an Alternative Rollover Award, a fraction (A) the numerator of which is the sum of (x) the cash portion of the Cash & Stock Consideration (which includes the cash portion of the Alternative Consideration (if any)) and (y) an amount equal to the product of (I) the stock portion of the Cash & Stock Consideration (which includes the stock portion of the Alternative Consideration (if any)) and (II) the Average Parent Stock Price and (B) the denominator of which is the Average Parent Stock Price.

(f)　　　　Immediately prior to, and contingent upon, the Effective Time, each Company Restricted Stock Award (or portion thereof) that is a Rollover Award shall be canceled in exchange for the right to receive (i) in the case of a CVR Rollover Award only, a number of fully vested CVRs equal to the number of shares of Company Class A Common Stock subject to such Rollover Award immediately prior to such cancelation and (ii) a number of restricted shares of Parent Common Stock equal to the product (rounded down to the nearest whole share) of (A) the number of shares of Company Class A Common Stock subject to such Rollover Award immediately prior to such cancelation and (B) the applicable Equity Award Ratio (such restricted shares, "<u>Parent Restricted Stock</u>").

(g)　　　　Immediately prior to, and contingent upon, the Effective Time, each Company RSU Award (or portion thereof) that is a Rollover Award shall be canceled in exchange for the right to receive (i) in the case of a CVR Rollover Award only, a number of fully vested CVRs equal to the number of shares of Company Class A Common Stock subject to such Rollover Award immediately prior to such cancelation and (ii) a restricted stock unit with respect to a number of shares of Parent Common Stock equal to the product (rounded down to the nearest whole share) of (A) the number of shares of Company Class A Common Stock subject to such Rollover Award immediately prior to such cancelation, and (B) the applicable Equity Award Ratio (such restricted stock units, collectively with the Parent Stock Options and Parent Restricted Stock, the "<u>Parent Awards</u>").

(h)　　　　Except as specifically provided in this <u>Section 3.04</u>, following the Effective Time, each Parent Award shall continue to be governed by the terms and conditions that applied to the applicable Rollover Award immediately prior to the applicable cancelation, including, for the avoidance of doubt, any service-based and performance-based vesting criteria that are not satisfied or deemed satisfied prior to the Effective Time (including pursuant to

<u>Sections 3.04(a)</u> and <u>(b)</u>). Notwithstanding the foregoing, solely to the extent set forth on <u>Section 3.04(b) of the Company Disclosure Letter</u>, Parent Awards in respect of Rollover Awards that are Performance-Vesting Awards shall no longer be subject to any performance-vesting criteria following the Effective Time.

(i)     Immediately prior to, and contingent on, the Effective Time, each Cash-Out Award shall be canceled and converted into the right to receive for each share of Company Stock subject to such Cash-Out Award as of immediately prior to such cancelation, in full satisfaction of the rights of the applicable holder with respect thereto, (i) in the case of a CVR Cash-Out Award, the CVR Consideration or (ii) in the case of an Alternative Cash-Out Award, the Cash & Stock Consideration, in each case, less (A) in the case of any Cash-Out Award that is a Company Stock Option, the applicable exercise price for such share and (B) in the case of all Company Equity Awards, any required withholding Taxes ((A) and (B) together, the "<u>Cash-Out Deductions</u>", and the net consideration payable hereunder in respect of a Cash-Out Award, the "<u>Cash-Out Award Consideration</u>"). Any Cash-Out Deductions shall be satisfied by reducing the cash portion of the applicable consideration by the amount of such Cash-Out Deductions, but not below zero. In the event such cash portion has a value that is less than such Cash-Out Deductions, such cash portion shall be reduced to zero and in addition Parent shall retain a portion of the stock portion of the applicable consideration that has a value equal to the amount by which the Cash-Out Deductions exceed such cash portion. The Cash-Out Award Consideration shall be paid as promptly as practicable following the Effective Time (and in no event later than five (5) Business Days thereafter) through Parent's, the Surviving Entity's or the applicable Subsidiary of the Surviving Entity's payroll. Notwithstanding the foregoing, to the extent that any Cash-Out Award Consideration relates to a Company RSU Award that is nonqualified deferred compensation subject to Section 409A of the Code, Parent, the Surviving Entity or the applicable Subsidiary shall pay such amounts at the earliest time, as applicable, that will not trigger a Tax or penalty under Section 409A of the Code, but no later than five (5) Business Days after such time.

(j)     Notwithstanding the foregoing, in the event any Cash-Out Award Consideration would result in the payment of a fractional share of Parent Common Stock, all such fractional shares a holder of Company Equity Awards in respect of Company Equity Awards would be entitled to shall be aggregated and paid in (i) a number of shares of Parent Common Stock equal to such aggregated number rounded down to the nearest whole share and (ii) an amount in cash equal to the product of (A) such aggregated number minus the number of whole shares determined in clause (i) and (B) the Average Parent Stock Price.

(k)     No later than the Effective Time, Parent shall, if registration of the shares of Parent Common Stock issuable under the Company Stock Plan or other Plan is required under the Securities Act and such registration is not covered by any Form S-4 filed in connection with the Transactions, file with the SEC a registration statement on Form S-8, as the case may be (or any successor form), or another appropriate form with respect to such Parent Common Stock and shall use commercially reasonable efforts to have such registration statement declared effective no later than the Effective Time.

(l)     At or prior to the Effective Time, the Company, the Company Board or a committee of the Company Board, as applicable, shall adopt any resolutions and take any actions which are necessary to effectuate the provisions of this <u>Section 3.04</u>.

(m)     Notwithstanding anything in this Agreement to the contrary, any Taxes required to be withheld in connection with CVRs issued in respect of any Company Equity Award pursuant to this <u>Section 3.04</u> (other than in respect of any Cash-Out Awards, which are covered solely by <u>Section 3.04(i)</u>) shall be satisfied by reducing the cash portion of the applicable consideration that would otherwise be received by the holder of the applicable Company Equity Award by the amount of such required Tax withholding, but not below zero and, in the event such cash portion has a value that is less than such required Tax withholding, such cash portion shall be reduced to zero and in addition Parent shall retain a portion of the stock portion of the applicable consideration that would otherwise be received by the holder of the applicable Company Equity Award that has a value equal to the amount by which the required Tax withholding exceeds such cash portion. In the event the cash and stock portion has a value that is less than such required Tax withholding, the Company shall determine an alternative means of satisfying such Tax withholding that is reasonably acceptable to Parent.

Section 3.05     <u>Appraisal Rights</u>. (a)  Notwithstanding anything in this Agreement to the contrary, shares of Company Stock that are outstanding immediately prior to the Effective Time and that are held by any holder who has not voted in favor of the Mergers or consented in writing, has not waived appraisal rights in connection with the Mergers, and properly demands appraisal of such shares pursuant to, and in accordance with, Section 262 of the DGCL ("<u>Appraisal Shares</u>") shall not be converted into the right to receive the Merger Consideration as provided in <u>Section 2.04(a)</u>, but instead shall be entitled to only those rights as are granted by Section 262 of the DGCL; <u>provided</u>, <u>however</u>, that if

any such holder shall fail to perfect or otherwise shall waive, withdraw or lose the right to appraisal under Section 262 of the DGCL, or a court of competent jurisdiction shall determine such holder is not entitled to the relief provided by Section 262 of the DGCL, then the right of such holder to be paid the fair value of such holder's Appraisal Shares under Section 262 of the DGCL shall cease and such Appraisal Shares shall thereupon be treated as if they were No Election Shares and shall be deemed to have been converted as of the Effective Time into, and shall represent only the right to receive, the CVR Consideration as provided in <u>Section 2.04(a)</u> upon the surrender of such shares in the manner provided in <u>Section 3.02</u>.

(b)    The Company shall give prompt notice to Parent of any demands received by the Company for appraisal of any shares of Company Stock, any attempted withdrawals of such demands and any other instruments served pursuant to the DGCL and received by the Company relating to be paid the "fair value" of the Appraisal Shares, as provided in Section 262 of the DGCL, and Parent shall have the right to participate in and direct all negotiations and Actions with respect to such demands.  Prior to the Effective Time, the Company shall not, without the prior written consent of Parent, make any payment with respect to, or settle or offer to settle, any such demands, or agree to do any of the foregoing.  Parent shall not, except with the prior written consent of the Company, require the Company to make any payment with respect to any demands for appraisal or offer to settle or settle any such demands.

34

Section 3.06    <u>Closing Capitalization Schedule</u>.  (a)  No less than five Business Days prior to the Closing, the Company shall deliver to Parent and the Exchange Agent a schedule (the "<u>Closing Capitalization Schedule</u>"), setting forth, as of the Effective Time:

(i)    a list, substantially in the form of <u>Section 3.06 of the Company Disclosure Letter,</u> of all holders of Company Stock and Company Equity Awards and each such holder's address and:

(A)    the number of shares of each class or series of Company Stock held by such holder immediately prior to the Closing Date, indicating whether any such shares are Company Restricted Stock Awards (and if so, whether or not such Company Restricted Stock Awards are subject to any performance-based vesting conditions and, if so, the target number of shares of Company Stock that may be issued under such award) and with respect to any shares of Company Class B Common Stock or Company Preferred Stock of any series, (I) the conversion rate to Company Class A Common Stock applicable thereto, (II) the liquidation preference applicable thereto and (III) the amount of any accrued but unpaid dividends applicable thereto;

(B)    the number of Company RSU Awards held by such holder immediately prior to the Closing Date, indicating whether or not such Company RSU Awards are subject to any performance-based vesting conditions and, if so, the target number of shares of Company Stock that may be issued under such award; and

(C)    the number of all Company Stock Options held by such holder immediately prior to the Closing Date, indicating (I) whether such Company Stock Options are vested or unvested, (II) the number of shares of Company Stock issuable upon exercise of such Company Stock Options, as applicable, (III) the exercise price with respect to each Company Stock Option and (iV) whether or not such Company Stock Options are subject to any performance-based vesting conditions and, if so, the target number of shares of Company Stock that may be issued under such award; and

(ii)    (A) the calculation of the Company Fully Diluted Share Count and Cash Consideration and Stock Consideration payable in respect of a share of each class or series of Company Stock, (B) the aggregate Merger Consideration to be paid to Company stockholders pursuant to Section 2.04(a) and (C) the aggregate consideration to be paid in respect of Company Equity Awards pursuant to <u>Section 3.04</u>, in each case calculated in accordance with this Agreement, the Company's certificate of incorporation, and any applicable Plan (including the Company Stock Plan and any other Plans governing the terms of any Company Stock Options, Company Restricted Stock Awards or Company RSU Awards) and accompanied with detailed calculations to arrive at the amounts set forth in the Closing Capitalization Schedule.

35

(b)    The Company shall (i) take all necessary actions to freeze all exercises of Company Stock Options as of immediately prior to delivery of the Closing Capitalization Schedule, and (ii) promptly, but in no event later than the Closing Date, provide Parent and the

Exchange Agent an updated Closing Capitalization Schedule reflecting any forfeiture, vesting or settlement (as applicable) of Company Restricted Stock Awards, Company RSU Awards and Company Stock Options that occur between the delivery of the Closing Capitalization Schedule and the Closing Date.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

As an inducement to Parent, First Merger Sub and Second Merger Sub to enter into this Agreement, except (i) as disclosed in the Company Registration Statement (including exhibits) filed by the Company and publicly available prior to the date of this Agreement (but excluding any forward-looking disclosures set forth in any "risk factors" section, any disclosures in any "forward-looking statements" section and any other disclosures included therein to the extent they are predictive or forward-looking in nature, in each case other than statements of historical fact) or (ii) as set forth in the Company Disclosure Letter (it being agreed that disclosure of any item in any section of the Company Disclosure Letter shall be deemed disclosure with respect to any other section of this Agreement to which the relevance of such disclosure is reasonably apparent on its face), the Company hereby represents and warrants to Parent, First Merger Sub and Second Merger Sub that:

Section 4.01    Organization and Qualification; Subsidiaries.  (a) The Company is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware and has the requisite corporate or similar power and authority to own, lease and operate its properties and assets and carry on its business as it is now being conducted. The Company has made available to Parent, prior to the execution of this Agreement, a true and complete copy of the Company's certificate of incorporation and bylaws, as amended to the date of this Agreement, which are in full force and effect.

(b)    Each Subsidiary of the Company is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has the requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. The Company and each of its Subsidiaries is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in each jurisdiction where the character of the properties or assets owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary or desirable, except where the failure to be so qualified or licensed and in good standing would not, individually or in the aggregate, be reasonably expected to have a Company Material Adverse Effect.

(c)    Section 4.01(b) of the Company Disclosure Letter sets forth, as of the date hereof, a true and complete list of each Subsidiary of the Company, the jurisdiction of

incorporation or formation of each such Subsidiary and the ownership interest of the Company and any third parties in each such Subsidiary.

(d)    The Company has made available to Parent, prior to the execution of this Agreement, a true and complete copy of the organizational documents of each of its Subsidiaries, in each case, as amended to the date of this Agreement. Such certificates of incorporation, bylaws and equivalent organizational documents are in full force and effect, except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. None of the Company's Subsidiaries is in violation of any of the provisions of its certificate of incorporation, bylaws or equivalent organizational documents except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. The Company is not in violation of any of the provisions of its certificate of incorporation or bylaws.

Section 4.02    Capitalization.  (a) The authorized capital stock of the Company consists of (i) 898,203,200 shares of Company Common Stock and (ii) 534,145,027 shares of Company Preferred Stock.  As of the date hereof, (i) 120,746,694 shares of Company Class A Common Stock were issued and outstanding, including 592,442 shares subject to Company Restricted Stock Awards (with zero (0) additional shares of Company Class A Common Stock issued and held in the treasury of the Company and 6,804,539 shares of Company Class A Common Stock reserved for future issuance pursuant to the Company Stock Plan); (ii) 24,989,397 shares of Company Class B Common Stock, which are convertible into 26,179,367 shares of Company Class A Common Stock, were issued and outstanding, none of which are subject to Company Restricted Stock Awards (with an additional zero (0) shares of Company Class B Common Stock issued and held in the treasury of the Company and zero (0) shares of Company Class B Common Stock reserved for future issuance pursuant to the Company Stock Plan); (iii) 85,000,000 shares of Company Series A Preferred Stock, which are convertible into 85,000,000 shares of Company Class A Common Stock, were issued and outstanding; (iv) 309,256,591 shares of Company Series B Preferred Stock, which are convertible into 309,256,591 shares of Company Class A Common Stock, were issued and outstanding; (v) 63,144,600 shares of Company Series C Preferred Stock, which are convertible into 63,144,600 shares of Company Class A Common Stock, were issued and outstanding; and (vi) 76,743,836 shares of Company

Series D Preferred Stock, which are convertible into 76,743,836 shares of Company Class A Common Stock, were issued and outstanding, in each case duly authorized and validly issued, fully paid and non-assessable. As of the date hereof, 96,320,592 shares of Company Class A Common Stock are subject to outstanding Company Stock Options, and 30,343,670 shares of Company Class A Common Stock are subject to outstanding Company RSU Awards. With respect to Company Equity Awards, the foregoing assumes 100% achievement of all applicable performance criteria. Except as set forth in this <u>Section 4.02</u> or as set forth in <u>Section 4.02(a) of the Company Disclosure Letter</u>, there are no authorized, issued, reserved for issuance or outstanding (i) shares of capital stock, voting securities or other equity interests of the Company; (ii) options, calls, warrants, convertible debt, other convertible or exchangeable instruments or rights, agreements, arrangements or commitments of any character made or issued by the Company or any of its Subsidiaries obligating the Company or any of its Subsidiaries to issue, deliver or sell any shares of capital stock, voting securities or other equity interests of the Company or any of its Subsidiaries; or

(iii) "phantom" stock, "phantom" stock rights, stock appreciation rights, stock-based units or any other similar interests issued by the Company or any of its Subsidiaries, or rights to acquire such interests from the Company or any Subsidiary. All shares of Company Stock subject to issuance as aforesaid, upon issuance on the terms and conditions specified in the instruments pursuant to which they are issuable, will be, and each outstanding share of Company Stock has been and is, (i) duly authorized, validly issued, fully paid and non-assessable; and (ii) not subject to or issued in violation of any preemptive rights purchase option, call option, right of first refusal, anti-dilutive right, subscription right or any similar right created by applicable Law, the organizational documents of the Company or any agreement to which the Company is a party or otherwise bound.

(b)     There are no outstanding contractual obligations of the Company or any of its Subsidiaries to repurchase, redeem or otherwise acquire any capital stock, voting securities or other equity interests or securities convertible into or exchangeable or exercisable for capital stock, voting securities or other equity interests of the Company or any of its Subsidiaries or to provide funds to, or make any investment (in the form of a loan, capital contribution or otherwise) in, any Subsidiary of the Company or any other Person. All Company Stock Options, Company Restricted Stock Awards and Company RSU Awards are evidenced by award agreements, in each case, in substantially the forms made available to Parent by the Company, and no award agreement contains terms that are materially inconsistent with the applicable forms. There are no declared or accrued unpaid dividends with respect to any Company Stock.

(c)     Each outstanding share of capital stock of, or other equity interests in, each Subsidiary of the Company is duly authorized, validly issued, fully paid and non-assessable; each such share or interest is owned by the Company or another of its wholly owned Subsidiaries free and clear of all Encumbrances and free of any restriction on the right to vote, sell or otherwise dispose of such capital stock or other equity interests (in each case, other than any Encumbrance or restriction arising under applicable securities Laws); and each such share or interest was not issued in violation, in any material respect, of any preemptive rights, purchase option, call option, right of first refusal, anti-dilutive right, subscription right or any similar right under applicable Law, the organizational documents of any applicable Subsidiary or any agreement to which the Company or any Subsidiary is a party or otherwise bound. Except for the capital stock of, or other equity interest in, its Subsidiaries, the Company does not own, directly or indirectly, any capital stock of, or other equity or similar interest in, any corporation, partnership, joint venture, association or other entity.

(d)     As of the date of this Agreement, no bonds, debentures, notes or other Indebtedness of the Company having the right to vote (or convertible into or exercisable for securities having the right to vote) on any matters on which stockholders of the Company may vote are issued or outstanding.

(e)     Except as provided in the Investor Agreements, the Selling Investor Support Agreement and the Support Agreements, none of the Company or any of its Subsidiaries is party to any stockholder agreements, voting trusts, proxies or other similar agreements, arrangements or understandings with respect to the voting or transfer, or requiring registration, of the Company Common Stock or the Company Preferred Stock or other voting or equity interests

in the Company or any of its Subsidiaries. The Company has made available to Parent a true and complete copy of the Investor Agreements (including any amendments thereto).

(f)     <u>Section 4.02(f) of the Company Disclosure Letter</u> sets forth a true and complete list as of the date hereof of each

registered holder of Company Stock, showing the number of shares of each class or series of such capital stock held by each such holder.

(g)        The Closing Capitalization Schedule will, as of the Closing Date, be true and complete in all respects and the amounts set forth therein will be calculated pursuant to and in accordance with this Agreement, the Company's certificate of incorporation and any applicable Plan (including the Company Stock Plan and any other Plans governing the terms of any Company Equity Awards).  As of the Closing, (i) the number of shares of Company Stock set forth in the Closing Capitalization Schedule as being owned by a Person, or subject to Company Equity Awards owned by such Person, will constitute the entire interest of such Person in the issued and outstanding capital stock of, or any other equity or ownership interests in, the Company, and record ownership of such shares of Company Stock set forth in the Closing Capitalization Schedule is held by such Person and (ii) no Person not disclosed in the Closing Capitalization Schedule will be the record owner of, or have a right to acquire from the Company any shares of capital stock of, or any other equity or ownership interests in, the Company or options in respect of the foregoing.

Section 4.03        Authority Relative to This Agreement; Vote Required.  (a)  The Company has all necessary corporate power and authority to execute and deliver this Agreement, and, subject to, with respect to the Mergers, obtaining the Company Stockholder Approvals and filing the Certificates of Merger with the Secretary of State of the State of Delaware as required by the DGCL and the DLLCA, as applicable, to perform its obligations hereunder and to consummate the Transactions.  The execution and delivery of this Agreement by the Company and the consummation by the Company of the Transactions have been duly and validly authorized by all necessary corporate action, and no other corporate proceedings on the part of the Company are necessary to authorize this Agreement or to consummate the Transactions (other than, with respect to the Mergers, obtaining the Company Stockholder Approvals and filing the Certificates of Merger with the Secretary of State of the State of Delaware as required by the DGCL and the DLLCA, as applicable).  This Agreement has been duly and validly executed and delivered by the Company and, assuming the due authorization, execution and delivery by Parent, First Merger Sub and Second Merger Sub, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to the effect of any applicable bankruptcy, insolvency (including all Laws relating to fraudulent transfers), reorganization, moratorium or similar Laws affecting creditors' rights generally and subject to the effect of general principles of equity (regardless of whether considered in a proceeding at law or in equity).

(b)        The Company Board, by resolutions duly adopted by the Company Board (by the unanimous vote of all directors, including both Preferred Directors (as defined in the Company's certificate of incorporation), present) at a meeting duly called and held on the date hereof and not subsequently rescinded, modified or withdrawn in any way prior to the date of this Agreement, has (i) determined that this Agreement and the Transactions are fair to, and in

the best interests of, the Company and its stockholders; (ii) approved and declared advisable this Agreement and the Transactions; (iii) adopted the Drag-Along Resolutions; (iv) resolved to recommend that the stockholders of the Company adopt this Agreement and (v) directed that this Agreement be submitted to the stockholders of the Company for adoption, which resolutions have not, as of the date hereof, been subsequently rescinded, modified or withdrawn in any way.

(c)        The only votes of the holders of any class or series of capital stock of the Company necessary to adopt this Agreement and approve the Transactions are the Company Stockholder Approvals.  The Selling Investors collectively hold a sufficient number of shares of Company Common Stock and Company Preferred Stock to deliver the Company Stockholder Approvals without further stockholder support.

(d)        The Voting Agreement is in full force and effect and has not been amended in any manner.  To the knowledge of the Company, there is no contract or other agreement in effect that would prevent or disable the effectiveness of the Drag-Along or restrict the exercise or effectiveness of the Drag-Along, in each case, with respect to the Transactions.

(e)        (i) The distribution of Merger Consideration to the stockholders of the Company pursuant to Article II and Article III will satisfy the requirements of Section 2.1 and Section 2.2 of Part B Article Fourth and Section 7 of Part A Article Fourth of the Company's certificate of incorporation and (ii) the Mergers will constitute a Deemed Liquidation Event (as defined in the Company's certificate of incorporation).

Section 4.04        No Conflict; Required Filings and Consents.  (a)  The execution and delivery of this Agreement by the Company do not, and the performance of this Agreement by the Company, and the consummation of the Transactions, will not, (i) conflict with or violate the certificate of incorporation, bylaws or other equivalent organizational documents of (A) the Company or (B) any of its Subsidiaries, (ii) assuming all consents, approvals, authorizations and other actions described in Section 4.04(b) have been obtained or taken and all filings and obligations described in Section 4.04(b) have been made or satisfied, conflict with or violate any Law applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound, or (iii) violate, conflict with, require consent

under, result in any breach of, result in loss of benefit under, or constitute a default (or an event which, with notice or lapse of time or both, would become a default) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of an Encumbrance on any property or asset of the Company or any of its Subsidiaries pursuant to, any contract, Company Permit or other instrument or obligation to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries or any of their respective assets or properties is bound, except, with respect to clauses (i)(B), (ii) and (iii) of this Section 4.04(a), for any such conflicts, violations, breaches, defaults or other occurrences which would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(b)        The execution and delivery of this Agreement by the Company do not, and the performance of this Agreement by the Company and the consummation of the Transactions will not, require any consent, approval, authorization or permit of, or filing with or notification

to, any Governmental Authority, except (i) applicable requirements of the Securities Act (including in connection with the Registration Statement) or any Blue Sky Laws, (ii) the pre-merger notification requirements of the HSR Act, the requirements of any other Antitrust Laws and the filing of the Certificates of Merger with the Secretary of State of the State of Delaware as required by the DGCL or the DLLCA, as applicable, or (iii) where the failure to obtain such consents, approvals, authorizations or permits, or to make such filings or notifications, would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

Section 4.05        Permits; Compliance.  (a)  Since January 1, 2018, the Company and its Subsidiaries have operated and conducted their businesses in compliance with all Laws of any Governmental Authority applicable to their respective businesses or operations, except where such non-compliance would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.  Since January 1, 2018, neither the Company nor any of the Subsidiaries has received any written notice alleging, or been charged by a Governmental Authority with, any violation of any Laws, except where such violation would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(b)        The Company and each of its Subsidiaries has obtained and holds all Company Permits and all such Company Permits are valid and in full force and effect, except where the failure to hold the same or to be in full force and effect would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.  In addition, (i) the Company and each of its Subsidiaries have not been in default under, or violation of, any such Company Permit, (ii) no suspension or cancellation of any of the Company Permits is pending or, to the knowledge of the Company, threatened, and (iii) the Company has taken all measures reasonably necessary (including by making all applications or filings required by applicable Law or the applicable Governmental Authority) to extend any Company Permit to prevent the expiration thereof, except, with respect to clauses (i), (ii) and (iii) of this Section 4.05(b), as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

Section 4.06        Company Registration Statement; Financial Statements; Undisclosed Material Liabilities.  (a)  The Company has made available to Parent true and complete copies of all written correspondence with the SEC related to the Company Registration Statement. The Company Registration Statement, at the time it was filed and, if amended, as of the date of such amendment, complied in all material respects with all applicable requirements of the Securities Act and the rules and regulations promulgated thereunder, and did not, at the time it was filed and, if amended, as of the date of such amendment, contain any untrue statement of material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

(b)        Each of the consolidated financial statements (including, in each case, any notes thereto) contained in the Company Registration Statement (collectively, the "Financial Statements") was prepared in accordance with GAAP applied on a consistent basis throughout

the periods indicated (except as may be indicated in the notes thereto) and each fairly presents, in all material respects, the consolidated financial condition, results of operations, changes in stockholders' equity and cash flows of the Company and its consolidated Subsidiaries as of the respective dates thereof and for the respective periods indicated therein (subject, in the case of unaudited financial statements, to normal year-end adjustments).

(c)        The Company and its Subsidiaries maintain a system of internal controls over financial reporting that are effective to ensure (i) the reliability of financial reporting, including policies and procedures that mandate the maintenance of records that in reasonable detail accurately and fairly reflect the material transactions and dispositions of the assets of the Company and its Subsidiaries, (ii) that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP, consistently applied, (iii) that transactions are executed only in accordance with the authorization of management and (iv) the prevention or timely detection of the unauthorized acquisition, use or disposition of assets.

(d)        Neither the Company nor any of its Subsidiaries has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise), except liabilities (i) reflected or reserved against in the consolidated balance sheet (or the notes thereto) of the Company as of December 31, 2019, included in the Financial Statements, (ii) incurred after December 31, 2019 in the ordinary course of business, (iii) incurred in connection with the negotiation, execution, delivery or performance of, or pursuant to the terms of, this Agreement or the other Transaction Documents (for clarity, any liability caused by or resulting from a breach by the Company of this Agreement shall not be deemed a liability "incurred in connection with the negotiation, execution, delivery or performance of, or pursuant to the terms of, this Agreement") or (iv) that would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(e)        Since January 1, 2018, none of the Company, the Company's independent accountants, the Company Board or its audit committee has received any written, or to the knowledge of the Company, oral notification of any (i) "significant deficiency" in the internal controls over financial reporting of the Company; (ii) "material weakness" in the internal controls over financial reporting of the Company; or (iii) fraud, whether or not material, that involves management or other employees of the Company who have a significant role in the internal controls over financial reporting of the Company.  Since January 1, 2018, there have been no material internal investigations regarding accounting, auditing or revenue recognition discussed with, reviewed by or initiated at the direction of the Chief Executive Officer, Chief Financial Officer or General Counsel of the Company or the Company Board or any committee thereof.  For purposes of this Agreement, the terms "significant deficiency" and "material weakness" shall have the meanings assigned to them in the Statement of Auditing Standard FAS 115 – Communicating Internal Control Related Matters Identified in an Audit, as in effect on the date hereof.

(f)        Since January 1, 2018, (i) neither the Company nor any of its Subsidiaries has received any written or, to the knowledge of the Company, oral complaint, allegation, assertion or claim regarding accounting, internal accounting controls or auditing practices, procedures, methodologies or methods of the Company or any of its Subsidiaries, or unlawful

accounting or auditing matters with respect to the Company or any of its Subsidiaries, and (ii) no attorney representing the Company or any of its Subsidiaries, whether or not employed by the Company or any of its Subsidiaries, has reported evidence of a breach of fiduciary duty or similar violation by the Company or any of its Subsidiaries or any of their respective officers, directors, employees or agents to the Company Board or any committee thereof or to the General Counsel or Chief Executive Officer of the Company, except as, in each of (i) and (ii), has not had and would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

Section 4.07        Absence of Certain Changes or Events.  Since December 31, 2019, there has not been any Company Material Adverse Effect.  From June 30, 2020 to the date of this Agreement, (a) the Company and its Subsidiaries have conducted their businesses in all material respects in the ordinary course and (b) neither the Company nor any of its Subsidiaries has taken any action that, if taken after the date of this Agreement, would constitute a breach of any of the covenants set forth in Section 6.01(b) (with the exception of those set forth in clauses (i), (ii), (iv), (viii), (xii), (xiv), (xv), (xix), (xx) and (xxii) (to the extent related to the foregoing)), except where such action has not had, and would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

Section 4.08        Absence of Litigation.  Except as set forth on Section 4.08 of the Company Disclosure Letter, there is no Action pending or, to the knowledge of the Company, threatened (i) against or involving the Company, any of its Subsidiaries or any of their respective assets, officers, directors or key employees (in the case of officers, directors or key employees, arising out of such officer's, director's or key employee's relationship with the Company) that, individually or in the aggregate, has or would reasonably be expected to have a Company Material Adverse Effect, or (ii) that seeks to restrain or enjoin the consummation of the Transactions.  There is not any Order of any Governmental Authority or arbitrator outstanding against, or, to the knowledge of the Company, investigation by any Governmental Authority involving, the Company, any of its Subsidiaries or any of their respective assets, officers, directors or key employees (in the case of such officers, directors or key employees, such as would affect the Company or any of its Subsidiaries) that, individually or in the aggregate, has or would reasonably be expected to have a Company Material Adverse Effect.  There is no material Action pending by the Company or any of its Subsidiaries, or which the Company or any of its Subsidiaries intends to initiate, against any other Person.

Section 4.09        Employee Benefit Plans.  (a)  Section 4.09(a) of the Company Disclosure Letter lists each material Plan as of the date hereof.  To the extent applicable, with respect to each material Plan, true and correct copies of the following have been delivered or made available to Parent by the Company:  (i) all Plan documents (including all amendments and attachments thereto), or written summaries of any such Plan not in writing; (ii) all related trust documents, insurance contracts or other funding arrangements and the most recent actuarial report; (iii) the most recent annual report (Form 5500) filed with the IRS or comparable report filed with any other applicable Governmental Authority; (iv) the most recent determination, opinion or advisory letter from the IRS or other applicable Governmental Authority; and (v) the most recent summary plan description and any summary of material modification thereto.

43

(b)        Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, (i) the terms of each Plan comply with applicable Law and each Plan has been operated and funded in accordance with its terms and applicable Law and (ii) the Company and its Subsidiaries are in compliance with all Laws relating to the Plans.  Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, no Action is pending or, to the knowledge of the Company, threatened with respect to any Plan (other than claims for benefits in the ordinary course), and, to the knowledge of the Company, there are not any facts that would be reasonably expected to give rise to any such Action.

(c)        Each Plan that is intended to be qualified under Section 401(a) of the Code either has received a favorable determination letter from the IRS or may rely upon a favorable prototype opinion letter from the IRS as to its qualified status and, to the knowledge of the Company, there are no facts or circumstances that could reasonably be expected to adversely affect such qualification.

(d)        Neither the Company nor any of its Subsidiaries has incurred or reasonably expects to incur any liability (actual or contingent) under, arising out of or by operation of Title IV of ERISA (other than liability for premiums to the PBGC arising in the ordinary course), except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.  Neither the Company nor any of its Subsidiaries has, during the six-year period ending on the date hereof, maintained, contributed to or been required to contribute to any "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA.

(e)        Except as provided in this Agreement or as set forth on Section 4.09(e) of the Company Disclosure Letter, neither the execution of this Agreement nor the consummation of the Transactions will (either alone or in connection with any other event, including a termination of employment or service of any current or former Service Provider in connection with the Transactions):  (i) entitle any current or former Service Provider to severance pay or benefits or any increase in severance pay or benefits upon any termination of employment or service with the Company or any of its Subsidiaries; and (ii) accelerate the time of payment or vesting or trigger any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, or increase the amount payable pursuant to, any of the Plans to any current or former Service Provider.  No payment or benefit that will or may be made by the Company or its Subsidiaries to any of their respective current or former Service Providers is reasonably expected to, individually or in combination with any other such payment or benefit, constitute an "excess parachute payment", as defined in Section 280G(b)(1) of the Code.

(f)        Neither the Company nor any of its Subsidiaries has any obligation to provide health or other welfare benefits to any current or former Service Provider following any termination of employment under any Plan (other than continuation coverage required under Section 4980(B)(f) of the Code or other applicable Law or for which the Service Provider bears the full cost).

44

(g)        No current or former Service Provider is entitled to any gross-up, make-whole or reimbursement payment from the Company or any of its Subsidiaries in respect of any Tax imposed on such Service Provider.

(h)        Neither the Company nor any of its Subsidiaries has (i) applied for or received any loan under the Paycheck Protection Program under the CARES Act or (ii) deferred any Taxes under Section 2302 of the CARES Act or claimed any Tax credit under Section 2301 of the CARES Act or Sections 7001-7003 of the FFCRA or I.R.S. Notice 2020-65.

(i)        With respect to each Non-U.S. Benefit Plan, except as would not, individually or in the aggregate, reasonably be

expected to have a Company Material Adverse Effect:

(i) all contributions to each Non-U.S. Benefit Plan required to be made by the Company or its Subsidiaries by Law or by the terms of such Non-U.S. Benefit Plan or pursuant to any mandatory provident fund schemes have been made or, if applicable, accrued in accordance with generally accepted accounting practices in the applicable jurisdiction applied to such matter;

(ii) each Non-U.S. Benefit Plan required to be registered has been so registered and has been maintained in good standing with applicable Governmental Authorities; and

(iii) each Non-U.S. Benefit Plan is in compliance with any funding requirements mandated by applicable Law.

Section 4.10    Labor and Employment Matters.  (a) Neither the Company nor any of its Subsidiaries is a party to any collective bargaining agreement or similar contract applicable to any current or former Service Provider.  Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, (i) from January 1, 2018 through the date of this Agreement, there have not been any strikes or other labor disputes or work stoppages or organizational campaigns, petitions or other unionization activities seeking recognition of a collective bargaining unit relating to any current or former Service Provider, (ii) there are no strikes or other labor disputes or work stoppages or campaigns, petitions or other activities ongoing or, to the knowledge of the Company, threatened, and (iii) neither the Company nor any of its Subsidiaries is the subject of any proceeding alleging that the Company or any of its Subsidiaries has engaged in any unfair labor practice under any applicable Law.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, the Company and each of its Subsidiaries are currently in compliance with all applicable Laws related to the engagement of service providers, employment practices and labor relations, including those related to wages, hours, classification, immigration, health, safety and collective bargaining.  Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, no current or former individual independent contractor that provides personal services to

45

the Company or its Subsidiaries (other than any current or former director) is entitled to any fringe or other benefits (other than cash consulting fees or other consulting payments) pursuant to any Plan.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, no Action by or before any Governmental Authority with respect to the Company or any of its Subsidiaries in relation to the employment or alleged employment of any individual is ongoing or, to the knowledge of the Company, pending or threatened.

(d)    Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect and except as set forth in Section 4.10(d) of the Company Disclosure Letter, since January 1, 2018, the Company and its Subsidiaries have not been subject to any Actions alleging sexual harassment, sexual misconduct, bullying or unlawful discrimination committed by any director, officer or other managerial employee of the Company or any of its Subsidiaries related to his or her directorship or employment with the Company or any of its Subsidiaries.

Section 4.11    Real Property; Title to Assets.  (a) Neither the Company nor any of its Subsidiaries owns any real property.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, (i) each Real Property Lease is valid and binding on the Company or the Subsidiary of the Company that is a party thereto and, to the knowledge of the Company, each other party thereto and is full force and effect, (ii) all rent and other sums and charges payable by the Company or any of its Subsidiaries as tenants thereunder are current and all obligations required to be performed or complied with by the Company or any of its Subsidiaries thereunder have been performed, (iii) no termination event or condition or uncured default of a material nature on the part of the Company or, if applicable, its Subsidiaries or, to the knowledge of the Company, the landlord thereunder, exists under any Real Property Lease, (iv) the Company and each of its Subsidiaries has a good and valid leasehold interest in each parcel of real property leased by it free and clear of all Encumbrances, except Permitted Encumbrances, (v) neither the Company nor any of its Subsidiaries has received any written notice from any landlord under any Real Property Lease that such landlord intends to terminate such Real Property Lease and (vi) neither the Company nor any of its Subsidiaries has received written notice of any pending and, to the knowledge of the Company, there is no threatened, condemnation with respect to any property leased pursuant to any of the Real Property Leases.  The Company and its Subsidiaries have not subleased or licensed any portion of any real property that is leased pursuant to any Real Property Lease to any Person.

(c)        The Company or one of its Subsidiaries, as the case may be, has valid title to, or valid leasehold or comparable contractual rights in or relating to, all material personal property owned or leased by it, free and clear of all Encumbrances, except Permitted Encumbrances.

46

Section 4.12        Intellectual Property.  (a)  Section 4.12(a) of the Company Disclosure Letter sets forth, as of the date of this Agreement, a true and complete list of all (i) Registered Company IP, indicating for each such item, as applicable, the owner, the application, publication or registration number, and date and jurisdiction of filing or issuance; and (ii) material Software included in the Company Owned IP.

(b)        Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, the Registered Company IP is subsisting and, to the knowledge of the Company, valid and enforceable.  The Company and its Subsidiaries possess all rights, title and interests in and to the Company Owned IP, free and clear of any Encumbrances other than Permitted Encumbrances, except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.  To the knowledge of the Company, the Registered Company IP owned by the Company is currently in compliance with any and all formal legal requirements necessary to record, perfect and maintain the Company or any of its Subsidiaries' interest therein and the chain of title thereof, except where any non-compliance would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(c)        Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect and to the knowledge of the Company, since January 1, 2018, the operation of the Company's business has not infringed, misappropriated or otherwise violated (including with respect to the development, clinical testing, manufacture, distribution, marketing, use or sale by the Company or any of its Subsidiaries of their respective products or of their respective Intellectual Property) the Intellectual Property of any third party (other than such rights determined and documented in writing by Company counsel and/or outside counsel to be invalid, not infringed or unenforceable) and to the knowledge of the Company, no other Person has infringed, diluted, misappropriated or otherwise violated, or is infringing, diluting, misappropriating or otherwise violating the Company IP.  Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect and except as set forth in Section 4.12(c) of the Company Disclosure Letter, there are currently no pending Actions or Actions threatened in writing regarding: (i) the licensing or use by the Company or any of its Subsidiaries of any other Person's Intellectual Property; (ii) any actual or potential infringement, dilution, misappropriation, or other violation by any other Person of the Company IP; (iii) any actual or potential infringement, dilution, misappropriation, or other violation of any other Person's Intellectual Property by the Company or any of its Subsidiaries; or (iv) the ownership, validity, registrability, enforceability or use of any Company IP, and to the knowledge of the Company (and except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect), no valid basis exists for any Action in connection with any of the foregoing items (i) through (iv) of this Section 4.12(c).

(d)        The Company Owned IP constitutes all of the material Intellectual Property owned by the Company and its Subsidiaries that is used, held for use or planned for use in the operation or conduct of the Company's business as currently conducted; and the Company IP constitutes all of the Intellectual Property that is used, held for use or planned for use in the conduct of the Company's business in the manner in which it is currently being conducted,

47

except where failure to own or otherwise possess rights to any such Intellectual Property would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.  To the knowledge of the Company, except as set forth in Section 4.12(d) of the Company Disclosure Letter, the consummation of this Agreement and compliance by the Company and its Subsidiaries with the provisions of this Agreement will not conflict with, or result in any violation or breach of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation or to the loss of a benefit under, or result in the creation of any Encumbrance (other than a Permitted Encumbrance) in or upon, any Company IP.  Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, after the Effective Time, Parent will own all right, title and interest in and to or otherwise have valid rights and licenses to use all Company IP.

(e)        To the knowledge of the Company, each of the Company and its Subsidiaries have used commercially reasonable efforts to maintain, preserve and protect the secrecy and confidentiality of their Trade Secrets and other confidential information and prevent the misuse or misappropriation of the Trade Secrets and other confidential information included in the Company IP, including through the development of

policies for the protection of Intellectual Property, except any failure to maintain, preserve or protect that would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.  To the knowledge of the Company, each current and former employee, consultant or independent contractor of the Company who has had access to Trade Secrets or confidential information included in the Company IP has entered into a written agreement with the Company that requires such employee, consultant or contractor to protect the secrecy and confidentiality of such Trade Secrets and information, except any failure to enter into such agreements would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.  To the knowledge of the Company, there has been no misappropriation or unauthorized disclosure or use of any of the Company's Trade Secrets or other confidential information, except any misappropriation or unauthorized disclosure would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(f)        Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, no current or former director, officer, employee, contractor or consultant of the Company or its Subsidiaries owns any rights in or to any Company Owned IP.  To the knowledge of the Company, all current and former directors, officers, employees, contractors and consultants of the Company and its Subsidiaries who contributed to the business or to the discovery, creation or development of any Company Owned IP did so (i) within the scope of his or her employment such that it constituted a work made for hire and all Company Owned IP arising therefrom became the exclusive property of the Company or any of its Subsidiaries or (ii) pursuant to an executed, enforceable, valid written agreement, assigned all of his or her rights in Company Owned IP to the Company or any of its Subsidiaries, except any failure to assign would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.  No current or former directors, officers, employees, contractors or consultants of the Company or any of its Subsidiaries has made a written claim, or threatened in writing to make any claim, of ownership or right, in whole

or in part, to any Company Owned IP or asserted in an Action against the Company or any of its Subsidiaries such claim of ownership or right.

(g)        Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, the IT Assets operate and perform as required to permit the operation of the Company's business as currently conducted. To the knowledge of the Company, since January 1, 2018, except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, (i) there has been no actual or threatened security breach or unauthorized access to or use of any of the IT Assets and (ii)  the IT Assets do not contain any material viruses, worms, trojan horses, bugs, or faults, and have not experienced breakdowns, errors, contaminants, or continued substandard performance that has caused or reasonably could be expected to cause any material disruption or interruption in or to the use of any such IT Assets or to the business of the Company. The Company and its Subsidiaries have implemented reasonable backup, security and disaster recovery technology reasonably consistent with industry practices and are in compliance in all material respects with applicable Privacy and Data Security Requirements for the IT Assets used in the business.

(h)        Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, there is no Public Software included in the Company IP that is subject to any open source, public source, freeware or other third party license agreement that: (i) requires the Company or its Subsidiaries to license, disclose or distribute any proprietary source code, IT Asset or Company IP to licensees or any other Person, (ii) prohibits or limits the receipt of consideration in connection with licensing, sublicensing or distributing any Software included in the Company Owned IP, (iii) except as specifically permitted by Law, allows any Person to decompile, disassemble or otherwise reverse-engineer any Software included in the Company Owned IP, (iv) requires the licensing of any Software included in the Company Owned IP to any other Person for the purpose of making derivative works or (v) otherwise materially limits the Company's or its Subsidiaries' right to require royalty payments for the use or restrict further distribution of such Software.  Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, the Company and its Subsidiaries are in compliance with all of the terms and conditions of any licenses applicable to any Public Software used by the Company and its Subsidiaries in the operation of the business as currently conducted.

(i)        All Company proprietary Software has been created, and the associated source code written, only by individuals, who, at the time they created and developed such Software, were Company employees, contractors or consultants of the Company or any of its Subsidiaries.  To the knowledge of the Company, the Company and its Subsidiaries have not disclosed, delivered or licensed to any Person, or obligated themselves to disclose, deliver or license to any Person, any Software source code included in Company Owned IP other than to a current or former employee, contractor or consultant who has executed, enforceable, valid written confidentiality obligations to the Company or any of its Subsidiaries restricting the use and disclosure of such source code.  To the knowledge of the Company, there has been no unauthorized use, reverse engineering, decompiling, disassembling, or other unauthorized disclosure of or access to any source code owned by the Company and its Subsidiaries.

(j)        Schedule 4.12(j) of the Company Disclosure Letter lists, as of the date hereof, all agreements pursuant to which a university, or other educational institution, research institution or agency, Governmental Authority, or other organization (each, an "R&D Sponsor") has sponsored research or development conducted in connection with the businesses of the Company and its Subsidiaries.  Except as set forth in Schedule 4.12(j) of the Company Disclosure Letter, no R&D Sponsor has any claim of right or license to, ownership of, or other Encumbrance (other than a Permitted Encumbrance) on, any Company IP.

(k)        Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, since January 1, 2018, the Processing of any Personal Data by the Company and its Subsidiaries has not violated, and does not violate, any applicable Privacy and Data Security Requirements.  Without limiting the foregoing the Company and its Subsidiaries have ensured that all appropriate consents required by applicable Privacy and Data Security Requirements have been obtained from data subjects or other Persons whose Personal Data is Processed thereby, except where such failure to obtain a consent would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.  Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, the Company and its Subsidiaries have further obtained all rights and licenses necessary to Process Personal Data in the manner it is now Processed thereby or by any Person on its behalf.  There is no Action pending, asserted in writing or threatened in writing against the Company or any of its Subsidiaries alleging a violation of any Privacy and Data Security Requirement or any Person's right of privacy or publicity, and, to the knowledge of the Company, no valid basis exists for any such Action.  Neither the Company nor its Subsidiaries has (i) received any written communications from or (ii) to the knowledge of the Company, been the subject of any investigation by a data protection authority or any other Governmental Authority, in each of (i) and (ii), regarding the Processing of Personal Data.  Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, the execution and performance of this Agreement will not breach or otherwise cause any violation on the part of the Company or any of its Subsidiaries of any applicable Privacy and Data Security Requirements.

(l)        Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, with respect to all Personal Data Processed by the Company and its Subsidiaries, the Company and its Subsidiaries have taken commercially reasonable measures designed to protect such information against loss and unauthorized access, use, disclosure or other misuse.

(m)        Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, to the extent required by applicable Privacy and Data Security Requirements, each of the Company and its Subsidiaries has contractually obligated all data processors to contractual terms relating to the protection and use of IT Assets, or Personal Data or confidential information thereon, no less protective than those implemented and maintained by the Company.  The Company is not aware of any material violations of such contractual obligations.

(n)        To the knowledge of the Company, no Person has gained unauthorized access to, engaged in unauthorized Processing, disclosure, use, or access to, or accidentally or unlawfully destroyed, lost or altered (i) any Personal Data related to the business of the Company and its Subsidiaries; or (ii) any IT Assets that Process Personal Data related to the business of and owned or maintained by the Company and its Subsidiaries, its respective personal data processors, customers, subcontractors or vendors, or any other Persons on its behalf.  Neither the Company nor its Subsidiaries has notified or, as of the date hereof, plans to notify, either voluntarily or as required by any Privacy and Data Security Requirements, any affected individual, any third party, any Governmental Authority, or the media of any breach or non-permitted use or disclosure of Personal Data of the Company and its Subsidiaries.  Neither the Company nor its Subsidiaries does, or permits any third party to, sell, rent, or otherwise make available to any Person any Personal Data, except in compliance with the applicable Privacy and Data Security Requirements.  To the knowledge of the Company, the Personal Data Processed by the Company and its Subsidiaries can be used after the Closing in a manner substantially the same as currently used by the Company and its Subsidiaries.

Section 4.13        Taxes.  Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect:

(a)  All Tax Returns required to be filed by or with respect to the Company or any of its Subsidiaries have been timely filed (taking into account any extension of time within which to file) and all such Tax Returns are true, complete and accurate.

(b)        All Taxes due and payable by the Company and its Subsidiaries have been timely paid, whether or not required to be shown on a Tax Return, or, in the case of Taxes not yet due or that are being contested in good faith, have been accrued or reserved, in accordance with GAAP, on the Financial Statements.  There are no Tax Encumbrances on the assets of the Company or any of its Subsidiaries other than Permitted Encumbrances.

(c)        Each of the Company and its Subsidiaries has timely paid or withheld all Taxes required to be paid or withheld with respect to their employees, independent contractors, creditors and other third parties (and timely paid over such Taxes to the appropriate Governmental Authority to the extent required by applicable Law).

(d)        Neither the Company nor any of its Subsidiaries has executed any outstanding waiver of any statute of limitations for the assessment or collection of any Tax and there is no pending request by a Governmental Authority in writing to execute such a waiver or extension.  No material audit or other examination or administrative, judicial or other proceeding of, or with respect to, any Tax Return or Taxes of the Company or any of its Subsidiaries is currently in progress.  No deficiency for any material amount of Tax has been asserted or assessed by a Governmental Authority in writing against the Company or any of its Subsidiaries that has not been settled, paid or withdrawn.

(e)        Within the two (2)-year period ending on the date hereof, neither the Company nor any of its Subsidiaries has been a party to any transaction treated by the parties as a distribution to which Section 355 or 361 of the Code applies.

51

(f)        Neither the Company nor any of its Subsidiaries has participated in a "listed transaction" within the meaning of Treasury Regulation § 1.6011-4, or any similar provision of state, local or foreign Law.

(g)        Neither the Company nor any of its Subsidiaries (i) is a party to or is bound by any Tax Sharing Agreement, (ii) has liability for payment of any amount as a result of being party to any Tax Sharing Agreement, (iii) has been a member of an affiliated group filing a consolidated United States federal income Tax Return (other than an affiliated group the common parent of which was the Company) or (iv) has liability for the Taxes of any Person (other than the Company or any of its Subsidiaries) under Treasury Regulation § 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, or by contract or otherwise.

(h)        Section 4.13(h) of the Company Disclosure Letter contains a list, as of the date of this Agreement, of all jurisdictions in which the Company or any of its Subsidiaries files any income Tax Returns.

(i)        To the knowledge of the Company, no claim has been made in writing by any Governmental Authority in a jurisdiction where the Company or any of its Subsidiaries do not file Tax Returns that any such entity is, or may be, subject to taxation by that jurisdiction.

(j)        Neither the Company nor any of its Subsidiaries has an outstanding request for a ruling or similar determination from a Governmental Authority with respect to Taxes.

(k)        Neither the Company nor any of its Subsidiaries will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period ending after the Closing Date as a result of any:  (i) adjustment pursuant to Section 481 of the Code (or similar provision under any federal, state, local or foreign Law) associated with a change of accounting method that was made on or before the date of this Agreement; (ii) closing agreement or other agreement with any Governmental Authority executed on or before the date of this Agreement; (iii) transaction entered into on or before the date of this Agreement and treated under the installment method, long-term contract method, cash method or open transaction method of accounting; or (iv) inclusion, other than in the ordinary course of business, under Section 951(a) of the Code or similar provision of state, local or foreign law.

Section 4.14        Environmental Matters.  Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect: (a) the Company is and, since January 1, 2018, has been in compliance with all Environmental Laws and possesses and is and, since January 1, 2018, has been in compliance with all Environmental Permits, (b) there is no Action, Order or notice of violation or liability, in each case pursuant to Environmental Law pending or, to the knowledge of the Company, threatened in writing against the Company or any of its Subsidiaries; (c) there has been no release, spill, discharge or disposal of or exposure to any Hazardous Material, nor are there any other facts or conditions, in each case that would reasonably be expected to form the basis of any Action or Order pursuant to

Environmental Law involving the Company or its Subsidiaries; (d) neither the Company nor any of its Subsidiaries has retained or assumed, either contractually or by operation of Law, any liabilities or obligations that would reasonably be expected to form the basis of any Action or Order pursuant to Environmental Law involving the Company or its Subsidiaries; and (e) there are no underground or aboveground storage tanks containing Hazardous Materials or any known or suspected asbestos-containing materials on, at or under any real property leased pursuant to any of the Real Property Leases.

        Section 4.15    <u>Material Contracts</u>. (a) Other than any contracts described in, or included as exhibits to, the Company Registration Statement, <u>Section 4.15(a) of the Company Disclosure Letter</u> contains a true and complete list of the following types of contracts to which the Company or any of its Subsidiaries is a party and that are in effect, or pursuant to which the Company or any Subsidiary has material ongoing obligations, in each case as of the date of this Agreement (such contracts, including those described in, or included as exhibits to, the Company Registration Statement, whether or not set forth on <u>Section 4.15(a) of the Company Disclosure Letter</u> and including any contract entered into after the date hereof in accordance with the terms of this Agreement that would have been required to be set forth on <u>Section 4.15(a) of the Company Disclosure Letter</u> if it had been entered into as of the date of this Agreement, the "<u>Material Contracts</u>"):

        (i)    all contracts that would, if the Company were an issuer of securities registered pursuant to Section 12 of the Exchange Act, be required to be filed by the Company as a "material contract" pursuant to Item 601(b)(10) of Regulation S-K under the Securities Act;

        (ii)    (A) all joint venture contracts or partnership arrangements or (B) similar agreements involving a sharing with any third party of profits, losses, costs or liabilities by the Company or any of its Subsidiaries, pursuant to which, in the case of this clause (B), the Company would reasonably expect its share of such profits, losses, costs or liabilities in any fiscal year to exceed $2,000,000 (or its equivalent in another currency);

        (iii)    all contracts involving the payment of royalties or other amounts calculated based upon the revenues or income of the Company or any of its Subsidiaries or income or revenues related to any product of the Company or any of its Subsidiaries and requiring payments by the Company in any fiscal year in excess of $500,000 (or its equivalent in another currency);

        (iv)    all contracts (A) relating to the acquisition or disposition of any assets or properties (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration in excess of $2,000,000 or (B) pursuant to which any earn-out, indemnification or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to the Company or any of its Subsidiaries of more than $2,000,000 after the date hereof (in each case, excluding, for the avoidance of doubt, acquisitions or dispositions of supplies, products or other assets in the ordinary course of business or of supplies, products or other assets that are

obsolete, worn out, surplus or no longer used or useful in the conduct of business of the Company or its Subsidiaries);

        (v)    all contracts relating to Indebtedness for borrowed money (including commitments to provide such Indebtedness) of the Company or any of its Subsidiaries;

        (vi)    all contracts that limit, or purport to limit, in any material respect, the ability of the Company or any of its Affiliates to compete in any line of business or with any Person or entity or in any geographic area or during any period of time or in any customer segment;

        (vii)    all material Company IP Agreements, except for shrink-wrap or click-wrap licenses for off the shelf computer software, pursuant to which the Company or any of its Subsidiaries would reasonably be expected to make or receive payments of more than $500,000 during any fiscal year;

        (viii)    all contracts with respect to any Intellectual Property that contain a covenant not to sue;

        (ix)    each contract between or among (A) the Company or any of its Subsidiaries, on the one hand, and (B) any

Affiliate, stockholder, employee, officer or director of the Company or of any Subsidiary, or, to the knowledge of the Company, any of their respective Affiliates or family members, on the other hand, but excluding, for the avoidance of doubt, (I) any contracts or arrangements between the Company and any of its Subsidiaries or between any Subsidiary of the Company and another Subsidiary of the Company, (II) any Plan, (III) any contract providing for indemnification or reimbursement of expenses for officers or directors of the Company or any of its Subsidiaries (in such individual capacity as such), and (IV) any contract entered into in the ordinary course of business and on arms' length terms;

(x)     all contracts (other than purchase orders under a master agreement) for the purchase of materials, supplies, goods, services, equipment or other assets pursuant to which the Company or any of its Subsidiaries would reasonably be expected to make payments of more than $1,000,000 during any fiscal year;

(xi)     all contracts relating to research services or clinical trials or pilot or other testing programs in respect of products (including products under development) of the Company or any of its Subsidiaries pursuant to which the Company or any of its Subsidiaries would reasonably be expected to make or receive payments of more than $500,000 during any fiscal year or which are otherwise material;

(xii)     all contracts that relate to collaboration or joint development or other similar agreement or arrangement with respect to any products (including products under development) or services of the Company or any of its Subsidiaries

pursuant to which the Company or any of its Subsidiaries would reasonably be expected to make or receive payments of more than $2,000,000 during any fiscal year or which are otherwise material;

(xiii)     all contracts that limit in any material respect the research, development, manufacture, distribution, sale, supply, license, marketing or manufacturing of products (including products under development) or services of the Company or any of its Subsidiaries pursuant to which the Company or any of its Subsidiaries would reasonably be expected to make or receive payments of more than $2,000,000 during any fiscal year or which are otherwise material;

(xiv)     all contracts granting any put, call, right of first refusal, right of first negotiation, right of first offer, redemption or similar right in favor of any Person other than the Company or its Subsidiaries, in each case, with respect to any asset that is material to the Company; and

(xv)     all contracts that provide for "exclusivity" or any similar requirement or "most favored nation" or similar rights, in each case in favor of any Person other than the Company or any of its Subsidiaries, and, in the case of contracts with suppliers or vendors, (A) the current term of which is longer than two years (not including any renewal terms) and (B) pursuant to which the Company or any of its Subsidiaries would reasonably be expected to make or receive payments of more than $1,000,000 during any fiscal year, which are otherwise material, other than, in each case, any such contract that is terminable without penalty by the Company or its Subsidiaries on no more than 6 months' notice.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, each Material Contract is in full force and effect, and is legal, valid, binding and enforceable in accordance with its terms against the Company and its Subsidiaries (as applicable) and, to the knowledge of the Company, the other parties thereto.  True and complete copies of each Material Contract (and a written summary of the terms of any oral Material Contracts) have been made available to Parent.  None of the Company, any of its Subsidiaries or, to the knowledge of the Company, any other party thereto is in violation of or in default under (nor does there exist any condition which upon the passage of time or the giving of notice or both would cause such a violation of or default under) any Material Contract to which it is a party or by which it or any of its properties or other assets is bound, nor have any of them given or received any notice alleging any of the same, except, in each case, as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

Section 4.16     Insurance.  Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, all insurance policies and all self-insurance programs and arrangements relating to the business, assets and operations of the Company and its Subsidiaries are in full force and effect, and all premiums thereon have been timely paid or, if not yet due, accrued.  As of the date of this Agreement, there is no claim pending under the Company's or any of its Subsidiaries' insurance

policies or fidelity bonds as to which coverage has been questioned, denied or disputed by the underwriters of such policies or bonds, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. The Company and its Subsidiaries are in compliance with the terms of such policies and bonds and the Company has no knowledge of any threatened termination of, or premium increase with respect to, any of such policies or bonds, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 4.17 <u>Brokers</u>. No broker, finder, financial advisor or investment banker (other than Morgan Stanley & Co. LLC, the fee payable to whom will not exceed the amount set forth in the engagement letter dated September 13, 2020, as made available to Parent prior to the date hereof) is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Company.

Section 4.18 <u>Regulatory Compliance</u>. (a) Since January 1, 2018, except as would not, individually or in the aggregate, reasonably be expected to result in a Company Material Adverse Effect, none of the Company, any of its Subsidiaries or, to the knowledge of the Company, any of their respective directors, officers, employees or Collaboration Partners (solely with respect to such Collaboration Partners' activities with the Company and its Subsidiaries) have (i) made an untrue statement of a material fact or fraudulent statement to the U.S. Food and Drug Administration (the "<u>FDA</u>") or any other Health Authority, (ii) failed to disclose a material fact required to be disclosed to the FDA or any other Health Authority, or (iii) committed any other act, made any statement or failed to make any statement, that (in the case of any of (i), (ii) or (iii)) establishes a reasonable basis for the FDA to invoke the policy respecting "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities" set forth in 56 Fed. Reg. 46191 (September 10, 1991) (the "<u>FDA Fraud Policy</u>") or for any other Health Authority to invoke a similar policy that may be applicable to the Company or any of its Subsidiaries in another jurisdiction. None of the Company, any of its Subsidiaries or, to the knowledge of the Company, any of their respective directors, officers, employees or Collaboration Partners (solely with respect to such Collaboration Partners' activities with the Company and its Subsidiaries) are the subject of any pending or, to the Company's knowledge, threatened investigation by the FDA under the FDA Fraud Policy, or the subject of any similar investigation by any other Health Authority.

(b) The Company has made available to Parent true and complete copies of all correspondence, pre-submissions, submissions and other communications with the FDA since January 1, 2018, other than immaterial correspondence of an administrative nature.

(c) Except as would not individually or in the aggregate, reasonably be expected to result in a Company Material Adverse Effect, since January 1, 2018, (i) the Company and each of its Subsidiaries and, to the knowledge of the Company, each Collaboration Partner (solely with respect to such Collaboration Partner's activities with the Company and its Subsidiaries), has been in compliance with all Health Laws, including those relating to laboratory developed tests, and without limiting the generality of the foregoing, (ii) all products under development by or on behalf of the Company or any of its Subsidiaries have been researched, developed, tested, manufactured, handled, labeled, packaged, stored, supplied,

distributed, imported, and exported, as applicable, in compliance with applicable Health Laws as presently enforced with respect to laboratory developed tests and (iii) all clinical trials conducted by or on behalf of the Company or any of its Subsidiaries have been conducted in compliance in all material respects with applicable protocols, procedures and applicable Health Laws. Except as would not, individually or in the aggregate, reasonably be expected to result in a Company Material Adverse Effect, none of the Company, any of its Subsidiaries or, to the knowledge of the Company, any Collaboration Partner (solely with respect to such Collaboration Partner's activities with the Company and its Subsidiaries) (A) has received any written notice or other written communication from any Health Authority (including a warning, untitled or notice of violation letter or Form FDA-483) alleging any violation of any Health Law, including any failure to maintain systems and programs adequate to ensure compliance with any such Health Laws or any violation of or failure to comply with any such Health Laws with respect to clinical trials, or contesting the premarket clearance or approval of, the uses of or the labeling and promotion of any product subject to any Health Law, or (B) is subject to any enforcement, regulatory or administrative proceedings against or affecting the Company relating to or arising under any Health Law and, to the knowledge of the Company, no such enforcement, regulatory or administrative proceeding has been threatened.

(d) Except as would not, individually or in the aggregate, reasonably be expected to result in a Company Material Adverse Effect, Company and its Subsidiaries have, since January 1, 2018, (i) filed with the applicable Health Authority all required filings, including adverse event reports, and (ii) all such filings were in material compliance with applicable Law when filed, and no deficiencies have been asserted in writing by any applicable Health Authority with respect to any such filings.

(e) Neither the Company nor any of its Subsidiaries, nor, to the knowledge of the Company, any director, officer, employee or agent of the Company or any of its Subsidiaries, has been convicted of any crime or engaged in any conduct for which debarment is mandated by Section 306 of the Federal Food, Drug, and Cosmetic Act (including the rules and regulations promulgated thereunder, the "<u>FDCA</u>"), (21 U.S.C. § 335a(a)) or any other Health Law or authorized by Section 306 of the FDCA (21 U.S.C. § 335a(b)) or any other Health Law.

(f) Neither the Company nor any of its Subsidiaries, nor, to the knowledge of the Company, any officer, employee or agent of the Company or any of its Subsidiaries, has been convicted of any crime or engaged in any conduct for which such Person or entity could be excluded from participating in the federal health care programs under Section 1128 of the Social Security Act of 1935 (the "<u>Social Security Act</u>"), or any similar Law in any foreign jurisdiction.

(g) Except as would not, individually or in the aggregate, reasonably be expected to result in a Company Material Adverse Effect, to the knowledge of the Company, there are no facts, circumstances or conditions that would reasonably be expected to form the basis for any Action against or affecting the Company or any of its Subsidiaries, in each case relating to or arising under (i) the FDCA or any other Health Law or (ii) the Social Security Act or any similar Law in any foreign jurisdiction.

57

Section 4.19 <u>Prohibited Payments</u>.  (a)  Except as would not, individually or in the aggregate, reasonably be expected to result in a Company Material Adverse Effect, none of the Company, any of its Subsidiaries, any of their respective officers or employees, and, to the knowledge of the Company, any supplier, distributor, licensee or agent or any other Person acting on behalf of the Company or any of its Subsidiaries, directly or indirectly, has (i) made or offered to make or received any direct or indirect payments in violation of the United States Foreign Corrupt Practices Act, the U.K. Bribery Act 2010, the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions or any other applicable anti-corruption or anti-bribery Law (collectively, "<u>Anti-Corruption Laws</u>"), including any contribution, payment, commission, rebate, promotional allowance or gift of funds or property or any other economic benefit or thing of value to or from any employee, official or agent of any Governmental Authority where either the contribution, payment, commission, rebate, promotional allowance, gift or other economic benefit or thing of value, or the purpose thereof, was illegal under any Law (including the Anti-Corruption Laws), or (ii) provided or received any product or services in violation of any Law (including the Anti-Corruption Laws).  Except as would not, individually or in the aggregate, reasonably be expected to result in a Company Material Adverse Effect, neither the Company nor any of its Subsidiaries has received any written or, to the knowledge of the Company, other communication from any Governmental Authority regarding any material violation of, or failure to comply with, any Anti-Corruption Laws or to the knowledge of the Company, is the subject of any internal complaint, audit or review process regarding a material violation of, or failure to comply with, any Anti-Corruption Laws.  Since January 1, 2018, neither the Company nor any of its Subsidiaries has made any disclosure (voluntary or otherwise) to any Governmental Authority with respect to any alleged irregularity, misstatement or omission or other potential violation or liability arising under or relating to any Anti-Corruption Laws, except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(b) The operations of the Company and its Subsidiaries are and have been conducted at all times in compliance in all respects with applicable financial recordkeeping, reporting and internal control requirements of the Currency and Foreign Transactions Reporting Act of 1970, the money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any Governmental Authority (collectively, the "<u>Money Laundering Laws</u>") and of the United States Foreign Corrupt Practices Act, except, in each case, where such non-compliance would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.  No action, claim, suit or proceeding by or before any Governmental Authority involving the Company or any of its Subsidiaries with respect to the Money Laundering Laws is pending or, to the knowledge of the Company, threatened, nor, to the knowledge of the Company, is any investigation by or before any Governmental Authority involving the Company or any of its Subsidiaries with respect to the Money Laundering Laws pending or threatened, in each case except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(c) None of the Company, any of its Subsidiaries or, to the knowledge of the Company, any of their respective Representatives or Affiliates (nor, to the knowledge of the Company, any Person or entity acting on behalf of any of the foregoing) is currently a Person

58

that is, or is owned or controlled by a Person that is ("Sanctioned Person"), (i) the subject or the target of any sanctions administered or enforced by the U.S. Government (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State), the United Nations Security Council, the European Union, or Her Majesty's Treasury (collectively, "Sanctions"), or (ii) located, organized, or resident in a country or territory subject to comprehensive Sanctions. The Company is not knowingly engaged in any dealings or transactions with any Sanctioned Person. No action, claim, suit or proceeding by or before any Governmental Authority involving the Company or any of its Subsidiaries with respect to any Sanctions is pending or, to the knowledge of the Company, threatened, nor, to the knowledge of the Company, is any investigation by or before any Governmental Authority involving the Company or any of its Subsidiaries with respect to any Sanctions pending or threatened, in each case except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(d)     The Company and its Subsidiaries have conducted their transactions in compliance with all applicable export and re-export control Laws, including the International Traffic in Arms Regulations and the Export Administration Regulations (collectively, "Export Control Laws"), except, in each case, where such non-compliance would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect. No action, claim, suit or proceeding by or before any Governmental Authority involving the Company or any of its Subsidiaries with respect to the Export Control Laws is pending or, to the knowledge of the Company, threatened, nor, to the knowledge of the Company, is any investigation by or before any Governmental Authority involving the Company or any of its Subsidiaries with respect to the Export Control Laws pending or threatened, in each case except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(e)     The Company has and has implemented policies and procedures reasonably designed to ensure compliance with the Anti-Corruption Laws, Money Laundering Laws, Sanctions and Export Control Laws except as would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

Section 4.20     Rights Agreement; State Takeover Statutes.  (a)  The Company is not party to any rights agreement, "poison pill" or similar agreement or plan.

(b)     The Company Board, including both Preferred Directors (as defined in the Company's certificate of incorporation) has approved unanimously by all directors present at a meeting of the Company Board held on the date hereof the terms of this Agreement, the consummation of the Transactions, including the Mergers, the terms of the Support Agreements and the terms of the Selling Investor Support Agreement and such approval is sufficient to render inapplicable to this Agreement, the Transactions, including the Mergers, the Support Agreements and the Selling Investor Support Agreement the restrictions on "business combinations" set forth in Section 203 of the DGCL, to the extent such restrictions would otherwise be applicable to this Agreement, the Transactions, including the Mergers, the Support Agreements and the Selling Investor Support Agreement.  Assuming the accuracy of the representations and warranties of Parent, First Merger Sub and Second Merger Sub set forth in Section 5.14, no "business

combination", "control share acquisition", "fair price", "moratorium" or other anti-takeover or similar Laws apply to this Agreement, the CVR Agreement or the Transactions, including the Mergers.  To the knowledge of the Company, the Company and its Subsidiaries are not subject to Section 2115(b) of the California Corporations Code.

Section 4.21     Opinion of Financial Advisor.  The Company has received the opinion of Morgan Stanley & Co. LLC, dated the date of this Agreement, to the effect that, as of the date of this Agreement, the Merger Consideration is fair, from a financial point of view, to the Company's stockholders, a signed copy of which opinion has been, or will promptly be, delivered to Parent.

Section 4.22     Information Supplied.  The information supplied by the Company for inclusion or incorporation by reference in the Registration Statement and the Consent Solicitation Statement will not when supplied contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

Section 4.23     No Other Representations and Warranties.  Notwithstanding anything herein to the contrary, the representations and warranties of the Company expressly set forth in this Article IV and in the certificate delivered by the Company pursuant to Section 8.02(c) are and shall constitute the sole and exclusive representations and warranties made with respect to the Company and its Subsidiaries in connection with this Agreement or the Transactions. Except for the representations and warranties referred to in previous sentence, none of the Company, its Subsidiaries or any other Person has made or is making any express or implied representations or warranty, statutory or

otherwise, of any nature, including with respect to any express or implied representation or warranty as to the merchantability, quality, quantity, suitability or fitness for any particular purpose of the business or the assets of the Company and its Subsidiaries. Except for the representations and warranties expressly set forth in Article IV and in the certificate delivered pursuant to Section 8.02(c), all other warranties, express or implied, statutory or otherwise, of any nature, including with respect to any express or implied representation or warranty as to the merchantability, quality, quantity, suitability or fitness for any particular purpose of the business or the assets of the Company and its Subsidiaries, are hereby expressly disclaimed. The Company hereby acknowledges and agrees that, except for the representations and warranties set forth in Article V and in the certificate delivered by Parent, First Merger Sub or Second Merger Sub pursuant to Section 8.03(c), (a) none of Parent or any of its Subsidiaries, or any of its or their respective Affiliates, stockholders or Representatives, or any other Person, has made or is making any express or implied representation or warranty with respect to Parent or any of its Subsidiaries or their respective business or operations, including with respect to any information provided or made available to the Company or any of its Affiliates, stockholders or Representatives, or any other Person, or, except as otherwise expressly set forth in this Agreement, had or has any duty or obligation to provide any information to the Company or any of its Affiliates, stockholders or Representatives, or any other Person, in connection with this Agreement, the transactions contemplated hereby or otherwise, and (b) to the fullest extent permitted by law, none of Parent or any of its Subsidiaries, or any of its or their respective Affiliates, stockholders or Representatives, or any other Person, will have or be subject to any liability or other obligation of any kind or nature to the Company or any of its

Affiliates, stockholders or Representatives, or any other Person, resulting from the delivery, dissemination or any other distribution to the Company or any of its Affiliates, stockholders or Representatives, or any other Person, or the use by the Company or any of its Affiliates, stockholders or Representatives, or any other Person, of any such information provided or made available to any of them by Parent or any of its Subsidiaries, or any of its or their respective Affiliates, stockholders or Representatives, or any other Person, including any information, documents, estimates, projections, forecasts or other forward-looking information, business plans or other material provided or made available to the Company or any of its Affiliates, stockholders, or Representatives, or any other Person, in "data rooms," confidential information memoranda, management presentations or otherwise in anticipation or contemplation of the Mergers or any other Transaction, and (subject to the express representations and warranties of Parent, First Merger Sub and Second Merger Sub set forth in Article V and the certificate delivered by Parent, First Merger Sub or Second Merger Sub pursuant to Section 8.03(c)) none of the Company or any of its Affiliates, stockholders or Representatives, or any other Person, has relied on any such information (including the accuracy or completeness thereof).

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF PARENT, FIRST MERGER SUB AND SECOND MERGER SUB

As an inducement to the Company to enter into this Agreement, except as disclosed in the Parent SEC Reports (including exhibits and other information incorporated by reference therein) filed by Parent and publicly available prior to the date of this Agreement ("Filed Parent SEC Reports") (but excluding any forward-looking disclosures set forth in any "risk factors" section, any disclosures in any "forward-looking statements" section and any other disclosures included therein to the extent they are predictive or forward-looking in nature, in each case other than statements of historical fact), Parent, First Merger Sub and Second Merger Sub hereby, jointly and severally, represent and warrant to the Company that:

Section 5.01    Organization.  Each of Parent, First Merger Sub and Second Merger Sub is a company duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or formation, as applicable, and has the requisite corporate or limited liability company power and authority and all necessary governmental approvals to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except where the failure to possess such governmental approvals would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect.  Each of Parent, First Merger Sub and Second Merger Sub is duly qualified or licensed as a foreign corporation or limited liability company to do business, and is in good standing, in each jurisdiction where the character of the properties or assets owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary, except where the failure to be so qualified or licensed and in good standing would not, individually or in the aggregate, be reasonably expected to have a Parent Material Adverse Effect.

Section 5.02    Certificate of Incorporation and Bylaws.  Parent has made available to the Company, prior to the execution of this Agreement, a true and complete copy of

the certificate of incorporation and bylaws of Parent and of First Merger Sub and a true and complete copy of the certificate of formation and operating agreement of Second Merger Sub, each as amended to the date of this Agreement.  Such certificates of incorporation and bylaws and such certificate of formation and operating agreement are in full force and effect.  None of Parent, First Merger Sub nor Second Merger Sub is in violation of any of the provisions of its certificate of incorporation, certificate of formation, bylaws, operating agreement or equivalent organizational documents.

Section 5.03    Capitalization.  (a)  The authorized capital stock of Parent consists of (i) 320,000,000 shares of Parent Common Stock and (ii) 10,000,000 shares of preferred stock, par value $0.01 per share.  As of September 11, 2020, (A) 146,360,372 shares of Parent Common Stock are issued and outstanding, all of which are duly authorized, validly issued, fully paid and non-assessable, (B) 47,967,116 shares of Parent Common Stock are held in the treasury of Parent, (C) 1,817,350 shares of Parent Common Stock are subject to outstanding equity-based awards granted pursuant to Parent's stock incentive plans and (D) there are no outstanding shares of preferred stock.  Except as set forth in this Section 5.03 and except for stock options granted pursuant to the stock option plans of Parent, there are no options, calls, warrants, convertible debt or other convertible or exchangeable instruments or other rights, agreements, arrangements or commitments of any character made or issued by Parent, First Merger Sub or Second Merger Sub relating to the issued or unissued capital stock of Parent, First Merger Sub or Second Merger Sub or obligating Parent, First Merger Sub or Second Merger Sub to issue, deliver or sell any shares of capital stock, voting securities or other equity interests or securities convertible into or exchangeable or exercisable for capital stock, voting securities or other equity interests of Parent, First Merger Sub or Second Merger Sub.  All shares of Parent Common Stock subject to issuance as aforesaid, upon issuance on the terms and conditions specified in the instruments pursuant to which they are issuable, will be duly authorized, validly issued, fully paid and non-assessable.

(b)    The authorized capital stock of First Merger Sub consists of 1,000 shares of common stock, par value $0.01 per share, all of which are duly authorized, validly issued, fully paid and non-assessable and free of any preemptive rights in respect thereof and all of which are owned by Parent.  Each outstanding share of capital stock of First Merger Sub is owned by Parent free and clear of all Encumbrances, except where failure to own such shares free and clear would not, individually or in the aggregate, materially adversely affect Parent's ability to consummate the Transactions.

(c)    All outstanding limited liability company interests of Second Merger Sub have been duly authorized, validly issued and are free of any preemptive rights in respect thereof and all of which are owned by Parent.  All limited liability company interests of Second Merger Sub are owned by Parent free and clear of all Encumbrances, except where failure to own such limited liability company interests free and clear would not, individually or in the aggregate, materially adversely affect Parent's ability to consummate the Transactions.

Section 5.04    Authority Relative to This Agreement; Vote Required.  (a)  Each of Parent, First Merger Sub and Second Merger Sub has all necessary corporate or limited liability company power and authority to execute and deliver this Agreement and the CVR

Agreement (as applicable) and, subject to adoption of this Agreement by Parent, as sole stockholder of First Merger Sub (which such adoption will occur on the date hereof), to perform its obligations hereunder and thereunder and to consummate the Transactions.  The execution and delivery of this Agreement and the CVR Agreement (as applicable) by Parent, First Merger Sub and Second Merger Sub and the consummation by Parent, First Merger Sub and Second Merger Sub of the Transactions have been duly and validly authorized by all necessary corporate or limited liability company action, and no other corporate or limited liability company proceedings on the part of Parent, First Merger Sub or Second Merger Sub are necessary to authorize this Agreement or the CVR Agreement or to consummate the Transactions (other than, with respect to the Mergers, the adoption of this Agreement by Parent, as sole stockholder of First Merger Sub (which such adoption will occur on the date hereof), and the filing of the Certificates of Merger with the Secretary of State of the State of Delaware as required by the DGCL, and the DLLCA, as applicable).  This Agreement has been duly and validly executed and delivered by Parent, First Merger Sub and Second Merger Sub and, assuming due authorization, execution and delivery by the Company, constitutes a legal, valid and binding obligation of each of Parent, First Merger Sub and Second Merger Sub, enforceable against each of Parent, First Merger Sub and Second Merger Sub in accordance with its terms, subject to the effect of any applicable bankruptcy, insolvency (including all Laws relating to fraudulent transfers), reorganization, moratorium or similar Laws affecting creditors' rights generally and subject to the effect of general principles of equity (regardless of whether considered in a proceeding at law or in equity).

(b)    No vote of the stockholders of Parent is required by Law, Parent's certificate of incorporation or bylaws or otherwise in order for Parent to execute and deliver this Agreement, and to perform its obligations hereunder and to consummate the Transactions.  The adoption of this Agreement by Parent, as sole stockholder of First Merger Sub, is the only vote of stockholders required in order for First Merger Sub to consummate the Transactions to perform its obligations hereunder.

Section 5.05          No Conflict; Required Filings and Consents.  (a)  The execution and delivery of this Agreement and the CVR Agreement (as applicable) by each of Parent, First Merger Sub and Second Merger Sub do not, and the performance of this Agreement and the CVR Agreement (as applicable) by each of Parent, First Merger Sub and Second Merger Sub, and the consummation of the Transactions, will not, (i) conflict with or violate the certificate of incorporation, certificate of formation, bylaws, operating agreement or other equivalent organizational documents of either Parent, First Merger Sub or Second Merger Sub, (ii) assuming all consents, approvals, authorizations and other actions described in Section 5.05(b) have been obtained or taken and all filings and obligations described in Section 5.05(b) have been made or satisfied, conflict with or violate any Law applicable to Parent, First Merger Sub or Second Merger Sub or by which any property or asset of either of them is bound, or (iii) violate, conflict with, require consent under, result in any breach of, result in loss of benefit under, or constitute a default (or an event which, with notice or lapse of time or both, would become a default) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of an Encumbrance (other than a Permitted Encumbrance) on any property or asset of Parent, First Merger Sub or Second Merger Sub pursuant to, any loan or credit agreement, note, bond, debenture, mortgage, indenture, deed

63

of trust, contract, agreement, lease, Parent Permit or other instrument or obligation to which Parent, First Merger Sub or Second Merger Sub is a party or by which Parent, First Merger Sub or Second Merger Sub or any of their respective assets or properties is bound, except, with respect to clauses (ii) and (iii) of this Section 5.05(a), for any such conflicts, violations, breaches, defaults or other occurrences which would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect.

(b)          The execution and delivery of this Agreement and the CVR Agreement (as applicable) by each of Parent, First Merger Sub and Second Merger Sub do not, and the performance of this Agreement by each of Parent, First Merger Sub and Second Merger Sub, and the consummation of the Transactions, will not, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority, except (i) for applicable requirements, if any, of the Securities Act (including in connection with the Registration Statement), the Exchange Act, the Trust Indenture Act, Blue Sky Laws and state takeover Laws, any filings required to be made with the NASDAQ, the HSR Act, the requirements of any other applicable Antitrust Laws and the filing of the Certificates of Merger with the Secretary of State of the State of Delaware as required by the DGCL and the DLLCA, as applicable, or (ii) where the failure to obtain such consents, approvals, authorizations or permits, or to make such filings or notifications, would not, individually or in the aggregate, prevent or materially delay consummation of any of the Transactions.

Section 5.06          Compliance.  Since January 1, 2018, Parent and its Subsidiaries have operated and conducted their businesses in compliance with all Laws of any Governmental Authority applicable to their respective businesses or operations, except where such non-compliance would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect.  Since January 1, 2018, neither Parent nor any of its Subsidiaries has received any written notice from any Governmental Authority alleging, or been charged by a Governmental Authority with, any violation of any Laws, except where such violation would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect.

Section 5.07          Intellectual Property.  (a)  The Registered Parent IP owned by Parent is subsisting and, to the knowledge of Parent, valid and enforceable, except as would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect. Parent and its Subsidiaries possess all rights, title and interests in and to the Parent Owned IP, free and clear of any Encumbrances other than Permitted Encumbrances, except as would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect.  To the knowledge of Parent, the Registered Parent IP owned by Parent is currently in compliance with any and all formal legal requirements necessary to record, perfect and maintain Parent or any of its Subsidiaries' interest therein and the chain of title thereof, except where any non-compliance would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect.

(b)          The Parent Owned IP constitutes all of the material Intellectual Property owned by Parent and its Subsidiaries that is used, held for use or planned for use in the operation or conduct of Parent's business as currently conducted; and the Parent IP constitutes all of the

64

Intellectual Property that is used, held for use or planned for use in the conduct of Parent's business in the manner in which it is currently being conducted, except where failure to own or otherwise possess rights to any such Intellectual Property would not, individually or in the aggregate,

reasonably be expected to have a Parent Material Adverse Effect. To the knowledge of Parent, the consummation of this Agreement and compliance by Parent and its Subsidiaries with the provisions of this Agreement will not conflict with, or result in any violation or breach of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation or to the loss of a benefit under, or result in the creation of any Encumbrance (other than a Permitted Encumbrance) in or upon, any Parent IP.

Section 5.08        <u>Financing</u>. Parent has delivered to the Company complete and correct copies of executed commitment letters from Goldman Sachs Bank USA, together with related fee letters (with respect to such fee letters, complete copies with only the fee amounts, interest rates, original issue discount, and economic and other "market flex" terms redacted, none of which redacted provisions would adversely affect the amount or availability of the Financing on the Closing Date) of which have been provided to the Company (collectively, the "<u>Financing Commitments</u>"), pursuant to which the Financing Sources party thereto have committed, subject to the terms and conditions set forth therein, to lend the amounts set forth therein for the purposes of financing the Transactions and related Expenses (together with any Alternative Financing and any capital markets debt or equity financing in replacement thereof or supplemental thereto, the "<u>Financing</u>"). Subject to Parent's rights with respect to Alternative Financing pursuant to and subject to the terms and conditions of <u>Section 7.18</u>, as of the date hereof, (i) none of the Financing Commitments has been amended or modified as of the date hereof in any material respect and (ii) the respective commitments contained in the Financing Commitments have not been withdrawn or rescinded in any material respect (it being understood that the exercise of "market flex" provisions under any fee letter shall not be deemed an amendment, modification, withdrawal or rescission). Except for engagement letters with respect to the Financing, there are no side letters or contracts, agreements or understandings to which Parent, First Merger Sub or Second Merger Sub is a party related to the funding or investing, as applicable, of the Financing other than as expressly set forth in the Financing Commitments. Parent has fully paid any and all commitment fees or other fees in connection with the Financing Commitments that are payable on or prior to the date of this Agreement. As of the date hereof, the Financing Commitments are in full force and effect and are the legal, valid, binding and enforceable obligations of Parent, First Merger Sub and Second Merger Sub, as the case may be, and, to the knowledge of Parent, First Merger Sub and Second Merger Sub, each of the other parties thereto, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles. There are no conditions precedent or other contingencies related to the funding of the full amount of the Financing Commitments, other than as expressly set forth in the Financing Commitments. Assuming the accuracy of the representations and warranties of the Company set forth in this Agreement, compliance by the Company with the covenants set forth in this Agreement and the satisfaction of the conditions set forth in <u>Article VIII</u>, no event has occurred as of the date hereof which, with or without notice, lapse of time or both, would constitute, or would reasonably be expected to constitute, a default or breach of the Financing

65

Commitments on the part of Parent, First Merger Sub or Second Merger Sub or, to the knowledge of Parent, First Merger Sub and Second Merger Sub, any other party thereto. Subject to the accuracy of the representations and warranties of the Company set forth in this Agreement and compliance by the Company with the covenants set forth in this Agreement, as of the date hereof, Parent has no reason to believe that any of the conditions to the Financing contemplated by the Financing Commitments will not be satisfied. Assuming the Financing is funded in accordance with the Financing Commitments (and assuming the accuracy of the representations and warranties of the Company set forth in this Agreement, compliance by the Company with the covenants set forth in this Agreement and the satisfaction of the conditions set forth in <u>Article VIII</u>), Parent, First Merger Sub and Second Merger Sub will have on the Closing Date sufficient funds to (i) pay the Merger Consideration; (ii) pay any and all Expenses required to be paid by Parent, First Merger Sub, Second Merger Sub, the Surviving Corporation and the Surviving Entity in connection with the Mergers and the Financing; and (iii) satisfy all of the other payment obligations of Parent, First Merger Sub, Second Merger Sub, the Surviving Corporation and the Surviving Entity contemplated hereunder.

Section 5.09        <u>SEC Filings; Financial Statements; Absence of Changes</u>. (a) Parent has filed all forms, reports, statements, schedules and other documents required to be filed by it, including all contracts required to be filed by Parent as a "material contract" pursuant to Item 601(b)(10) of Regulation S-K under the Securities Act, with the SEC since January 1, 2018 (collectively, the "<u>Parent SEC Reports</u>"). The Parent SEC Reports (i) at the time they were filed and, if amended, as of the date of such amendment, complied in all material respects with all applicable requirements of the Securities Act, the Exchange Act or SOX, as the case may be, and the rules and regulations promulgated thereunder, and (ii) did not, at the time they were filed, and, if amended, as of the date of such amendment, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

(b)        Each of the consolidated financial statements (including, in each case, any notes thereto) contained (or incorporated by reference) in the Parent SEC Reports was prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto or, in the case of unaudited statements, as permitted by Form 10-Q of the SEC) and each fairly presents, in all material respects, the consolidated financial condition, results of operations, changes in stockholders' equity and cash flows of

Parent and its consolidated Subsidiaries as of the respective dates thereof and for the respective periods indicated therein (subject, in the case of unaudited financial statements, to normal year-end adjustments).

(c)         Parent maintains disclosure controls and procedures required by Rule 13a-15 or Rule 15d-15 under the Exchange Act and such controls and procedures are effective to ensure that all material information concerning Parent and its Subsidiaries is made known on a timely basis to the individuals responsible for the preparation of Parent's SEC filings and other public disclosure documents.

66

(d)         Neither Parent nor any of its Subsidiaries has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise), except liabilities (i) reflected or reserved against in the consolidated balance sheet (or the notes thereto) of Parent as of December 31, 2019, included in the Filed Parent SEC Reports, (ii) incurred after December 31, 2019 in the ordinary course of business, (iii) incurred in connection with the negotiation, execution, delivery or performance of, or pursuant to the terms of, this Agreement or the other Transaction Documents (for clarity, any liability caused by or resulting from a breach by the Parent of this Agreement shall not be deemed a liability "incurred in connection with the negotiation, execution, delivery or performance of, or pursuant to the terms of, this Agreement) or (iv) that would not, individually or in the aggregate, reasonably be expected to have a Parent Material Adverse Effect.

(e)         Since December 31, 2019, (i) there has not been any Parent Material Adverse Effect and (ii) neither Parent nor any of its Subsidiaries has taken any action that, if taken after the date of this Agreement, would constitute a breach of any of the covenants set forth in Section 6.02.

Section 5.10        Information Supplied.  The information supplied by Parent for inclusion or incorporation by reference in the Registration Statement and the Consent Solicitation Statement does not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

Section 5.11        Absence of Litigation.  There is no Action pending or, to the knowledge of Parent, threatened (i) against or involving Parent, First Merger Sub or Second Merger Sub, any of their respective Subsidiaries or any of their respective assets, officers, directors or key employees (in the case of officers, directors or key employees, arising out of such officer's, director's or key employee's relationship with Parent, First Merger Sub or Second Merger Sub, as applicable) that, individually or in the aggregate, had or would reasonably be expected to have a Parent Material Adverse Effect, or (ii) that seeks to restrain or enjoin the consummation of the Transactions or that would reasonably be expected to affect the ability of Parent, First Merger Sub or Second Merger Sub to perform its obligations under this Agreement or prevent or materially impede or delay the consummation of the Transactions.  There is no Order of any Governmental Authority or arbitrator outstanding against, or, to the knowledge of Parent, investigation by any Governmental Authority involving, Parent, any of its Subsidiaries or any of their respective assets, officers, directors or key employees (in the case of such officers, directors or key employees, such as would affect Parent or any of its Subsidiaries) that would reasonably be expected to affect the ability of Parent, First Merger Sub or Second Merger Sub to perform its obligations under this Agreement or prevent or materially impede or delay the consummation of the Transactions.  There is no material Action pending by Parent, First Merger Sub or Second Merger Sub or any of their respective Subsidiaries, or which Parent, First Merger Sub or Second Merger Sub or any of their respective Subsidiaries intends to initiate, against any other Person, except where the failure of which would not have, or would not reasonably be expected to have, a Parent Material Adverse Effect.

67

Section 5.12        Operations of First Merger Sub and Second Merger Sub.  Each of First Merger Sub and Second Merger Sub is a direct, wholly owned Subsidiary of Parent, was formed solely for the purpose of engaging in the Transactions, has engaged in no other business activities and has conducted its operations only as contemplated by this Agreement.

Section 5.13        Brokers.  No broker, finder, financial advisor or investment banker (other than Goldman Sachs & Co. LLC) is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Parent, First Merger Sub or Second Merger Sub.

Section 5.14        No Other Representations and Warranties.  Notwithstanding anything herein to the contrary, the

representations and warranties of Parent, First Merger Sub and Second Merger Sub expressly set forth in this Article V and in the certificate delivered by Parent, First Merger Sub or Second Merger Sub pursuant to Section 8.03(c) are and shall constitute the sole and exclusive representations and warranties made with respect to Parent and its Subsidiaries in connection with this Agreement or the Transactions. Except for the representations and warranties referred to in previous sentence, none of Parent, its Subsidiaries or any other Person has made or is making any express or implied representations or warranty, statutory or otherwise, of any nature, including with respect to any express or implied representation or warranty as to the merchantability, quality, quantity, suitability or fitness for any particular purpose of the business or the assets of Parent and its Subsidiaries. Except for the representations and warranties expressly set forth in this Article V and in the certificate delivered by Parent, First Merger Sub or Second Merger Sub pursuant to Section 8.03(c), all other warranties, express or implied, statutory or otherwise, of any nature, including with respect to any express or implied representation or warranty as to the merchantability, quality, quantity, suitability or fitness for any particular purpose of the business or the assets of Parent and its Subsidiaries, are hereby expressly disclaimed. Parent, First Merger Sub and Second Merger Sub hereby acknowledge and agree that, except for the representations and warranties set forth in Article IV, in the certificate delivered by the Company pursuant to Section 8.02(c) (in each case as qualified and limited by the Company Disclosure Letter), (a) none of the Company or any of its Subsidiaries, or any of its or their respective Affiliates, stockholders or Representatives, or any other Person, has made or is making any express or implied representation or warranty with respect to the Company or any of its Subsidiaries or their respective business or operations, including with respect to any information provided or made available to Parent, First Merger Sub, Second Merger Sub or any of their respective Affiliates, stockholders or Representatives, or any other Person, or, except as otherwise expressly set forth in this Agreement, had or has any duty or obligation to provide any information to Parent, First Merger Sub, Second Merger Sub or any of their respective Affiliates, stockholders, members or Representatives, or any other Person, in connection with this Agreement, the transactions contemplated hereby or otherwise, and (b) to the fullest extent permitted by law, none of the Company or any of its Subsidiaries, or any of its or their respective Affiliates, stockholders or Representatives, or any other Person, will have or be subject to any liability or other obligation of any kind or nature to Parent, First Merger Sub, Second Merger Sub or any of their respective Affiliates, stockholders, members or Representatives, or any other Person, resulting from the delivery, dissemination or any other distribution to Parent, First Merger Sub, Second Merger Sub or any of their respective Affiliates, stockholders or Representatives, or any other Person, or the use by Parent, First Merger Sub,

68

Second Merger Sub or any of their respective Affiliates, stockholders, members or Representatives, or any other Person, of any such information provided or made available to any of them by the Company or any of its Subsidiaries, or any of its or their respective Affiliates, stockholders or Representatives, or any other Person, including any information, documents, estimates, projections, forecasts or other forward-looking information, business plans or other material provided or made available to Parent, First Merger Sub, Second Merger Sub or any of their respective Affiliates, stockholders, members or Representatives, or any other Person, in "data rooms," confidential information memoranda, management presentations or otherwise in anticipation or contemplation of the Mergers or any other Transaction, and (subject to the express representations and warranties of the Company set forth in Article IV and the certificate delivered by the Company pursuant to Section 8.02(c) (in each case as qualified and limited by the Company Disclosure Letter)) none of Parent, First Merger Sub, Second Merger Sub or any of their respective Affiliates, stockholders, members or Representatives, or any other Person, has relied on any such information (including the accuracy or completeness thereof).

## ARTICLE VI

## CONDUCT OF BUSINESS PENDING THE MERGERS

Section 6.01    Conduct of Business by the Company Pending the Mergers.  (a)  The Company covenants and agrees that, between the date of this Agreement and the Effective Time or such earlier date as this Agreement may be terminated in accordance with its terms, except (i) as set forth in Section 6.01 of the Company Disclosure Letter, (ii) as expressly contemplated by this Agreement or (iii) with the prior written consent of Parent (which consent shall not be unreasonably withheld, delayed or conditioned), the Company shall, and shall cause each of its Subsidiaries to, conduct its business in the ordinary course.  Without limiting the generality of the foregoing, the Company shall, and shall cause its Subsidiaries to, use its reasonable best efforts to preserve intact its present business organization and maintain the goodwill and existing relationships with its suppliers, licensors, licensees and others having significant business relationships with them. In addition, notwithstanding anything to the contrary contained in herein (including the foregoing sentences of this Section 6.01(a)), the Company and its Subsidiaries shall be permitted, without the prior consent of Parent, to take or refrain from taking all actions, whether or not in the ordinary course of business, that the Company or its Subsidiaries reasonably believe necessary or appropriate in response to the COVID-19 pandemic, including complying with orders, directives or recommendations of any Governmental Authority; provided that the Company shall, to the extent reasonably practicable in the circumstances, reasonably consult with Parent prior to taking or refraining from taking any such action to the extent it would otherwise constitute a breach of this Section 6.01(a).

(b)    By way of amplification and not limitation, except (v) as set forth in Section 6.01 of the Company Disclosure Letter, (w) as expressly contemplated by this Agreement (including pursuant to Section 9.04) or the other Transaction Documents, (x) with the prior

written consent of Parent (which consent shall not be unreasonably withheld, delayed or conditioned), (y) as required by Law, or (z) as the Company reasonably believes necessary or appropriate in response to the COVID-19 pandemic, including complying with orders, directives or recommendations of any Governmental Authority (provided that the Company shall, to the

69

extent reasonably practicable in the circumstances, reasonably consult with Parent prior to taking or refraining from taking any action in reliance on this clause (z) to the extent it would otherwise constitute a breach of this Section 6.01(b)), neither the Company nor any of its Subsidiaries shall, between the date of this Agreement and the Effective Time, do any of the following:

(i)     amend or otherwise change its certificate of incorporation or bylaws, or equivalent organizational documents, or the equivalent organizational documents of any of its Subsidiaries or create any new Subsidiaries other than direct or indirect wholly owned Subsidiaries;

(ii)     amend or otherwise change the Investor Agreements in a manner adverse to Parent or that would materially to prevent or materially delay the consummation of the Transactions;

(iii)     merge or consolidate the Company with any other Person or restructure, reorganize or completely or partially liquidate;

(iv)     issue, deliver, sell, grant, pledge, dispose of or grant an Encumbrance (other than any Encumbrance arising under applicable securities Laws) on any shares of any class of capital stock of the Company or any of its Subsidiaries, any other voting securities or other ownership interests, or any options, warrants, convertible securities or other rights of any kind to acquire any shares of such capital stock, voting securities or equity interests, or any "phantom" stock, "phantom" stock rights, stock appreciation rights, stock-based units or other similar interests of the Company or any of its Subsidiaries (except (i) for the issuance of shares of Company Stock issuable pursuant to the exercise of Company Stock Options or the settlement of Company RSU Awards, in each case, outstanding on the date hereof in accordance with their terms on the date hereof and (ii) as set forth in Section 6.01(b) of the Company Disclosure Letter);

(v)     other than in the ordinary course of business, (A) sell, lease, license, pledge or dispose of or (B) grant an Encumbrance on any properties or assets or any interests therein of the Company or any of its Subsidiaries, other than Permitted Encumbrances;

(vi)     sell, lease, sublease, license, sublicense, assign or otherwise grant rights under any Company IP (except for non-exclusive licenses or exclusive licenses for therapeutics granted in fields other than the Field (as defined in the CVR Agreement), in each case, granted in the ordinary course of business, consistent with past practice) or transfer, cancel, abandon, or fail to renew, maintain or diligently pursue applications for or otherwise dispose of any Company IP (except for patent and trademark portfolio management in the ordinary course of business, consistent with past practices, but excluding abandonment of patent applications);

(vii)     declare, set aside, make or pay any dividend, payable in cash, stock, property or otherwise, with respect to any of its capital stock, except for

70

dividends by any of the Company's direct or indirect wholly owned Subsidiaries to the Company or any of its other wholly owned Subsidiaries;

(viii)     adjust, reclassify, combine, split, subdivide or redeem, or purchase or otherwise acquire, directly or indirectly, any of its capital stock, voting securities or other ownership interests or any securities convertible into or exchangeable or exercisable for capital stock, voting securities or other ownership interests;

(ix)     acquire any assets outside the ordinary course of business from any other Person for consideration in

excess of $5,000,000 in any individual transaction or series of related transactions or $25,000,000 in the aggregate;

(x)        make any loans, advances, guarantees or capital contributions to or investments in any Person, other than (A) advances to employees of the Company or any of its Subsidiaries in respect of travel or other related business expenses in the ordinary course of business or (B) advance payments or prepayments under any contract in the ordinary course of business;

(xi)        incur any Indebtedness for borrowed money with a principal amount in excess of $10,000,000 or guarantee such Indebtedness of another Person, or issue or sell any debt securities or warrants or other rights to acquire any debt security of the Company;

(xii)        make or authorize any capital expenditure in excess of $25,000,000 in the aggregate during any 12-month period beginning on or after the date hereof (excluding any capital expenditures referenced on Section 6.01(b) of the Company Disclosure Letter);

(xiii)        modify in any material respect any accounting policies, other than as required by GAAP or Law;

(xiv)        except as required by applicable Law, (A) make any material change (or file any such change) in any method of Tax accounting, (B) make, change or rescind any material Tax election; (C) settle or compromise any material Tax liability for an amount materially in excess of the amount accrued or reserved therefor in the Financial Statements or enter into any closing agreement relating to a material amount of Taxes; or (D) other than in the ordinary course of business, waive or extend the statute of limitations in respect of any material Tax claim or assessment, unless requested by the appropriate Governmental Authority;

(xv)        except as required by applicable Law or the terms of any Plan in effect on the date hereof or adopted or entered into after the date hereof in accordance with, or as set forth on, Section 6.01(b) of the Company Disclosure Letter, (A) adopt, enter into, terminate, materially modify or materially amend any collective bargaining agreement or similar contract or any Plan; (B) other than annual base cash

71

compensation raises (x) that are merit-based and do not exceed 4% per annum in the aggregate or (y) in connection with promotions for employees below the level of Vice President, in each case, in the ordinary course of business and in a manner consistent with past practice, increase the compensation or benefits of any current or former Service Provider; (C) grant or pay any change-in-control, retention, severance or termination pay to, or increase in any manner the change-in-control, retention, severance or termination pay of any current or former Service Provider; (D) accelerate the vesting or payment of any compensation or benefit to any Service Provider under any Plan; or (E) terminate or hire any Service Provider, other than terminations in the ordinary course of business consistent with past practice (which, for the avoidance of doubt, shall include terminations for "cause", as reasonably determined by the Company);

(xvi)        apply for any loan under the Paycheck Protection Program under the CARES Act or make any election pursuant to Sections 2301-2308 of the CARES Act, Sections 7001-7005 of the FFCRA, IRS Notice 2020-65 or any other similar Law;

(xvii)        except as required by Law or any judgment by a court of competent jurisdiction, (A) settle or compromise any Action which involves payment to or by the Company or any of its Subsidiaries (exclusive of attorney's fees) in excess of $10,000,000 in any single instance or involves any non-*de minimis* injunctive or equitable relief or the imposition of any non-*de minimis* restrictions on the business activities of the Company and its Subsidiaries; (B) cancel or compromise any Indebtedness in excess of $2,000,000 in the aggregate; or (C) waive or assign any claims or rights in excess of $250,000 individually or $2,000,000 in the aggregate;

(xviii)        (A) (1) enter into new clinical trial contracts or (2) terminate, cancel, fail to renew, or modify or amend, or waive, release or assign any material rights or claims under any existing clinical trial contract, other than in the ordinary course of business, or (B) enter into, terminate, cancel, fail to renew, or modify or amend, or waive, release or assign any material rights or claims under, (x) any Material Contract described in clause (iii) of the definition thereof, or any contract that, if existing on the date hereof, would have been such a Material Contract; or (y) any Material Contract (other than of the type described in clause (A) or clause (B)(x)) or Real Property Lease, or any contract or lease that, if existing on the date hereof, would have been a Material Contract or Real Property Lease, other than in the ordinary course of business;

(xix)        other than in the ordinary course of business, amend any material Company Permit in any material

respect, or allow any material Company Permit to lapse, expire or terminate, other than (A) amendments, renewals or extensions of material Company Permits or (B) non-renewal or non-extension of material Company Permits that are not necessary to conduct the Company's business as then conducted;

(xx)      authorize, apply for, or cause to be approved, the listing of shares of Company Common Stock or Company Preferred Stock on any stock exchange;

(xxi)      file any amendment to the Company Registration Statement, or cause, request or seek to have the Company Registration Statement declared effective under the Securities Act other than any such actions taken in connection with the withdrawal of the Company Registration Statement; or

(xxii)      authorize, commit or agree to do any of the foregoing.

(c)      Nothing contained in this Agreement is intended to give Parent, directly or indirectly, the right to control or direct the operations of the Company or its Subsidiaries prior to the Effective Time in violation of applicable Law.

Section 6.02      <u>Conduct of Business by Parent Pending the Mergers</u>.  Parent covenants and agrees that, between the date of this Agreement and the Effective Time, except (a) as expressly contemplated by this Agreement or the other Transaction Documents or (b) with the prior consent of the Company (which consent shall not be unreasonably withheld, delayed or conditioned), Parent shall not, and shall cause its Subsidiaries not to, do any of the following:

(i)      amend or otherwise change, including by merger, consolidation or otherwise, Parent's certificate of incorporation or bylaws, except for any amendments or changes that would not (x) materially delay, materially impede or prevent the consummation of the Transactions or (y) adversely affect the stockholders of the Company in any material respect differently than the stockholders of Parent;

(ii)      declare, set aside, make or pay any dividend, payable in cash, stock, property or otherwise, with respect to any of Parent's capital stock;

(iii)      liquidate, dissolve, reorganize or otherwise wind up the business and operations of Parent, First Merger Sub or Second Merger Sub; or

(iv)      authorize, commit or agree to do any of, the foregoing.

**ARTICLE VII**

**ADDITIONAL AGREEMENTS**

Section 7.01      <u>Registration Statement; Consent Solicitation Statement</u>.  (a)  As promptly as practicable after the execution of this Agreement, Parent and the Company shall cooperate in preparing and shall prepare (i) a consent solicitation statement (such consent solicitation statement, as amended or supplemented from time to time, the "<u>Consent Solicitation Statement</u>") to be sent to the stockholders of the Company relating to the solicitation of consents from the Company's stockholders in connection with obtaining the Company Stockholder Approvals and (ii) a registration statement on Form S-4 to register the shares of Parent Common Stock and CVRs to be issued in connection with the Mergers (together with all amendments

thereto, the "<u>S-4 Registration Statement</u>"), and Parent shall file with the SEC the S-4 Registration Statement, in which the Consent Solicitation Statement shall be included as part of the prospectus, in connection with the registration under the Securities Act of the shares of Parent Common Stock to be issued to the stockholders of the Company pursuant to the Mergers and CVRs to be issued in connection with the Mergers.  Parent

shall use its reasonable best efforts to cause the Registration Statement to become effective as promptly as practicable and to keep the Registration Statement effective as long as necessary to consummate the Transactions, and, if required by Law, each of Parent and the Company shall use its reasonable best efforts to have the CVR Agreement become qualified under the Trust Indenture Act as promptly as practicable. Each of Parent and the Company shall furnish all information concerning itself as the other may reasonably request in connection with such actions and the preparation of the Registration Statement and the Consent Solicitation Statement. The Registration Statement and the Consent Solicitation Statement shall include all information reasonably requested by such other party to be included therein.

(b)     Company shall use its reasonable best efforts to cause the Consent Solicitation Statement to be mailed to the stockholders of the Company and shall use commercially reasonable efforts to solicit and obtain the Company Stockholder Approvals via written consent, in each case as promptly as practicable after the S-4 Registration Statement is declared effective under the Securities Act (the "S-4 Effectiveness Time"); provided that, notwithstanding the foregoing, in no event shall the Company or any of its Subsidiaries be obligated to bear any expense or pay any fee (other than the payment of nominal administrative, processing or similar fees or charges) or grant any concession in connection with obtaining the Company Stockholder Approvals following such solicitation. The Company shall include the Company Recommendation in the Consent Solicitation Statement (unless there has been a Change in the Company Recommendation in accordance with Section 7.02(d) prior to the date of distribution of the Consent Solicitation Statement in accordance with this Section 7.01(b)). Notwithstanding anything to the contrary in this Agreement, the Company's obligations pursuant to the first sentence of this Section 7.01(b) shall not be affected by the commencement, public proposal, public disclosure or communication to the Company of any Competing Proposal or any Change in the Company Recommendation.

(c)     No amendment or supplement to the Consent Solicitation Statement or the S-4 Registration Statement will be made by Parent or the Company without providing the other party a reasonable opportunity to review and comment thereon. Each party will advise the other promptly after receiving oral or written notice of any oral or written request by the SEC for amendment of the S-4 Registration Statement or Consent Solicitation Statement or SEC comments thereon or requests by the SEC for additional information. Parent will advise the Company promptly after receiving oral or written notice of the issuance of any stop order or the suspension of the qualification for offering or sale in any jurisdiction of the Parent Common Stock issuable in connection with the Mergers. Each party shall promptly provide the other with copies of any written communication from the SEC and shall cooperate on the preparation of appropriate responses thereto (and will provide the other with copies of any such responses given to the SEC) and modifications to the S-4 Registration Statement or Consent Solicitation Statement as shall be reasonably appropriate.

74

(d)     If, at any time prior to the Effective Time, any information relating to (i) the Company or any of its Subsidiaries, or their respective Affiliates or Representatives, or (ii) Parent, First Merger Sub or Second Merger Sub, or their respective Affiliates or Representatives, shall be discovered by the Company or Parent which should be set forth in an amendment or a supplement to the S-4 Registration Statement or the Consent Solicitation Statement so that either such document would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the party which discovers such information shall promptly inform the other party and the parties will cooperate to prepare an appropriate amendment or supplement describing such information which shall promptly be filed with the SEC and, to the extent required by Law, disseminated to the stockholders of the Company.

(e)     The Company will not call or convene any meeting of its stockholders in connection with the Company Stockholder Approvals. The only corporate actions to be set forth in the Consent Solicitation Statement are (i) the adoption of this Agreement and approval of the Transactions, including the Mergers, by the holders of Company Common Stock and Company Preferred Stock and (ii) any other matters contemplated by this Agreement that may be required to be approved by the holders of Company Common Stock and/or the holders of Company Preferred Stock under applicable Law.

(f)     Following receipt of the Company Stockholder Approvals via written consent, the Company shall promptly provide any notices required by Section 228 of the DGCL in accordance therewith.

(g)     The Company shall, as promptly as practicable and (i) no later than 45 days after the end of any fiscal quarter (other than any fourth fiscal quarter) ending after the date hereof, prepare and furnish to Parent copies of the unaudited consolidated financial statements of the Company and its Subsidiaries as of the end of and for such fiscal quarter, together with the comparable period of the prior fiscal year, reviewed by the Company's independent accountants as provided in the procedures specified by the Public Company Accounting Oversight Board in AU 722 and (ii) no later than 90 days after the end of any fiscal year ended after the date hereof, prepare and furnish to Parent copies of the annual consolidated financial statements of the Company and its Subsidiaries as of the end of and for such fiscal year, accompanied by an audit report, on such annual financial statements from the Company's independent accountants, in the case of each of clauses (i) and (ii) together with the

notes thereto, and prepared from the books and records of the Company and its Subsidiaries and in accordance with GAAP applied on a consistent basis through the periods involved (except as may be otherwise required under GAAP) and the rules and regulations of the SEC, including the requirements of Regulation S-X. When delivered pursuant to this <u>Section 7.01(g)</u>, such financial statements shall present fairly in all material respects the consolidated financial position and results of operations of the Company and its Subsidiaries as of the dates and for the periods shown therein.

Section 7.02    <u>No Solicitation of Transactions</u>.  (a)  The Company agrees that it will not, and that it will cause each of its Subsidiaries not to and will direct each of its and its Subsidiaries' Representatives not to, directly or indirectly, (i) solicit, initiate, seek or take any

other action to facilitate or knowingly encourage the making, submission or announcement of any proposal that constitutes, or would be reasonably be expected to lead to any Competing Proposal, (ii) enter into, maintain, continue or participate in any discussions or negotiations with any Person or entity in furtherance of, or furnish to any Person any information or otherwise cooperate in any way with respect to, any Competing Proposal, (iii) agree to, approve, endorse, recommend or consummate any Competing Proposal, (iv) enter into, or propose to enter into, any Competing Transaction Agreement, or (v) resolve, propose or agree, or authorize or permit any Representative to do any of the foregoing.  The Company shall, and shall cause its Subsidiaries to and will direct its and its Subsidiaries' Representatives to, immediately cease and cause to be terminated all existing discussions or negotiations with any Persons conducted prior to the execution of this Agreement by the Company, any of its Subsidiaries or its or any of their respective Representatives with respect to any Competing Proposal, request the prompt return or destruction of all confidential information previously furnished and terminate access to any physical or electronic data rooms related to a potential Competing Proposal previously granted to such Person.

(b)    The Company shall promptly, and in any event within 24 hours of the Company obtaining knowledge of the receipt thereof, advise Parent in writing of any Competing Proposal, the financial and other material terms and conditions of any such Competing Proposal (including any changes thereto) and the identity of the Person making any such Competing Proposal.  The Company shall (i) keep Parent reasonably informed of the status and material details (including any change to the terms thereof) of any such Competing Proposal and (ii) provide to Parent, as soon as practicable after receipt or delivery thereof (and in any event, within 24 hours of such receipt or delivery), copies of all correspondence (other than non-substantive written correspondence) and other written material (including all draft and final versions (and any amendments thereto) of agreements (including schedules and exhibits thereto) and any comments thereon) relating to any such Competing Proposal exchanged between the Company or any of its Subsidiaries (or their Representatives), on the one hand, and the Person making such Competing Proposal (or its Representatives), on the other hand.

(c)    Notwithstanding anything to the contrary in this Agreement, at any time prior to the receipt of the Company Stockholder Approvals, the Company may, subject to compliance with <u>Section 7.02(b)</u>, furnish information to, and enter into discussions with, a Person who has made, after the date hereof, an unsolicited, written, bona fide Competing Proposal so long as such Competing Proposal did not result from a breach of this <u>Section 7.02</u> and, prior to furnishing such information and entering into such discussions, the Company Board has (i) reasonably determined, in its good faith judgment (after having received the advice of a financial advisor of nationally recognized reputation and outside legal counsel) that (A) such Competing Proposal constitutes, or could reasonably be expected to lead to, a Superior Proposal and (B) the failure to furnish such information to, or enter into such discussions with, the Person who made such Competing Proposal would be inconsistent with the Company Board's fiduciary duties to the Company and its stockholders under applicable Law, (ii) previously provided all such information to Parent (or provides such information to Parent substantially concurrent with the time it is provided to such Person), and (iii) obtained from such Person an Acceptable Confidentiality Agreement.

(d)    Except as set forth in this <u>Section 7.02(d)</u>, neither the Company Board nor any committee thereof shall (i) (A) fail to make, withdraw, qualify, modify or amend, or propose publicly to fail to make, withdraw, qualify, modify or amend, the Company Recommendation or fail to include the Company Recommendation in the Consent Solicitation Statement, (B) adopt or recommend, or propose publicly to adopt or recommend, any Competing Proposal, or (C) enter into any agreement relating to a Competing Proposal (other than an Acceptable Confidentiality Agreement), or (ii) make any public statement inconsistent with the Company Recommendation (any of the actions described in the foregoing clauses (i) and (ii), a "<u>Change in the Company Recommendation</u>").  Notwithstanding the foregoing, if at any time prior to the receipt of the Company Stockholder Approvals and subject to compliance with <u>Section 7.02(b)</u> the Company Board determines in its good

faith judgment (after having received the advice of a financial advisor of nationally recognized reputation and outside legal counsel) that the failure of the Company Board to make a Change in the Company Recommendation would be inconsistent with the fiduciary duties of the Company Board to the Company and its stockholders under applicable Law, then the Company Board may make a Change in the Company Recommendation; provided, however, that no Change in the Company Recommendation may be made that relates to a Competing Proposal unless such Competing Proposal constitutes a Superior Proposal; provided, further, that the Company shall not be entitled to exercise its right to make a Change in the Company Recommendation until after the fourth Business Day following Parent's receipt of written notice from the Company advising Parent that the Company Board intends to make a Change in the Company Recommendation (a "Notice of Adverse Recommendation") and specifying the reasons therefor, including the terms and conditions of any Superior Proposal and including an unredacted copy of any proposed agreement (including schedules and exhibits thereto) relating to such Superior Proposal (it being understood and agreed that any subsequent amendment to the financial terms or any other material term of such Superior Proposal shall require a new Notice of Adverse Recommendation and a three Business Day notice period). The Company agrees that, during the applicable four or three Business Day notice period prior to the Company Board making a Change in the Company Recommendation, the Company and its Representatives shall negotiate in good faith with Parent and its Representatives regarding any revisions to the terms of this Agreement proposed by Parent. In determining whether to make a Change in the Company Recommendation, the Company Board shall take into account any changes to the financial or other terms of this Agreement proposed by Parent in response to a Notice of Adverse Recommendation or otherwise. At the end of the four Business Day notice period (or three Business Day notice period with respect to any amendment to the financial terms or any other material term of such Superior Proposal) the Company Board may effect a Change in the Company Recommendation if the Company Board shall again make a determination in good faith after consultation with its outside legal counsel and financial advisors (and taking into account any adjustment or modification of the terms of this Agreement proposed by Parent), that the Competing Proposal continues to be a Superior Proposal and that the Change in the Company Recommendation is required to comply with the fiduciary duties of the Company Board to the Company and its stockholders under applicable Law.

(e)  Notwithstanding anything in this Agreement to the contrary, (i) neither the Company Board nor any committee thereof shall withdraw, revoke, rescind, modify or amend in any manner the Drag-Along Resolution and (ii) in no event shall any Change in the Company

Recommendation (A) affect the validity and enforceability of this Agreement or the other Transaction Documents, including the obligations of the Company and the Company's stockholders that are party to the Transaction Documents to consummate the Mergers or the other Transactions and to deliver (or cause to be delivered) the written consent contemplated by Section 3(b) of the Selling Investor Support Agreement, or (B) cause any state corporate takeover statute or other similar statute to be applicable to the Mergers or the other Transactions.

Section 7.03    Access to Information; Confidentiality.  (a) Except as otherwise prohibited by applicable Law, from the date of this Agreement until the Effective Time, the Company shall, and shall cause its Subsidiaries to, provide to Parent and Parent's Representatives reasonable access during normal business hours upon reasonable prior notice to the officers, employees and other personnel, agents, properties, offices and other facilities of the Company and its Subsidiaries and to the books and records thereof (including for purposes of conducting regulatory compliance reviews and audits to allow Parent to be in compliance with its policies and procedures and any applicable Law at the Effective Time); provided, however, that (x) the Company shall not be required to provide access to or disclose any such information to the extent such access or disclosure would result in the loss of attorney-client privilege of the Company or any of its Subsidiaries (provided that the Company and its Subsidiaries shall use their reasonable best efforts to allow for such access or disclosure in a manner that does not result in a loss of attorney-client privilege) and (y) the Company may limit physical access to the properties, offices and other facilities of the Company and its Subsidiaries to the extent the Company reasonably determines, in light of COVID-19, that such access would jeopardize the health and safety of any employee of the Company or its Subsidiaries or to the extent necessary to comply with applicable Laws.

(b)  Without limiting the generality of the foregoing, the Company covenants and agrees that, between the date of this Agreement and the Effective Time, the Company shall keep Parent reasonably informed as to the Company's FDA regulatory strategy with respect to non-immaterial communications with FDA, pre-submissions to FDA, submissions to FDA, and any other regulatory issues under consideration for presentation to FDA, including IDEs, clinical trials (whether new or on-going), and medical technology, including by providing copies of material information to Parent; provided, that the Company shall not be required to provide such information to the extent providing such information would result in the loss of attorney-client privilege of the Company or any of its Subsidiaries (provided that the Company and its Subsidiaries shall use their reasonable best efforts to provide such information in a manner that does not result in a loss of attorney-client privilege). In order to keep Parent reasonably informed regarding the Company's regulatory relationship with FDA, the Company also agrees to in a reasonably timely manner provide Parent with any and all material communications with FDA with respect to its pre-submissions, submissions, and other non-immaterial regulatory issues such as IDEs, clinical trials (whether new or on-going), medical technology and any other subject which would likely have a material impact on the Company's current or future business. Nothing contained in this Section 7.03(b) is intended to give Parent, directly or indirectly, the right to control or direct the FDA regulatory strategy of the Company or its Subsidiaries prior to the Effective Time.

(c)        Except as otherwise prohibited by applicable Law, from the date of this Agreement until the Effective Time, Parent shall, and shall cause its Subsidiaries to, provide to the Company and the Company's Representatives reasonable access during normal business hours upon reasonable prior notice to Parent's personnel and records on a basis consistent with the Company's access to such personnel and records prior to the date hereof in connection with the Company's due diligence review of Parent and its Subsidiaries in connection with the Transactions.

(d)        All information obtained by the parties hereto pursuant to this Section 7.03 shall be kept confidential in accordance with the Confidentiality Agreement.

(e)        No investigation pursuant to this Section 7.03 shall affect any representation, warranty, covenant or agreement in this Agreement of any party hereto or any condition to the obligations of the parties hereto.

Section 7.04        Employee Benefits Matters.  (a)  From and after the Effective Time, Parent shall (or shall cause its Affiliates, including the Surviving Entity and its Subsidiaries to), honor in accordance with their terms, all Plans and all other contracts, agreements, arrangements, policies, plans and commitments of the Company and its Subsidiaries, in each case, as in effect immediately prior to the Effective Time that are applicable to current or former Service Providers.  For the period beginning on the Closing Date and continuing through the first anniversary of the Closing Date (or, if shorter, during the period of employment), Parent shall, or shall cause the Surviving Entity and its Subsidiaries to, provide each employee of the Company or its Subsidiaries who continues to be employed by the Company or the Surviving Entity or their respective Affiliates after the Closing Date (collectively, the "Continuing Employees") with (i) an annual base salary or hourly wage rate, as applicable, and annual cash target bonus or other recurring cash incentive opportunity that is no less favorable, in the aggregate, than the annual base salary or hourly wage rate, as applicable, and annual target cash bonus or other recurring cash incentive opportunity provided to such Continuing Employee immediately prior to the Effective Time, in the aggregate, and (ii) health, welfare and retirement benefits that are substantially comparable, in the aggregate, to either, in Parent's sole discretion, (A) the health, welfare and retirement benefits provided to such Continuing Employee immediately prior to the Effective Time or (B) the health, welfare and retirement benefits provided to similarly situated employees of Parent and its Affiliates, in each case and for the avoidance of doubt, excluding defined benefit pension benefits.  Without limiting the foregoing, the Chief Executive Officers of each of Parent and the Company, or each of their respective designees, shall cooperate to design and implement an annual bonus program, including performance goals, for the benefit of the Continuing Employees for the first full calendar year commencing after the Closing Date (the "Post-Closing Bonus Plan"), with the bonus payouts to be based on the attainment of performance goals applicable to the business of the Company and its Subsidiaries for such year (and not, for the avoidance of doubt, performance goals applicable to the business of Parent or any of its Subsidiaries other than the Company and its Subsidiaries).  Each Continuing Employee shall be entitled to participate in the Post-Closing Bonus Plan with an annual bonus target equal to the greater of (x) such Continuing Employee's annual bonus target under the Closing Year VCP (as defined below) and (y) the

annual bonus target of a similarly-situated employees of Parent (as reasonably determined by Parent where such targets constitute a range).

(b)        For all purposes under the employee benefit plans of Parent and its Subsidiaries providing benefits to any Continuing Employee after the Effective Time (including the Plans), but excluding any retiree health or welfare plans or programs and (solely for purposes of vesting) any equity compensation arrangements (the "New Plans"), Parent shall credit each Continuing Employee with his or her years of service with the Company and its Subsidiaries and their respective predecessors before the Effective Time, to the same extent as such Continuing Employee was entitled, immediately prior to the Effective Time, to credit for such service under any similar Plan in which such Continuing Employee participated or was eligible to participate immediately prior to the Effective Time; provided that the foregoing shall not apply to the extent that its application would result in a duplication of benefits with respect to the same period of service.  In addition, and without limiting the generality of the foregoing, Parent shall (or shall cause its Subsidiaries, including the Surviving Entity and its Subsidiaries, to) cause (i) each Continuing Employee to become immediately eligible to participate, without any waiting time, in any and all New Plans to the extent coverage under such New Plan is replacing coverage under a Plan in which such Continuing Employee participated immediately prior to the Effective Time, and (ii) for purposes of each New Plan providing medical, dental, pharmaceutical and/or vision benefits to any Continuing Employee, all pre-existing condition exclusions or limitations, evidence of insurability requirements, required physical examinations and actively-at-work requirements of such New Plan to be waived for such Continuing Employee and his or her covered dependents, to the extent such conditions were

inapplicable or waived under the comparable Plans in which such Continuing Employee participated immediately prior to the Effective Time. Parent shall (or shall cause its Subsidiaries, including the Surviving Entity and its Subsidiaries, to) cause any eligible expenses incurred by any Continuing Employee and his or her covered dependents during the portion of the Plan year ending on the date such Continuing Employee's participation in the corresponding New Plan begins to be taken into account under such New Plan for purposes of satisfying all applicable deductible, coinsurance and maximum out-of-pocket requirements applicable to such Continuing Employee and his or her covered dependents for the applicable plan year as if such amounts had been paid in accordance with such New Plan.

(c)       To the extent any payments to "disqualified individuals" of the Company or its Subsidiaries (within the meaning of Section 280G of the Code) could be characterized as "excess parachute payments" within the meaning of Section 280G(b)(1) of the Code in connection with the Transactions, the Company shall (i) no later than the Closing (and in any event prior to obtaining the consent of any recipient of such payment in accordance with (ii) below), disclose its calculations with respect to the potential excess parachute payments to Parent, and provide any other information reasonably requested by Parent that is necessary in order for Parent to review and understand such calculations (it being understood that the Company shall not be required to provide documents and information not in the Company's possession or to prepare or draft any calculations or documents (other than the waivers, disclosure and solicitation documents and calculations of excess parachute payments otherwise referenced in this Section 7.04(c))), (ii) use commercially reasonable efforts to obtain from any disqualified individual a waiver of his or her rights to any such potential excess parachute

payment absent approval by the Company's shareholders in accordance with this Section 7.04(c), and (iii) prior to the Closing, submit such payments for approval or disapproval by a vote of the stockholders of the Company entitled to vote on such matters in a manner intended to meet the requirements of Section 280G of the Code and the applicable treasury regulations thereunder. Parent shall have the right to review and comment on any waiver required by clause (ii) and any disclosure and solicitation documents required by clause (iii) before such waiver or consent is sought or document is distributed, as applicable, and the Company shall consider any such comments in good faith. Parent shall, no later than ten (10) Business Days prior to the Closing, provide to the Company any Parent plans or arrangements that could result in the payment of any excess parachute payment that would be subject to the foregoing; provided that, in any event, the Company's failure to include such Parent plans or arrangement in the stockholders voting materials described herein due to Parent's failure to provide such plans and arrangements as contemplated hereby will not result in a breach of the covenants set forth in this Section 7.04(c).

(d)       Parent shall maintain (or cause its Subsidiaries, including, following the Closing, the Surviving Entity and its Subsidiaries, to maintain) the Company's annual Variable Compensation Plan for the year in which the Closing Date occurs (the "Closing Year VCP") until at least December 31st of the year in which the Closing Date occurs, and shall pay (or cause its Subsidiaries, including, following the Closing, the Surviving Entity or its Subsidiaries, to pay) to each Continuing Employee who was a participant in the Closing Year VCP immediately prior to the Closing an award thereunder for the calendar year in which the Closing occurs based on the greater of (x) actual performance under the Closing Year VCP (which, for the avoidance of doubt, may be up to 150%) and (y) target performance (each, a "VCP Bonus"), subject to each such Continuing Employee's continued employment with the Surviving Entity or its Subsidiaries through the applicable payment date and otherwise in accordance with the terms of the Closing Year VCP. If any such Continuing Employee's employment is involuntarily terminated prior to the payment of his or her VCP Bonus, he or she will remain eligible to receive his or her VCP Bonus following the end of the applicable calendar year (but in no event later than March 15th of the year following the year in which the Closing Date occurs).

(e)       Following the Closing, Parent shall provide each Continuing Employee with equity-based compensation ("Parent Equity Awards") in accordance and consistent with Parent's standard incentive equity grant practices, which shall include (without limitation), grants of Parent Equity Awards no less frequently than, in amounts and values that are no less than, and with terms and conditions (including vesting conditions) that are no less favorable than, Parent Equity Awards granted to similarly-situated Parent employees from time to time.

(f)       Without limiting the generality of Section 11.05, the provisions of this Section 7.04 are for the sole benefit of the parties to this Agreement and nothing herein, express or implied, is intended or shall be construed as to confer upon or give any Person (including for the avoidance of doubt, any Continuing Employee or other current or former Service Provider), other than the parties hereto and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (including with respect to the matters provided for in this Section 7.04) under or by reason of any provision of this Agreement. Nothing contained in this Agreement, express or implied, shall (i) be treated as an amendment to any Plan, New Plan or other compensation or benefit plan, program, policy, agreement, arrangement or understanding

for any purpose, (ii) obligate Parent or the Surviving Entity or any of their Subsidiaries to (A) maintain any particular benefit plan or arrangement or (B) retain the employment of any particular employee or (iii) prevent Parent or the Surviving Entity or any of their Subsidiaries from amending or terminating any benefit plan or arrangement, in each case, subject to compliance with the other provisions of this Section 7.04.

Section 7.05      Directors' and Officers' Indemnification and Insurance. (a)  Parent shall cause the Surviving Entity to assume, and shall cause the Surviving Entity to comply with (including by providing the Company with sufficient funds to comply with), the obligations with respect to all rights to indemnification, advancement of expenses, and exculpation from liabilities, for acts or omissions occurring at or prior to the Effective Time now existing in favor of the current or former directors or officers of the Company as provided in the certificate of incorporation and bylaws of the Company or any indemnification contract between such directors or officers and the Company (in each case, as in effect on the date hereof), without further action, as of the Effective Time, and such obligations shall survive the Mergers and shall continue in full force and effect in accordance with their terms.  For the avoidance of doubt, the applicable rights of indemnification, advancement of expenses, and exculpation contemplated by this Section 7.05 and pursuant to the terms of the certificate of incorporation or bylaws of the Company as in effect at or prior to the Effective Time shall not be impaired by any modification of such terms in any amendment or restatement of such certificate of incorporation or bylaws following the Effective Time.

(b)      Parent shall obtain, at the Effective Time, a prepaid (or "tail") directors' and officers' liability insurance policy in respect of acts or omissions occurring at or prior to the Effective Time for six years from the Effective Time, covering each Person currently covered by the Company's directors' and officers' liability insurance policies (a true and complete copy of which has been heretofore made available to Parent), on terms with respect to such coverage and amounts no less favorable than those of such policy in effect on the date hereof; provided, however, that in no event shall the Surviving Entity be required to expend pursuant to this Section 7.05(b) an aggregate amount in excess of 300% of the last annual premium paid by the Company for such insurance; provided, further, that, if the aggregate amount necessary to procure such insurance coverage exceeds such maximum amount, Parent shall only be obligated to provide as much coverage as may be obtained for such maximum amount.

(c)      In the event the Surviving Entity or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving limited liability company or entity of such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of the Surviving Entity, as the case may be, or at Parent's option, Parent, shall assume the obligations set forth in this Section 7.05.

Section 7.06      Notification of Certain Matters. (a)  The Company shall give prompt notice to Parent, and Parent shall give prompt notice to the Company, of (i) the occurrence, or non-occurrence, of any change, event, fact or development which would reasonably be expected to cause any of their respective representations or warranties contained in this Agreement to become untrue or inaccurate such that the conditions set forth in

Section 8.02(a) or Section 8.03(a) would not be satisfied and (ii) any failure of the Company, Parent, First Merger Sub or Second Merger Sub, as the case may be, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement such that the conditions set forth in Section 8.02(b) or Section 8.03(b) would not be satisfied; provided, however, that the delivery of any notice pursuant to this Section 7.06 shall not limit or otherwise affect the remedies available hereunder to the party receiving such notice.

(b)      The Company shall give prompt notice to Parent, and Parent shall give prompt notice to the Company, of any notice or other communication from any Governmental Authority in connection with the Transactions or from any Person alleging that the consent of such Person is or may be required in connection with the Transactions.

Section 7.07      Reasonable Best Efforts; Further Action. (a)  Upon the terms and subject to the conditions set forth in this Agreement, each of the parties hereto agrees to use its reasonable best efforts to take, or cause to be taken, all actions that are necessary, proper or advisable to consummate and make effective the Transactions, including using its reasonable best efforts to accomplish the following: (i) the satisfaction of the conditions precedent set forth in Article VIII, (ii) the obtaining of all necessary consents, approvals or waivers from third parties, including pursuant to the contracts set forth on Section 4.04 of the Company Disclosure Letter; provided that, notwithstanding the foregoing, in no event shall the Company or any of its Subsidiaries be obligated to bear any expense or pay any fee (other than the payment of nominal administrative, processing or similar fees or charges) or grant any concession in connection with obtaining the consents, approvals or waivers referred to in this clause (ii), (iii) the obtaining of all necessary actions or nonactions and consents from, and the giving of any necessary notices to, Governmental Authorities and third parties and the making of all necessary registrations, declarations and filings under the HSR Act, which shall

be made as soon as reasonably practicable following the date hereof and in any event no later than fifteen (15) Business Days following the date hereof, or are required or advisable under other applicable antitrust, competition or pre-merger notification Laws of any jurisdiction (collectively, "Antitrust Laws"), if any, (iv) the taking of all reasonable steps to provide any supplemental information requested by any Governmental Authority, including participating in meetings with officials of such entity in the course of its review of this Agreement or the Transactions, including the Merger, (v) the taking of all reasonable steps as may be necessary to avoid any Action by any Governmental Authority or third party that would otherwise have the effect of materially delaying or preventing the consummation of the Merger and (vi) the defending or contesting of any Actions challenging this Agreement or the consummation of the Merger, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed. In connection with and without limiting the generality of the foregoing, reasonable best efforts shall include (and with respect to remedies, shall be limited to) Parent and its Subsidiaries offering and agreeing to undertake Permitted Restrictions as reasonably necessary to obtain pre-merger clearance in as timely a manner as reasonably possible from Governmental Authorities under Antitrust Laws in the United States and, if applicable, the UK and Germany (specifically, for (1) any waiting period applicable to the Mergers under the HSR Act to have been terminated or expired and the avoidance of an Action in the US seeking to prohibit consummation of the Merger, and (2) any antitrust clearance required to be obtained in the UK and Germany (if applicable)). Notwithstanding the foregoing or any other provision of this

Agreement to the contrary, in no event shall Parent or its Subsidiaries (including First Merger Sub and Second Merger Sub and, after the Effective Time, the Surviving Corporation and its Subsidiaries and, after the Second Effective Time, the Surviving Entity and its Subsidiaries) be required to agree to or accept (A) any commitment, undertaking or Order to divest, hold separate or otherwise dispose of any portion of its or their respective businesses or assets, including after giving effect to the Transactions, or (B) any limitation on the ability of Parent or its Subsidiaries to acquire or hold or exercise full rights of ownership of any capital stock of the Company or its Subsidiaries, including after giving effect to the Transactions; provided, however, it being understood that Permitted Restrictions affecting the operations of Parent or its Subsidiaries (including, for this purpose, the Company and its Subsidiaries) shall be deemed not to be a limitation on the ability to exercise full rights of ownership. In no event shall the Company or any of its Subsidiaries be permitted to commit or agree to any remedy (including any matter described in clauses (A) and (B) and any Permitted Restriction) without Parent's prior written consent. Nothing in this Section 7.07(a) shall require any party to take or agree to take any action with respect to its business or operations pursuant to this Section 7.07(a) unless the effectiveness of such agreement or action is conditioned upon the Closing.

For purposes of this Agreement, "Permitted Restrictions" shall mean the actions described in Section 7.07 of the Company Disclosure Letter.

(b)     Each of Parent and the Company shall (i) reasonably cooperate with each other in connection with any filing or submission with any Governmental Authorities in connection with the Transactions and any consents from any Governmental Authority in connection therewith and any investigation or other inquiry related thereto and in connection with resolving any such investigation or inquiry with respect to any such filing or the Mergers, (ii) not extend any waiting or suspension period under any applicable Antitrust Laws or enter into any agreement with any Governmental Authority not to consummate the Mergers, except with the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed), (iii) respond as promptly as practicable to any applicable inquiries or requests received from any Governmental Authority for additional information or documentation, (iv) promptly make any applicable further filings or information submissions pursuant thereto that may be necessary or advisable and (v) promptly make any requisite filings or submissions required or advisable under any applicable Antitrust Laws. Each of Parent and the Company shall (A) promptly notify the other party of any written or oral communication to that party or its Subsidiaries or Representatives from any Governmental Authority regarding the parties' collaborative efforts to obtain consents to the Mergers under Antitrust Laws, (B) subject to applicable Law and to the extent reasonably practicable, permit the other party to review and comment on any substantive written communication regarding such efforts prior to providing such communication to any Governmental Authority and (C) to the extent reasonably practicable, not agree to participate, or permit its Subsidiaries or Representatives to participate, in any substantive meeting or discussion with any Governmental Authority in respect of any filings, investigation or inquiry concerning consents to the Mergers under Antitrust Laws unless it consults with the other party in advance and, to the extent permitted by such Governmental Authority and reasonably practicable, gives the other party the opportunity to attend and participate. For the avoidance of doubt, subject to the proviso in the following sentence, Parent and the Company shall jointly control all communications with any Governmental Authority

relating to Antitrust Laws, and determine and direct the strategy and process by which the parties will seek required approvals relating to Antitrust Laws. If the parties hereto initially disagree upon any such proposed communication, strategy or process, the parties agree to work together in good faith to resolve the disagreement and endeavor to implement such communication, strategy or process in a mutually acceptable manner; provided that to the extent that a disagreement is unresolved after good faith discussions between Parent and the Company, the implementation of such communication, strategy or process will be controlled by Parent after good faith consideration of the views of Company. Without limiting the foregoing, neither party shall make any filings, submissions or substantive written communications to any Governmental Authority to obtain consents to the Mergers under Antitrust Laws without first providing a written copy of such filing, submission or communication to the other party (or as appropriate to such party's outside counsel) and allowing the other party a reasonable opportunity to provide comments on such filing, submission or communication prior to submission. Parent and the Company covenant and agree to incorporate all reasonable comments of the other party (or as appropriate such party's outside counsel) with respect to such filings, submissions and communications prior to delivery of the same to any Governmental Authority.

Section 7.08    Obligations of First Merger Sub and Second Merger Sub. Parent shall take all action necessary to cause each of First Merger Sub and Second Merger Sub to perform its obligations under this Agreement and to consummate the Mergers on the terms and subject to the conditions set forth in this Agreement.

Section 7.09    Consents of Accountants. Parent and the Company will each use their respective reasonable best efforts to cause to be delivered to each other consents from their respective independent auditors, in form reasonably satisfactory to the recipient and customary in scope and substance for consents delivered by independent public accountants in connection with registration statements on Form S-4 under the Securities Act.

Section 7.10    Listing. Parent shall cause the shares of Parent Common Stock to be issued in the Mergers to be approved for listing on the NASDAQ, subject to official notice of issuance, and the Company shall cooperate with Parent to the extent reasonably necessary with respect to such listing.

Section 7.11    Public Announcements. The initial press release relating to the Transactions shall be a joint press release, the text of which has been agreed to by each of Parent and the Company. Thereafter, unless otherwise required by applicable Law or the requirements of applicable stock exchanges, each of Parent and the Company shall each use its reasonable best efforts to consult with the other before issuing, and give each other the opportunity to review and comment upon, any press release or notice to stockholders, or otherwise making any public statements with respect to this Agreement, the Mergers or any of the other Transactions; provided, however, that each of Parent and the Company may make public statements that do not contain any information relating to the Transactions that has not been previously announced or made public in accordance with this Agreement and do not reveal material, nonpublic information regarding the other party; provided, further, that the Company may make public statements regarding a Change in the Company Recommendation pursuant to Section 7.02(d).

Section 7.12    Certain Tax Matters. (a) During the period from the date of this Agreement to the Closing Date, the Company and its Subsidiaries shall: (i) prepare and timely file all Tax Returns that are due on or before the Closing Date in accordance with, to the extent applicable and, except as required by Law, past practice, (ii) pay all Taxes due and payable in respect of such Tax Returns, except in the case of clauses (i) and (ii), where failure to file or pay would not, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect, (iii) accrue a reserve in the applicable books and financial statements in accordance with past practices for all Taxes payable for which no Tax Return is due prior to the Closing Date for which failure to pay would, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect and (iv) promptly notify Parent of any suit, claim, action, investigation, proceeding or audit (in each case with respect to a material amount of Taxes) that becomes pending against or with respect to the Company or any of its Subsidiaries that would, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

(b)    The Company shall deliver to Parent on or prior to the Closing Date a properly executed statement signed by the Company to the effect that the shares of Company Stock are not "United States real property interests" within the meaning of Section 897 of the Code; provided, however, that notwithstanding the foregoing, the sole remedy under this Agreement in respect of any Person for the failure of the Company to deliver such certification specified in this Section 7.12(b) to Parent shall be to withhold in accordance with Section 3.02(i) any Taxes that are required to be withheld by such Person pursuant to Section 1445 of the Code by reason of such failure from any payment otherwise payable pursuant to this Agreement.

Section 7.13    Drag-Along; Stockholder Agreements and Communications. (a) Following the execution of the Drag-Along Consent by the Selling Investors, the Company shall promptly send a notice to the its stockholders (in the form attached hereto as Exhibit E) regarding the approval of this Agreement and the Transactions for purposes of the Drag-Along and the exercise of the Drag-Along and informing

the Voting Agreement Parties of their obligations pursuant to Section 2 of the Voting Agreement with respect to the Drag-Along.

(b)     Promptly following the S-4 Effectiveness Time and prior to the Effective Time, and in consideration of, among other things, the entry into this Agreement by the Company, Parent, First Merger Sub and Second Merger Sub and the anticipated consummation of the Transactions, the Company shall, pursuant to Section 2.2(c) of the Voting Agreement, use commercially reasonable efforts to cause each Voting Agreement Party to duly execute and deliver to the Company and Parent a support agreement in the form attached hereto as <u>Exhibit F</u> (with such changes and modifications as may be mutually agreed by Parent and the Company, each, a "<u>Support Agreement</u>"); <u>provided</u> that, notwithstanding the foregoing, in no event shall the Company or any of its Subsidiaries be obligated to bear any expense or pay any fee (other than the payment of nominal administrative, processing or similar fees or charges) or grant any concession in connection with the foregoing.

(c)     Unless otherwise required by Law or a Governmental Authority, the Company (i) shall recognize the proxy granted to Parent in respect of all shares of Company Stock held by the Voting Agreement Parties pursuant to the Drag-Along Consent and the proxy

granted to Parent pursuant to the Selling Investor Support Agreement and each Support Agreement and (ii) shall not register transfers of Company Stock that do not comply with the terms of the Selling Investor Support Agreement and the Support Agreements (as applicable).

(d)     Notwithstanding anything in this Agreement to the contrary, in no event shall any Change in the Company Recommendation affect the validity and enforceability of the obligations of the Company pursuant to this <u>Section 7.13</u>.

Section 7.14     <u>Anti-Takeover Statutes</u>.  The Company and the Company Board shall: (a) grant such approvals and take all actions necessary so that no "business combination", "control share acquisition", "fair price", "moratorium" or other anti-takeover or similar Laws become applicable to this Agreement, the CVR Agreement, the Support Agreements and the Selling Investor Support Agreement or the Transactions, including the Mergers, and (b) if any such anti-takeover or similar Law becomes applicable to the Transactions, grant such approvals and take all actions necessary so that the Transactions may be consummated as promptly as practicable and otherwise to take all such other actions as are reasonably necessary to eliminate or minimize to the greatest extent possible the effects of any such Law on the Transactions.

Section 7.15     <u>Stockholder Litigation</u>.  From and after the date hereof, the Company shall promptly advise Parent orally and in writing of any Actions (including derivative claims) commenced or, to the knowledge of the Company, threatened against the Company and/or its directors or officers relating to this Agreement, the Mergers and/or the other Transactions contemplated hereby and shall keep Parent promptly and reasonably informed regarding any such Action. The Company shall give Parent the opportunity to participate in the defense or settlement of any such Action and shall give due consideration to Parent's views with respect thereto. The Company shall not agree to any settlement of any such Action without Parent's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed).

Section 7.16     <u>Section 16 Matters</u>.  Prior to the Effective Time, the Parent Board (or a duly formed and duly authorized committee thereof) shall take all such actions as may be necessary or appropriate to cause any acquisitions of Parent Common Stock (including derivative securities related to Parent Common Stock) by any individual who shall become subject to the reporting requirements of Section 16(a) of the Exchange Act as a result of the Transactions to be exempt under Rule 16b-3 under the Exchange Act, to the extent permitted by applicable Law.

Section 7.17     <u>CVR Agreement.</u>  At or prior to the Effective Time, Parent will duly adopt, execute and deliver, and each of Parent and the Company shall use its commercially reasonable efforts to cause the Trustee to execute and deliver, the CVR Agreement.

Section 7.18     <u>Financing</u>.  (a) Each of Parent, First Merger Sub and Second Merger Sub shall use its reasonable best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary or advisable to arrange and obtain the Financing on the terms and conditions described in or contemplated by the Financing Commitments prior to when the conditions to the Mergers set forth in <u>Article VIII</u> (other than those conditions that by their terms must be satisfied at the Closing) are satisfied, including using reasonable best efforts to (i)

maintain in effect the Financing Commitments; (ii) satisfy on a timely basis all conditions and covenants applicable to Parent, First Merger Sub and

Second Merger Sub in the Financing Commitments and otherwise comply with its obligations in each case thereunder; (iii) enter into definitive agreements with respect to the Financing Commitments on the terms and conditions (including the "market flex" provisions) contemplated thereby; (iv) in the event that all conditions in the Financing Commitments have been satisfied, cause the Persons providing Financing under the Financing Commitments to fund the Financing and consummate the Financing contemplated by such Financing Commitments on or prior to the date the Closing is required to occur pursuant to <u>Section 2.02</u>; and (v) enforce its rights under the Financing Commitments, except, in the case of clauses (i) through (v) above, to the extent (and solely to the extent) Parent or one or more of its Subsidiaries has issued in one or more offerings any debt or equity securities in lieu of the Financing on or prior to the Closing Date or otherwise will have sufficient cash at the Closing, in each case in an amount such that Parent, First Merger Sub, Second Merger Sub, the Surviving Corporation and the Surviving Entity will be able to satisfy all of the payment obligations of Parent, First Merger Sub, Second Merger Sub, the Surviving Corporation and the Surviving Entity contemplated hereunder in connection with the Closing. Notwithstanding the foregoing, in no event shall Parent be required to pursue litigation against the Financing Sources in respect of this clause (a) or otherwise.

(b)        None of Parent, First Merger Sub or Second Merger Sub shall agree to any amendment or modification to be made to, or any waiver of any provision or remedy under the Financing Commitments, without the prior written consent of the Company if such amendments, modifications or waivers would, or would reasonably be expected to, (i) reduce the aggregate amount of the Financing; (ii) impose new conditions (or expand any existing conditions) to the receipt of the Financing (in the case of each of (i) and (ii), only if such amendments, modifications or waivers would reasonably be expected to (x) interfere with Parent's ability to make available to the Exchange Agent at or immediately prior to the Closing funds sufficient for the satisfaction of all of Parent's, First Merger Sub's and Second Merger Sub's obligations under this Agreement, including the payment of the Merger Consideration and the payment of all associated costs and Expenses or (y) prevent, materially delay or materially impair the ability of Parent, First Merger Sub and Second Merger Sub to consummate the Mergers or its other obligations under the Agreement); (iii) prevent or materially delay the consummation of the Transactions; or (iv) adversely impact the ability of Parent, First Merger Sub or Second Merger Sub to enforce its rights against the other parties to the Financing Commitments (<u>provided</u>, <u>however</u>, that, for the avoidance of doubt, Parent, First Merger Sub and Second Merger Sub may amend or modify the Financing Commitments to add lenders, lead arrangers, underwriters, initial purchasers, bookrunners, syndication agents or similar entities, if the addition of such additional parties, individually and in the aggregate, would not prevent or materially delay the Financing or the consummation of the Transactions).

(c)        Parent, First Merger Sub and Second Merger Sub shall keep the Company reasonably informed on a timely basis of the status of its efforts to arrange the Financing.

(d)        Parent, First Merger Sub and Second Merger Sub shall give the Company prompt notice of Parent's receiving any notice of any material breach or material default by any party to any Financing Commitment or definitive document related to the Financing of which

Parent, First Merger Sub or Second Merger Sub become aware; <u>provided</u>, <u>however</u>, that in no event will Parent, First Merger Sub and Second Merger Sub be under any obligation to disclose any information that is subject to attorney-client or similar privilege. If any portion of the Financing becomes unavailable on the terms and conditions (including the "market flex" provisions) contemplated in the Financing Commitments and such portion is necessary to consummate the Mergers, Parent shall use its reasonable best efforts to arrange and obtain alternative financing from alternative sources in an amount sufficient to consummate the transactions contemplated by this Agreement upon terms and conditions not materially less favorable to Parent than those in the Financing Commitments (including, as necessary, the "market flex" provisions contained in any fee letter related to the Financing Commitments) (the "<u>Alternative Financing</u>") as promptly as practicable following the occurrence of such event and prior to when the conditions to Mergers set forth in <u>Article VIII</u> (other than those conditions that by their terms must be satisfied at the Closing) are satisfied. Any replacement commitment letters and related fee letters (which may be redacted) in connection with an Alternative Financing shall constitute Financing Commitments under this Agreement.

Section 7.19        <u>Financing Cooperation</u>. (a) Prior to the Closing, the Company shall, and shall cause its Subsidiaries and each of its and their respective officers, employees, consultants and representatives to, use reasonable best efforts to cooperate with Parent, First Merger Sub and Second Merger Sub in connection with Parent's obtaining the Financing; <u>provided</u>, <u>however</u>, that nothing herein shall require such cooperation to the extent it would interfere unreasonably with the business or operations of the Company or its Subsidiaries in any material respect; <u>provided</u>, <u>further</u>, that neither the Company nor any of its Subsidiaries shall be required to commit to take any action that is not contingent upon the Closing (including the entry into any agreement) or that would be effective prior to the Effective Time other than as specifically set forth herein. Such cooperation shall include, without limitation:

(i)        furnishing Parent, First Merger Sub and Second Merger Sub and their Financing Sources, promptly following Parent's request, with such pertinent and customary (as compared to other transactions of this size and nature) information

(other than financial information, which is covered by clause (ii) below), to the extent reasonably available to the Company, regarding the Company and its Subsidiaries as may be reasonably determined by Parent to be necessary in order to consummate the Financing, including all information necessary to satisfy the conditions set forth in the Financing Commitments;

(ii) furnishing Parent and its Financing Sources as promptly as practicable (but no earlier than (i) 90 days after the end of the relevant final fiscal year end in the case of paragraph (1), and (ii) 45 days after the end of the relevant fiscal quarter in the case of paragraph (2)) with: (A)(1) audited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Company prepared in accordance with GAAP for the three most recently completed fiscal years ended at least 90 days before the Closing Date, and (2) unaudited consolidated balance sheets and related statements of income, and cash flows of the Company prepared in accordance with GAAP and reviewed by the Company's independent accountants in accordance with the procedures set forth in AS 4105 (*Reviews of Interim Financial*

*Information*) for each subsequent fiscal quarter ended at least 45 days prior to the then expected Closing Date and (B) financial information of the type that would be required by Regulation S-X and Regulation S-K under the Securities Act for an offering of securities registered on Form S-3 under the Securities Act, including all information required to be incorporated by reference therein and audit reports of annual financial statements to the extent so required or otherwise reasonably necessary to permit Parent to prepare pro forma financial statements customary for Financings of the applicable type (all such information in clauses (A) and this clause (B), the "Required Information"); provided, however, that the Required Information shall not include, and Parent shall be solely responsible for, the preparation of pro forma financial information, including pro forma cost savings, synergies, capitalization, ownership or other pro forma adjustments desired to be incorporated into any pro forma financial information;

(iii) cooperating with Parent's Financing Sources' due diligence investigation of the Company and its Subsidiaries;

(iv) participating in and assisting with the syndication, underwriting, placement or other marketing of the Financing, including participating in a reasonable number of meetings, presentations, road shows, due diligence sessions, drafting sessions and sessions with rating agencies, including direct contact between senior management of the Company and its Subsidiaries and representatives of the Company with prospective investors, lenders and rating agencies in connection with a Financing;

(v) assisting with the preparation of customary materials for registration statements, rating agency presentations, offering documents, private placement memoranda, bank information memoranda, prospectuses and supplements related thereto and similar documents required in connection with the Financing (all such documents and materials, collectively, the "Financing Offering Documents"), providing customary authorization letters authorizing the distribution of information to prospective Financing Sources and containing customary 10b-5 representations and representations that the public side versions of such documents, if any, do not include material non-public information regarding the Company or its Subsidiaries or securities and management representation letters and delivering and consenting to the inclusion or incorporation in any SEC filing related to the Financing of the historical audited consolidated financial statements and unaudited consolidated interim financial statements of the Company;

(vi) executing and delivering any currency or interest hedging arrangements, other definitive financing documents (provided, however, that the effectiveness of such documents will be conditioned upon the occurrence of the Effective Time), and obtaining and delivering certificates or documents required to satisfy the conditions in the Financing Commitments;

(vii) obtaining from the Company's registered public accounting firm that has audited the Company's most recent financial statements customary comfort

letters, consents, and other documentation and items required in connection with the Financing with respect to financial information provided pursuant to clause (a)(ii) of this Section 7.19 that is included or incorporated by reference in any prospectus, prospectus supplement, private placement memorandum or other offering document for which such comfort is customarily required, including

customary confirmations (in customary form and scope and delivered at such customary times) of such accountants that they are prepared to issue any such comfort letter or consent subject to the completion of its customary procedures related thereto and obtaining customary legal opinions, in each case as reasonably requested by Parent (including those requested by Parent on behalf of a Financing Source);

(viii)        delivering notices of prepayment within the time periods required by the relevant agreements governing indebtedness and arranging for customary payoff letters, lien terminations and instruments of discharge to be delivered at Closing to allow for the payoff, discharge and termination in full on the Closing Date of all indebtedness and Encumbrances under indebtedness of the Company required to be repaid as of the Effective Time by the terms of any Financing;

(ix)        taking all corporate and other actions, subject to the occurrence of the Effective Time, reasonably requested by Parent to (A) permit the consummation of the Financing, (B) the distribution or payment of the proceeds of the Financing, if any, obtained by any Subsidiary of the Company to the Surviving Entity, and (C) cause the direct borrowing or incurrence of all of the proceeds of the Financing, by the Surviving Entity or any Subsidiary of the Company concurrently with or immediately following the Effective Time;

(x)        furnishing Parent and its Financing Sources promptly and in any event at least 3 Business Days before the Closing Date with all documentation and other information which any Financing Source providing or arranging the Financing has reasonably requested at least 10 Business Days prior to the Closing Date that such Financing Source has determined is required by Governmental Authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA PATRIOT Act;

(xi)        procuring consents to the reasonable use of all of the Company's logos in connection with the Financing (provided, however, that such logos are used solely in a manner that is not intended to and is not reasonably likely to harm or disparage the Company or its Subsidiaries or the reputation or goodwill of the Company or any of its Subsidiaries); and

(xii)        furnishing customary information reasonably available to the Company regarding the Company and its Subsidiaries required for Parent to obtain corporate and facilities ratings and ratings on any debt securities issued in connection with the Financing.

(b)        At Parent's reasonable request, the Company shall or shall cause its Subsidiaries to use their respective reasonable best efforts to amend or supplement any information supplied in writing by or on behalf of the Company or any of its Subsidiaries to Parent, First Merger Sub, Second Merger Sub or any Financing Source on a reasonably current basis to the extent such information (excluding any projections, forecasts, pro forma financial information and other forward-looking information), to the knowledge of the Company, taken as a whole, is not correct in all material respects, contains any untrue statement of material fact or omits to state any material fact necessary to make such information supplied in writing by or on behalf of the Company or any of its Subsidiaries not materially misleading.

(c)        Nothing in this Section 7.19 shall require such cooperation to the extent it would (i) require the Company to agree to pay any fees, reimburse any expenses or give any indemnities prior to the Effective Time, (ii) require the Company to incur any other liability or obligation prior to the Effective Time (it being understood, however, that the Company shall bear all costs and expenses of its annual audit and quarterly reviews of its financial statements but not the costs of any comfort letter (which shall be borne by Parent)), or (iii) cause any condition to the Mergers set forth in Article VIII to fail to be satisfied or otherwise cause any breach of this Agreement that would give Parent the right to terminate this Agreement (unless, in each case, waived in writing by Parent). Parent shall promptly, upon request by the Company, pay all reasonable and documented out-of-pocket third party costs incurred by the Company or any of its Subsidiaries in connection with cooperation pursuant to this Section 7.19 except for the costs of the Company's registered public accounting firm described in the prior sentence. All confidential information provided by the Company or its Subsidiaries to Parent or its Affiliates pursuant to this Section 7.19 shall be kept confidential in accordance with the Confidentiality Agreement, except that Parent shall be permitted to disclose such information to its Financing Sources and prospective Financing Sources, subject to ordinary and customary confidentiality undertakings. Notwithstanding the foregoing, Parent shall be permitted to disclose such confidential information upon prior written notice to the Company if such disclosure is required in order to comply with applicable laws (including any securities Law or the rules of a securities exchange) and with judicial process. Parent, First Merger Sub and Second Merger Sub shall indemnify and hold harmless the Company, its Subsidiaries and their respective Representatives from and against any and all losses, damages, claims, costs or expenses suffered or incurred by any of them in connection with the Financing (other than arising from fraud, willful misconduct or misrepresentations, misstatements or omissions) and any information utilized in connection therewith (other than written information directly provided by the Company and its Subsidiaries).

(d)        For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, Parent acknowledges and agrees that its obligation to consummate the transactions contemplated by this Agreement on the terms and subject to the conditions set forth herein are not conditioned upon the availability or consummation of the Financing or any other debt financing, the availability of any equity financing or the receipt of the proceeds therefrom.

(e)        Without limiting in any respect the liabilities of the Financing Sources to Parent, First Merger Sub, Second Merger Sub or their Affiliates, or the remedies of Parent, First Merger Sub, Second Merger Sub or their Affiliates against the Financing Sources under any

92

other agreement to which they are both parties, none of the Financing Sources shall have any liability to the parties or their Affiliates relating to or arising out of this Agreement, whether at law or equity, in contract, in tort or otherwise, and neither the parties nor any of their Affiliates will have any rights or claims against the Financing Sources in respect of the Financing under this Agreement.  Notwithstanding anything herein to the contrary, in no event shall the Company or its Affiliates be entitled to seek any remedy, including specific performance of this Agreement, against any of the Financing Sources (it being expressly agreed that the Financing Sources in their capacities as such shall be third party beneficiaries of this Section 7.19(e) and shall be entitled to enforce the provisions contained in this Section 7.19(e) as if they were a party to this Agreement).

(f)        Notwithstanding anything to the contrary herein, it is understood and agreed that the condition precedent set forth in Section 8.02(b), as applied to the Company's obligations under this Section 7.19, shall be deemed to be satisfied unless the financing contemplated by the Debt Commitment Letter has not been obtained as a direct result of the Company's Intentional Breach of its obligations under this Section 7.19.

(g)        The Company and Parent agree to the matters set forth on Section 7.19(g) of the Company Disclosure Letter.

Section 7.20        Resignations of Directors and Officers.  At or prior to the Closing, the Company shall request that each director and officer of the Company deliver to Parent written resignation and release letters, effective as of the Closing Date, of each of the directors and officers of the Company requested by Parent in writing at least five Business Days prior to the Closing, effectuating his or her resignation from such position as a member of the Company Board or as an officer (although not as an employee, if applicable, unless otherwise so requested by Parent), in form and substance reasonably satisfactory to Parent.

# ARTICLE VIII

## CONDITIONS TO THE MERGERS

Section 8.01        Conditions to the Obligations of Each Party.  The respective obligations of the Company, Parent, First Merger Sub and Second Merger Sub to consummate the Mergers are subject to the satisfaction or written waiver (where permissible under applicable Law) at or prior to the Effective Time of the following conditions:

(a)        Registration Statement.  The Registration Statement shall have become effective under the Securities Act and no stop order suspending the effectiveness of the Registration Statement shall have been issued by the SEC.

(b)        Stockholder Approval.  The Company Stockholder Approvals shall have been obtained in accordance with the DGCL and the Company's certificate of incorporation and bylaws.

93

(c)        No Order.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law, whether temporary, preliminary or permanent (collectively, a "Restraint"), which is then in effect and has the effect of enjoining, restraining, prohibiting or otherwise preventing the consummation of the Transactions.

(d)        Regulatory Approvals.  (i) Any waiting period (and any extension thereof) applicable to the consummation of the

Mergers under the HSR Act shall have expired or been terminated and (ii) any approval or waiting period with respect to those jurisdictions set forth in <u>Section 8.01(d) of the Company Disclosure Letter</u> shall have been obtained or terminated or shall have expired.

(e)     <u>NASDAQ Listing</u>.  The shares of Parent Common Stock to be issued in the Mergers shall have been authorized for listing on the NASDAQ, subject to official notice of issuance.

Section 8.02     <u>Conditions to the Obligations of Parent, First Merger Sub and Second Merger Sub</u>.  The obligations of Parent, First Merger Sub and Second Merger Sub to consummate the Mergers are subject to the satisfaction or written waiver (where permissible under applicable Law) at or prior to the Effective Time of the following additional conditions:

(a)     <u>Representations and Warranties</u>.  In each case as of the date of this Agreement and as of the Closing Date, except to the extent any such representations and warranties expressly relate to an earlier date, in which case as of such earlier date, (i) the representations and warranties of the Company set forth in the first sentence of <u>Section 4.07</u> (Absence of Certain Changes or Events) shall be true and correct in all respects, (ii) the representations and warranties of the Company set forth in <u>Section 4.01</u>(a) (Organization and Qualification; Subsidiaries) (only as it relates to the Company), <u>Section 4.02</u> (Capitalization) (except with respect to <u>Section 4.02(b)</u> and <u>Section 4.02(e)</u>), <u>Section 4.03</u> (Authority Relative to This Agreement) (except with respect to <u>Section 4.03(d)</u> and <u>Section 4.03(e)</u>), and <u>Section 4.17</u> (Brokers) shall be true and correct in all material respects and (iii) the other representations and warranties of the Company set forth in <u>Article IV</u> shall be true and correct (without giving effect to any "material", "materiality" or "Company Material Adverse Effect" qualification contained therein) except where the failure of any such representations and warranties to be so true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(b)     <u>Agreements and Covenants</u>.  The Company shall have performed or complied, in each case, in all material respects with the agreements and covenants required by this Agreement to be performed by it or complied with at or prior to the Effective Time.

(c)     <u>Officer's Certificate</u>.  The Company shall have delivered to Parent a certificate, dated the Closing Date, signed by the Chief Executive Officer or Chief Financial Officer of the Company, certifying as to the satisfaction of the conditions specified in <u>Section 8.02(a)</u> and <u>Section 8.02(b)</u>.

94

(d)     <u>Restrictions</u>.  No Restraint shall be in effect, in each case, under any Antitrust Law which imposes any remedies on Parent and its Subsidiaries (including First Merger Sub and Second Merger Sub and, after the Effective Time, the Surviving Corporation and its Subsidiaries and, after the Second Effective Time, the Surviving Entity and its Subsidiaries), (a) other than Permitted Restrictions or (b) unless such Restraint is part of an agreement between Parent and its Subsidiaries and a Governmental Authority.

(e)     <u>Stockholder Agreements</u>.  The Selling Investors shall have duly executed and delivered, or caused to be delivered, to Parent, First Merger Sub or Second Merger Sub the Selling Investor Support Agreement and the Drag-Along Consent.

Section 8.03     <u>Conditions to the Obligations of the Company</u>.  The obligations of the Company to consummate the Mergers are subject to the satisfaction or waiver (where permissible under applicable Law) at or prior to the Effective Time of the following additional conditions:

(a)     <u>Representations and Warranties</u>.  In each case as of the date of this Agreement and as of the Closing Date, except to the extent any such representations and warranties expressly relate to an earlier date, in which case as of such earlier date, (i) the representations and warranties of Parent, First Merger Sub and Second Merger Sub set forth in <u>Section 5.09(e)(i)</u> (Absence of Changes) shall be true and correct in all respects, (ii) the representations and warranties of Parent, First Merger Sub and Second Merger Sub set forth in <u>Section 5.01</u> (Corporate Organization), <u>Section 5.03</u> (Capitalization) and <u>Section 5.04</u> (Authority Relative to This Agreement; No Vote Required) shall be true and correct in all material respects and (iii) the other representations and warranties of Parent, First Merger Sub and Second Merger Sub set forth in <u>Article V</u> shall be true and correct (without giving effect to any "material", "materiality" or "Parent Material Adverse Effect" qualification contained therein) except where the failure of any such representations and warranties to be so true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

(b)     <u>Agreements and Covenants</u>.  Parent, First Merger Sub and Second Merger Sub shall have performed or complied, in each case, in all material respects with the agreements and covenants required by this Agreement to be performed by them or complied with at or prior to the Effective Time.

(c)     <u>Officer's Certificate</u>.  Parent shall have delivered to the Company a certificate, dated the Closing Date, signed by the Chief Executive Officer or Chief Financial Officer of Parent, certifying as to the satisfaction of the conditions specified in <u>Section 8.03(a)</u> and <u>Section 8.03(b)</u>.

(d)     <u>CVR Agreement</u>.  The CVR Agreement shall be in full force and effect at or prior to the Effective Time.

95

**ARTICLE IX**

**TERMINATION, AMENDMENT AND WAIVER**

Section 9.01    <u>Termination</u>.  This Agreement may be terminated and the transactions contemplated by this Agreement may be abandoned at any time prior to the Effective Time, as follows:

(a)     by mutual written consent of Parent and the Company, duly authorized by the Parent Board and the Company Board, respectively; or

(b)     by either Parent or the Company if:

(i)     the Effective Time shall not have occurred on or before 11:59 p.m., Eastern time, on the Outside Date; <u>provided</u>, <u>however</u>, that if on the Outside Date all of the conditions set forth in <u>Section 8.01</u>, <u>Section 8.02</u> and <u>Section 8.03</u> have been satisfied (or, with respect to the conditions that by their terms must be satisfied at the Closing, would have been so satisfied if the Closing would have occurred) other than the conditions set forth in <u>Section 8.01(c)</u> (to the extent such Restraint arises under the HSR Act or any other Antitrust Laws), <u>Section 8.01(d)</u> or <u>Section 8.02(d)</u>, then either Parent or the Company may extend the Outside Date to 11:59 p.m., Eastern time, on December 20, 2021 by delivering written notice to the other party, which notice shall expressly reference extension of the Outside Date to December 20, 2021 pursuant to this <u>Section 9.01(b)(i)</u>; <u>provided</u>, <u>further</u>, that the right to terminate this Agreement under this <u>Section 9.01(b)(i)</u> shall not be available to any party whose breach of any provision of this Agreement has been the proximate cause of, or resulted in, the failure of the Effective Time to occur on or before such time; or

(ii)     any Restraint having the effect set forth in <u>Section 8.01(c)</u> hereof shall have become final and nonappealable; <u>provided</u>, <u>however</u>, that the party seeking to terminate this Agreement shall have complied in all material respects with its obligations under <u>Section 7.07</u>; <u>provided</u>, <u>further</u>, that an Initial Enforcement Order made by the Competition and Markets Authority pursuant to section 72(2) of the UK Enterprise Act 2002 is not considered a Restraint for the purposes of this <u>clause 9.01(b)(ii)</u>; or

(c)     by Parent:

(i)     upon a breach by the Company of, or failure by the Company to perform, any representation, warranty, covenant or agreement set forth in this Agreement such that the conditions set forth in <u>Section 8.02(a)</u> or <u>Section 8.02(b)</u> would not be satisfied and such breach or failure is incapable of being cured by the Outside Date or, if curable by the Outside Date, is not cured by the Company within thirty (30) days of receipt by the Company of written notice of such breach or failure; <u>provided</u>, <u>however</u>, that Parent shall not have the right to terminate this

96

Agreement pursuant to this <u>Section 9.01(c)(i)</u> if either of Parent, First Merger Sub or Second Merger Sub is in breach of its representations, warranties or covenants such that the conditions in <u>Section 8.03(a)</u> and <u>Section 8.03(b)</u> would not be satisfied;

(ii)     If any Restraint having the effect set forth in <u>Section 8.02(d)</u> hereof shall have become final and nonappealable; <u>provided</u>, <u>however</u>, that Parent shall have complied in all material respects with its obligations under <u>Section</u>

7.07; provided, further, that an Initial Enforcement Order made by the Competition and Markets Authority pursuant to section 72(2) of the UK Enterprise Act 2002 is not considered a Restraint for the purposes of this clause 9.01(c)(ii);

(iii)     if the Selling Investors fail to duly execute and deliver, or cause to be delivered, to Parent, First Merger Sub or Second Merger Sub the Selling Investor Support Agreement and the Drag-Along Consent within 24 hours following the execution and delivery of this Agreement; or

(d)     by the Company upon a breach by any of Parent, First Merger Sub or Second Merger Sub of, or a failure by any of Parent, First Merger Sub or Second Merger Sub to perform, any representation, warranty, covenant or agreement set forth in this Agreement such that the conditions set forth in Section 8.03(a) or Section 8.03(b) would not be satisfied and such breach or failure is incapable of being cured by the Outside Date or, if curable by the Outside Date, is not cured by Parent, First Merger Sub or Second Merger Sub, as applicable, within 30 days of receipt by Parent, First Merger Sub or Second Merger Sub, as applicable, of written notice of such breach or failure; provided, however, that the Company shall not have the right to terminate this Agreement pursuant to this Section 9.01(d) if the Company is in breach of its representations, warranties or covenants such that the conditions in Section 8.02(a) and Section 8.02(b) would not be satisfied.

Section 9.02     Effect of Termination.  In the event of termination of this Agreement pursuant to Section 9.01, written notice thereof shall be given to the other parties hereto, specifying the provision or provisions hereof pursuant to which such termination shall have been made, and this Agreement shall forthwith become void, and there shall be no liability under this Agreement on the part of any party hereto or their respective Subsidiaries or Representatives, except (a) with respect to this Section 9.02, Section 4.17, Section 5.13, Section 7.03(d), Section 7.19(c), Section 9.03, Section 9.04, Section 9.05, the tenth and eleventh sentences of Section 10.02 and Article XI, each of which shall survive any termination of this Agreement and remain in full force and effect and (b) nothing in this Section 9.02 or Section 9.03 shall relieve any party from liability for fraud committed prior to such termination or for any Intentional Breach prior to such termination of any of its representations, warranties, covenants or agreements set forth in this Agreement; provided, however, that the Confidentiality Agreement shall survive any termination of this Agreement.

Section 9.03     Fees and Expenses.  (a)  In the event that:

97

(i)     Parent or the Company terminates this Agreement pursuant to Section 9.01(b)(i) and, at the time of such termination, one or more of the conditions set forth in Section 8.01(c) (if the failure of such condition to be satisfied is a result of a Restraint arising under Antitrust Laws), Section 8.01(d) or Section 8.02(d) were not satisfied or waived;

(ii)     Parent or the Company terminates this Agreement pursuant to Section 9.01(b)(ii) as a result of a Restraint arising under Antitrust Laws; or

(iii)     Parent terminates this Agreement pursuant to Section 9.01(c)(ii),

and, in the case of each of clauses (i), (ii) and (iii), at the time of such termination (A) all of the other conditions set forth in Article VIII have been satisfied or validly waived (except for those conditions that by their terms must be satisfied at the Closing, provided that such conditions would have been so satisfied if the Closing would have occurred) and (B) the Company and the Selling Investors are not in breach in any material respect of its obligations under this Agreement or Selling Investor Support Agreement, as applicable, in any manner that shall be the proximate cause of the failure of any of the conditions referred to in clause (i) above or the imposition of the Restraint in clause (ii) above or the imposition of any remedies (x) other than Permitted Restrictions or (y) unless such remedy is part of an agreement between Parent and its Subsidiaries and a Governmental Authority, as applicable, then Parent shall pay to the Company a fee equal to $300,000,000 (the "Regulatory Termination Fee"), by wire transfer on the second Business Day following the date of termination of this Agreement.  In no event shall Parent be required to pay the Regulatory Termination Fee on more than one occasion.

(b)     All Expenses incurred in connection with this Agreement and the Transactions shall be paid by the party incurring such Expenses, whether or not the Mergers or any other Transaction is consummated, except Expenses incurred in connection with filing, printing and mailing of the Registration Statement and the Consent Solicitation Statement (including filing fees) shall be borne by Parent, whether or not the Mergers or any other Transaction is consummated.

(c)     The parties hereto acknowledge and agree that the agreements contained in Section 9.03(a) are an integral part of the Transactions, and that, without these agreements, the parties hereto would not enter into this Agreement; accordingly, if Parent fails promptly to pay the Regulatory Termination Fee, and, in order to obtain such payment, the Company commences a suit that results in a judgment against

Parent for the Regulatory Termination Fee, Parent shall pay to the Company its costs and expenses (including attorneys' fees and expenses) in connection with such suit, in each case, together with interest on the amount of the Regulatory Termination Fee, as applicable, from the date such payment was required to be made until the date of payment at the prime rate set forth in *The Wall Street Journal*, in effect on the date such payment was required to be made. Each party further acknowledges that the Regulatory Termination Fee is not a penalty, but rather is a reasonable amount that will compensate the receiving party in the circumstances in which such payment is payable for the efforts and resources expended and opportunities forgone while negotiating this Agreement and in reliance

on this Agreement and on the expectation of the consummation of the Transactions contemplated hereby, which amounts would otherwise be impossible to calculate with precision.

(d)        Subject to the proviso at the end of this sentence, in the event the Regulatory Termination Fee is required to be paid and is paid to the Company pursuant to <u>Section 9.03(a)</u>, such payment of the Regulatory Termination Fee shall constitute liquidated damages and be the sole and exclusive monetary remedy of the Company and its Subsidiaries and the Company's and its Subsidiaries' respective current or future stockholders, employees, directors, officers or Affiliates (collectively, the "<u>Company Related Parties</u>") against Parent, First Merger Sub and Second Merger Sub and their respective current, former or future Representatives (collectively, the "<u>Parent Related Parties</u>") for all losses, damages, costs or expenses in respect of this Agreement (or the termination thereof) or the Transactions (or the failure of such transactions to occur for any reason or for no reason) or any breach of any covenant or agreement or otherwise in respect of this Agreement or any oral representation made or alleged to be made in connection herewith, and upon payment of the Regulatory Termination Fee, none of the Parent Related Parties shall have any further monetary liability or obligation relating to or arising out of this Agreement or the Transactions, and none of the Company, its Subsidiaries or any other Company Related Party shall seek to recover any other monetary damages; <u>provided</u>, <u>however</u>, that (x) <u>Section 7.19(c)</u> shall survive any such termination and (y) in the event of any Intentional Breach by Parent, First Merger Sub or Second Merger Sub prior to such termination, the Company shall be entitled to the payment of the Regulatory Termination Fee (to the extent owed pursuant to <u>Section 9.03(a)</u>) and to seek any damages (including, for the avoidance of doubt, damages of the type referred to in <u>Section 11.05(ii)</u>), to the extent proven, resulting from or arising out of such Intentional Breach (as reduced by any Regulatory Termination Fee paid by Parent).

Section 9.04        <u>Continuation Payments; Additional Termination Payment; Equity Issuance Fees and Expenses</u>.  (a)  In the event (i) the Effective Time has not occurred on or before 11:59 p.m., Eastern Time, on December 20, 2020, and (ii) the Company is not in breach in any material respect of its obligations under this Agreement in any manner that shall have proximately caused the failure of the Effective Time to occur prior to the date on which a Continuation Payment (as defined below) is due, Parent shall make a payment to the Company of $35 million (each, a "<u>Continuation Payment</u>"), by wire transfer on the next Business Day following such date and on the 20th day of each month thereafter until the earlier of (a) the Closing Date or (b) the termination of this Agreement by either Parent or the Company pursuant to <u>Section 9.01</u> (such date, the "<u>Continuation End Date</u>"); <u>provided</u>, <u>however</u>, that Parent shall have no obligation to make any Continuation Payment which is an Excess Continuation Payment unless and until the Company Conditions have been satisfied (it being understood that any Excess Continuation Payment(s) that would have been required to have been paid if the Company Conditions have been satisfied will be paid by Parent to the Company promptly following satisfaction of the Company Conditions); <u>provided</u>, <u>further</u>, that the Company may waive Parent's obligation to make any

Excess Continuation Payment.  For the avoidance of doubt, no additional Continuation Payments shall be payable by Parent in relation to periods after the Continuation End Date.

(b)        In the event that this Agreement is terminated in a circumstance where the Regulatory Termination Fee becomes payable by Parent in accordance with <u>Section 9.03</u> and subject to the satisfaction (or waiver by Parent) of the Company Conditions (unless Parent's material breach of this <u>Section 9.04</u> is the proximate cause of the failure of such Company Conditions to be satisfied), at the Company's election, by written notice to Parent no later than the date which is ten (10) Business Days after such termination, Parent shall pay to the Company an additional amount specified by the Company up to $300 million (the "<u>Additional Termination Payment</u>") on or prior to the date which is three (3) Business Days after the later of: (i) the date of the Company's written election referred to in this <u>Section 9.04(b)</u>, and (ii) the satisfaction of the Company Conditions (unless Parent's breach of this <u>Section 9.04</u> is the proximate cause of the failure of such Company Conditions to be satisfied, in which

case the Additional Termination Payment shall be payable upon the date specified in clause (i)).

(c)        Upon the date which is the later of (i) sixty (60) days after the date of termination of this Agreement (the "<u>Termination Date</u>"), and (ii) three (3) Business Days after satisfaction or waiver (where permissible) of the Issuance Conditions, as consideration for any Excess Continuation Payments and the Additional Termination Payment, in each case, actually made by Parent, as applicable, the Company shall (x) issue and deliver to Parent a number of validly issued, fully paid and non-assessable shares of Series E-1 Preferred Stock equal to (I) (A) the aggregate amount of Excess Continuation Payments actually paid by Parent to the Company, plus (B) the amount of the Additional Termination Payment actually paid by Parent to the Company ((A) plus (B) being the "<u>Investment Amount</u>"), minus (C) an amount (if any) specified by the Company in its sole discretion (the "<u>Reduction Amount</u>"), divided by (II) the Issue Price (the "<u>Equity Issuance</u>"), and (y) pay to Parent the Reduction Amount (if any); <u>provided that</u>, prior to consummation of the Equity Issuance, the Company may elect (in its sole discretion) to pay to Parent an amount of cash equal to the Investment Amount, and, upon such payment being made to Parent, the Company shall have no further liability pursuant to this <u>Section 9.04</u> and, for the avoidance of doubt, will not be obliged to consummate the Equity Issuance or follow the process set forth in <u>Section 9.04(f)</u>.

(d)        The Company shall use its reasonable best efforts to cause the Company Conditions to be satisfied prior to the earlier to occur of (i) in circumstances where the Regulatory Termination Fee is payable, the Termination Date, and (ii) prior to the date that the first payment by Parent to the Company of any Excess Continuation Payment is payable. Parent irrevocably agrees that it shall (and shall cause its Subsidiaries to), upon the written request of the Company, vote any shares of capital stock of the Company held by it to approve all matters and execute any written consents and/or amendments or restatements of the Investor Agreements, in each case as are reasonably necessary to satisfy the Company Conditions.

(e)        As used in this <u>Section 9.04</u>:

(i)        "<u>Class A-1 Common Stock</u>" shall mean a series of common stock of the Company having substantially the same terms as the Class A Common

Stock, except that (1) shares of Class A-1 Common Stock shall have no voting rights and (2) upon the transfer by the holder thereof to a third party, a share of Class A-1 Common Stock shall automatically convert into a share of Class A Common Stock if such conversion satisfies the Regulatory Condition.

(ii)        "<u>Company Conditions</u>" shall mean:

(A)        The Company shall have received all necessary stockholder and other corporate approvals and adopted and filed with the Secretary of State of the State of Delaware an amendment to its certificate of incorporation, in a form consistent with this <u>Section 9.04</u>, creating and authorizing the issuance of the Series E-1 Preferred Stock and the Series E Preferred Stock, Class A-1 Common Stock and Class A Common Stock into which such Series E-1 Preferred Stock may be converted

(B)        The Company shall have either (x) received such waivers as are reasonably required under its certificate of incorporation, bylaws and the Investor Agreements to permit the consummation of the Equity Issuance, including the waiver of any preemptive rights, rights of first offer, rights of first refusal or similar rights of any stockholder of the Company with respect to the Equity Issuance, or (y) notified the Parent that it has complied, or intends to comply, with any such preemptive rights, rights of first offer, rights of first refusal or similar rights of any stockholder of the Company with respect to the Equity Issuance (it being understood that the Company may, at its election, issue additional shares of Series E-1 Preferred Stock to such stockholders above and beyond the amount of shares to be issued to Parent in the Equity Issuance (assuming there is no Reduction Amount) or adjust the number of shares to be issued to Parent in the Equity Issuance by specifying a Reduction Amount).

(C)        Amendments to each of the Investor Agreements to include the Series E-1 Preferred Stock and the Series E Preferred Stock in the definition of "Preferred Stock" and to define "Class A Common Stock" to include shares of Class A-1 Common Stock in each such Investor Agreement, in each case in a consistent with this <u>Section 9.04</u>, shall have been approved and adopted.

(iii)        "<u>Excess Continuation Payments</u>" shall mean Continuation Payments actually paid to the Company in excess

of $315 million.

(iv)    "<u>Issuance Conditions</u>" shall mean the Regulatory Condition and the Company Conditions.

(v)    "<u>Issue Price</u>" shall mean $8 billion divided by the Company Fully Diluted Share Count (with the reference to the Effective Time in the definition of "Company Fully Diluted Share Count" deemed to be a reference to the date of the Equity Issuance).

101

(vi)    "<u>Regulatory Condition</u>" shall mean (A) no Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law, whether temporary, preliminary or permanent, which is then in effect and has the effect of enjoining, restraining, prohibiting or otherwise preventing the Equity Issuance, (B) no Action by a Governmental Authority seeking such Law shall be pending, and (C) any waiting period under the HSR Act, if applicable, shall have expired or been terminated.

(vii)    "<u>Series E Preferred Stock</u>" shall mean a series of preferred stock of the Company having substantially the same terms as the Series A Preferred Stock, except that the Original Issue Price (as defined in the Restated Certificate of Incorporation) shall be equal to the Issue Price.

(viii)    "<u>Series E-1 Preferred Stock</u>" shall mean a series of preferred stock of the Company having substantially the same terms as the Series A Preferred Stock, except that (i) the Original Issue Price (as defined in the Restated Certificate of Incorporation) of the Series E-1 Preferred Stock shall be equal to the Issue Price, (ii) shares of Series E-1 Preferred Stock shall have no voting rights (including with respect to a vote on mandatory conversion in connection with a Qualified IPO (as defined in the Restated Certificate of Incorporation)), other than the right to approve (x) the amendment, alteration or repeal of any provision of the certificate of incorporation or bylaws of the Company in a manner that alters or changes the powers, preferences or rights of the shares of Series E-1 Preferred Stock so as to adversely affect them disproportionately to any other series or class of stock (it being understood that the creation of a new series of preferred stock shall not be deemed to alter or change the powers, preferences, or rights of the Series E-1 Preferred Stock or otherwise require the affirmative vote or written consent of the holders of the Series E-1 Preferred Stock), and (y) any waiver of any adjustment to the conversion price for the Series E-1 Preferred Stock, (iii) holders of Series E-1 Preferred Stock will have no rights to designate a member of the Company Board, (iv) upon transfer by the holder thereof to a third party, a share of Series E-1 Preferred Stock shall automatically convert into a share of Series E Preferred Stock if such conversion satisfies the Regulatory Condition and (v) the Series E-1 Preferred Stock shall otherwise be convertible into shares of Class A-1 Common Stock on substantially the same terms on which the Series A Preferred Stock is convertible into Class A Common Stock.

(f)    In the event that a Governmental Authority shall, pursuant to any applicable Antitrust Law, have enacted, issued, promulgated, enforced or entered any Law, which shall have become final and nonappealable, that has the effect of enjoining, restraining, prohibiting or otherwise preventing the satisfaction of the Regulatory Condition or the consummation of the Equity Issuance on or before the date which is 180 days after the Termination Date (the "<u>Equity Issuance End Date</u>"), then Parent shall nonetheless be obligated to make the Excess Continuation Payments and the Additional Termination Payment to the extent otherwise payable pursuant to this <u>Section 9.04</u>; <u>provided</u> that:

102

(i)    for a period of 60 days after the Equity Issuance End Date, the parties hereto shall use reasonable best efforts to structure the Equity Issuance in a manner that is in compliance with applicable Law (including arranging for the Equity Issuance to be made in favor of a nominee of Parent or such other arrangement as is mutually agreed between the Company and Parent);

(ii)    if, after such 60 day period, neither the Equity Issuance nor an alternative structure contemplated by clause (i) have been consummated, the Company shall (subject to the proviso at the end of this sentence of this clause (ii)) (x) from such date until the date which is 24 months after the Termination Date (the "<u>Alternative Financing End Date</u>"), use its commercially reasonable efforts to carry out one or more bona fide equity capital raises (each, an "<u>Alternative Capital Raise</u>") in respect of shares of Company

Capital Stock, and (y) if any Alternative Capital Raise is consummated prior to the Alternative Financing End Date, pay to Parent an amount equal to the lesser of (A)(I) the lesser of (a)(1) the number of shares of Series E-1 Preferred Stock that would have been issued pursuant to the Equity Issuance (and have not yet been covered by an Alternative Capital Raise pursuant to this Section 9.04(f)(ii)), and (2) the actual number of shares issued on the Alternative Capital Raise, multiplied by (II) the price per security obtained by the Company on the Alternative Capital Raise minus (b) the costs and expenses incurred by Company in connection with such Alternative Capital Raise, and (B) the Investment Amount;

provided that, notwithstanding the foregoing provisions of this Section 9.04(f), at any time between the Equity Issuance End Date and the Alternative Financing End Date, the Company may elect (in its sole discretion) to pay to Parent an amount of cash equal to the Investment Amount and, upon such payment being made to Parent, the Company shall have no further obligations or liability pursuant to this Section 9.04 in respect of the Excess Continuation Payments and the Additional Termination Payment. Notwithstanding the foregoing provisions of this Section 9.04, except in the event of an Intentional Breach of this Section 9.04 by the Company, with effect from the Alternative Financing End Date, the Company shall have no obligations or liability pursuant to this Section 9.04 or in respect of the Excess Continuation Payments and the Additional Termination Payment.

(g)     Until the Equity Issuance End Date, solely in connection with the Equity Issuance and/or the alternative structure contemplated by Section 9.04(f)(i), the Company will use its commercially reasonable efforts to reasonably cooperate with Parent to obtain any required approvals under Antitrust Laws in connection with the Equity Issuance and/or such alternative structure by: (i) providing Parent with such information as Parent reasonably requests in writing in connection with making any filings required under Antitrust Laws, (ii) at Parent's reasonable request (and at Parent's sole cost and expense) making such administrative filings with Governmental Authorities that are required by Antitrust Law to be made by the Company in connection with the Equity Issuance or such alternative structure, (iii) at Parent's reasonable request (and at Parent's sole cost and expense), attending and participating in meetings with any Governmental Authorities which are reasonably required in connection with obtaining clearance under Antitrust Laws, (iv) promptly notifying Parent of any written or material oral communication from any Governmental Authority relating to such approvals or clearance, (v)

103

subject to applicable Law and to the extent reasonably practicable, permit Parent to review and comment on any substantive written communication regarding the Equity Issuance or such alternative structure prior to providing such communication to any Governmental Authority and (vi) to extent reasonably practicable, not agree to participate, or permit its Subsidiaries or Representatives to participate, in any substantive meeting or discussion with any Governmental Authority with respect to the Equity Issuance or such alternative structure unless it consults with Parent in advance and, to the extent permitted by such Governmental Authority and reasonably practicable, gives Parent the opportunity to attend and participate. For the avoidance of doubt, and notwithstanding any provision in this Section 9.04(g), nothing in this Section 9.04(g) shall obligate the Company or any of its Subsidiaries to offer, agree to or accept any commitment, remedy, undertaking or Order of any kind.

Section 9.05     Amendment. This Agreement may be amended by the parties hereto by action taken by or on behalf of their respective boards of directors at any time prior to the Effective Time; provided, however, that, after the Company Stockholder Approvals have been obtained, no amendment may be made that under applicable Law or in accordance with the rules of any relevant stock exchange requires further approval by the stockholders of the Company without such approval having been obtained. This Agreement may not be amended except by an instrument in writing signed by each of the parties hereto. Notwithstanding anything to the contrary in this Section 9.05, none of Section 5.08, Section 7.18, Section 7.19, Section 9.05, Section 11.05, Section 11.07 and Section 11.09 (or any other provision of this Agreement the amendment or waiver of which has the effect of modifying such Sections) may be amended, modified, terminated or waived in a manner that is adverse to the Financing Sources without the prior written consent of such Financing Sources (it being expressly agreed that the Financing Sources in their capacities as such shall be third party beneficiaries of this Section 9.05 and shall be entitled to the protections of the provisions contained in this Section 9.05 as if they were a party to this Agreement).

Section 9.06     Waiver. At any time prior to the Effective Time, any party hereto may (a) extend the time for the performance of any obligation or other act of any other party hereto, (b) to the extent permitted by applicable Law, waive any breach of or inaccuracy in the representations and warranties of any other party contained in this Agreement or in any document delivered pursuant hereto and (c) to the extent permitted by applicable Law, waive compliance with any agreement of any other party or any condition to its own obligations contained in this Agreement. No extension or waiver by the Company shall require the approval of the stockholders of the Company, unless required by applicable Law. Notwithstanding the foregoing, no failure or delay by the Company or Parent, First Merger Sub or Second Merger Sub in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or future exercise of any other right hereunder. Any such extension or waiver shall be valid if set forth in an instrument in writing signed by the party or parties to be bound thereby.

Section 9.07     Procedure for Termination or Amendment.  A termination of this Agreement pursuant to Section 9.01 or an amendment of this Agreement pursuant to Section 9.04 shall, in order to be effective, require, in the case of Parent or the Company, action by its board of directors or, with respect to any amendment of this Agreement pursuant to

Section 9.04, the duly authorized committee of its board of directors to the extent permitted by applicable Law.

## ARTICLE X

## CVR HOLDER REPRESENTATIVE

Section 10.01     Designation and Replacement of CVR Holder Representative.  The parties have agreed that it is desirable to designate a representative to act on behalf of those holders of Company Stock and Company Equity Awards who receive CVRs pursuant to the terms of this Agreement (each, a "Holder") for all purposes under the CVR Agreement (the "CVR Holder Representative"). The Company (and, upon execution of a Letter of Transmittal, each Holder) will, promptly following the date hereof, subject to the prior written consent of Parent (not to be unreasonably withheld, conditioned or delayed), designate an initial CVR Holder Representative, and appoint the CVR Holder Representative as agent and attorney-in-fact for and on behalf of the other Holders for all purposes under the CVR Agreement; provided that notwithstanding the foregoing, the Company may appoint Fortis Advisors LLC (or any of its Affiliates) or Shareholder Representative Services LLC (or any of its Affiliates) as the CVR Holder Representative without Parent's consent. The CVR Holder Representative may resign at any time by five days' prior written notice to Parent. The CVR Holder Representative may be removed pursuant to the terms of the CVR Agreement. In the event that the CVR Holder Representative has resigned or been removed, a new CVR Holder Representative, as applicable, shall concurrently be appointed pursuant to the CVR Agreement. All power, authority, rights and privileges conferred in this Agreement and the CVR Agreement to the initial CVR Holder Representative will apply to any successor CVR Holder Representative. The designation of any Person as a CVR Holder Representative is and shall be coupled with an interest, and, except as set forth in this Article X, such designation is irrevocable and shall not be affected by the death, incapacity, illness, bankruptcy, dissolution or other inability to act of any of the stockholders of the Company.

Section 10.02     Authority and Rights of the CVR Holder Representative; Limitations on Liability.  The CVR Holder Representative shall have such powers and authority as are necessary to carry out the functions, assigned to it under the CVR Agreement, as applicable; provided, however, that the CVR Holder Representative shall have no obligation to act, except as expressly provided herein. Without limiting the generality of the foregoing, each Holder agrees that the CVR Holder Representative has full power, authority and discretion, on behalf of each Holder and his, her or its successors and assigns, to (a) interpret the terms and provisions of the CVR Agreement and the documents to be executed and delivered by the Holders in connection therewith, (b) execute and deliver and receive deliveries of all agreements, certificates, statements, notices, approvals, extensions, waivers, undertakings, amendments and other documents required or permitted to be given in connection with the consummation of the transactions contemplated by the CVR Agreement, as applicable, (c) receive service of process in connection with any claims under the CVR Agreement or any document or agreement contemplated to be executed or delivered in connection with the CVR Agreement, (d) agree to, negotiate and enter into settlements and compromises of, and assume the defense of, claims, and demand arbitration and comply with Orders and awards of arbitrators

with respect to such claims, and take all actions necessary or appropriate in the judgement of the CVR Holder Representative for the accomplishment of the foregoing, (e) give and receive notices and communications, and (f) take all actions necessary or appropriate in the judgment of the CVR Holder Representative in connection with the CVR Agreement. All actions taken by the CVR Holder Representative under the CVR Agreement shall be binding upon the Holders and their successors as if expressly confirmed and ratified in writing by each of them. The CVR Holder Representative shall not, in its capacity as such, have any liability to any Holder with respect to actions taken or omitted to be taken in its capacity as the CVR Holder Representative, except that the CVR Holder Representative will be liable for its willful misconduct or actual fraud, as finally determined by a court of competent jurisdiction from which no further appeal may be taken. The CVR Holder Representative shall at all times be entitled to rely on any directions received from the Majority Holders (as defined in the CVR Agreement); provided, however, that the CVR Holder Representative shall not be required to follow any such direction, and shall be under no obligation to take any action in its capacity as the CVR Holder Representative, unless the CVR Holder Representative has been provided with other funds, security or indemnities which, in the sole determination of the CVR Holder Representative are sufficient to protect the CVR Holder Representative against the costs,

expenses and liabilities which may be incurred by the CVR Holder Representative in responding to such direction or taking such action. At no cost to the Parent, First Merger Sub, Second Merger Sub or the Company, the CVR Holder Representative shall be entitled to engage such counsel, experts and other agents and consultants as it shall deem necessary in connection with exercising its powers and performing its function hereunder and (in the absence of bad faith on the part of the CVR Holder Representative) shall be entitled to conclusively rely on the opinions and advice of such Persons. The CVR Holder Representative shall be entitled to reimbursement from the Holders or the holders of the CVRs, as applicable, for all reasonable expenses, disbursements and advances (including fees and disbursements of their counsel, experts and other agents and consultants) incurred by the CVR Holder Representative in such capacity, and shall be entitled to indemnification from the Holders against any loss, liability or expenses arising out of actions taken or omitted to be taken in its capacity as the CVR Holder Representative (except in each case for those arising out of the CVR Holder Representative's, as applicable, gross negligence or willful misconduct), including the costs and expenses of investigation and defense of claims. Parent and the Company shall be able to rely conclusively (without liability) on any instructions given and actions taken by the CVR Holder Representative as the instruction and decision of each Holder in all matters referred to therein, including instructions with respect to the payment and distribution of any amounts payable pursuant to or in relation to the CVR Agreement. No Holder shall have any cause of action against Parent or the Company for any action taken by Parent or the Company in reliance upon the written instructions or decisions of the CVR Holder Representative, or otherwise on account of payments or distributions made by or on behalf of Parent in accordance with the instructions of the CVR Holder Representative. The annual administration or retainer fees payable to the CVR Holder Representative shall be borne by Parent. Other than such annual administration or retainer fees, none of Parent, the Company or their respective Subsidiaries shall be responsible for or pay any other fees, expenses or other costs of the CVR Holder Representative. Notwithstanding anything to the contrary in this Article X, in the event of a conflict between the terms of the CVR Agreement and this Article X, the CVR Agreement shall control.

106

**ARTICLE XI**

**GENERAL PROVISIONS**

Section 11.01    Non-Survival of Representations, Warranties, Covenants and Agreements; Exclusive Remedy.  The representations, warranties, covenants and agreements in this Agreement and in any certificate delivered pursuant hereto shall terminate at the Effective Time, except for those covenants and agreements contained in this Agreement (including, without limitation, Article II, Article III, Section 7.04, Section 7.05, Article X and this Article XI) that by their terms are to be performed in whole or in part after the Effective Time (the "Post-Closing Covenants").  Effective as of the Effective Time, except for claims for Fraud or in respect of the Post-Closing Covenants, following the Effective Time, none of Parent, First Merger Sub, Second Merger Sub, the Company or any holder of Company Stock or Company Equity Awards (each, an "Equityholder") shall have any other rights or remedies in connection with any breach of this Agreement or any other liability arising out of the negotiation, entry into or consummation of the Transactions, whether at law or in equity or based on contract, tort, statute or otherwise. The provisions of and the limited remedies provided in this Section 11.01 were specifically bargained for among the parties and were taken into account by the parties in arriving at the Merger Consideration. After the Closing, no party or its Affiliates may seek the rescission of the Transactions.

Section 11.02    Notices.  All notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) upon confirmation of receipt after transmittal by facsimile (to such number specified below or another number or numbers as such Person may subsequently specify by proper notice under this Agreement), (c) upon confirmation of receipt after transmittal by email (to such email address specified below or another email address or addresses as such Person may subsequently specify by proper notice under this Agreement) and (d) on the next Business Day when sent by national overnight courier (providing proof of delivery), in each case to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 11.02):

if to Parent, First Merger Sub or Second Merger Sub:

Illumina, Inc.
5200 Illumina Way
San Diego, California  92122
Attention:     Charles E. Dadswell, Senior Vice President and General Counsel
Telephone:    858-202-4500
Facsimile:     858-202-4545
Email:          CDadswell@illumina.com
                    legalnotices@illumina.com

with a copy to:

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York  10019-7475
Attention:      Faiza J. Saeed
                      Ting S. Chen
Telephone:      212-474-1000
Facsimile:      212-474-3700
Email:      fsaeed@cravath.com
                tchen@cravath.com

if to the Company:

GRAIL, Inc.
1525 O'Brien Drive
Menlo Park, California 94025
Attention:      General Counsel
Telephone:      650-863-1024
Email:      msong@grailbio.com

with a copy to:

Latham & Watkins LLP
Attention:      W. Alex Voxman, Esq.
                Andrew Clark, Esq.
Telephone:      213-485-1234
Facsimile:      213-891-8763
Email:      alex.voxman@lw.com
                andrew.clark@lw.com

Section 11.03    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by virtue of any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the Transactions be consummated as originally contemplated to the fullest extent possible.

Section 11.04    <u>Entire Agreement; Assignment</u>.  This Agreement (including the exhibits and schedules hereto, including the Company Disclosure Letter), the other Transaction Documents and the Confidentiality Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject

matter hereof and thereof.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties, in whole or in part (whether pursuant to a merger, by operation of Law or otherwise), without the prior written consent of the other parties, except that Parent, First Merger Sub and Second Merger Sub may assign all or any of their rights and obligations under this Agreement to any Affiliate of

Parent, provided that no such assignment shall relieve the assigning party of its obligations under this Agreement if such assignee does not perform such obligations.

Section 11.05    Parties in Interest.  This Agreement shall be binding upon, inure solely to the benefit of, and be enforceable by, only the parties hereto, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, except (i) as specifically provided in Section 7.05, Section 7.18, Section 7.19, Section 9.05, Section 11.05, Section 11.07 and Section 11.09 (which is intended to be for the benefit of the Persons expressly covered thereby and may be enforced by such Persons) and (ii) that the Company shall have the right to pursue damages on behalf of its stockholders in the event of Parent's, First Merger Sub's or Second Merger Sub's Intentional Breach of this Agreement, which right is hereby acknowledged by Parent, First Merger Sub and Second Merger Sub.

Section 11.06    Specific Performance.  The parties hereto agree that the parties hereto would be irreparably damaged if any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached.  Accordingly, the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the performance of the terms of this Agreement, in addition to any other remedy at law or in equity.  The parties further agree that no party to this Agreement shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any such legal or equitable relief and each party waives any objection to the imposition of such relief or any right it might have to require the obtaining, furnishing or posting of any such bond or similar instrument.

Section 11.07    Governing Law.  (a)  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice or conflict of law provisions or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  All Actions arising out of or relating to this Agreement or the Transactions shall be heard and determined exclusively in the Court of Chancery of the State of Delaware and any state appellate court therefrom within the State of Delaware (or in the event, but only in the event, that the Court of Chancery of the State of Delaware does not have subject matter jurisdiction, the Superior Court of the State of Delaware (Complex Commercial Division) or, if subject matter jurisdiction over the action or proceeding is vested exclusively in the federal courts of the United States of America, the United States District Court for the District of Delaware, and, in each case, the appellate court(s) therefrom).  The parties hereto hereby (i) irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware and any state appellate court therefrom within the State of Delaware (or in the event, but only in the event, that the Court of Chancery of the State of Delaware does not have subject matter jurisdiction, the Superior Court of the State of Delaware (Complex Commercial Division)

or, if subject matter jurisdiction over the action or proceeding is vested exclusively in the federal courts of the United States of America, the United States District Court for the District of Delaware and, in each case, the appellate court(s) therefrom) for the purpose of any Action arising out of or relating to this Agreement or the Transactions brought by any party hereto, (ii) irrevocably waive, and agree not to assert by way of motion, defense or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the Transactions may not be enforced in or by the above-named courts, and (iii) agree that such party will not bring any Action arising out of or relating to this Agreement or the Transactions in any court other than the Court of Chancery of the State of Delaware (or in the event, but only in the event, that the Court of Chancery of the State of Delaware does not have subject matter jurisdiction, the Superior Court of the State of Delaware (Complex Commercial Division) or, if subject matter jurisdiction over the action or proceeding is vested exclusively in the federal courts of the United States of America, the United States District Court for the District of Delaware).  Service of process, summons, notice or document to any party's address and in the manner set forth in Section 11.02 shall be effective service of process for any such action.

(b)    Each of the parties hereto and each Affiliate of Parent acknowledges and irrevocably agrees (i) that any Action (whether at law, in equity, in contract, in tort or otherwise) arising out of, or in any way relating to, the Financing or the performance of services thereunder or related thereto against or by any Financing Source in its capacity as such shall be subject to the exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan, New York, New York, and any appellate court therefrom, and each party hereto submits for itself and its property with respect to any such Action to the exclusive jurisdiction of such courts, (ii) not to bring or permit any of its Affiliates to bring or support anyone else in bringing any such Action in any other court, (iii) to waive and hereby waive, to the fullest extent permitted by Law, any objection which any of them may now or hereafter have to the laying of venue of, and the defense of an inconvenient forum to the maintenance of, any such Action in any such court, (iv) that a final judgment in any such Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law and (v) that any such Action shall be governed by, and construed in accordance with, the Laws of the State of New York (it being expressly agreed that the Financing Sources in their capacities as such shall be third party beneficiaries of this Section 11.07 and shall be entitled to enforce the provisions contained in this Section 11.07 as if they were a party to this Agreement).

Section 11.08    <u>Counterparts</u>.  This Agreement may be executed and delivered (including by facsimile transmission or .pdf) in counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

SECTION 11.09    <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO AND EACH AFFILIATE OF PARENT ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE, EACH OF THE

PARTIES HERETO AND EACH AFFILIATE OF PARENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS (INCLUDING THE COMMITMENT LETTER AND ANY FINANCING CONTEMPLATED BY PARENT OR ANY OF ITS AFFILIATES IN CONNECTION WITH THIS AGREEMENT).  EACH OF THE PARTIES HERETO CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS IN THIS <u>SECTION 11.09</u>.

Section 11.10    <u>Non-Assertion of Attorney-Client Privilege</u>.  Parent acknowledges that Latham & Watkins LLP and other legal counsel ("<u>Prior Company Counsel</u>") have, on or prior to the Closing Date, represented one or more of the Selling Investors, Equityholders, the Company, and its Subsidiaries and other Affiliates, and their respective officers, employees and directors (each such Person, other than the Company and its Subsidiaries and their respective officers and employees, a "<u>Designated Person</u>") in one or more matters relating to this Agreement or any other agreements or transactions contemplated hereby (including any matter that may be related to a litigation, claim or dispute arising under or related to this Agreement or such other agreements or in connection with such transactions) (excluding, for the avoidance of doubt, the Company's planned initial public offering) (each, an "<u>Existing Representation</u>").  Each of Parent and the Company (on behalf of itself and its Affiliates) waives and shall not assert, and agrees after the Closing to cause its Affiliates to waive and to not assert, any attorney-client privilege, attorney work-product protection or expectation of client confidence with respect to any communication between any Prior Company Counsel, on the one hand, and any Designated Person or the Company or any of its Subsidiaries (collectively, the "<u>Pre-Closing Designated Persons</u>"), or any advice given to any Pre-Closing Designated Person by any Prior Company Counsel, occurring during one or more Existing Representations in connection with any representation by one or more Prior Company Counsel of one or more Designated Persons, in each case, in connection with one or more post-Closing matters relating to this Agreement or any other agreements or transactions contemplated hereby (including any matter that may be related to a litigation, claim or dispute arising under or related to this Agreement or such other agreements or in connection with such transactions) (collectively, "<u>Pre-Closing Privileges</u>"), it being the intention of the parties hereto that all rights to such Pre-Closing Privileges, and all rights to waiver or otherwise control such Pre-Closing Privilege, shall be retained by such Designated Persons and shall not pass to or be claimed or used by Parent or the Company, except as provided in the last sentence of this <u>Section 11.10</u>.  Furthermore, each of Parent and the Company (on behalf of itself and its Affiliates) acknowledges and agrees that any advice given to or communication with any of the Designated Persons in connection with any Existing

Representation shall not be subject to any joint privilege (whether or not the Company or one more of its Subsidiaries also received such advice or communication) and shall be owned solely by such Designated Persons.  Notwithstanding the foregoing, (i) in the event that a dispute arises between Parent or the Company or any of its Subsidiaries, on the one hand, and a third party other than a Designated Person, on the other hand, the Company may assert the Pre-Closing Privileges on behalf of the Designated Persons to prevent disclosure to such third party, <u>provided</u>, <u>however</u>, that such privilege may be waived only with the prior written consent of the Designated Persons, acting on behalf of the applicable Designated Persons (such consent not to be unreasonably withheld, conditioned or delayed) and (ii) the foregoing provisions of this <u>Section 11.10</u> shall not extend to any communication or materials not involving the negotiation, documentation and consummation of the transactions contemplated by this Agreement or any claims brought in connection with such transactions or this Agreement.

Section 11.11    <u>Release by Equityholders</u>.  (a) Effective as of the Effective Time, upon execution of a Letter of Transmittal, each Equityholder, on behalf of himself, herself or itself and each of his, her or its past, present and future controlled Affiliates, parent(s) and subsidiary companies, representatives, and assigns (each, an "<u>Equityholder Releasing Party</u>" and, collectively, the "<u>Equityholder Releasing Parties</u>") will absolutely, unconditionally and irrevocably release, acquit and forever discharge the Company and each of its respective past, present and future controlled Affiliates, parent(s) and subsidiary companies, joint ventures, predecessors, successors and assigns, and their respective past, present and future representatives, investors, equityholders, insurers and indemnitees, firms, corporations, limited liability companies, partnerships, trusts, associations, organizations, stockholders, members, managers, directors, officers, employees, partners, trustees, principals, consultants, contractors, family members, heirs, executors, administrators, predecessors, successors and assigns (collectively the "<u>Released Parties</u>"), of and from any and all manner of action or inaction, cause or causes of action, Actions, Encumbrances, contractual obligations, promises, liabilities or damages (whether for compensatory, special, incidental or punitive damages, equitable relief or otherwise) of any kind or nature whatsoever, past, present or future, at law, in equity or otherwise (including with respect to conduct which is negligent, grossly negligent, willful, intentional, with or without malice, or a breach of any duty, applicable Law or rule), whether known or unknown, whether fixed or contingent, whether concealed or hidden, whether disclosed or undisclosed, whether liquidated or unliquidated, whether foreseeable or unforeseeable, whether anticipated or unanticipated, whether suspected or unsuspected ("<u>Claims</u>"), which such Equityholder Releasing Parties, or any of them, ever have had or ever in the future may have against the Released Parties, or any of them, in each case, to the extent arising solely as a result of the ownership or purported ownership of any of Company Stock, Company Stock Options or other security or interest of the Company and which, in each case, are based on acts, events or omissions occurring prior to or contemporaneously with the Effective Time (the "<u>Equityholder Released Claims</u>"); <u>provided</u>, <u>however</u>, that the foregoing release shall not release, impair or diminish, and the term "Equityholder Released Claims" shall not include, in any respect (i) an <u>Equityholder's</u> right pursuant to the Transaction Documents, including the right to receive its respective portion of the Merger Consideration; (ii) any Claims for indemnification, insurance benefits, reimbursement or advancement of expenses in such <u>Equityholder's</u> capacity as a director, officer or employee of the Company under the Company's

112

organizational documents or any indemnification agreement in effect as of the date hereof (or any fiduciary insurance policy maintained by the Company or the Surviving Entity for the benefit of the <u>Equityholder</u>, or any indemnification agreements with the <u>Equityholder</u> or its board designee) with respect to any act, omission, event or transaction occurring prior to or contemporaneously with the Effective Time; or (iii) the rights of any <u>Equityholder</u> Releasing Party in his or her capacity as an employee of the Company.

(b)    Upon execution of a Letter of Transmittal, each <u>Equityholder</u> shall represent and acknowledge that he, she or it has read this release and the Merger Agreement and other Transaction Documents and understands their terms and has been given sufficient opportunity to review this release and the Transaction Documents and to ask questions of the Company's Representatives.  Each <u>Equityholder</u> will further represent that, in signing the Letter of Transmittal, he, she or it does not rely, and has not relied, on any representation or statement made by any Representative of the Company or any other Person with respect to the subject matter, basis or effect of this release or otherwise, except such express representations and warranties set forth in the Merger Agreement or this Agreement.

(c)    Without limiting the generality of <u>Section 11.11(a)</u>, with respect to the Equityholder Released Claims, each <u>Equityholder</u>, upon execution of a Letter of Transmittal, will acknowledge that he, she or it is familiar with Section 1542 of the Civil Code of the State of California ("<u>Section 1542</u>") and expressly waive all rights under Section 1542 and any similar applicable Law or common law principle in any applicable jurisdiction prohibiting or restricting the waiver of unknown claims.  Section 1542 reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

(d)    Notwithstanding the provisions of Section 1542 or any similar applicable Law or common law principle in any applicable jurisdiction, upon execution of a Letter of Transmittal, each <u>Equityholder</u> will expressly acknowledge that the foregoing release is intended to include in its effect all claims within the scope of such release which any <u>Equityholder</u> does not know or suspect to exist in his, her or its favor against any of the Released Parties (including, without limitation, unknown and contingent claims), and that the foregoing release expressly contemplates the extinguishment of all such claims (except to the extent expressly set forth in this <u>Section 11.11</u>).

113

IN WITNESS WHEREOF, Parent, First Merger Sub, Second Merger Sub and the Company have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

ILLUMINA, INC.

By:   /s/ Francis deSouza
Name: Francis deSouza
Title:   President and Chief Executive Officer


SDG OPS, INC.

By:   /s/ Francis deSouza
Name: Francis deSouza
Title:   President


SDG OPS, LLC

By:   /s/ Francis deSouza
Name: Francis deSouza
Title:   President


GRAIL, INC.

By:   /s/ Hans Bishop
Name: Hans Bishop
Title:   Chief Executive Officer


*[Signature Page to Agreement and Plan of Merger]*

---

EXHIBIT A

<u>SELLING INVESTOR SUPPORT AGREEMENT</u>

Exhibit A is omitted because the Selling Investor Support Agreement is being filed separately as Exhibit 10.1 to this current report on Form 8-K.

---

EXHIBIT B

**CONSENT**
**OF THE PREFERRED STOCKHOLDERS**
**AND CLASS A COMMON STOCKHOLDERS**
**OF GRAIL, INC.**

The undersigned (the "<u>Selling Investors</u>"), being the holders of a majority of the shares of Class A Common Stock, par value $0.001 per share (the "<u>Company Class A Common Stock</u>"), of GRAIL, Inc., a Delaware corporation (the "<u>Company</u>"), issuable or previously issued upon conversion of the shares of the Company's Series A Preferred Stock, par value $0.001 per share, Series B Preferred Stock, par value $0.001 per share, Series C Preferred Stock, par value $0.001 per share, and Series D Preferred Stock, par value $0.001 per share (collectively, the "<u>Company</u>